## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

_____
                                              )
**THIAN LOK TIO, M.D. ET AL.,**               )
                                              )
    **Petitioners,**                       )
                                              )
    **v.**                                )    **Case No. 08-CV-00626 (JR)**
                                              )
**WASHINGTON HOSPITAL CENTER, ET AL.**  )
                                              )
    **Respondents.**                       )
_____)


### RESPONDENTS' OPPOSITION TO PETITIONERS' MOTION TO VACATE

Respondents Washington Hospital  Center ("Hospital") *et al.* (collectively,

"Respondents") hereby file this Opposition to Petitioners' Motion to Vacate the Arbitration

Award, dated January 2, 2008, entered in favor of Respondents.

### INTRODUCTION

Petitioners are dissatisfied with the fact that the Arbitrator's decision was not in their

favor and are asking this Court for a "do-over" because they do not like the result.

Dissatisfaction, however, is not a basis for vacating an arbitration award.  To overcome this

obstacle, Petitioners couch their dissatisfaction in the language of the very narrow and limited

grounds on which arbitration awards may be vacated.  Their arguments, however, are completely

devoid of any factual or legal merit and should be denied.

Each of Petitioners' arguments for vacatur suffer from numerous fatal flaws.  First,

Petitioners' baseless arguments that their claims are not arbitrable were not only waived by their

participation in the arbitration, but were previously rejected by this Court when it dismissed their

Complaint and compelled arbitration of all of their claims.   Second, Petitioners' various

arguments that the Arbitrator evidenced partiality, engaged in misconduct, exceeded his authority and demonstrated a manifest disregard for the law are all entirely unsupportable, both legally and factually.  Indeed, the overwhelming evidence affirmatively demonstrates that the Arbitrator was neutral, reasonably exercised his authority, acted well within his authority, and properly understood and applied the relevant law.  As Petitioners' Petition and Memorandum make clear, there is not a shred of evidence to suggest otherwise.

As such, Petitioners' Motion to Vacate the arbitration award should be denied, and an Order confirming the arbitration award should be entered.

## FACTUAL BACKGROUND

On March 17, 2004, Petitioners Dr. Tio the former Director of Endoscopy in the Section of Gastroenterology at the Hospital, and his wife, Mrs. Tio, (together, "Petitioners") filed a Complaint in the District of Columbia Superior Court against Respondents.  Respondents removed the case to the United States District Court for the District of Columbia on March 28, 2004. The Complaint alleged ten claims:  tortious breach of contract, tortious interference with contract, breach of the implied duty of good faith and fair dealing, tortious interference with third-party physician contracts, defamation, intentional infliction of emotional distress, fraud, an unspecified antitrust claim, race and national origin discrimination and loss of consortium. All of these claims arose from the termination of Dr. Tio's employment which occurred on April 18, 2003. *See* Complaint (Ex. A). As a precondition of employment, Petitioner signed an employment agreement with the Hospital.  The employment agreement included an arbitration clause.  The arbitration clause contained in paragraph 12 of the Agreement provided, in pertinent part, as follows:

> Any controversy, dispute or disagreement arising out of or relating
> to this Agreement, or breach thereof, shall be settled by binding

2

arbitration, which shall be conducted in Washington, DC, in accordance with the National Health Lawyers Association Alternative Dispute Resolution Service Rules and Procedure for Arbitration. Judgement (sic) on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Arbitrator, transcription and facility cost shall be shared equally by the parties. Each party shall be responsible for its own attorney and witness fees.

On May 5, 2004, the Respondents filed a motion to dismiss Petitioners' complaint and compel arbitration, based on the arbitration clause contained in Dr. Tio's employment agreement. *See* Motion to Dismiss (Ex. B).

In its Motion, Respondents argued that all of Petitioners' claims had to be submitted to arbitration, pursuant to the arbitration clause, because all of their claims arose out of or were related to Dr. Tio's employment agreement with the Hospital. Respondents also put the issue of the fee splitting provision contained in Paragraph 12 before the Court. *See* Motion to Dismiss at p. 2; Reply at p 13 n. 2, (Ex. C). Petitioners, however, never raised an issue or objected to the fee-splitting provision contained in the arbitration clause. Based on the foregoing, the Court granted Respondents' motion to dismiss the complaint and compelled arbitration of the claims raised in Petitioners' Complaint. The Court further ruled that all of the claims in Petitioners' complaint were covered by the arbitration clause and thus subject to arbitration. *See Tio v. Washington Hospital Center*, 2004 U.S. Dist. LEXIS 23503 (D.D.C. Nov. 5, 2004) (Ex. D).

Petitioners then commenced arbitration before JAMS as to all claims contained in their Complaint. *See* Final Award at p. 2 (Ex. E). Upon completion of the arbitration selection process, in which both parties participated, Jerry Roscoe was assigned as a neutral arbitrator to decide the case. Upon commencement of the arbitration, Mr. Roscoe held teleconferences with the parties to outline the arbitration procedures and to set pre-hearing discovery and motions deadlines. *See* Notice of Conference Call (Ex. F). The Arbitrator subsequently memorialized

the procedures and deadlines in various scheduling orders. *See e.g.* Report of Preliminary Hearing and Scheduling Order No. 1 (Ex. G); Scheduling Order No. 4 (Ex. H).  Petitioners did not object to any of the procedures or deadlines set forth in the orders.

    In accordance with the deadlines set by the Arbitrator, Respondents filed a motion for summary judgment on October 16, 2006, which was fully briefed by the parties.  On October 31, 2006, Respondents also filed motions in *limine* to exclude and limit certain of Petitioners' witnesses, based on Petitioners' failure to disclose those witnesses or make them available for deposition. On January 25, 2007, the Arbitrator issued Pre-hearing Order No. 1.  Prehearing Order No. 1 granted Respondents' motion for summary judgment as to all claims with the exception of Petitioners' claims for breach of contract and wrongful termination of employment. The Order also reduced the number of witnesses of Petitioners' witness list from 47 to 8 (including Dr. Tio), and ordered Petitioners to make two of the witnesses on the newly condensed witness list available for deposition.  Pre-Hearing Order No. 1 at p. 2 (Ex. I); *see* Claimants' Amended Witness List (Ex. J).  Thereafter, the Arbitrator held a conference call with counsel for the parties to discuss Pre-hearing Order No. 1 and its impact on the length and procedure at the arbitration hearing.  *See* Hearing Transcript ("TR") at 29-31 (relevant excerpts attached as Ex. K).

    The arbitration hearing finally commenced on August 20, 2007, due in part to continuances requested by Petitioners.  Counsel for the Respondents arrived at the hearing prepared to begin the arbitration.  Petitioners stalled the arbitration hearing for at least a day and a half, refusing to put on any witnesses on the stand or otherwise begin presenting their case. Petitioners raised at the arbitration hearing, for the first time, that the entry of summary judgment

over seven months ago as to eight of their claims somehow prejudiced their case.  *See* TR at 5.

Petitioners demanded a motion for reconsideration of the Arbitrator's summary judgment ruling.

In response, the Arbitrator permitted counsel for Petitioner time to prepare a proffer as to

what his motion for reconsideration would contain.  After hearing Petitioners' proffer regarding

the motion for reconsideration, the Arbitrator determined that Petitioners had failed to raise any

new issues or any issue that would require the reconsideration of summary judgment.  *See* TR at

81-82.

Once Petitioners finally began their case in chief, the Arbitrator gave Petitioners

overwhelming latitude and discretion in calling witnesses.  He even permitted the testimony of

witnesses who were not on the witness list, despite the ruling in Pre-hearing Order No. 1, that

both parties would be strictly limited to their witness as identified on the witness list.  The

arbitrator allowed multiple, long recesses to permit depositions of witnesses whom Petitioners

had been ordered to make available long before the start of the arbitration hearing and to

accommodate the schedules of Petitioners' witnesses.

As a direct result of Petitioners' delays and stall tactics, the arbitration hearing went on at

least four days longer than the parties agreed.  The Arbitrator permitted Petitioners to put on

evidence that was tangentially relevant, at best, *see, e.g.,* TR at 1425-1429, in an effort to afford

Petitioners ample opportunity to prove their case.  The Arbitrator further permitted the

Petitioners to enter into evidence several documents that never appeared on Petitioners' exhibit

list or produced during discovery.  *See, e.g.,* TR at 869-878.  In the end, Petitioners had over 40

hours of time to present and prove their case, while Respondents had just over 4 hours.  *See* Tr.

At 1901:10-11.

Following eight days of hearings, resulting in over 2000 pages of transcript, the Arbitrator concluded that Petitioners failed to prove that the Hospital breached Dr. Tio's employment agreement when it terminated his employment or that any Respondent discriminated against Dr. Tio on the basis of his race or national origin. Final Award at 6. In fact, the Arbitrator explicitly declared, "this matter was noteworthy for the complete absence of any evidence of racial basis or other impermissible intent to discriminate against Claimant on the part of Respondent Washington Hospital Center." Final Award at 6.

## ARGUMENT AND AUTHORITIES

**I.     This Court Has Already Correctly Decided That All Of Petitioners Claims Were Arbitrable.**

When the case was first before this Court in 2005, the Honorable Judge Urbina ordered all of Petitioners' claims dismissed and submitted to arbitration. *Tio v. Washington Hospital Center*, 2004 U.S. Dist. LEXIS 23503 (D.D.C. Nov. 5, 2004) (hereinafter "Opinion"). Petitioners failed to appeal that order. Petitioners then participated fully in a long and involved arbitration, culminating in an eight-day hearing without objecting to the arbitrability of the claims. Now, two and a half years after that initial determination and after a full hearing on the merits, Petitioners seek to contest again the arbitrability of their claims because they are unhappy with the results of arbitration.

These arguments are meritless for at least three reasons. First, this Court has already correctly decided that the claims were within the scope of the arbitration clause and the time to appeal this decision is long past. Second, Petitioners waived the argument that the claims were not arbitrable by failing to raise it before the Arbitrator. Third, discrimination claims are indisputably arbitrable.

**A.    This Court Has Already Correctly Held That All Of Petitioners', Claims Are Within The Scope Of The Arbitration Agreement And, Therefore, Subject To Arbitration.**

This Court has already correctly determined that "the arbitration provision contained in the Agreement between Dr. Tio and the Hospital is broad enough to encompass each claim in the plaintiffs' complaint, including those brought by Dr. Tio for defamation and slander." Opinion at 11. Despite this clear holding based on well-established case law, Petitioners now seek to revisit this decision without providing a shred of legal or factual support for their motion.

The Arbitration Agreement entered into by Dr. Tio and the Hospital requires that "any controversy, dispute or disagreement arising out of or relating to this Agreement, or breach thereof, shall be settled by binding arbitration." Opinion at 11. Both the United States Supreme Court and the District of Columbia Circuit have unequivocally stated that the "language 'arising out of or relating to' the underlying contract or agreement" is to be interpreted broadly. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 628 (1985); *Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 98 (D.D.C. 2004). Arbitration clauses containing such language have been uniformly held to include tort claim arising from or relating to the underlying contract or agreement. *See e.g. Nur v. K.F.C. USA, Inc.*, 142 F. Supp. 2d 48, 51 (D.D.C. 2001) (ruling that employment agreement arbitration clause containing the "arise out of or relate to" language encompassed the plaintiff's wrongful discharge, defamation, discrimination, and FLSA violation claims).

As this Court previously explained, all the claims brought by Petitioners arose from or related to Dr. Tio's employment at the Hospital. Petitioners alleged ten causes of action: tortious breach of contract; tortious interference with contract; breach of the implied duty of good faith and fair dealing; tortious interference with third-party physician contracts; defamation; intentional infliction of emotional distress; fraud; an unspecified antitrust claim; race and

national origin discrimination; and loss of consortium. *See* Complaint. Each of these claims is inherently linked to Dr. Tio's employment and subsequent termination for cause from his position at the Hospital. Opinion at 11. As all the claims arise out of or relate to the Agreement, they were properly submitted to arbitration and Petitioners' argument to the contrary should be rejected. Indeed, Petitioners concede the arbtitrability of their claims based on their requested relief for "vacation of the arbitration award and remand for a new arbitration hearing before a new Arbitrator." Petition to Vacate Arbitration Award at p. 12 (Ex. L).

Even if Petitioners had a plausible argument against the arbitrability of their claims, which they do not, their time to challenge the Award on this basis has long expired. Orders granting motions to compel arbitration and otherwise dismissing the claims are appealable final orders. *Green Tree Financial Corp.-Alabama v. Randolph*, 531 U.S. 79, 86-87 (2000) (holding that a district court's order dismissing claims and ordering arbitration was "a final decision with respect to an arbitration…and an appeal may be taken"). Petitioners did not appeal the order compelling the arbitration of all claims alleged in their Complaint. Rather, Petitioners brought all claims before the Arbitrator and litigated the case through completion, without ever objecting to the Arbitrator's authority to decide the dispute.

This Court properly decided the issue of arbitrability over two and a half years ago, and Petitioners did not appeal that order. The arbitrability of their claims has been decided, and they cannot now re-argue the issue merely because arbitration did not work out in their favor.

B.    **Petitioners Waived Any Objection To Arbitration By Participating In Arbitration Without Objection.**

Petitioners fully participated in the arbitration and, therefore, waived their objection to arbitration. The D.C. Circuit has made clear that a party that does not object to the Arbitrator's jurisdiction during the arbitration may not do so later in court." *See Howard University v.*

*MCPOU*, 512 F.3d 716, 720 (D.C. Cir. 2008); *see also United Indus. Workers v. Gov't of the Virgin Islands*, 987 F.2d 162, 168 (3d Cir. 1993) (explaining that, "because arbitrators derive their authority from the contractual agreement of the parties, a party may waive its right to challenge an arbitrator's authority to decide a matter by voluntarily participating in an arbitration and failing to object on the grounds that there was no agreement to arbitrate."); *United Food & Commercial Workers, Local 400 v. Marval Poultry Co.*, 876 F.2d 346, 353 (4th Cir. 1989) ("Parties to arbitration proceedings cannot sit idle while an arbitration decision is rendered and then, if the decision is adverse, seek to attack the award collaterally on grounds not raised before the arbitrator.").

Petitioners fully participated in the eight day arbitration and failed to object to the Arbitrator's jurisdiction during the arbitration. *See* Claimant's Opposition to the Respondents' Motion for Summary Judgment (Ex. M); Claimant's Post Hearing Brief (Ex. N). As the Arbitrator noted in his Final Award, the parties consented to arbitrability of the claims and his jurisdiction over all the issues. Final Award p. 2. Because the Petitioners failed to object to the arbitrability of the claims, they waived any argument that the claims were not arbitrable.

Similarly, Petitioners have waived any argument that they should not have been required to pay any of the arbitration fees. Despite the fact that the Respondents placed this issue before the Court in their Reply in support of their Motion to Compel, Petitioners have never once asserted that their payment of fees was improper, based on public policy, until now. Indeed, Petitioners did not raise it when the Court was considering the Respondents' Motion to Compel, and they did not raise it at any point prior to or during the arbitration. Their time to argue whether they should pay any arbitration fees is long past and they have, therefore, waived their right to raise it now. Regardless, even if they could raise it, their payment of fees has nothing to

do with the validity of the Award and is not one of the very narrow bases on which arbitration awards may be vacated.

### C.    Discrimination Claims Are Arbitrable.

The Supreme Court has specifically rejected Petitioners' argument that discrimination claims cannot be arbitrated.  In *Circuit City Stores, Inc. v. Adams*, the Supreme Court held that "arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law."  532 U.S. 105, 123 (2001).  Furthermore, as this Court has explained, "[t]here is no statutory or policy bar to the arbitrability of claims under Title VII of the Civil Rights Act of 1964 , as amended, or the District of Columbia Human Rights Act or of Common law claims."  *Cole v. Burns Int'l Security Service*, 1996 U.S. Dist. LEXIS 22541 *4 n.1 (D.D.C. 1996) (internal citations omitted).  As is clear from the well-settled case law from the Supreme Court as well as this Court, there is no legal basis whatsoever for Petitioners' argument that the arbitration of such claims in this case was improper.

### II.    There Are No Statutory or Common-Law Bases To Vacate The Arbitration Award.

In addition to improperly rehashing their arbitrability arguments, Petitioners also attempt to argue statutory and common-law bases for vacating the Award.  None of these arguments, however, has any factual or legal support.

It is well settled that "judicial review of arbitral awards is extremely limited."  *Kurke v. Oscar Gruss and Sons, Inc.*, 454 F.3d 350, 354 (D.C. Cir. 2006) (*quoting Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001)).  An arbitration award can only be vacated if the petitioner demonstrates, by clear and convincing evidence, one of the

Federal Arbitration Act's four enumerated grounds or common law manifest disregard of the law.

Under the Federal Arbitration Act, there are only four bases upon which an arbitration award can be vacated:

> "(1) where the award was procured by corruption, fraud, or undue means; (2) where there was evident partiality or corruption un the Arbitrators, or either of them; (3) where the Arbitrators were guilty of misconduct in refusing to postpone the hearing, upon sufficient cause shown, or in refusing to hear evidence pertinent and material to the controversy; or of any other misbehavior by which the rights of any party have been prejudiced; or (4) where the Arbitrators exceeded their powers, or so imperfectly executed them that a mutual, final, and definite award upon the subject matter submitted was not made."

9 U.S.C. § 10(a). The only other basis for vacating an arbitration award is "if [it is] in manifest disregard of the law." *Kurke*, 454 F.3d at 354. These statutory and common-law grounds, which Petitioner has the burden of proving by clear and convincing evidence, are the only bases upon which a Court may vacate an arbitration award. *Al-Harbi v. Citibank, N.A.*, 1995 U.S. Dist. LEXIS 22158 *4 (D.D.C. July 18, 1995).

In this case, Petitioners recite both the statutory and common-law grounds for vacating an award, and sprinkle their Petition and Memorandum with some of the same words utilized in these standards. Thus, it can only be assumed that Petitioners are attempting to invoke both the statutory and common-law bases for vacating the award. By piecing together these various references that are scattered throughout their Petition and Memorandum, it appears that Petitioners are attempting to argue that the award should be vacated for three of the four statutory reasons (Arbitrator bias, Arbitrator misconduct for failing to admit evidence, and Arbitrator exceeding his authority) and for the common-law basis of manifest disregard of the law. These arguments, however, have no factual or legal support and are entirely without merit.

11

As an initial matter, in order to vacate an arbitration award, Petitioners must prove by clear and convincing evidence either a statutory basis or the common-law basis. In this case, Petitioners have proved neither. Petitioners have utterly failed to demonstrate anything by clear and convincing evidence, much less that the arbitration award should be vacated. Petitioners' Petition and Memorandum are completely devoid of a single piece of record evidence to support their arguments. Indeed, Petitioners have presented no evidence whatsoever for this Court to consider. The only document Petitioners have presented to the Court is their Post-Hearing Brief, which is notable only for its similar absence of any reference to record evidence. Petitioners ask this Court to vacate an arbitration award based solely on their unsupported suppositions, many of which are patently wrong, as demonstrated below. Petitioners' complete failure to present any evidence, much less clear and convincing evidence, of a statutory or common-law basis for vacating the Award warrants denial of Petitioners' Motion and an Order confirming the Award.

**A.    There is no statutory basis to vacate the award.**

Petitioners appear to rely on three of the four statutory grounds for vacating an arbitration award set forth in the FAA: Arbitrator partiality (9 U.S.C. § 10(a)(2)); Arbitrator misconduct (9 U.S.C. § 10(a)(3)); and Arbitrator over-reaching or exceeding his authority (9 U.S.C. § 10(a)(4)). Relevant case law and the record evidence in this case demonstrate, however, that all of these arguments are baseless.

**1.    There was no partiality.**

Petitioners' claim that the Award should be vacated because there was evident partiality of the Arbitrator is entirely baseless. Nothing could be farther from the truth. Of course, Petitioners offer no evidence in support of this contention. Instead, they argue what is in essence a "sour grapes" argument – because the Arbitrator ruled against them on several procedural

issues – he must have been partial.  This, however, is not the correct standard for evaluating

whether an Arbitrator was impartial, and Petitioner's misguided argument in no way constitutes a

basis to vacate the Award.

In order to vacate an arbitration award based on partiality, Petitioners must prove, by

clear and convincing evidence, "specific facts that indicate improper motives on the part of the

Arbitrator."  *Williams Fund Private Equity Group, Inc. v. Engel*, 519 F. Supp. 2d 100, 104

(D.D.C. 2007) (*quoting Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 683 (D.C. Cir. 1996)).  The

"mere appearance of bias is insufficient to demonstrate evident partiality."  *Williams Fund*, 519

F. Supp. at 104 (*quoting Alston v. UBS Financial Services, Inc.*, 2006 U.S. Dist. LEXIS 656, *12

(D.D.C. Jan. 2, 2006)).  In this case, Petitioners have not even argued the mere appearance of

bias, much less, established specific facts that indicate improper motives on the part of the

Arbitrator.

Petitioners' partiality argument is based almost entirely on procedural rulings with which

Petitioners disagreed.  *See e.g.* Petition ¶ 15 (listing the Arbitrator's procedural rulings that,

according to Petitioners, restricted the claims, parties, number of witnesses, timing, and order of

Petitioners' case-in-chief as demonstrating partiality); Petition ¶ 13(a)[1] (claiming that the

Arbitrator cut short the trial time and extended deadlines for the Hospital after setting firm

dates); Petition ¶ 15(a) (alleging that the Arbitrator allowed the Hospital's witnesses to be non-

responsive and evasive to questioning, while "threatening" Petitioners' witnesses with

"comments of disbelief and trivial relevance").

---

[1] Petitioner's Petition inexplicably repeats paragraph numbers 13-15 after paragraph number 20.
For ease of reference, these repeated paragraph numbers will be referred to as ¶ __(a).

Petitioners' argument suffers from three fatal flaws. First, as discussed above, Petitioners have not come forward with even a shred of evidence to support any of their contentions. Indeed, they have utterly failed to identify, much less prove, "specific facts that indicate improper motives on the part of the Arbitrator." *Williams Fund Private Equity Group*, 519 F. Supp. 2d at 104 (*quoting Al-Harbi v. Citibank, N.A.*, 85 F.3d 680, 683 (D.C. Cir. 1996). Denial of their motion to vacate and confirmation of the Award are appropriate on this basis alone.

Second, the purported instances of partiality are belied by the record. In fact, the Arbitrator afforded Petitioners considerable leeway in presenting their case. As just one example, the Arbitrator allowed Petitioner to utilize six full hearing days, and elicit testimony from 9 witnesses, several of whom were not on Petitioners' witness list, for a total of 40 hours of testimony. Tr. 1901:10-11. The Arbitrator granted Petitioners this wide latitude over the Hospital's multiple objections. By agreement, the Hospital completed its case in only two days.

Finally, and most importantly, even if Petitioners' bald suppositions were true, which they are not, they do not rise to the level of "evident partiality." Rather, the rulings about which Petitioners complain amount to nothing more than the Arbitrator exercising the "wide latitude" Arbitrators are given to "control order, procedure, and presentation of evidence" in arbitration hearings. *Alston*, 2006 U.S. Dist. LEXIS at *15 (*citing Industrial Risk Insurers v. M.A.N. Gutehoffnungshutte GmbH*, 141 F.3d 1434, 1442-44 (11th Cir. 1998); *Kruse v. Sands Bros. & Co.*, 226 F. Supp. 2d 484, 488 (S.D.N.Y. 2002)). In *Alston*, this Court was presented with a similar argument to the one Petitioners make here – that the Arbitrator demonstrated evident partiality based on several of the Arbitrator's comments about the merits of the case and his failure to follow the rules of evidence. The Court in *Alston* noted that "it is not surprising that within the informal confines of an arbitration proceeding, an unsuccessful party eventually may

14

perceive the demeanor of an Arbitrator as less than satisfactory." *Alston*, 2006 U.S. Dist. LEXIS 656 at *15-16 (*quoting Fairchild & Co., Inc. v. Richmond, Fredricksburg & Potomac R.R. Co.*, 516 F. Supp. 1305, 1313 (D.D.C. 1981)). More importantly, this Court ruled that dissatisfaction "fails to qualify as grounds for vacating an arbitration award." *Id.*

Petitioners in this case have done little more than generically allege rulings with which they were dissatisfied. Regardless of the fact that they have failed to provide any evidence to support these allegations, and the fact that the allegations are demonstrably false based on the record evidence, Petitioners' dissatisfaction with the Arbitrator's procedural rulings "fails to qualify as grounds for vacating an arbitration award," as a matter of law. Indeed, Petitioners ultimately admitted the Arbitrator's impartiality and fairness when their counsel withdrew their frivolous motion for the Arbitrator to recuse himself, which was based entirely on the Petitioners' dissatisfaction with the Arbitrator's partial grant of Respondents' Motion for Summary Judgment.

### 2.    There was no misconduct.

Similarly, Petitioners' assertion that the Award should be vacated because of Arbitrator misconduct is equally meritless. While it is not clear, Petitioners appear to argue that the Arbitrator was guilty of misconduct for refusing to hear evidence pertinent and material to the controversy. 9 U.S.C. § 10(a)(3). Petitioners fail, however, to demonstrate how the evidence the Arbitrator excluded was in any way pertinent or material. More importantly, Petitioners fail to demonstrate how they were prejudiced or denied a full and fair hearing by the alleged exclusion.

Petitioners' Petition and Memorandum are peppered with vague and conclusory references concerning the Arbitrator's purported refusal to hear evidence. The clearest articulation of this argument, however, is found in Petitioners' Memorandum where they claim

that the Arbitrator refused to hear the testimony of Mrs. Lopez and Ms. Beltree "taken as Depositions during the hearing outside [the Arbitrator's] presence."  They also assert that the Arbitrator refused to "allow petitioner to call the following witnesses for hearing that were stricken from his filed witness list, including but not limited to, the following witnesses: Ms. Barbara Sullivan; Dr. Ken Brown . . . ; Mr. Darryl Tester . . .; Dr. Michael Gold and other witnesses."  Memo in Support of Petition to Vacate Arbitration Award at p. 25-26 (Ex. O). Petitioners then summarily declare that the exclusion of these witnesses substantially undermined the fundamental fairness of the hearing.  *Id.*  Nowhere do Petitioners even attempt to explain the relevance of these witnesses, much less the pertinence or materiality of their testimony to the claims before the Arbitrator.  Indeed, none of these witnesses were on the witness list.  Moreover, none had any relevant evidence.  For example, Dr. Michael Gold was an out of town physician who was not even available to testify.  Other witnesses were either patients or patient family members who had no relevant information to impart.  *See, e.g.,* TR at 996-999 and 1011-1017.

More importantly, Petitioners were permitted to elicit testimony from 9 witnesses during the first six days of the eight-day hearing.  Initially, Petitioners had submitted a witness list consisting of 47 witnesses. Claimants Tios' Witness List (Ex. P). The Arbitrator narrowed this list to seven witnesses.  *See* Pre-Hearing Order No. 1.  This fact notwithstanding, the Arbitrator nevertheless allowed Petitioners to put on two additional witnesses who were never previously identified in any witness list, and permitted the Petitioners to introduce evidence that was wholly irrelevant to any issue in the case.

In limiting Petitioners' witness list, the Arbitrator exercised his "broad discretion to determine whether to hear or not hear evidence, or whether additional evidence is necessary or

would simply prolong the proceedings." *The Fairchild Corp. v. ALCOA, Inc.*, 510 F. Supp. 2d 280, 286 (S.D.N.Y. 2007). As this Court has stated, "Arbitrators must be expected to take actions which will expedite the proceedings." *Cearfoss Constr. Co. v. Sabre Constr. Co.*, 1989 U.S. Dist. LEXIS 9639, *12 (D.D.C. Aug. 14, 1989), *relying on Fairchild*, 516 F. Supp. at 1313, ("since the advantages of arbitration are speed and informality, an Arbitrator should be expected to act affirmatively to simplify and expedite the proceedings before him")). Indeed, had the Arbitrator not excluded any witnesses, at the rate Petitioner was eliciting testimony, the hearing would likely still not be completed.

The mere fact that the Arbitrator excluded witnesses is not grounds to vacate an arbitration award, especially in cases such as this where the Petitioners have not demonstrated in any way the relevance, pertinence, or materiality of the excluded testimony. *See, e.g. Cearfoss Constr. Co.*, 1989 U.S. Dist. LEXIS 9639 at *12. In fact, the Arbitrator would have been remiss had he not narrowed the witness list given the expectation that Arbitrators "act affirmatively to simplify and expedite the proceedings before him." *Fairchild*, 516 F. Supp. at 1313.

### 3.    The Arbitrator did not exceed his authority.

As their final statutory basis for vacatur, Petitioners erroneously contend that the Arbitrator exceeded his powers. While this argument is even more difficult to discern than Petitioners' other arguments, it appears that Petitioners are claiming that the Arbitrator exceeded his powers by ruling on Petitioners' tortious interference with prospective business claim and doing so in a single sentence. Petition ¶ 11; Memo p. 23. In addition, Petitioners claim that the Arbitrator exceeded his powers by "crediting" the testimony of certain witnesses over others. Memo p. 25. These arguments are utterly baseless.

First, Petitioners never alleged a tortious interference with prospective business advantage claim. Instead, Petitioners' Complaint stated a claim for tortious interference with

third-party physician-patient contracts. *See* Complaint at ¶¶ at 56-59. This was the claim the District Court compelled to arbitration (Opinion at 11), the claim for which discovery was sought, the claim addressed in the parties' summary judgment briefs (*See* Motion for Summary Judgment at p. 23-24 (Ex. Q); Petitioner's Affidavit in Support of Opposition at ¶ 22 (Ex. R)), and the claim the Arbitrator dismissed (*See* Pre-Hearing Order No. 1). Indeed, Petitioners did not even mention a prospective business advantage tort, which is an entirely separate and distinct tort from the tortious interference with contract claim that they actually pled, until after discovery had closed, after the Arbitrator and ruled on the Motion for Summary Judgment, and after the arbitration hearing had already commenced.

Therefore, the Arbitrator did not exceed his authority in dismissing Petitioners' prospective business advantage claim because Petitioners never had a prospective business advantage claim. Tortious interference with contract and tortious interference with prospective business advantage are separate and distinct claims. *See Telephone and Data Systems, Inc. v. American Cellular Network Corp.,* 966 F.2d 696, 700 (D.C. Cir. 1992) (remanding case based on lower court's failure to distinguish between separate torts of interference with contract and interference with prospective business advantage). The Arbitrator properly exercised his authority by not deciding a claim that was never before him.

Second, Petitioners' claim that the Arbitrator exceeded his powers by "crediting" the testimony of certain witnesses over others is not only nonsensical, but specifically refuted by the Arbitrator's Final Order. In his Order, the Arbitrator expressly stated that "The parties' versions of the circumstances related to their mutual allegations were diametrically opposed. While credibility of witnesses was taken into account by the Arbitrator, a finding that does not comport with a particular party's testimony should not necessarily be deemed a finding that the party

lacked credibility. All findings were based upon the cumulative weight of all admissible evidence, including testimony." Final Order p. 3 n.1. By its explicit terms, therefore, the Arbitrator's decision was not dependent on any credibility determination. Rather, the Arbitrator, as he should, weighed all of the evidence and issued his ruling accordingly.

Regardless, even if the Arbitrator had "credited" the testimony of some witnesses over others, which he did not, such "crediting" is not grounds for vacating the Award. *See Kurke*, 454 F.3d at 354 (stressing that courts "do not sit to hear claims of factual or legal error by an Arbitrator as [they would] in reviewing decisions of lower courts," *quoting Teamsters Local Union No. 61 v. United Parcel Serv., Inc.*, 272 F.3d 600, 604 (D.C. Cir. 2001)).

**B.    There Was No Manifest Disregard of the Law.**

Finally, Petitioners repeatedly declare that various actions by the Arbitrator constituted manifest disregard of the law. Like Petitioners' other arguments, this argument lacks even a shred of evidentiary support and demonstrates a fundamental misunderstanding of the concept of "manifest disregard of law," as it applies to the vacatur of arbitration awards.

It is well settled that "manifest disregard" is "an extremely narrow standard of review" that means "much more than failure to apply the correct law." *Kurke*, 454 F.3d at 354 (*quoting Kanuth v. Prescott, Ball & Turben, Inc.*, 949 F.2d 1175, 1182 (D.C. Cir. 1991)). Instead, Petitioners must demonstrate that "(1) the Arbitrators knew the governing legal principle yet refused to apply it or ignored it altogether[,] and (2) the law ignored by the Arbitrators was well defined, explicit, and clearly applicable to the case." *Williams Fund*, 519 F. Supp. 2d at 103 (*quoting LaPrade v. Kidder, Peabody & Co., Inc.*, 246 F.3d 702, 706 (D.C. Cir. 2001)). In this case, Petitioners have not even come close to meeting this "extremely narrow standard of

review." At best, Petitioners have only demonstrated that they disagree with the Arbitrator's decision. That is simply not sufficient to warrant vacatur of the Award.

Petitioners argue that the Arbitrator demonstrated manifest disregard by partially granting the Respondents' Motion for Summary Judgment and dismissing all of Petitioners' claims except for their breach of contract and discrimination claims. *See* Petition ¶¶ 11, 14, 15; Memo pp. 21, 27. While it is terribly unclear, Petitioners appear to argue that not only did the merits of the summary judgment decision constitute a manifest disregard of law, but that the actual act of granting partial summary judgment, in and of itself, constituted manifest disregard.

As an initial matter, Petitioners seem to argue that an Arbitrator's grant of summary judgment is, by itself, manifest disregard. This assertion is patently wrong. Arbitrators routinely grant partial and complete summary judgment, which are subsequently ratified by the courts. *See, e.g. Wise*, 450 F.3d 265 (affirming Arbitrator's grant of summary judgment); *Sherrock Brothers, Inc. v. Daimlerchrysler Motors Co., LLC*, 2008 U.S. App. LEXIS 282 (3d Cir. Jan. 7, 2008) (affirming Arbitrator's grant of summary judgment); *In re: Excel Innovations, Inc.*, 502 F.3d 1086 (9th Cir. 2007) (noting without comment the Arbitrator's grant of partial summary judgment); *Hamilton v. Sirius Satellite Radio, Inc.*, 375 F. Supp. 2d 269, 278 (S.D.N.Y. 2005) (confirming arbitration award based on grant of summary judgment). As the Third Circuit explained:

> Granting summary judgment surely falls within [the standard allowing the Arbitrator, absent an agreement between the parties stating otherwise, to grant any relief reasonably fitting and necessary to a final determination of the matter submitted to him], and fundamental fairness is not implicated by an arbitration panel's decision to forego an evidentiary hearing because of its conclusion that there were no genuine issues of material facts in dispute. An evidentiary hearing will not be required just to find out whether real issues surface in the case."

*Sherrock Brothers*, 2008 U.S. App. LEXIS 282 at *13.

Moreover, as this Court has stated, "Arbitrators must be expected to take actions which will expedite the proceedings." *Cearfoss Constr. Co. v. Sabre Constr. Co.*, 1989 U.S. Dist. LEXIS 9639, *12 (D.D.C. Aug. 14, 1989) (*relying on Fairchild*, 516 F. Supp. at 1313 ("since the advantages of arbitration are speed and informality, an Arbitrator should be expected to act affirmatively to simplify and expedite the proceedings before him")).  Dismissing numerous claims for which there were no disputed issues of material facts, which the Arbitrator did in this case, was a reasonable exercise of the Arbitrator's discretion to "expedite the proceedings."

Petitioners take umbrage with the fact that the Arbitrator's partial summary judgment was a single sentence.  Arbitrators are under no obligations, however, to explain the basis for their decisions.  *Wise v. Wachovia Securities, LLC*, 450 F.3d 265, 268 (7th Cir. 2006) (*citing Bernhardt v. Polygraphic Co. of America*, 350 U.S. 198, 204 n.4 (1956)).  Indeed, as the D.C. Circuit has explained, "when the Arbitrators give no explanation for their decision, as commonly occurs, we must confirm the award 'if any justification can be gleaned from the record.'"  *Kurke*, 454 F.3d at 354 (*quoting GMS Group LLC v. Benderson*, 326 F.3d 75, 78 (2d Cir. 2003)).

Nevertheless, there was ample justification in the record for the Arbitrator to grant partial summary judgment.  Respondents filed a Motion for Summary Judgment that was amply supported by record evidence demonstrating that it was entitled to summary judgment.  *See* Motion for Summary Judgment.  In response, Petitioners filed an Opposition, that, like the Petition and Memorandum before this Court, amounted to nothing more than conclusory assertions of factual disputes with no evidentiary support.  *See* Opposition.  Accordingly, the Arbitrator considered "the written motions and all responses filed thereto, as well as oral argument made by the parties" and dismissed all of Petitioners' claims except for the breach of contract and discrimination claims.  Pre-Hearing Order No. 1.

After Petitioners' counsel claimed that he had never seen the order granting partial summary judgment, despite participating in at least two teleconferences with the Respondents' counsel and the Arbitrator before the hearing, the Arbitrator allowed Petitioner to make a proffer as to a potential motion for reconsideration of his ruling on summary judgment. After the proffer, the Arbitrator denied Petitioners' motion for reconsideration because Petitioner did not "offer any new area that would persuade [the arbitrator] to reconsider." TR. at 83:7-9. In denying the motion to reconsider, the Arbitrator also detailed the basis for his initial grant of summary judgment: "The basis [for the dismissal] is in Respondent's 43-page brief [where] they thoroughly briefed these issues. Claimant had an opportunity to review that brief and respond, and Claimant did take advantage of that both in writing and in oral argument." TR. at 81:2-7. Thus, the record in this case is replete with facts and evidence to support the Arbitrator's grant of partial summary judgment in this case.

Finally, Petitioners expend considerable effort arguing that the Arbitrator should not have "cut off by way of summary judgment" Dr. Tio's discrimination claim. Memo in Support of Petition to Vacate Arbitration Award at p. 27. The Arbitrator did not grant summary judgment on Dr. Tio's discrimination claim, however. As the Arbitrator stated in his Pre-Hearing Order: "All causes of action heretofore asserted by Claimant against Respondent shall be, and hereby are Dismissed, with prejudice, except for: (a) Breach of Contract, and (b) Wrongful Termination of Employment." Pre-Hearing Order No. 1. Petitioners' wrongful termination claim was their discrimination claim. *See* Complaint at ¶ ¶ 97-99. Indeed, as the Arbitrator stated in his Final Order, "the claims remaining to be heard were Claimant's allegations that Respondent . . . illegally terminated his employment on the basis of discrimination." Final Order at p. 2. After a protracted eight-day hearing, the Arbitrator ruled that Petitioners had failed to prove a claim for

discrimination, noting that "other than inferences drawn by Claimant, this matter was noteworthy for the complete absence of any evidence of racial bias or other impermissible intent to discriminate against Claimant on the part of Respondent Washington Hospital Center." Final Order at p. 6. Based on this ruling, the Arbitrator clearly weighed all of the evidence presented and ruled accordingly.  In no way was this in manifest disregard of the law.  Instead, Petitioner failed to introduce even a scintilla of evidence of racial bias or discrimination of any sort.

## **<u>CONCLUSION</u>**

Petitioners' Petition to Vacate and supporting Memorandum is wholly without merit. Petitioners have not provided a shred of evidence to support either a statutory or common-law basis for vacating the Award, but rather rely on conclusory statements and unsupportable generalizations.  That notwithstanding, even if Petitioners had relied on some form of evidence, their arguments state nothing more than their disagreement with the Arbitrator's decision.  They have not articulated even a colorable argument for vacating the award.

The Arbitrator afforded Petitioners every opportunity to prove their case, but they failed to do so.  Overwhelming case law, as well as the record evidence in this case, make clear that the Arbitrator afforded Petitioners a full and fair hearing on their claims.  There is no evidence whatsoever to suggest that the Arbitrator was partial, engaged in misconduct, exceeded his authority, or demonstrated a manifest disregard of the law.  To the contrary, the Arbitrator bent over backwards to afford Petitioners every possible opportunity to present and prove their case. Their dissatisfaction with the Arbitrator's decision cannot form the basis for vacating the Award. As such, Petitioners' Petition to Vacate should be denied, and the Arbitrator's Award should be confirmed.

Respectfully submitted,


__ */s/ Keith J. Harrison* _____
Keith J. Harrison (DC Bar No. 416755)
Trina L. Fairley (DC Bar No. 464102)
Daniel M. Creekman (DC Bar No. 488983)
CROWELL & MORING
1001 Pennsylvania Avenue, NW
Washington, DC 20004
(202) 624-2500 (office)
(202) 628-5116 (fax)

# Exhibit A

# SUPERIOR COURT FOTHE DISTRICT OF COLUMBIA
## CIVIL DIVISION

THIAN LOK TIO, M.D.                          :
169 South Detroit Street
Los Angles, California  90036

    and

MRS. TING SOAN S. TIO
169 South Detroit Street
Los Angles, California  90036,

        Plaintiffs,                      :

          v.                        :        Civil Action No._____

WASHINGTON HOSPITAL CENTER    :
    CORPORATION
T/A WASHINGTON HOSPITAL CENTER
110 Irving Street, N.W.                       :
Washington, D.C.  20010,
      Serve:  Registered Agent
           CT Corporation System           :
           1015 15th Street, N.W.,
           Suite 1000
           Washington, D. C.  20005,       :
    and

MEDSTAR HEALTH, INC.                   :
110 Irving Street, N.W.
Washington, D.C.  20010                    :
      Serve:  Registered Agent
           CT Corporation System
           1015 15th Street, N.W.,          :
           Suite 1000
           Washington, D. C.  20005,       :

    and                                     :

JAMES CALDAS,                               :
individually and as President,
WASHINGTON HOSPITAL CENTER
110 Irving Street, N.W.                       :

RECEIVED
CIVIL CLERK'S OFFICE
MAR 17 2004
SUPERIOR COURT
OF THE DISTRICT OF COLUMBIA
WASHINGTON, DC

04--0002054

Washington, D.C. 20010,                    :

    and                                        :

**EUGENE WOOD,**                           :
individually and as Vice President
WASHINGTON HOSPITAL CENTER                 :
110 Irving Street, N.W.
Washington, D.C. 20010,                    :

    and                                        :

**Wm. JAMES HOWARD, M.D.,**
individually and as Senior Vice President  :
and Medical Affairs
WASHINGTON HOSPITAL CENTER
110 Irving Street, N.W.                     :
Washington, D.C. 20010,

    and                                        :

**SUSAN HART,**                            :
individually and as Assistant Vice-
President, Chief Executive Administrator
for Dept. of Medicine                      :
WASHINGTON HOSPITAL CENTER
110 Irving Street, N.W.
Washington, D.C. 20010,                    :

    and                                        :

**MICHAEL R. BOIVIN SR.,**                 :
individually and as Assistant Vice President
WASHINGTON HOSPITAL CENTER
110 Irving Street, N.W.
Washington, D.C. 20010,                    :

    and                                        :

**LEONARD WARTOFSKY, M.D.,**               :
individually and as Chairman,
Department of Medicine
WASHINGTON HOSPITAL CENTER                 :
110 Irving Street, N.W.
Washington, D.C. 20010,

and                                          :

**MICHAEL GOLD, M.D.,**
individually and as Interim Chief,           :
Section of Gastroenterology
WASHINGTON HOSPITAL CENTER                   :
110 Irving Street, N.W.
Washington, D.C.  20010,                     :

    And                                  :

**NOEL "KIM" SIMPSON,**
individually and as Head Nurse of            :
Gastrointestinal (GI) Laboratory
WASHINGTON HOSPITAL CENTER                   :
110 Irving Street, N.W.
Washington, D.C.  20010,                     :

    and

**LINDA JACKSON,**                           :
individually and as Vice-Administrator of Billing
and Secretary of Gastroenterology Section    :
WASHINGTON HOSPITAL CENTER
110 Irving Street, N.W.                       :
Washington, D.C.  20010,
                                             :

        Defendants.              :

---

## VERIFIED COMPLAINT AND JURY DEMAND

Plaintiff Thian Lock Tio, M.D. (hereinafter "Dr. Tio") and Plaintiff Ting Soan S. Tio

(hereinafter "Mrs. Tio"), by and through their attorney plead and allege as their Verified

Complaint, with Jury Demand, in their suit against Defendants Washington Hospital Center,

Medstar Health, Inc., James Caldas, Eugene Wood, Susan Hart, Leonard Wartofsky, M.D., Wm.

James Howard, M.D., Michael R. Boivin, Sr., Michael Gold, Kim Simpson, and Linda Jackson,

as follows:

## JURISDICTION ALLEGATIONS

1.  Jurisdiction for this court over the above-captioned matter and all counts herein is based on D.C. Code Sections 11-921, 12-301, and 13-423, whereby permission is granted to persons sustaining damages and injuries in the District of Colombia caused by breach of contract, defamation, tortious and negligent acts or omission in the District of Colombia.

2.  All acts and/or omissions complained of herein occurred in the District of Columbia.

## GENERAL ALLEGATIONS

3.  Plaintiff Dr. Tio was, and at all pertinent times had been, a physician duly licensed in the District of Columbia in Medicine and Surgery, and had been employed and retained in association with Defendant Washington Hospital Center Corporation, trading as, Washington Hospital Center (hereinafter "WHC") as Director, Endoscopy Laboratory in the Section of Gastroenterology, since February 1, 2001.

4.  Plaintiff Dr. Tio is the first physician to qualify for the District of Columbia licensure as a Physician of eminence criteria and was issued Licensure No. MD 21429.

5. Plaintiff Dr. Tio is now licensed and employed in the State of California by the internationally renowned Cedar Sini Medical Center, 8635 Third Street, Los Angles, California and appointed as Clinical Professor of Medicine at University of California at Los Angeles as of November 17, 2003.

6. Plaintiff Mrs. Tio is the wife of Plaintiff Dr. Tio for thirty-one (31) years, and at all pertinent times, had lived at 6304 Owns Place, Silver Spring, Maryland and the plaintiffs now reside at 169 South Detroit Street, Los Angeles, California 90036.

7. As a direct and proximate cause of Defendants acts and/or omissions, Plaintiff Mrs. Tio was not able to maintain her established five (5) year old business as the owner of a Dental Laboratory in Gaithesburg, Maryland.

8. As a direct and proximate cause of Defendants acts and/or omissions, she lost thousands of her patients through dental referrals and their fees because she was forced to relocate with her husband to California for his new employment due to his malicious and wrongful firing by Defendants.

9. Plaintiff Mrs. Tio has sustained, as a direct and proximate result of her husband's intentional and wrongful termination by Defendants, both personal injuries from the loss of consortium, personal monetary damages from loss of her business income in the sum of $35,000.00, and other injuries and financial damages from loss of investment and opportunity income in the sum of Three Million Dollars ($3,000,000.00).

10. Plaintiffs loss $42,000.00 on the untimely forced sale below its appraised value of their Maryland home under all Counts of this Complaint.

11. Upon information and belief, Defendant WHC, is, and at all pertinent times has been, a corporation in District of Columbia, and is doing business in the District of Columbia, for the purpose of operating a private for-profit medical and health care institution at 110 Irving Street, N.W., Washington, D.C. 20010.

12. Upon information and belief, Defendant WHC is owned and operated by Defendant MedStar Health, Inc. (hereinafter referred to as "MSI") which is doing business in the District of Columbia as either a domestic or foreign corporation duly organized under laws of the District of Columbia or of the State of Delaware, for the purpose of owning and operating a private

for-profit medical and health care institution at 110 Irving Street, N.W., Washington, D.C.

20010.

13.  For certain matters, Defendant WHC and Defendant MSI, each acts as a public

agency and its actions are state action subject to the provisions of the state and federal

constitution by virtue of the fact that it is an organization operated in and affected with the public

interest, it is subject to public control in the form of regulation and licensure by the District of

Columbia, and it receives public contracts for medical services, public financial assistance in the

form of funding under Hill-Brown Act and in the form of DC medicare reimbursements and in

the form of its tax-exempt status from federal and state taxes.

14.  Defendants James Caldas, Eugene Wood, Susan Hart, Leonard Wartofsky, M.D.,

Wm. James Howard, M.D., Michael R. Boivin, Sr., Michael Gold, Kim Simpson, and Linda

Jackson, at all pertinent times hereto were, are, and have been, acting individually and as the duly

appointed officers, agents, apparent agents, employees, representatives, servants and assigns of

Defendants WHC and MSI and have been duly acting individually and in their scope of

employment on behalf of Defendants WHC and MSI while serving in their respective capacities.

15.  At all relevant times herein, Defendants WHC and MSI are responsible for the acts

and/or omissions of their duly appointed officers, agents, apparent agents, employees,

representatives, servants and assigns under the doctrine of respondent superior.

## FIRST CAUSE OF ACTION
### (Tortious Breach of Contract)

16.  By written contract dated February 1, 2001, Plaintiff was employed by defendant

WHC as a full time Physician for an annul term, which written contract was to remained in

continued in force year after year. A copy of said contract is attached hereto, marked Exhibit 1 and incorporated by reference herein as a part hereof.

17. Plaintiff Dr. Tio's duties and responsibilities were set forth in his position description, a copy of which is attached hereto, marked Exhibit 2 and incorporated by reference herein as a part hereof.

18. Due to his special training, education, unique skills and reputation, Plaintiff Dr. Tio has given, produced and authored voluminous medical publications, specialized training programs, seminars, presentations, and lectures in the field of Endoscopy Ultrasound.

19. Since February 1, 2001, Plaintiff Dr. Tio had successfully completed and was continuously employed for two and ¼ years under said contract for said position of Director of Endoscopy until Defendants intentionally, maliciously, unjustly and wrongfully terminated him without just cause by a notification letter dated April 18, 2003 from Defendant Leonard Wartofsky, M.D., (hereinafter "Dr. Wartofsky") Chairman, Department of Medicine for Defendants WHC and MSI. A true and correct copy of said notification is attached hereto, marked Exhibit 3 and incorporated by reference herein as a part hereof.

20. Plaintiff Dr. Tio's termination was made effective that same day and that his summarily dismissal was without an opportunity to defend or challenge the pro ported grounds for termination at a prior hearing or prior to any arbitration or court action.

21. Previously during April of 2002, Defendants aborted a dismissal action after the successful challenge by Plaintiff Dr. Tio and the adverse reaction by private physicians and surgeons. See a true and correct copy of said notification is attached hereto, marked Exhibit 4 and incorporated by reference herein as a part hereof.

22. Plaintiff Dr. Tio has received positive job performance evaluations, promotion, earned bonuses, patient recognition awards, honorariums, including contract renewals as shown by the contract extension, all of which support his outstanding performance in his position since his employment through and until the date of his summary and wrongful dismissal without just cause. See a true and correct copy of said items attached hereto, marked Exhibits 5 and 6 incorporated by reference herein as a part hereof.

23. Based upon negotiations for joining the Hospital, but prior to joining without compensation, Plaintiff was induced to arrange for outside funding from PENTAX Precision Instrument Corporation in the sum of $250,000.00 over five years for the benefit of Defendant WHC, and plaintiff did in fact so secure with the delivery of the first check of $49,000.00 for the fellowship program at Defendant WHC, see attached Exhibits 7 and 8, respectively made a part hereof by reference herein.

24. As a part of Annual performance appraisal, on January 9, 2002, Robert Burakoff, M.D., M.PH., F.A.C.G., F.A.C.P., as former Director of Gastroenterology for Defendant WHC congratulated Plaintiff Dr. Tio for exceeding his First Quarter Gross Revenue Billings at seventy-five percent (plus 75%) above budgeted projections, see attached Exhibit 5, respectfully made a part hereof and incorporated by reference herein.

25. Plaintiff Dr. Tio was treated disparagingly and discriminated against although he brought to Defendants WHC and MSI an increase in its patient base where its former inpatient and outpatient revenues of $1.3 million dollars, as Director of Endoscopy Laboratory in the Section of Gastroenterology, Dr. Tio realized new client billings of $2.3 million dollars ( $1.2 million in 2001, plus approximately $800,000 in 2002 , plus $300,000.00 in 2003) while other

Doctors with less client billings were retained as employees and remained on staff and with all privileges.

26. Plaintiff Dr. Tio's referred many patients to Defendants WHC and MSI; these patients received other medical services from Defendants WHC and MSI for which Plaintiff Dr. Tio did not received credit nor compensation as part of his percentage package as promised and agreed, and over the 2 ¼ year period these unshared income totaled between $1,000,000.00 to $2,000,000.00 approximately for services including but not limited surgeries, oncology, pathology, radiology, and radiation oncology.

27. Said wrongful termination of the contract was done without legal cause, and defendant WHC has failed to comply with Defendant's Hospital's own Bylaws, prior practices and customs because WHC refused to provide a meeting or hearing prior to summary dismissal on the alleged grounds for termination.

28. The intentional and unlawful/wrongful termination was not determined by Defendants WHC and MSI on the basis of harmful patient care or upon reasonable grounds related thereto since there were no deaths, nor patient claims, nor complaints pending against Plaintiff Dr. Tio, no open or pending peer reviews, nor any other patient care related issues with any of Plaintiff Dr. Tio's patients under his diagnosis, supervised care, treatment or consultancy, nor upon the basis of any malpractice. There has been no decrease in the quality of patient care or treatment in his area and responsibility of practice nor patient complaints sufficient to justify such willful action resulted in his termination.

29. To the contrary, Plaintiff Dr. Tio's attention to patient care and treatment has received outstanding compliments from patients, fellows and private physicians and Dr. Tio has been recognized by hospital awards in recognition from patients, fellows and private physicians.

30. Plaintiff's wrongful discharge is in total disregard of the provisions of the hospital by-laws, prior practices and costumes, to wit, all other employees were given an opportunity to a hearing or supervisory review, reprimands, warnings and prior written documentation in order to challenge said action, and is therefore totally void and of no effect.

31. The alleged grounds cited by defendant were baseless, arbitrary, capricious, and insufficient to justified a termination for cause as alleged since plaintiff, to wit:

A. Did not abuse his time and attendance, or received prior documentation of such abuses;

B. Did not fail to achieve projected revenues were Chairman acknowledged his achieving performance results 75% over budgeted projections or was prevented from doing so by defendants actions of interrupting his services with an aborted dismissal and reinstatement during the year's activity;

C. Did not fail to attend meetings because meeting were never scheduled or confirmed with plaintiff, nor did plaintiff communicate in a condescending manner with Hospital peers, fellows, nurses or patients;

D. Did not delay reports or medical billings but do to the delay of other parties not proper supervised by Defendants WHC and MSI;

E. Did not destroy equipment because the equipment was under a net lease arrangement which included all necessary repairs or replacement of such equipment, and such equipment does not have long life because the equipment was replaced annually, and any alleged damage to said equipment was due to other hospital personnel, who were not properly supervised or controlled by Defendant WHC, who actually called for such repairs or replacement; and

F. Did not disable any hospital equipment, or ask that it be disabled, by other Hospital personnel, not properly supervised or controlled by Defenc

32. Although all the defendants, knew, or should have known, that t wrongful, baseless and illegal, they, individually and collectively, did nothin this wrongful and malicious termination of Plaintiff Dr. Tio.

33. Plaintiff is now, was, and has been at all times since his wrongfu termination, ready, willing and able to perform all of the duties and obligatio by him as Director of Endostropy for said institution, and has been and is bei illegally deprived of his rights to perform said duties and obligations in order bonuses, fringe benefits and emoluments appertaining to his position.

34. By reason of the foregoing, defendants, in violation of law, wron Plaintiff in willful and wanton disregard of his rights and failed to pay plainti provided under his contract since April 18, 2002.

35. The average monthly salary for Plaintiff Dr. Tio as of April 18, 2 $19,315.00, and had he not been unlawfully terminated, Dr. Tio would have t Twelve (12) months compensation of $231,780.00.

36. Furthermore, Plaintiff Dr. Tio demands return of back pay wron from payroll check #CL92566 equaling $7,302.82, with the acknowledgment require a net payment to Dr. Tio after all customary deductions and full fringe position.

37. Because Plaintiff Dr. Tio is without any other adequate and speci the reason that monetary damages cannot adequately and fully compensate Pl from his loss of said position and its resultant damage to his long-established

professional reputation in this highly specialized medical community both nationally and internationally, demands that prompt publication of an article providing a full apology acceptable to him with his picture in the **WHC's Physician** newsletter in order to correct the basis of his departure for medical staff, residents, fellows and alumni.

Wherefore, Plaintiff Dr. Tio prays for judgment against defendants, jointly and severally, commanding defendant WHC, defendant MSI and defendants: James Caldas, Eugene Wood, Susan Hart, Leonard Wartofsky, M.D., Wm. James Howard, M.D., Michael R. Boivin, Sr., Michael Gold, M.D., Kim Simpson and Linda Jackson to:

1. Enter Judgment in favor of plaintiffs declaring defendants' action as unlawful;

2. Restore plaintiff's wrongfully withheld pay of $7,302.82 with interest from withheld;

3. Pay plaintiff, inaddition to the withheld pay of $7,302.82, his nominal back pay since the date of termination to the date of re-employment of $231,780.00 and increased monthly from the filing of the complaint at the rate of $19,315.00 per month until entry of judgment with interest on this total adjusted amount of $239,082.82 from the date of termination, plus loss bonuses with fringe benefits, including retirement contributions and any other compensatory damages;

4. Award plaintiffs punitive or exemplary damages as an adequate deterrent against future abusive misconduct by defendants in the amount of $10,000,000.00;

5. Restore Plaintiff Dr. Tio's personnel file and publish apology acceptable to Plaintiffs in the **WHC's Physician** newsletter in order to correct the basis of his departure for medical staff, residents, fellows and alumni;

6. Award Plaintiff Mrs. Tio damages for consortium, loss business income, opportunity income from loss on sale of home in the amount of $3,000,000.00;

7. Award Plaintiffs all costs of this action, including reasonable attorney fees; and

8. Grant such other and further relief as the Court deems equitable, just, and proper.

## SECOND CAUSE OF ACTION
### (Tortoise Interference With Contract of Employment)

38. Plaintiff herein adopts and incorporates by reference all of the allegations set forth in paragraphs 1 through 37, and further alleges:

39. Defendant James Caldas was, and is still, employed as President of WHC by Plaintiff's former employer, defendant WHC, and was Defendant's Eugene Wood, Vice President of WHC, first line, and immediate superior during all times pertinent to this action.

40. Defendant Dr. Howard, was, and is still, employed as a Vice President, Medical Affairs, by Plaintiff's former employer, defendant WHC, and was Plaintiff's third line supervisor, and immediate superior during all times pertinent to this action.

41. Defendant Dr. Gold, was, and is still, employed as Interim Chief of Gastoenterology Plaintiff's former employer, defendant WHC, and was Plaintiff's first line supervisor, and immediate superior during all times pertinent to this action.

42. Defendant Dr. Wartofsky, was, and is still, employed as Chairman, Department of Medicine by Plaintiff's former employer, defendant WHC, and was Plaintiff's second line supervisor, and immediate superior during all times pertinent to this action.

43. Plaintiff Dr. Tio's former employer entered an employment contract with Plaintiff with incentive pay provisions. Soon after the commencement of performance under said employment agreement, Defendants, individually and collectively, sought to undermine said contract by making false, malicious and slanderous representations and misrepresentations, all design to frustrate Plaintiff's maximum earnings and advancement opportunities due to

Defendants' hatred, dislike and discrimination against Plaintiff due to his race and foreign

national origin. For defendant on good, financial benefit and well being and promotion at

Defendant WHC.

44. On or after his employment, Defendants made statements or wrote memos, report or

letters to Defendant WHC , and to his/her immediate supervisors complaining generally about

Plaintiff's alleged work performance, attitude, and noting poor relations and unprofessional

behavior with staff and patients.

45. As a result thereof, Plaintiff was first terminated without cause but latter reinstated;

however, this unwarranted disruption and interference with Plaintiff's medical practice resulted

in the reduced projected revenues in 2002 and compared with his earnings for the full year in

2001, which could not be recaptured, and ultimately resulted in this final wrongful termination

action which is involve with this action.

46. These negative comments and acts and/or omissions by defendants, caused

Defendants WHC and MSI to assign Plaintiff to lower paying clients and procedures and denied

Plaintiff full accounting and crediting of referral of patients to Defendant WHC for other

medical, drug, health care and treatment needs not in Plaintiff area of expertise or specialty that

should have be dully credit to Plaintiff revenues earnings figures for incentive pay adjustments in

order that Defendant WHC and MSI would be unjustly enriched and retains earnings that rightly

should have been credited to Plaintiff by Defendants WHC and MSI in violation of the terms of

compensation for his personal and professional services under this contract.

47. As a direct and proximate result, Plaintiff suffered loss of full employment earnings,

because he was interfered with by Defendants and was not permitted to achieve the full

opportunity earnings and who was credit with only part of his generated earnings, as compared with all his income generation in his first year and in all subsequent years with Defendant WHC.

48. During the last full year prior to termination, Plaintiff was wrongfully docketed salary earned based upon Defendants false and misleading statements and/or representations to Defendants WHC and MSI, and these loss wages and benefits have never been recovered during his continued period of employment.

49. After a period of Plaintiff's wrongly unemployment of several months, Plaintiff was forced to uprooted his family moving to another city and suffered a sizable loss on the forced sale of Plaintiffs' marital and family home at a distressed sale, incurred travel and moving expenses, job hunting costs, and the continued loss of income and benefits for himself his wife and children.

50. As a direct and proximate cause of Defendants' malicious and wrongful conduct in terminating Plaintiff Dr. Tio, he suffered injuries, pain, emotional suffering, embarrassment, loss of enjoyment of life and other losses and damages.

WHEREFORE, Plaintiffs respectfully pray for judgment against Defendants, and request that the Court grant relief as follows:

1. Enter Judgment in favor of plaintiffs declaring defendants' action as unlawful;

2. Restore plaintiff's wrongfully withheld pay of $7,302.82 with interest from withheld;

3. Pay plaintiff, inaddition to the withheld pay of $7,302.82, his nominal back pay since the date of termination to the date of re-employment of $231,780.00 and increased monthly from the filing of the complaint at the rate of $19,315.00 per month until entry of judgment with interest on this total adjusted amount of $239,082.82 from the date of termination, plus loss

bonuses with fringe benefits, including retirement contributions and any other compensatory

damages;

4. Award plaintiffs punitive or exemplary damages as an adequate deterrent against future

abusive misconduct by defendants in the amount of $10,000,000.00;

5. Restore Plaintiff Dr. Tio's personnel file and publish apology acceptable to Plaintiffs

in the **WHC's Physician** newsletter in order to correct the basis of his departure for medical

staff, residents, fellows and alumni;

6. Award Plaintiff Mrs. Tio damages for consortium, loss business income, opportunity

income from loss on sale of home in the amount of $3,000,000.00;

7. Award Plaintiffs all costs of this action, including reasonable attorney fees; and

8. Grant such other and further relief as the Court deems equitable, just, and proper.

### THIRD CAUSE OF ACTION
### (Denial of Common-law Good Faith And Fair Dealing)

51. Plaintiff herein adopts and incorporates by reference all of the allegations set forth in

paragraphs 1 through 50, and further alleges:

52. That defendant owed plaintiff a duty or covenant of good faith and fair dealing

arising out of their relationship where plaintiff gave up employment to join the defendant's

hospital to established this special medical unit relying upon plaintiff esteemed national and

international reputation in this medical patice area among his medical professional peers.

53. That by virtue of his professional standing, defendant obtain plaintiff's patients and

expoited his good name retaining for themselves $1.2 million in first hearing billings without

proper adjustment to plaintiff's contract as promised in the subsequent year was motivated by

bad faith and breach of the convenient of fair dealing .

54. That said wrongful termination of the contract was done without legal cause, and defendant has not failed and refused to prefer charges to arbitration prior to summary dismissal or to grant plaintiff a hearing thereon.

55. Defendants' refusal to reinstate the Plaintiff was willful and wanton, unjustified and contrary to law, and in callous disregard for Plaintiff's rights in that Plaintiff is entitled to have the contract forthwith reinstated and subsequently renewed for another term together with all rights and emoluments for his position.

WHEREFORE, Plaintiffs pray for judgment and damages as follows:

1. Enter Judgment in favor of plaintiffs declaring defendants' action as unlawful;

2. Restore plaintiff's wrongfully withheld pay of $7,302.82 with interest from withheld;

3. Pay plaintiff, inaddition to the withheld pay of $7,302.82, his nominal back pay since the date of termination to the date of re-employment of $231,780.00 and increased monthly from the filing of the complaint at the rate of $19,315.00 per month until entry of judgment with interest on this total adjusted amount of $239,082.82 from the date of termination, plus loss bonuses with fringe benefits, including retirement contributions and any other compensatory damages;

4. Award plaintiffs punitive or exemplary damages as an adequate deterrent against future abusive misconduct by defendants in the amount of $10,000,000.00;

5. Restore Plaintiff Dr. Tio's personnel file and publish apology acceptable to Plaintiffs in the **WHC's Physician** newsletter in order to correct the basis of his departure for medical staff, residents, fellows and alumni;

6. Award Plaintiff Mrs. Tio damages for consortium, loss business income, opportunity income from loss on sale of home in the amount of $3,000,000.00;

7. Award Plaintiffs all costs of this action, including reasonable attorney fees; and

8. Grant such other and further relief as the Court deems equitable, just, and proper.

## FOURTH CAUSE OF ACTION
### (Tortious Interference with Third-party Physician-Patient Contracts)

56. Plaintiff herein adopts and incorporates by reference all of the allegations set forth in paragraphs 1 through 55, and further alleges:

57. Plaintiff Dr. Tio had many prior and current patients that he was not permitted to maintain his professional and business relationship with as direct and proximate wrongful interference by defendants.

58. Defendants WHC and MSI through their agents, apparent agents, employees, representatives, servants and assigns interfered with Plaintiff Dr. Tio's ability to communicate with and contact his patients, make professional presentations, and complete research projects.

59. Defendants WHC and MSI through their agents, apparent agents, employees, representatives, servants and assigns interfered with Plaintiff Mrs. Tio's to remain in contact with her patients and business partners as a proximate result of the wrongful termination of her husband.

WHEREFORE, Plaintiffs pray for judgment and damages as follows:

1. Enter Judgment in favor of plaintiffs declaring defendants' action as unlawful;

2. Restore plaintiff's wrongfully withheld pay of $7,302.82 with interest from withheld;

3. Pay plaintiff, inaddition to the withheld pay of $7,302.82, his nominal back pay since the date of termination to the date of re-employment of $231,780.00 and increased monthly from the filing of the complaint at the rate of $19,315.00 per month until entry of judgment with interest on this total adjusted amount of $239,082.82 from the date of termination, plus loss

bonuses with fringe benefits, including retirement contributions and any other compensatory

damages;

4. Award plaintiffs punitive or exemplary damages as an adequate deterrent against future

abusive misconduct by defendants in the amount of $10,000,000.00;

5. Restore Plaintiff Dr. Tio's personnel file and publish apology acceptable to Plaintiffs

in the **WHC's Physician** newsletter in order to correct the basis of his departure for medical

staff, residents, fellows and alumni;

6. Award Plaintiff Mrs. Tio damages for consortium, loss business income, opportunity

income from loss on sale of home in the amount of $3,000,000.00;

7. Award Plaintiffs all costs of this action, including reasonable attorney fees; and

8. Grant such other and further relief as the Court deems equitable, just, and proper.

### FIFTH CAUSE OF ACTION
### (Defamation/Slander)

60. Plaintiff herein adopts and incorporates by reference all of the allegations set forth in

paragraphs 1 through 59, and further alleges:

61. That by reason of his profession and occupation at all times mentioned herein,

plaintiff has enjoyed been well known and recognized by numerous and divers people,

physicians, and other medical individual, medical institutions, medical schools and businesses

throughout the United sStates and other international countries, where plaintiff practiced or now

practices, has taught or now teaches, has resided or now resides, and at all times has enjoined a

good name and reputation in his profession and occupation.

62. That plaintiff's ability to procure patients, referrals, lecture contracts or other Honiara

and carry on his professional practice and business  successfully islargely dependent on the

public estimate of the quality of the professional skill and work done by him in his line of

medical practice and business and on his reputation as a competent and distinguish physician.

63. That on or after April 18, 2003, in the District of Columbia and elsewhere, the

defendant WHC falsely and maliciously composed and published in a conspicuous place

concerning the plaintiff in his profession the following defamatory matter: as statements,

separately or in conjunction with each other, as contained in, or related to, its letter of

termination.

64. That by the defamatory matter as set forth above, defendant meant, and was

understood to mean its patients and clients that: plaintiff was guilty of committing various acts of

negligence, gross carelessness, dereliction of his duties, incompetence, unprofessional, cruel,

heartless charater and unskilled in the care and treatment of patients seeking medical services of

the WHC; or that plaintiff unexplained absence, dismissal and withdrawal from treatment and

care has done, or has committed various acts, or has done various things because of some

criminal, negligent or other wrongful conduct that by innuendo justified his summary release

from the employment of WHC.

65. That defendant's statements in said publication were false, malicious, libelous, and

made with the intent to injure the plaintiff in his good name and credit in his profession and

business, and to cause it to believe that by reason thereof he had become incompetent to

discharge his duties and property practice his profession with WHC. That by reason of said

publication, plaintiff has been injured in his good name and credit and professional reputation as

a physician and medical specialist, and fellow professor on faculty of WHC, and it will cast a

strong stigma on his standing as a physician, medical specialist, and professor, will result in the

loss of patients, physician referrals, faculty opportunities, and invitations for lectures or presentations, and will work greatly to his injury in procuring patients and practice inthe future.

66. That by reason of the publication of defendant's grounds for termination as set forth above, have natural and reasonable tendency to degrade plaintiff, and cause him to be disgraced in the eyes of his professional peers, friends and acquaintances, both business and social, and the general public; and that such publicity has rendered him incompetent, unhappy, depressed and contemptible in the estimation of his family members, friends, acquaintances, business associates, patients and the general public, and is libelous per se.

67. That as a proximate cause thereof, plaintiff has been financially injured, embarrassed, and exposed to public scorn, hatred, contempt, ridicule, and obloquy, and causing him to be damaged in the sum of $5,00,000.00 compensatory damages and $10,000,000.00 punitive damages.

WHEREFORE, Plaintiffs pray for judgment and damages as follows:

1. Enter Judgment in favor of plaintiffs declaring defendants' action as unlawful;

2. Restore plaintiff's wrongfully withheld pay of $7,302.82 with interest from withheld;

3. Pay plaintiff, inaddition to the withheld pay of $7,302.82, his nominal back pay since the date of termination to the date of re-employment of $231,780.00 and increased monthly from the filing of the complaint at the rate of $19,315.00 per month until entry of judgment with interest on this total adjusted amount of $239,082.82 from the date of termination, plus loss bonuses with fringe benefits, including retirement contributions and other compensatory damages of $5,000,000.00.

4. Award plaintiffs punitive or exemplary damages as an adequate deterrent against future abusive misconduct by defendants in the amount of $10,000,000.00;

5. Restore Plaintiff Dr. Tio's personnel file and publish apology acceptable to Plaintiffs in the **WHC's Physician** newsletter in order to correct the basis of his departure for medical staff, residents, fellows and alumni;

6. Award Plaintiff Mrs. Tio damages for consortium, loss business income, opportunity income from loss on sale of home in the amount of $3,000,000.00;

7. Award Plaintiffs all costs of this action, including reasonable attorney fees; and

8. Grant such other and further relief as the Court deems equitable, just, and proper.

### SIXTH CAUSE OF ACTION
**(Intentional Infliction of Emotional Distress)**

68. Plaintiffs herein adopt and incorporate by reference all of the allegations set forth in paragraphs 1 through 67, and further allege:

69. Defendants conduct was outrageous ie conduct the "offends against the generally accepted standards of decency and morality".

70. Defendant WHC's officers, agents, and employees asserted and held positions of authoriuty over Plaintiff or were in positions to affect plaintiff Dr. Tio's interest adversely by abuse of their positions in giving him undesirable work assignments and falsifying the plaintiff's work reports, alleged acts of harassment of interns and staff, unfounded claims of destruction of equipment which all taken together constitute a pattern of coerion and retaliation.

71. Defendants engage in a malicious Campaign and Course of conduct over a period of time to embrass or discredit Dr. Tio.

72. Defendants conduct indicated a calculated, persistent plan to disturb, humilate, harass and ruin him, and therefore done with the intent ot cause him severe mental distress.

73. Plaintiff Dr. Tio is generally known and perceived normally as a contagiously friendly, happy and kind person, who as a result of Defendant WHC actions and that of the defendant officers, agents and employees, became uncharacteristically sadden, depressed, burdened and isolated.

74. Falsely stating grounds for Dr. Tio's termination that knowingly, or should have been known, to be baseless, arbitrary, capacious and unreasonable in order to damage his professional reputation and future employability so that with a diminished professional stature Defendant WHC could convert and retain his patients and cause future patients to seek their services rather than his care and treatment.

75. Where plaintiff was terminated by employer in what plaintiff alleged was a "humiliating manner" without warning, notice, or opportunity to consult with his patient whose appointments were cancelled without explantion.

76. That as a result of defendants' conduct, they exposed plaintiff Dr. Tio to public scourn, hatred, contempt, ridicule, and obloquy, causing him to be shunned and avoided, and which had a tendency, and still has a tendency to injury, defame, libel and disgrace him in his poccupation, and which proximately caused him to sustain a severe and continuing nervous shock and strain, to suffer great mental anguish, mortification, humiliation, loss of personal dignity and shame, all to his damage in the sum of of $5,000,000.00 compensatory damages and $10,000,000.00 punitive damages.

77. On or after April 18, 2003, Defendants disseminated derogatory statements and comments, knowingly false and unsupported by facts, design to ridicule and ruin plaintiff Dr. Tio's professional reputation and character.

78.  The acts and/ omissions of Defendant(s) described above in paragraphs of this Complaint were done willfully, maliciously, outrageously, deliberately, and purposely with the intention to inflict emotional distress upon Plaintiff and/or were done in reckless disregard of the probability of causing Plaintiff emotional distress, and those acts did in fact result in severe and extreme emotional distress.

79.  As a direct and proximate result of the Defendants' acts alleged herein, Plaintiff was caused to incur severe and grievous mental and emotional suffering, fright, anguish, shock, nervousness, and anxiety.  Plaintiff continues to be fearful, anxious, and nervous of additional ridicule and harm to his personal image and professional reputation.  For this harm Plaintiff requests reinstatement of unpaid wages of $200,000.00 plus loss benefits and other compensatory damages in the total sum of $5,000,000.00.

80.  As a direct and proximate result of the Defendants' acts  alleged herein, Plaintiff was caused to obtain medical and psychiatric treatment on several occasions since his wrongful termination, which medical and psychiatric treatment will continue for and indeterminable length of time.  Plaintiff reuses compensatory damages in the sum of $5,000,000.00.

81.  As a result Plaintiff could not perform his customary marital duties and Plaintiff wife suffered loss of love, support, services, aid, comfort, and society expected in normal  marital consortiumship and spousal compainonship to her damage in the sum of $5,000,000.00.

WHEREFORE, Plaintiffs pray for judgment against Defendants, jointly and severally, as follows:

1.  Compensatory damages in the sum of $5,000,000.00 for Plaintiff Dr. Tio and $3,000,000.00 for Plaintiff Mrs. Tio;

2.  Punitive damages in the sum of  $10,000,000.00.

3.  Costs associated with this suit, including reasonable attorney fees and such other and further relief as the Court deems just and proper.

## SEVENTH CAUSE OF ACTION
### (Fraud/Mispresentation)

82.  Plaintiff herein adopts and incorporates by reference all of the allegations set forth in paragraphs 1 through 81, and further alleges:

83.  Plaintiff was fraudulently induce to leave the employment of Georgetown University Medical Center based upon false promises, statements and misrepresentations by Defendants on behalf of the WHC upon which plaintiff relied to his detriment.

84.  Plainitff was fraudulently induce to refer his patients to Defendant WHC based upon false promises, statements and misrepresentations by Defendants on behalf of the WHC upon which plaintiff relied to his detriment.

85.  Defendants exploited plaintiff's immeeint professional reputation in order to establish a practice area in plaintiff's area of medical specialty by inducing plaintiff to train physicians that defendant later hired to replace plaintiff after taking his patients.

86.  Defendants failed to proper report and pay plaintiff for all referrals made by plaintiff for his patience's that received other services from the hospital and failed to propoer credit this reveues to plaintiff's total earned in order to deny plaintiff additional compensation as required under the contract.

87.  Defeants failed to account for all fees earned in the department where some patience's accounts were uncollected and plaintiff has never been renumerated for these additional funds after collection by defendant in order to defraud plaintiff out his lawful compensation under the contract.

88. Defendants never paid plaintiff a proper bonus as promise under the contract for future renews of the contract.

89. Defendants acted in bad faith by seeking to deprive plaintiff of all compensation rightfully due under the contract by terminating plaintiff's contractual relationship when plaintiff was on the brink of successfully completing the first two years of the agreement.

90. Defendants acted in bad faith in the ensuing transactions between plaintiff and defendants by not properly accounting to plaintiff for all patient income he brought in for other services rendered by defendant for the referrals and by not properly accounting for uncollectible amounts which were later collected upon with compensation to plaintiff for these additional sums including back-pay, fringe benefits unpaid bonuses, and commissions.

WHEREFORE, Plaintiffs pray for judgment and damages as follows:

1. Enter Judgment in favor of plaintiffs declaring defendants' action as unlawful;

2. Restore plaintiff's wrongfully withheld pay of $7,302.82 with interest from withheld;

3. Pay plaintiff, inaddition to the withheld pay of $7,302.82, his nominal back pay since the date of termination to the date of re-employment of $231,780.00 and increased monthly from the filing of the complaint at the rate of $19,315.00 per month until entry of judgment with interest on this total adjusted amount of $239,082.82 from the date of termination, plus loss bonuses with fringe benefits, including retirement contributions and any other compensatory damages;

4. Award plaintiffs punitive or exemplary damages as an adequate deterrent against future abusive misconduct by defendants in the amount of $10,000,000.00;

5.  Restore Plaintiff Dr. Tio's personnel file and publish apology acceptable to Plaintiffs in the **WHC's Physician** newsletter in order to correct the basis of his departure for medical staff, residents, fellows and alumni;

6.  Award Plaintiff Mrs. Tio damages for consortium, loss business income, opportunity income from loss on sale of home in the amount of $3,000,000.00;

7.  Award Plaintiffs all costs of this action, including reasonable attorney fees; and

8.  Grant such other and further relief as the Court deems equitable, just, and proper.

## EIGHT CAUSE OF ACTION
### (Antitrust Violation)

91.  Plaintiff herein adopts and incorporates by reference all of the allegations set forth in Paragraphs 1 through 90, and further alleges:

92.  Because of the size and resources of defendant WHC, and its parent defendant MedStar, Plaintiffs are unable to compete with defendant both for his existing customers or patients and for those potential customers or patients who are drawn to defendants because of its unfair use and exploitation of Plaintiff's name, reputation and experience.

93.  It is impossible for plaintiff to obtain similar number of patients following the predatory and anti-competitive tactics resorted to by defendants to discredit, diminish and destroy the professional reputation of Plaintiff for the reminded of the term of the contract and for future employability.

94.  Defendants willfully and maliciously acted to deny access to Plaintiff patients in order to tortuously inferred with Plaintiff business opportunity and cause a cessation of his established client patient relationships.

95. Because Defendant WHC has acquired Plaintiff's former employer Georgetown University Medical Center which is now part of Defendant such that Defendant exercises market power to unlawfully precluded Plaintiff from returning to his former employer or to obtain similar employment in this area.

96. As a result of the wrongful actions buy defendants against her husband, Plaintiff Mrs. Tio suffers interference with her established business clients and loss of income from such business and well as the loss of opportunity income following the sale of their home at a loss.

WHEREFORE, Plaintiffs pray for judgment and damages as follows:

1. Enter Judgment in favor of plaintiffs declaring defendants' action as unlawful;

2. Restore plaintiff's wrongfully withheld pay of $7,302.82 with interest from withheld;

3. Pay plaintiff, inaddition to the withheld pay of $7,302.82, his nominal back pay since the date of termination to the date of re-employment of $231,780.00 and increased monthly from the filing of the complaint at the rate of $19,315.00 per month until entry of judgment with interest on this total adjusted amount of $239,082.82 from the date of termination, plus loss bonuses with fringe benefits, including retirement contributions and any other compensatory damages;

4. Award plaintiffs punitive or exemplary damages as an adequate deterrent against future abusive misconduct by defendants in the amount of $10,000,000.00;

5. Restore Plaintiff Dr. Tio's personnel file and publish apology acceptable to Plaintiffs in the **WHC's Physician** newsletter in order to correct the basis of his departure for medical staff, residents, fellows and alumni;

6. Award Plaintiff Mrs. Tio damages for consortium, loss business income, opportunity income from loss on sale of home in the amount of $3,000,000.00;

7.  Award Plaintiffs all costs of this action, including reasonable attorney fees; and

8.  Grant such other and further relief as the Court deems equitable, just, and proper.

## NINTH CAUSE OF ACTION
### (Wrongful Discrimination under State and Federal Law)

97.  Plaintiffs herein adopt and incorporate by reference all of the allegations set forth in Paragraphs 1 through 97, and further allege:

98.  That Defendant's wrongful discharge violates plaintiff's rights under both the District of Columbia Humans Rights Act and the Federal Civil Rights Act of 1866, 42 USCS Section 1981 which laws prohibit discrimination based upon race or national origin.

99.  That plaintiff was treated differently because of his race and national origin in terms of the terms of compensation under his contract and under the terms of the basis for his unlawful termination.

100.  That plaintiff be awarded his attorney fees as permitted by law as the prevailing party in this action.

WHEREFORE, Plaintiffs pray for judgment and damages as follows:

1.  Enter Judgment in favor of plaintiffs declaring defendants' action as unlawful;

2.  Restore plaintiff's wrongfully withheld pay of $7,302.82 with interest from withheld;

3.  Pay plaintiff, inaddition to the withheld pay of $7,302.82, his nominal back pay since the date of termination to the date of re-employment of $231,780.00 and increased monthly from the filing of the complaint at the rate of $19,315.00 per month until entry of judgment with interest on this total adjusted amount of $239,082.82 from the date of termination, plus loss bonuses with fringe benefits, including retirement contributions and any other compensatory damages;

4. Award plaintiffs punitive or exemplary damages as an adequate deterrent against future abusive misconduct by defendants in the amount of $10,000,000.00;

5. Restore Plaintiff Dr. Tio's personnel file and publish apology acceptable to Plaintiffs in the **WHC's Physician** newsletter in order to correct the basis of his departure for medical staff, residents, fellows and alumni;

6. Award Plaintiff Mrs. Tio damages for consortium, loss business income, opportunity income from loss on sale of home in the amount of $3,000,000.00;

7. Award Plaintiffs all costs of this action, including reasonable attorney fees; and

8. Grant such other and further relief as the Court deems equitable, just, and proper.

## TENTH CAUSE OF ACTION
### (Loss of Consortium)

101. Plaintiff herein adopts and incorporates by reference all of the allegations set forth in paragraphs 1 through 100, and further alleges:

102. That as result of defendant WHC'S actions, and those of its defendant offices, agents and employees, acting in their scope and authority, which injured plaintiff's mood and self-image so adversely, that joint and severely, that they so affected plaintiff whereby plaintiff felt inadequate at not being able to care for the continue education of his two children, because he was no longer able to pay their tuition fees for college.

103. That their actions inflicted such further suffering, whereby plaintiff felt inadequate, stupid, foolish, and dishonest because as a man of profession education, as respected author and physician of distinction, he wrongfully became unemployed and he now needed to relied on the contributions of his wife for major commitments for the first time in his life, having had his

professional reputation and credentials falsely accused and maliciously impugned and attacked

by defendant WHC and its defendant officers, agents and employees.

104.  That as a direct and proximate result of the wrongful and tortious actions described

in, each and every, aforestated Counts of this Complaint, Plaintiff Mrs. Tio has been deprived,

and will in the future continue to be deprived of the services, aid, comfort, and society of her

husband to her damage in the sum of  $3,000,000.00.

105.  That as a further direct and proximate result of the wrongful and tortious actions of

defendant WHC's officers, agents and employees as described in, each and every, aforestated

Counts of this Complaint, Plaintiff Mrs. Tio has incurred, and will in the future incur, financial

losses and expenses, all to her damage in the sum of $3,000,000.00.

106.  Despite plaintiff's demand for payment, the defendants refused, and continues to

refuse, to compensate plaintiff  for her injuries and damages incurred.

Wherefore, plaintiffs prays for judgment against defendants, jointly and severally, with

damages awarded in the sum of $3,000,000.00 including plaintiff's reasonable attorney fees as

warranted under the malious circumstances of the case and such other and further relief as to this

court is deemed just.

**Jury Demand**

Plaintiffs Dr. Tio and Mrs. Tio demand a trial by jury of all issues in the Complaint on all

issues triable by right by a jury.

Respectfully submitted,

BY: Thian Lok Tio, M.D., Plaintiff

BY: Mrs. Ting Soan S. Tio, Plaintiff

Anthony M. Rachal III
D.C. Bar #229047
Edmonds Bldg. - Capitol Hill, Suite 200
9th and D Streets, N.E.
Washington, D.C. 20002
(202) 393-7000

Attorney for Plaintiffs
Thian Lok Tio, M.D., and
Mrs. Ting Soan S. Tio

## VERIFICATION

I, Thian Lok Tio, M.D., being first duly sworn on oath according to law, deposes and says:

That I am a Plaintiff in the above entitled cause, that I have read and know the contents of this Verified Complaint, on behalf of myself, and I am duly qualified and empowered to verified those statements, facts and matters as alleged and contained therein are true and accurate to best of my knowledge, except as to matters that are therein stated on information and belief, and, as to those matters, that I believe it to be true.

_____
Thian Lok Tio, M.D., Plaintiff

SUBSCRIBED AND SWORN to before me this _16th_ day of March, 2004.

_____
Notary Public

My commission expires: 

## VERIFICATION

I, Mrs. Ting Soan S. Tio, M.D., being first duly sworn on oath according to law, deposes and says:

That I am a Plaintiff in the above entitled cause, that I have read and know the contents of this Verified Complaint, on behalf of myself, and I am duly qualified and empowered to verified those statements, facts and matters as alleged and contained therein are true and accurate to best of my knowledge, except as to matters that are therein stated on information and belief, and, as to those matters, that I believe it to be true.

_____

Mrs. Ting Soan S. Tio,  Plaintiff


SUBSCRIBED AND SWORN to before me this __th day of March, 2004.



Notary Public

My commission expires:_____

LINDA WALKER
Commission # 1277717
Notary Public - California
Los Angeles County
My Comm. Expires Sep 21, 2004

# AGREEMENT OF EMPLOYMENT

THIS AGREEMENT, made and executed this 28 th day of November, 2000, by and between the WASHINGTON HOSPITAL CENTER, a not-for-profit Delaware corporation, hereinafter referred to as "HOSPITAL" and Thian Lok Tio, M.D., hereinafter referred to as "DOCTOR".

## WITNESSETH

WHEREAS, HOSPITAL is an institution rendering general and specialized hospital services to citizens of the District of Columbia and the surrounding counties of Maryland and Virginia and as part of its teaching and clinical program desires to employ a physician in the Department of Medicine, Section of Gastroenterology; and

WHEREAS, HOSPITAL finds it necessary to obtain the services of a physician licensed in the District of Columbia and desires to contract with DOCTOR to fulfill that responsibility; and

WHEREAS, DOCTOR represents that he possesses a license to practice medicine in the District of Columbia, professional expertise in gastroenterology, is eligible for membership and appropriate privileges on Medical and Dental Staff of HOSPITAL, is willing to provide to HOSPITAL medical professional services in the Department of Medicine, Section of Gastroenterology; and is willing to engage in the teaching, instruction and supervision of postgraduate medical students, residents and fellows as part of the approved training programs of HOSPITAL;
56

NOW, THEREFORE, in consideration of the mutual promises, covenants, and agreements set forth herein, the receipt, adequacy and sufficiency of which are hereby acknowledged and intending to be bound, it is agreed as follows:

1.  **Services to be provided by DOCTOR.** DOCTOR will perform all services required as a full time employed Director, Endoscopy Laboratory in the Section of Gastroenterology, as described in the attached position description which is made a part hereof by this reference and as may be revised from time to time at HOSPITAL'S discretion. All such services shall be performed in a manner acceptable to the Board of Directors, Administration, and the Medical Staff of HOSPITAL and shall be rendered in accordance with the standards of the Joint Commission on Accreditation of Healthcare Organizations, the Department of Consumer and Regulatory Affairs of the District of Columbia and the Accreditation Council for Graduate Medical Education.


PLAINTIFF'S EXHIBIT

DOCTOR shall be required to maintain, in good standing, his license to practice medicine in the District or Columbia and appropriate membership and clinical privileges on the Medical and Dental Staff of HOSPITAL. It should specifically be noted that deferment of privileges for medical records issues constitutes a breach of the requirement to maintain Medical and Dental Staff privileges in good standing.

DOCTOR shall not be permitted to engage in any private professional practice of medicine outside of this Agreement during the term thereof except as specifically authorized in writing by his departmental Chair and the Medical Director.

Nothing in this Agreement shall contravene the medical ethics or judgement of DOCTOR.

2.    **Annual Compensation.** Annual base compensation in the amount of two hundred twenty-five thousand dollars ($225,000) shall be paid to DOCTOR as compensation for the services provided for in this Agreement. All fringe benefits shall be determined by the annual base compensation.

HOSPITAL agrees to review DOCTOR'S performance each year to determine, in HOSPITAL'S sole discretion, if a bonus or change in the compensation is indicated.

It is the intent of the parties to develop an incentive compensation model for DOCTOR beginning in year two of this Agreement. It is mutually understood that in order to convert from a pure base compensation model to an incentive model that DOCTOR'S base compensation shall be decreased and an incentive formula developed with the goal of at least maintaining DOCTOR'S total compensation at the same level for the same billing and collections rates. HOSPITAL'S standard incentive model includes consideration of both the amount of billings and the actual collections from such billings in the monthly calculation of the incentive.

DOCTOR shall be entitled to receive such fringe benefits as are and may be specified from time to time in the Benefits for Salaried Physicians Handbook of HOSPITAL. DOCTOR will be allowed to accrue a maximum of thirty-three (33) days of vacation which may be carried over from one anniversary date to the next. DOCTOR shall also be entitled to participate in HOSPITAL's 403B Deferred Income Plan.

Any earnings from approved activities such as expert testimony, teaching, lecturing and writing done outside of working hours at HOSPITAL shall be the property of DOCTOR and not that of HOSPITAL and shall be retained by



Thian Lok Tio, M.D.
November 28, 2000
Page 3

Physician. All other earnings from such activities shall be the property of Hospital.

3. **Fees for Professional Services.** DOCTOR designates, appoints, and assigns HOSPITAL to make all billings for all professional services rendered by DOCTOR during the term of this Agreement. The HOSPITAL shall retain all receipts from such billings.

DOCTOR agrees to comply with all applicable laws and regulations relating to the provision, billing and payment of health care services. DOCTOR agrees to attend training courses and review educational materials as reasonably necessary to remain appraised of applicable third-party billing and payment rules. DOCTOR further agrees to support HOSPITAL'S compliance efforts by whatever means reasonably possible, including reporting to appropriate individuals any suspected or known incidents of illegal or improper activity.

DOCTOR represents and warrants that he has never been convicted of a criminal offense related to healthcare nor been listed by a federal or state agency as debarred, excluded or otherwise ineligible for participation in any federal or state program. DOCTOR shall immediately notify HOSPITAL upon learning of any audit or other investigation of DOCTOR'S claims or practices by a Medicare Part B carrier, HCFA, the HHS Office of Inspector General or other government enforcement agency. In the event that DOCTOR is convicted of any crime related to healthcare or is listed by a federal or state agency as debarred, excluded or otherwise ineligible for participation in any federal or state program. DOCTOR shall immediately notify HOSPITAL of such action.

DOCTOR further agrees to assist HOSPITAL in obtaining provider numbers and in securing appropriate payment by third party payors.

4. **Protection from Liability Claims.** DOCTOR will be protected by HOSPITAL's Risk Management Financing Plan for public and professional liability which may arise from the performance of professional services under this Agreement or from the rendering of Good Samaritan Acts. The coverage afforded is on an occurrence basis.

HOSPITAL agrees and reserves the right and duty to defend, settle and pay any and all claims arising from DOCTOR'S professional services and duties to HOSPITAL. Professional services performed by DOCTOR, in addition to the duties set forth in paragraph 1 of this agreement, and attached position description, include membership on a formal professional or standards review committee of HOSPITAL and any acts or actions of the committee members within the scope of the committee's functions and purposes as well as duties

Thian Lok Tio, M.D.
November 28, 2000
Page 4

outside HOSPITAL in which any and all fees, or any form of remuneration for professional services pass directly and totally to HOSPITAL.

Good Samaritan Acts as used in this agreement are defined as physician acts rendered to persons at the scene of an accident, without compensation, when DOCTOR in good faith believes the administering of medical care is the only alternative to probable death or serious physical damage to the injured person. Accidents include incidents of choking, cardiac arrest and similar emergencies.

DOCTOR shall not be required to procure insurance coverage for his own protection and shall not be entitled to reimbursement for such insurance, or any additional insurance, should he choose to contract therefore.

*L. T JB*
*MR B*

*February 1, 2001*

5. **Term and Termination.** This Agreement shall continue in effect for one year beginning on ~~November 1, 2000~~, and ending on ~~October 31, 2001~~, and shall automatically be renewed, thereafter from year to year. Either party shall have the right at any time to terminate this Agreement without cause by providing at least ninety (90) days prior written notice to the other party of intention to terminate.

*L. T January 2002 MR B*

In the event that this Agreement is terminated by either party under the without cause provision, at HOSPITAL'S option, DOCTOR will (a) continue performing his employment responsibilities and duties until the date of employment termination or a date mutually agreeable to HOSPITAL and DOCTOR; or (b) terminate his employment relationship with HOSPITAL immediately upon notice from HOSPITAL and accept ninety (90) days annual base compensation as severance pay.

This Agreement may also be terminated forthwith for cause or for breach of contract, provided, however, that in the case of a breach or cause which is remediable, the termination shall not become effective until notice in writing has been given, and the party so notified has failed to remedy the breach or cause, including the payment of all costs incident thereto within thirty (30) days after receipt thereof. For the purpose of this Agreement, "cause" shall be taken to be i) professional incompetence as determined by the department Chair and the Medical Director of HOSPITAL, ii) conviction of a felony or any offense involving moral turpitude, iii) failure to comply with policies, standards or regulations of HOSPITAL, iv) voluntary or involuntary neglect of responsibilities, v) failure to meet any requirements applicable to him under law, vi) death, vii) theft, misappropriation, diversion or embezzlement of HOSPITAL'S funds, viii) DOCTOR is physically or mentally unable to perform the essential functions of the position, with or without accommodation, for a period in excess of ninety consecutive days (90), ix) participation in activities which are detrimental to the

best interests of HOSPITAL or in conflict with DOCTOR'S duties under this Agreement, x) insolvency of HOSPITAL or xi) failure of HOSPITAL to make payments as described hereunder.

6. **Records of Services.** DOCTOR agrees that he will cause to be prepared and will submit to the Office of Medical Affairs accurate hourly records of all administrative, teaching and supervision and patient care services on forms provided by HOSPITAL.

In accordance with Section 952 of the Omnibus Reconciliation Act of 1980 (PL 96-499), DOCTOR agrees to make available for a period of four years following completion of the terms of this Agreement, upon request of the Secretary of Health and Human Services or the Comptroller General or any of their authorized agents, all of his books, documents and records necessary to certify the nature and extent of the cost of the services rendered pursuant to this Agreement as required by Federal statute or duly promulgated regulations.

7. **Amendments.** This Agreement may be amended by mutual consent of the parties provided that before any amendment, supplemental agreement or novation shall be operative or valid, it shall be reduced in writing and signed by HOSPITAL and DOCTOR.

8. **Medical Records.** All patient medical records, charts, and files developed or assembled or added to during the course of DOCTOR'S performance of duties under this Agreement, shall be and remain the property of HOSPITAL. DOCT shall have reasonable access to such medical records for purposes of provid medical services.

9. **Notices.** Any notices related to this Agreement shall be deemed proper if n in writing and hand delivered, receipt acknowledged, or mailed, registered certified mail return receipt requested, with all postage or other charges p'd to:

a) HOSPITAL

Wm. James Howard, M. D.
Senior Vice President and Medical Directr
Washington Hospital Center
110 Irving Street, NW
Washington, DC      20010

b) DOCTOR

Thian Lok Tio, M.D.
6304 Owen Place
Bethesda, MD   20817

10.    **Non-assignability and Governing Law.**  This Agreement shall not be assigned by either party without the written approval of the other, except that HOSPITAL may assign this Agreement to an affiliate or subsidiary of Medlantic Healthcare Group should tax or other considerations require. This Agreement shall be interpreted in accordance with the laws of the District of Columbia without regard to otherwise applicable principles of conflict of laws.

11.    **Entire Agreement and Severability.**  This Agreement constitutes the entire agreement and supersedes all other prior agreements, representations and understandings between the parties or their predecessors.  If any portion of this Agreement shall be held to be invalid or unenforceable all other parts of this Agreement shall remain in full force and effect.

12.    **Dispute Resolution.**  Any controversy, dispute or disagreement arising out of relating to this Agreement, or the breach thereof, shall be settled by binding arbitration, which shall be conducted in Washington, DC, in accordance with the National Health Lawyers Association Alternative Dispute Resolution Service Rules and Procedure for Arbitration.  Judgement on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof.  Arbitrator transcription and facility cost shall be shared equally by the parties.  Each party shall be responsible for its own attorneys and witness fees.

13.    **Survival.**  Any covenant or provision which requires or might require performance after the termination or expiration of this Agreement, including not limited to indemnities, settlement of accounts and records retention access shall survive any termination or expiration of this Agreement.

14.    **Waivers.**  No waiver of any term, provision, or condition of this Agreement whether by conduct or otherwise, in any one or more instances, shall be deemed to be or construed as a further and continuing waiver of any such term, provision or condition of this Agreement.

Thian Lok Tio, M.D.
November 28, 2000
Page 7

IN WITNESS WHEREOF, we hereby execute this Agreement.

_Betsy J. Greenhouse_
Witness

By _____
Thian Lok Tio, M.D.

11.30.00
Date

_B. Jackson_
Witness

By _____
Leonard Wartofsky, M.D.
Chair, Department of Medicine

12/10/00
Date

_____
Witness

By _Kathy Bell-Hennings_
Wm. James Howard, M.D.
Senior Vice President and Medical Director
for Dr. Howard

12/12/00
Date

_____
Witness

By _____
Michael R. Boivin Sr.
Assistant Vice President

12/12/00
Date

# WASHINGTON HOSPITAL CENTER
## Position Description

**TITLE**: Director, Endoscopy Laboratory
**Department No**: 27300
**Department Name**: Gastroenterology

**Job Code**: 8150
**Pay Grade**: 20N

The Director Endoscopy Laboratory will be a full-time Gastroenterologist functioning within the Section of Gastroenterology. The Director will provide administrative policy, quality assurance, credentialing, academic, and liaison roles as described below. As a member of the Gastroenterology full-time staff, he will serve in academic, clinical consultative, diagnostic and therapeutic roles and assist or interact with the Section Director in coordinating Section activities as required within the subspecialty.

## DUTIES AND RESPONSIBILITIES

### Administrative

As Director, the physician will provide the major professional guidance to daily activities of the unit, including but not limited to, the following:

* The Director will be responsible to the Section Director and will interact with the Section Director and the supervising nurse, to insure efficient and appropriate supervision function of the unit. These interactions will include the development of appropriate policies and guidelines in accordance with national, local, as well as internal standards and regulations (including JCAHO, Department of Consumer and Regulatory Affairs, ACGME, the Board of Directors and the Medical and Dental Staff Bylaws).

* The Director will interact and participate in committees to implement functional policy, quality assurance, and regulatory goals including regular meetings with:

  * Section Practice Committee
  * Endoscopy Unit Advisory Committee
  * Liaison groups for other relevant departments
  * Section credentials committee
  * Other medical staff, hospital and departmental committees



PLAINTIFF'S
EXHIBIT
2

Thian Lok Tio, M.D.
September 5, 2000
Page 2

* The Director will, in conjunction with the Section Director and the supervising nurse, develop a budget and supervise operational costs and assist in recommendations with regards to the purchasing and maintenance of capital equipment.

* The Director will supervise the academic activities of the unit including in-service education of staff and trainees.

* The Director will supervise the selection, employment, and training of Endoscopy Suite staff.

As a physician member of the full-time staff of the Gastroenterology Section: The Director will serve in traditional patient care, academic (training and education) research, and extramural activities as follows:

Patient Care Services

The physician will personally or through associates provide consultations, follow-up care, and procedural diagnostic or therapeutic services on both inpatient and outpatient basis. He will assist the Section Director in the supervision of the respective subspecialty clinics and in the administration or provision of attending coverage for emergency services.

Training and Education

The physician will assist the Section Director in structuring, conducting, and providing direct supervision of subspecialty training at all levels. He will conduct rounds and conferences for housestaff, participate in postgraduate continuing education and electives for medical students.

Research

The physician may participate in the coordination, development, and performance of research programs and obtaining grants to carry out research.

Publication

The physician will encourage and participate in the preparation and publication of medical articles.

Thian Lok Tio, M.D.
September 5, 2000
Page 3

## Relationship with other institution extramural activities

The physician may conduct teaching rounds or conferences and provide consultation out of the hospital particularly if they involve commitments to teaching programs for fellows, residents, or medical students.

He may serve on committees of national professional societies and serve as officers of these committees.

All such activities shall have prior approval by the Director of the Section, the Chairman of the Department of Medicine and the Medical Director.

## Qualifications

1.  Board certification in Internal Medicine and Gastroenterology.

2.  Specialty training and active participation in advanced therapeutic endoscopic techniques.

3.  Eligible for appropriate appointment to the Active Staff of the Washington Hospital Center.

4.  License to practice medicine in the District of Columbia.

_____
Date

_____
Leonard Wartofsky, M.D.
Chair, Department of Medicine

G Contracts\GI\tiopd.wpd

APR-21-2003 08:15 PM   TIO                    301 ███ 9199

Leonard W███
*Chairman*



# Washington Hospital Center

Department███

April 18, 2003

**CERTIFIED MAIL AND HAND DELIVERED**
**PERSONAL AND CONFIDENTIAL**

Thian Lok Tio, MD
6304 Owen Place
Bethesda, MD  20817

Re:    Notice of Termination with Cause

Dear Dr. Tio:

This is to notify you that your employment as Director, Endoscopy Labor███ the Section of Gastroenterology, Washington Hospital Center, is terminated effec███ close of business, Friday, April 18, 2003 for cause that is not remediable.  Your a███ consistently demonstrate failure to comply with the policies, standards or regulati███ the Hospital as well as voluntary or involuntary neglect of responsibilities.  These███ include, but are not limited to:

1.    Abuse of time and attendance, as I have previously admonished y███ including the high unusual use of 31 days of administrative leave ███ the July to November, 2002 time period.

2.    Failure to attend to your clinical obligations as demonstrated by dramatically reduced clinical revenue productivity compared to the███ year, with July to March, 2003 Inpatient Actual Revenue of only ███ versus $275,000 budgeted revenue.  On the outpatient side, actual amounted to only $274,000 versus $573,000 budgeted revenue.  ███ amounts were conservative and based upon your first year's activi███

3.    A total lack of leadership, specifically as required by your title an███ description as Director of Endoscopy.  Your lack of leadership or for the Endoscopy Suite is exemplified by your failure to attend s███ meetings, your abrogation of responsibility to lead the Advisory/ ███ group; your lack of concern or interest in the needs of the private physician group; your failure to address day-to-day issues in the ███

*MedStar Health*
110 Irving Street, NW, Washington, DC 20010-2975
*phone:* 202 877 3109 • *fax:* 202 877 6292

Thian Lok Tio, MD
April 18, 2003
Page 2:

your failure to make any visible attempt at team building within the unit; and finally what is viewed as your condescending manner with support staff and Fellows-in-Training, inconsistent with desirable and appropriate professional relationships, or with this Department's philosophy of Graduate Medical Education.

4. There are continuing concerns regarding deficiencies in Administrative Accountability. For example, you require Fellows to complete all consult service billing, which is your responsibility. This is a non-educational activity for the Fellows and constitutes negative role modeling. You are regularly reminded about delinquent Medicare reporting "bluesheets", some of which have been delayed for many months. You have been restricted in removal of charts from Medical Records due to your lengthy chronic delays in returning charts; and your Logician file records are regularly incomplete and poorly managed, likely related to the infrequency of your presence in the Ambulatory Care Center.

5. There have been many issues in regard to abuse of supplies and equipment, some of which follow:

- Biomedical Engineering reports that the catastrophic failure of the fluoroscopy tube was due to excessive exposure during endoscopic procedures performed by you, resulting in an expense of $16,000 to replace the tube.

- Constant breakage due to misuse by you of ultrasound probes which cost $3,500 each. To date there have been six probes replaced for a total cost of $21,500.

- The current inventory includes in excess of $100,000 cost of supplies that you ordered and are not being used with any frequency.

- Fourteen major repairs of ultrasound scopes have occurred. Each repair averages $8,000, with a total cost of $112,000.

6. Finally, and more recently, there have been mounting concerns from Radiation Safety about excessive radiation exposure to patients. Safety Committee minutes note that "collar badge

Thian Lok Tio, MD
April 18, 2003
Page 3:

doses in the GI Lab have risen significantly this year, but do not exceed ALARA levels." You asked Biomedical Engineering to disable the alarm that automatically goes off when levels reach a pre-established standard. This approach is both unprofessional and unethical.

After having worked so hard to both bring you here and to keep you here, I take this action with deep regret and a great sense of personal disappointment. You have continued to fail to meet expectations in spite of counseling by Dr. Burakoff and myself. For the above reasons, your employment is terminated for cause under Section 5 of your Employment Agreement.

Sincerely,

Leonard Wartofsky, MD
Chairman, Department of Medicine

<u>**Receipt Acknowledged**</u>:

_____
Thian Lok Tio, MD

APR-21-2003  08:14 PM   TIO                          229 9199          P.02

Leonard Wartofsky, MB, MACP
*Chairman*



# Washington
# Hospital Center

Department of Medicine
110 Irving Street, NW
Washington, DC 20010-2975

phone: 202 877 3109
fax: 202 877 6292

April 23, 2002

## MEMORANDUM

**TO:**      Lok Tio, M.D.

**FROM:**   Leonard Wartofsky, M.D.

**SUBJECT:**   Termination of Employment

Due to a change in the financial status of the Washington Hospital Center and the need for a programmed reduction in our manpower of the Department of Medicine, it will be necessary to terminate your employment in the Section of Gastroenterology, effective Wednesday, July 31, 2002.

This termination is no reflection on the quality of your performance and Dr. Burakoff and I wish you the best of luck in finding another suitable position. We sincerely regret that circumstances preclude your continued employment here in the Department of Medicine. Please accept my thanks for your contributions to the Section and Department in the education of our fellows, and residents and in the provision of outstanding patient care during your tenure here.

Received: _____        April 23, 2002
                        Lok Tio, M.D.

PLAINTIFF'S
EXHIBIT
4

*MedStar Health*

**Robert Burakoff, MD, M PH,**
**FACG, FACP**
*Director*

# Washington
# Hospital Center

**Gastroenterology**
110 Irving Street, NW, #3A3-A7
Washington, DC 20010-2975

**phone:** 202 877 7108
*fax:* 202 877 8163

1/9/02

LOK,

Congratulations,

your Gross (billing) revenue for 1st Quarter July – Sept 2001
is $288,207

you were budgeted for Gross revenue of
$164,738 which is 75% above
projected.

Bob



PLAINTIFF'S
EXHIBIT
5

*MedStar Health*



PLAINTIFF'S
EXHIBIT
6



**PRECISION INSTRUMENT CORPORATION**

90 Ramland Road, Orangeburg, NY 10962-2699
914–365-0700 • 800-431-5880 • FAX 914-365-0822

May 27, 2001

Lok Tio, M.D.
Director of Endoscopy
Room 3A3-A7
Washington Hospital Center
110 Irving Street NW
Washington, DC. 20010-2975

Dear Lok,

It was a pleasure meeting with you in Atlanta again last week. As per our conversation I would like to highlight support Pentax Precision Instrument Corporation (PPIC) is willing to provide Washington Hospital.

1.  PPIC would provide fellowship support in the amount of 50,000.00 annually over a five-year period.
2.  PPIC would long term consign endoscopic equipment for animal study research. This would include: 1 video processor, 1 video monitor and 1 EUS Scope.
3.  Pentax would provide assistance for the conference room, once designated, in an effort to provide a facility for continued education and research.
4.  Pentax will sponsor a nurse representative for attendance at the SGNA meeting.
5.  Pentax will express a sincere desire to Hitachi North America that they work closely with, and lend support to, Washington Hospital Center.

All of us here at Pentax Precision Instrument Corporation are excited with the prospect of continuing to work with you and all of the Washington Hospital Center staff with this exciting technology.

Please call me personally if you have any additional questions, concerns or needs.

Sincerely,

Marc Pierce
Vice President

Cc : David Woods, Area Manager
Cc : Daryl Testa, Sales Representative

PLAINTIFF'S
EXHIBIT
7



# PENTAX
## PRECISION INSTRUMENT CORPORATION

30 Ramland Road, Orangeburg, NY 10962-2699
845-365-0700 • 800-431-5880 • FAX 845-365-0822

March 20, 2003

Lok Tio, MD
Washington Hospital Center
110 Irving Street NW
Washington, DC 20010

Dear Dr. Tio,

It is with great pleasure we present the following funds for your fellowship program at the Washington Hospital Center. We value you and your staff as a Pentax Partner and look forward to future support of your GI program.

Sincerely,

David Woods
Director of Business Development

PLAINTIFF'S EXHIBIT 8

---

ENTAX PRECISION INSTRUMENT CORP.
) RAMLAND ROAD, ORANGEBURG, NY 10962-2699

CHECK NUMBER          DATE          **PNCBANK**  55-760/312
                                    PNC Bank, N.A.
108896          01/28/03          New Jersey    060

108896

PAY THIS AMOUNT

PAY   EXACTLY 49,000 Dollars and No Cents          ******$49,000.00

TO THE
ORDER OF   WASHINGTON HOSPITAL CENTER
           110 IRVING STREET NW
           WASHINGTON DC 20010

⑈"108896"⑈ ⑆031202607⑆ 010

Exhibit B

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| THIAN LOK TIO, M.D. ET AL., | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | **Case No. 1:04-cv-00701 (RMU)** |
| | ) | |
| WASHINGTON HOSPITAL CENTER, ET AL. | ) | |
| | ) | |
| Defendants. | ) | |

### DEFENDANTS' MOTION TO DISMISS AND COMPEL ARBITRATION

Defendants Washington Hospital Center, et al. (collectively, "the Hospital"), through counsel submit this Motion to Dismiss and Compel Arbitration and state as follows:

### I.

### INTRODUCTION

The Court should dismiss this action and compel arbitration of Plaintiff Thian Lok Tio's ("Dr. Tio") claims pursuant to the terms of the Employment Agreement ("the Agreement") entered into between Dr. Tio and the Hospital, which Dr. Tio attached to his Complaint as Exhibit 1. Paragraph 12 of the Agreement clearly states that "any controversy, dispute or disagreement arising out of or relating to" the Agreement "shall be settled by binding arbitration." All of Dr. Tio's claims arise out of or relate to his employment with the Hospital, which was controlled by the Agreement. Thus, Dr. Tio's claims arise out of or relate to the Agreement and must be "settled by binding arbitration" pursuant to the terms of the Agreement entered into by Dr. Tio and the Hospital. In addition, because all of Plaintiff Ting Soan S. Tio's ("Mrs. Tio") claims are derivative claims, inextricably linked to her husband's, Mrs. Tio's claims

should be dismissed with her husband's claims. The Court, therefore, should dismiss this action with prejudice in its entirety and compel Dr. Tio to submit his claims to arbitration.

## II.

## STATEMENT OF MATERIAL FACTS NOT IN DISPUTE

1.     Dr. Tio is a former employee of the Hospital who held the position of Director of Endoscopy in the Section of Gastroenterology. Complaint at ¶ 3.

2.     Dr. Tio was employed with the Hospital pursuant to a written contract originally dated February 1, 2001, which set forth the terms and renewal of Dr. Tio's annual employment. Complaint at ¶ 16. Dr. Tio executed the Agreement on November 30, 2000. See Employment Agreement attached to Dr. Tio's Complaint as Exhibit 1.

3.     Paragraph 12 of the Employment Agreement, entitled "Dispute Resolution," states in full:

> Any controversy, dispute or disagreement arising out of or relating to this Agreement, or the breach thereof, shall be settled by binding arbitration, which shall be conducted in Washington, DC, in accordance with the National Health Lawyers Association Alternative Dispute Resolution Service Rules and Procedure for Arbitration. Judgment on the award rendered by the arbitrator may be entered in any court having jurisdiction thereof. Arbitrator, transcription and facility cost shall be shared equally by the parties. Each party shall be responsible for its own attorneys and witness fees.

4.     Dr. Tio was employed under the Agreement through his entire employment with the Hospital, from February 1, 2001, until his termination on April 18, 2003. Complaint at ¶ 19.

5.     Mrs. Tio is seeking damages "as a direct and proximate result of her husband's intentional and wrongful termination by Defendants." Complaint at ¶ 9.

2

## III.

## ARGUMENT AND AUTHORITIES

Dr. Tio should be compelled to submit his claims, all of which arise out of or relate to his employment with the Hospital, to arbitration, in accordance with the terms of his Employment Agreement and the Federal Arbitration Act.

### A.    The Legal Standard

Pursuant to § 4 of the Federal Arbitration Act ("FAA"), 9 U.S.C. § 1 et seq. (2004), the Hospital, as a party to an arbitration agreement, is entitled to "petition...[the] District Court which save for such agreement, would have jurisdiction...for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4 (2004). Following that dictate, courts have allowed parties to petition the court through the use of a motion to dismiss for lack of subject matter jurisdiction. Thomas v. Nienaber, 239 F. Supp. 2d 478, 483 (D.N.J. 2002).

The proper approach for the Court to employ in reviewing a defendant's motion to compel arbitration "is to apply the same standard of review that governs Rule 56 motions." Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61 (D.D.C. 2003). "In as much as the district court's order to arbitrate is in effect a summary disposition of the issue of whether or not there had been a meeting of the minds on the agreement to arbitrate," consideration of the motion according to the standard used by district court's in resolving summary judgment motions pursuant to Fed. R. Civ. P. 56(c) "is appropriate." Par-Knit Mills, Inc. v. Stockbridge Fabrics Co., Ltd., 636 F.2d 51, 54 n.9 (3d Cir. 1980); Nelson v. Insignia ESG, Inc., 215 F. Supp. 2d 143, 147 (D.D.C. 2002) (holding that "summary judgment [was] the proper procedural mechanism to use in evaluating whether the plaintiff must submit her claims to arbitration").

3

Pursuant to Rule 56 of the Federal Rules of Civil Procedure, "when a motion for summary judgment is made and supported as provided by this rule, an adverse party may not rest upon the mere allegations with denials of the adverse parties' pleading but ... by affidavit or as otherwise provided in this rule, must set forth specific facts showing that there is a genuine issue for trial." Fed. R. Civ. P. 56(e). This Court must grant the motion for summary judgment "forthwith if the pleadings, depositions, answers to interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

**B.    The Federal Arbitration Act Applies And Requires Arbitration of Plaintiff's Claims Against The Hospital**

This matter is governed by the FAA, 9 U.S.C. § 1 et seq. Section 2 of the FAA provides that the arbitration provisions in any "contract evidencing a transaction involving commerce ... shall be valid, irrevocable, and enforceable save upon such grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The Supreme Court and the District of Columbia Circuit have both held that the provisions of the FAA are applicable to agreements to arbitrate contained in employment contracts. See Circuit City Stores v. Adams, 532 U.S. 105, 123 (2001) ("The Court has been quite specific in holding that arbitration agreements can be enforced under the FAA without contravening the policies of congressional enactments giving employees specific protection against discrimination prohibited by federal law"); Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991) ("It is by now clear that statutory claims may be the subject of any arbitration agreement, enforceable pursuant to the FAA."); Booker v. Robert Half International, Inc., 2004 U.S. Dist LEXIS 7242, *7-*8 (D.C. Cir. 2004) (applying the Supreme Court's ruling that the FAA applies to employment contracts).

4

The FAA has created a federal policy that favors the arbitration of employment disputes. See Nelson, 215 F. Supp. 2d at 149 ("federal courts have recognized a strong public policy favoring arbitration"); Nur v. K.F.C. USA, Inc., 142 F. Supp. 2d 48, 50 (D.D.C. 2001) ("federal courts have recognized a strong policy favoring alternative means of dispute resolution"). "As a result of this policy, any 'ambiguity' in the language of the [employment] agreement should be resolved in favor of arbitration." EEOC v. Waffle House, Inc., 534 U.S. 279, 294 (2002).

Under well-settled case law interpreting the FAA, an affirmative answer to the following two questions means that this Court should order Dr. Tio to submit his claims to arbitration:

(1) did the parties enter into a valid and enforceable arbitration agreement and, if they did,

(2) does the arbitration agreement encompass the claims raised in the Complaint?

Nelson, 215 F. Supp. 2d at 149-50 (citing Nur, 142 F. Supp. 2d at 50-51); Brown, 267 F. Supp. 2d at 70. In this case, based on undisputed facts and the plain language of Dr. Tio's Employment Agreement, the answer to both of these questions is an unqualified yes.

1.    **The Parties' Agreement To Arbitrate Is Valid And Should Be Enforced**

It is undisputed that the parties agreed to submit any and all employment-related disputes to arbitration. Employment Agreement at ¶ 12. The plain terms of the Employment Agreement specifically indicate that Dr. Tio contracted to submit any and all disputes arising out of or relating to his employment at the Hospital to arbitration. Under basic law, "one who signs a contract which he had an opportunity to read and understand is bound by its provision." Brown, 267 F. Supp. 2d at 75; see also Nur, 142 F. Supp. 2d at 51 (rejecting Plaintiff's claims that "he did not know 'the implication of his opting for arbitration' in that [his employer] did nothing to encourage him to 'think the matter through before signing it'").

5

Under District of Columbia law, "arbitration is predicated upon consent of the parties to a dispute, and the determination of whether the parties have consented to arbitrate a matter is to be determined by the courts on the basis of the contracts between the parties." Bailey v. Fed. Nat'l Mortgage Assoc., 209 F.3d 740, 746 (D.C. Cir. 2000) (quoting Ballard & Assoc., Inc. v. Mangum, 368 A.2d 548, 551 (D.C. 1977)). Here, Dr. Tio signed a contract containing a detailed arbitration provision. "[A] signature on a contract indicates mutuality of assent and a party is bound by the contract unless he or she can show special circumstances relieving him or her of such an obligation." Emeronye v. CACI Int'l, Inc., 141 F. Supp. 2d 82, 86 (D.D.C. 2001) (citing Davis v. Winfield, 664 A.2d 836, 838 (D.C. 1995)). As the decisions of the Court make clear, "where an employee has been provided with the opportunity to read an agreement whose terms concerning a duty to arbitrate are understandable, and there are no facts that material terms were intentionally withheld from the employee, the agreement should not be invalidated." Brown, 267 F. Supp. 2d at 83. In this case, there can be no question as to whether Dr. Tio executed an explicit arbitration agreement with clear and understandable terms on November 30, 2000.

### 2.    The Arbitration Agreement Between The Parties Encompasses the Claims in the Complaint

For the Court to require arbitration under the FAA, it must be able to conclude that the parties to the contract explicitly agreed to arbitrate the dispute at issue. Nur, 142 F. Supp. 2d at 50-51. The Arbitration Agreement entered into between Dr. Tio and the Hospital requires that "any controversy, dispute or disagreement arising out of or relating to this Agreement, or breach thereof, shall be settled by binding arbitration." The Supreme Court and the District of Columbia Circuit have clearly stated that the "language 'arising out of or relating to' the underlying contract or agreement" is to be interpreted broadly. Booker, 2004 U.S. Dist. LEXIS

6

7242 at *8 (citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985) ("arise out of or relating to" is a "broad arbitration clause")).  Thus, the District Court for the District of Columbia has interpreted this language to encompass the myriad of claims that plaintiffs have brought in connection with their unlawful termination claims.  See e.g., Nur, 142 F. Supp. 2d. at 51 (holding that an employment agreement arbitration clause containing the "arise out of or relate to" language encompassed the plaintiff's wrongful discharge, defamation, DCHRA discrimination and FSLA violation claims).

In his Complaint, Dr. Tio, like the plaintiff in Nur, also sets forth a host of counts against the Hospital, all of which arise out of or relate to his employment with the Hospital.  The claims therefore arise out of or relate to his Employment Agreement and are subject to the arbitration provision.  In fact, several of Dr. Tio's claims deal specifically with the Employment Agreement.  Plaintiff's Second Cause of Action for "Tortious Interference With Contract of Employment," for example, explicitly references the Employment Contract.  Indeed, the Employment Contract is attached to and incorporated by reference in Dr. Tio's Complaint.

As a result, this action should be dismissed and Dr. Tio should be compelled to submit his claims to binding arbitration.  Because Mrs. Tio's claims are derivative in nature, they are entirely dependent on the resolution of Dr. Tio's claims, and must, therefore, also be dismissed.  See e.g., Evans v. Visual Technology, Inc. 953 F. Supp. 453, 460 n.9 (N.D.N.Y. 1997) (dismissing spouse's derivative claims along with plaintiff's primary claims because the derivative claims could not survive independently from the primary claims).

## IV.

## <u>CONCLUSION</u>

Plaintiff entered into a binding arbitration agreement that controls the claims he has raised in this action. Under well-settled case law, this arbitration clause is enforceable and prevents Plaintiff from raising his claims in any court. Therefore, this Court should dismiss Plaintiff's claims with prejudice for lack of subject matter jurisdiction and compel arbitration.

Dated: May 5, 2004

                                             /s/

Keith J. Harrison (D.C. Bar No. 416755)
Trina L. Fairley (D.C. Bar No. 454102
KING, PAGANO & HARRISON
1730 Pennsylvania Ave, N.W., Suite 900
Washington, DC 20006
(202) 371-6800
(202) 371-6770 (fax)

Counsel for Washington Hospital Center, et al.

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 5th day of May 2004, I caused a copy

of the foregoing DEFENDANTS' MOTION TO DISMISS AND COMPEL ARBITRATION to

be delivered via first class mail, postage pre-paid, and facsimile to the following individual:

> Anthony M Rachal III
> 903 D. Street, N.E.
> Suite 200
> Washington, DC 20002

Counsel for Plaintiff

Daniel M. Creekman

# Exhibit C

**UNITED STATES DISTRICT COURT FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **THIAN LOK TIO, M.D. ET AL.,** ) | |
| ) | |
| **Plaintiff,** ) | |
| ) | |
| **v.** ) | **1:04-cv-0701 (RMU)** |
| ) | |
| **WASHINGTON HOSPITAL CENTER ET AL.** ) | |
| ) | |
| **Defendant.** ) | |
| ) | |

## DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO DISMISS AND COMPEL ARBITRATION

### I.

### INTRODUCTION

This Court should dismiss this action and compel arbitration of Dr. and Mrs. Tio's (collectively, "Plaintiffs") claims. Plaintiff Thian Lok Tio (Dr. Tio) signed a valid Employment Agreement that requires the submission to arbitration of any claims arising out of his employment with Defendant Washington Hospital Center, et al. ("the Hospital"). All of Dr. Tio's claims arise out of his employment with the Hospital and he should be compelled to submit them to binding arbitration pursuant to the terms of his Employment Agreement. Moreover, Plaintiff Ting Soan S. Tio's (Mrs. Tio) claims are entirely derivative of, and dependent on, Dr. Tio's claims and should accordingly be arbitrated along with Dr. Tio's claims. The Court should therefore dismiss this action and compel Plaintiffs to arbitrate their claims.

1

## II.

## ARGUMENT

As addressed more fully in the Hospital's Motion to Dismiss and Compel Arbitration ("Hospital's Motion"), pursuant to the controlling Federal Arbitration Act ("FAA" or "the Act"), 9 U.S.C. § 1 et seq. (2004), the courts engage in a two-part analysis to determine whether to dismiss an action and compel arbitration. The courts first look to whether the parties entered into a valid and enforceable arbitration agreement. If there is a valid and enforceable arbitration agreement, the courts then determine whether the arbitration agreement encompasses the claims raised in the complaint. See Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 70 (D.D.C. 2003) (Walton, J.); Nelson v. Insignia/ESG, Inc., 215 F. Supp. 2d 143, 149-150 (D.D.C. 2002) (Walton, J.); Nur v. K.F.C. USA, Inc., 142 F. Supp. 2d 48, 50-51 (D.D.C. 2001) (Kennedy, Jr., J.). The record plainly demonstrates that Dr. Tio and the Hospital entered into a valid and enforceable arbitration agreement that encompasses the claims brought in his Complaint. The Complaint should therefore be dismissed and the Tios should be compelled to arbitrate their claims.

**A.    The FAA Governs The Disposition Of This Case And The Hospital Did Not Waive Its Right To Invoke The Arbitration Clause And Proceed Under The FAA**

**1.    Dr. Tio Is Not Exempt From the FAA**

In an effort to avoid the applicability of the FAA, Dr. Tio frivolously argues that he falls within the "class of workers engaged in foreign or interstate commerce," such as "seamen [and] railroad employees" that are exempt from the provisions of the FAA under section 1 of the Act. See Plaintiffs' Reply in Opposition to Defendants' Motion to Dismiss and Compel Arbitration ("Opposition") at 15-17. The Supreme Court has spoken definitively on this issue and has said

that the exemption only applies to "transportation workers." Circuit City Stores, Inc. v. Saint Claire Adams, 532 U.S. 105, 109 (2001). Plaintiff's argument is not only unsupportable by case law, but definitively refuted by the FAA, the United States Court of Appeals for the District of Columbia, the Supreme Court, and virtually every court that has confronted the argument.

In Circuit City, the Supreme Court stated "we now decide that the better interpretation [of section 1 of the FAA] is to construe the statute, as most of the Courts of Appeals have done, to confine the exemption to *transportation workers*." (emphasis added) Id; see also Power Agent Inc. v. Elec. Data Sys. Corp., 358 F.3d 1187, 1193 n.1. (9th Cir. 2004) ("The Supreme Court overruled our prior precedent that the FAA does not apply to any employment contracts and held, in a case involving an individual employment contract, that the FAA applies to all individual employment contracts except those involving transportation workers," citing Circuit City, 532 U.S. at 109); Cole v. Bains, Int'l Security Services, 105 F.3d 1465, 1471 (D.C. Cir. 1997) ("our research indicates that every circuit to consider this issue squarely has found that section of the FAA exempts only the employment contracts of workers actually engaged in the movement of good in interstate commerce," citing cases from the First, Second, Third, Fifth, Sixth and Seventh Circuits).

Accordingly, in Nelson v. Insignia/ESG, Inc., this Court held that the FAA applied to the plaintiff's employment discrimination and breach of implied contract claims "because the plaintiff's claims arise from her employment as a non-transportation worker, and because her employment contract contained an arbitration clause." 215 F. Supp. 2d at 150. Dr. Tio is a medical doctor allegedly "with a national and international reputation in the specialized field of advanced endoscopic ultrasound for gastroenterology medicine." Opposition at 3. He is not a transportation worker. The transportation worker exception to the applicability of the FAA does

3

not apply to him. In short, "the provisions of the FAA are applicable to agreements to arbitrate contained in employment contracts," and since Dr. Tio in no way satisfies the exemption requirements, this matter "is governed by the FAA." Brown v. Dorsey & Whitney, LLP, 267 F. Supp. 2d 61, 69 (D.D.C. 2003) (Walton, J.).

### 2. The Hospital Has Not Waived Its Right, Nor Can It Be Estopped From Invoking Its Right To Compel Arbitration

Dr. Tio's argument that the Hospital has somehow waived its right, or should be estopped from invoking its right to proceed under the arbitration clause of the Agreement is similarly meritless. Dr. Tio appears to argue that the Hospital waived its right to arbitration because the Hospital did not seek "to invoke its application prior to the dismissal action," and should be estopped from claiming "any harm after failure to timely reply to demanded letter as promised [sic]." Opposition at 19. The facts Dr. Tio presents, however, do not support in any way a waiver/estoppel argument. Even assuming that they are accurate, the facts on which Dr. Tio relies do not demonstrate that the Hospital acted inconsistent with the arbitration provision.

In determining whether a party has waived its right to arbitration, "the essential question is whether, under the totality of the circumstances, the defaulting party has acted inconsistently with the arbitration right." Brick v. J.C. Bradford & Co., Inc., 677 F. Supp. 1251, 1257-1258 (D.D.C. 1987) (Gasch, J.) (quoting National Foundation for Cancer Research v. A.G. Edwards & Sons, Inc., 821 F.2d 772, 774 (D.C. Cir. 1987)). As early as June 20, 2003, only 2 months after Dr. Tio's termination, the Hospital responded with a letter written by Dr. Tio's counsel in which the Hospital reminded Dr. Tio that he "agreed to arbitration when he signed his Agreement of Employment on November 30, 2000. See 6/20/03 letter from G. Murad to A. Rachal attached to Opposition as Exhibit 9. Moreover, the Hospital filed the present Motion to Dismiss and Compel Arbitration within the time proscribed by the Federal Rules of Civil Procedure, after

4

timely removing the action from D.C. Superior Court. Other than the removal documents and this Motion, the Hospital has not filed any document with any court indicating that the Hospital was not proceeding under the arbitration clause. Thus, the Hospital has acted consistently with its arbitration right.

In his Opposition, Dr. Tio states that "defendant WHC did not chose to arbitrate the alleged grounds for plaintiff's dismissal, but rather summarily on its own decision exercised termination of his employment and revocation of the contract [sic]." Opposition at 6. This action, Dr. Tio argues, "was never suspended pending the outcome of arbitration as defendants argue was understood and was called for under the contract [sic]." Id. Without a shred of legal or case law support, Dr. Tio suggests that because the Hospital did not seek arbitration before it terminated Plaintiff, that it has somehow waived its arbitration rights. Such an argument turns the arbitration provision on its head. Had Dr. Tio ever demanded arbitration of his dismissal, perhaps this argument would be at least credible. Absent such a demand, there was no dispute to arbitrate until Dr. Tio sued the Hospital. Thus, the Hospital has not acted inconsistent with the arbitration clause. As soon as the controversy arose with the filing of Dr. Tio's Complaint, the Hospital moved to compel arbitration. The Hospital simply has not waived any right to compel arbitration, nor should it be estopped from doing so.

Dr. Tio also contends that the recommendation letter issued on his behalf prior to his termination somehow "refutes other alleged termination grounds" and supports his waiver argument. Opposition at 18. The letter does not implicate or even relate to any sort of invocation of the arbitration clause. That same recommendation also does not "explain their steps to avoid an opportunity for dispute resolution." Opposition at 18. This aspect of the argument simply defies logic.

5

**B.    Dr. Tio And The Hospital Entered Into A Valid And Enforceable Arbitration Agreement**

Plaintiffs have scattered throughout their disjointed Opposition several arguments, none of which have any merit, in an attempt to demonstrate that Dr. Tio should be relieved of his contractual obligation to arbitrate this dispute. There is no doubt that Dr. Tio entered into and signed an Employment Agreement with the Hospital that set forth the terms and conditions of his employment, including a requirement that all disputes arising out of or relating to the Agreement be arbitrated. See Employment Agreement attached to Plaintiffs' Complaint as Exhibit 1. In addition, the law is quite clear that a "signature on a contract indicates mutuality of assent and a party is bound by the contract unless he or she can show special circumstances relieving him or her of such obligation." Emeronye v. CACI Int'l, Inc., 141 F. Supp. 2d 82, 86 (D.D.C. 2001) (Huvelle, J.). It appears that Plaintiff is attempting to show "special circumstances," and thus challenge the applicability of the Employment Agreement, on four grounds. Dr. Tio argues that the Agreement is unenforceable because: it does not encompass his slander/defamation claim; he was fraudulently induced into entering the Agreement; it is an unconscionable contract of adhesion; and there is a failure of consideration and mutuality. None of these arguments have any merit.

**1.    The Arbitration Clause Encompasses All of Plaintiff's Claims**

Dr. Tio seems to argue that, at a minimum, his defamation and slander claim is not arbitable. Dr. Tio contends that the defamation and slander was "committed after the contract was terminated, by employees, agents, representatives or assigns of defendant hospitals [sic]," and is not arbitable under the arbitration clause of the Agreement because "the contract and the provision for arbitration was never intended to cover actions after the contract is revoked or breached by either party." Opposition at 8. Not only is this argument not supported by the one

6

case Dr. Tio cites, Poire v. Kaplan, 491 A.2d 529, 533 at n.6 (D.C. 1985), it is, in fact, refuted by relevant case law.  Dr. Tio's defamation claim is based on his allegation that the Hospital "falsely and maliciously composed and published in a conspicuous place…its letter of termination."  Complaint at ¶ 63.  As a result, the defamation alleged in the Complaint is based entirely on his termination letter and falls squarely within the scope of the arbitration clause.

In a similar situation, in which the Plaintiff alleged defamation based on the employer's publication of the Plaintiff's termination letter, the Third Circuit ruled that "the alleged defamation was a description of [Plaintiff's] activities while employed at Prudential and was contained in [Plaintiff's] termination letter," and thus "arose out of his employment and its termination."  Wood v. Prudential Insurance Co. of America, 207 F.3d 674, 681 (3rd Cir. 2000). The Court then concluded, "thus [Plaintiff's] defamation claim is arbitable."  Id.  As in Wood, Dr. Tio's alleged acts of defamation are descriptions of his activities while employed at the Hospital that are contained in the termination letter.  Thus, they clearly arise out of his employment with the hospital under the terms of his employment agreement, and are therefore subject to its arbitration agreement.  See Wood, 207 F.3d at 681; see also Booker v. Robert Half Int'l, Inc., 2004 U.S. Dist. LEXIS 7242, *8 (D.D.C. April 28, 2004) (Bates, J.) ("language 'arising out of or relating to' the contract agreement" is to be interpreted broadly citing Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985)).

Moreover, Plaintiff's reliance on Poire is entirely misplaced.  In the footnote Dr. Tio cites from Poire, the D.C. Court of Appeals stated "If the arbitration had been based on Paragraph 6 of the joint venture agreement, then resolution of this case would be different, since parties to an arbitration agreement cannot be required to submit to arbitration matters that they did not agree would be the subject of arbitration."  Poire, 491 A.2d at 533 n.6.  Paragraph 6 of the Joint

Venture Agreement, to which the Court of Appeals was referring, required the parties of the agreement to arbitrate only disputes as to whether or not the property in question was to be put up for sale or disputes concerning the terms and conditions of that sale. Placed in this context, it is clear that the Court's statement meant that a clause mandating the arbitration of specific claims cannot be used to compel arbitration of any claims other than those specifically referenced. Such a situation is certainly not present in the instant case. As the Hospital discussed more fully in its Motion, the arbitration clause in Dr. Tio's employment agreement is a broad one, not limited to a specific claim, which the courts have interpreted to encompass the myriad of claims that the Plaintiffs have brought in this action. See Motion at 6-7. The scope of the arbitration clause at issue is clearly broad enough to cover any claim related to the termination of Plaintiff's employment, including claims related to the letter that effectuated that termination.

### 2.    Plaintiff's Fraudulent Inducent Claim Is Subject to Arbitration

Rather than require a hearing by this Court, Dr. Tio's claim that he was fraudulently induced into entering the Employment Agreement generally mandates arbitration. Dr. Tio argues that "[t]he fraudulent promise of future revenue participation in all his professional and client referred income generated for the hospital was never honored and the allegation of similar treatment of all physicians were misrepresentations upon which plaintiff was induced to rely to sign the contract and to accept the arbitration clause to his detriment [sic]." Opposition at 9-10. Dr. Tio is arguing that he was fraudulently induced into entering the Agreement generally, not the specific arbitration clause. The case law is clear and well settled that Dr. Tio's fraudulent inducement claim does not affect the arbitrability of the Complaint because Dr. Tio is not claiming fraudulent inducement into the specific arbitration clause.

Courts determine whether a plaintiff was fraudulently induced into entering the specific arbitration clause, while arbitrators determine whether the plaintiff was fraudulently induced into entering the contract. In Prima Paint Corp. v. Flood & Conklin Mfg. Co., the Supreme Court stated "if the claim is fraud in the inducement of the arbitration clause itself -- an issue which goes to the 'making' of the agreement to arbitrate -- the federal court may proceed to adjudicate it. But the statutory language [of the FAA] does not permit the federal court to consider claims of fraud in the inducement of the contract generally." 388 U.S. 395, 404 (1967).

Both the U.S. District Court for the District of Columbia and the District of Columbia Court of Appeals have adopted the Supreme Court's approach to fraud in the inducement claims as they relate to the question of arbitrability. See Smith Wilson Co. v. Trading and Development Establishment, 744 F. Supp. 14, 17 (D.D.C. 1990) (Richey, J.) ("It is well established that the dispute must be arbitrated when a party raises fraud in the inducement of the contract generally whereas when the 'claim is fraud in the inducement of the *arbitration clause itself* – an issue which goes to the 'making' of the agreement to arbitrate – the federal court may proceed to adjudicate it'" (emphasis in original) (quoting Prima Paint Corp., 388 U.S. at 403-404)); Haynes v. Kuder, 591 A.2d 1286, 1290 (D.C. 1991) (stating that "a claim of fraudulent inducement of the arbitration clause of a contract effectively 'denies the existence of the agreement to arbitrate,' and so is resolved by the court" and adding in the accompanying footnote that "[i]n contrast, an attack based on fraud in the making of the entire contract may be resolved by the arbitrator").

Both Dr. Tio's argument in his Opposition and Count Seven of the Complaint contend that he was fraudulently induced to enter into the entire Agreement. Nowhere in the Twelve Count, 29 page Complaint does Plaintiff suggest that he was fraudulently induced to enter the arbitration clause. He does not argue that he was fraudulently induced to specifically enter the

9

arbitration clause. Based on the well-established case law, his fraudulent inducement allegation is a matter for the arbitrator to resolve and is entirely ineffective in avoiding arbitration.[1]

### 3.    The Employment Agreement Is Not Unconscionable

Dr. Tio's suggestion that an employment agreement negotiated between a well-educated physician and a Hospital is an unconscionable contract of adhesion, borders on the very edge of frivolity. This is especially true when the Court considers that Dr. Tio states in his Opposition that he was "enticed away" by the very contract he is now arguing is unconscionable. Opposition at 3. Dr. Tio contends that the "arbitration clause was unenforceable as a provision of an 'unconscionable contract of adhesion,' imposed on one party by the other." Opposition at 11. Dr. Tio argues that because the arbitration language was a standard form clause that "was not voluntarily bargained for," enforcement of the clause should be denied. Id. But, Dr. Tio's Agreement was not one of adhesion and even if it were, its terms are not unconscionable so as to render the Agreement unenforceable.

Under well-established law, the fact that a contract may be one of adhesion merely renders it subject to judicial scrutiny for unconscionability. See Riggs National Bank v. District of Columbia, 581 A.2d 1229, 1251 (D.C. 1990). The D.C. Circuit has held that "to describe a contract as adhesive in character is not to indicate its legal effect . . . [A] contract of adhesion is fully enforceable according to its terms unless certain other factors are present which, under established legal rules – legislative or judicial – operate to render it otherwise." Smith, Bucklin & Assoc., Inc. v. Sonntag, 83 F.3d 476, 480 (D.C. Cir. 1996) (citations omitted). Thus, in order

---

[1]    Dr. Tio claims that "Court [sic] must determine" [the issue of a plaintiff's fraud in the inducement claim] upon evidentiary [sic] hearing and not upon affidavits, and cites to Hayes & Thompson v. Lee 589 A.2d 406 (D.C. 1991) as supporting this claim. Hayes & Thompson does not support this argument at all. The court in Hayes & Thompson was hearing an appeal of a denial of a motion to confirm an arbitration award. The court, in fact, noted that "Courts often refuse to reach the merits of the claims of fraudulent inducement and require that those issues be resolved by the arbitrator when the arbitration clause has a broad scope and the clause itself is not a product of fraud." Id. at 411.

to be relieved of the obligations of a contract, a plaintiff must demonstrate that the contract is not only one of adhesion, but that it is also unconscionable. "To establish unconscionability, however, the [plaintiff] must prove not only that one of the parties lacked a meaningful choice but also that the terms of the contract are unreasonably favorable to the other party." Id. (quoting Riggs, 581 A.2d at 1251). Thus, even if the contract is one of adhesion, "the court must still decide whether the contract is unconscionable." Id. Dr. Tio has utterly failed in both respects. He was not deprived of a meaningful choice, nor are the terms of the Agreement unconscionable.

Recently, in Booker v. Robert Half Int'l, Inc., 2004 U.S. Dist. LEXIS 7242 (D.D.C. April 28, 2004) (Bates, J.), this Court refused to hold that the plaintiff was deprived of a meaningful choice when he had a fair opportunity to understand the terms of his Employment Agreement and was not compelled to sign the agreement out of fear of unemployment. In Booker, the plaintiff sued his former employer for unlawful constructive discharge on the basis of race. The employer moved to dismiss and compel arbitration based on the arbitration clause in the plaintiff's employment agreement. The plaintiff challenged the enforceability of the arbitration clause, arguing among other grounds, that enforcement of the clause would be unconscionable. This Court held that this argument "fared no better" than his other "unpersuasive" arguments. Id at *21.

Specifically, this Court held that when examining whether a contract is unconscionable, "the court must determine whether one party lacked a meaningful choice and the contract terms were unreasonably favorable to the other party." Id. (citations omitted). This Court stated that "mere inequality in bargaining power, however, is not a sufficient reason to hold that arbitration agreements are never enforceable in the employment context." Id. at *22 (quoting Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 33 (1991)). Given that the plaintiff "had a fair

11

opportunity to understand the terms of the agreement, including the arbitration clause, which were not 'hidden in a maze of fine print,'" the Court concluded that he "had a meaningful choice when he decided to sign the agreement." Id. In further support of this Court's conclusion that the plaintiff had a meaningful choice, the Court added that "there was no evidence that plaintiff was compelled to sign the agreement out of a fear of unemployment if he decided not to." Id.

Similarly, in Brown v. Dorsey & Whitney, 267 F. Supp. 2d at 74, the plaintiff sued her employer for race discrimination. The employer sought to compel arbitration based on the arbitration clause contained in her employment agreement. Like the plaintiff in Booker and Dr. Tio, the plaintiff in Brown argued that the employment agreement was unconscionable and therefore unenforceable. In rejecting her argument, this Court noted that the plaintiff "was employed and voluntarily chose to leave her employment for what plaintiff presumably believed was a better opportunity for her." Id. This Court added that this was not "a case where the plaintiff was compelled to sign the Employment Agreement because she feared being unemployed if she failed to do so." Id. In addition, this Court concluded that the plaintiff was "given the 'opportunity to understand the terms of the contract'" (citation omitted). Id. In both Brown and Booker, this Court held that the opportunity to review and understand the terms of the agreement, coupled with the absence of the threat of unemployment, refuted the plaintiffs' arguments that they were parties to a contract of adhesion or deprived of a meaningful choice.

Similarly, in the instant case, Dr. Tio had ample time to read and understand the provisions of the contract. Not only did Dr. Tio read and understand the terms, he even questioned and negotiated for different and/or additional terms. Dr. Tio submitted to the Hospital a document entitled "First Addendum to Agreement of Employment" (attached to Opposition as Exhibit 10) that set forth the changes Dr. Tio wanted made to the Employment

12

Agreement. As demonstrated by the Hospital's letter responding to Dr. Tio's concerns (attached to Plaintiffs' Opposition as Exhibit 11), the Hospital replied by sending Dr. Tio a "revised agreement." Opposition Exhibit 11. Dr. Tio cannot now be heard to argue that the Agreement was forced upon him when he was given a revised agreement that "includes a number of the items" [Dr. Tio] raised in his "First Addendum." Opposition Exhibit 11. The fact that he was not able to negotiate all of the terms that he would have liked does not render the Agreement one of adhesion or an unconscionable agreement. Moreover, Dr. Tio was not presented with the choice of signing the contract or facing unemployment. Rather, he claims he was being "enticed away by the WHC." Opposition at 3. Had he not signed the Agreement with the Hospital, Dr. Tio could have remained at Georgetown University Medical Center.

Even if the Court determines that Dr. Tio was deprived of a meaningful choice, which he was not, he nonetheless has not demonstrated that the Agreement, and more specifically, the arbitration clause, is unconscionable. As the Court stated in Smith, Bucklin, & Assoc., "[a]ssuming *arguendo* that the covenant is a contract of adhesion, the court must still decide whether the contract is unconscionable." 83 F.3d at 480. To be unconscionable, the plaintiff must demonstrate that the terms "are so unreasonably favorable to the defendant that the Court must find the Employment Agreement as a whole unconscionable." Brown, 267 F. Supp. 2d at 75. Plaintiff has not pointed to a single term in the entire Agreement that "so unreasonably favors" the Hospital so as to render the Agreement unconscionable.[2] See e.g., Brown, 267 F. Supp. 2d at 75; Booker, 2004 U.S. Dist. LEXIS at *23. Moreover, "courts have firmly rejected

---

[2]    To the extent the Court considers whether the fee-splitting provision of the arbitration clause could render the clause unenforceable, the Hospital submits that the clause is severable pursuant to the Severability Clause of the Employment Agreement. See Employment Agreement at ¶ 11; Brown, 267 F. Supp. 2d at 77 (stating that the plaintiff had "not advanced any argument regarding why [the severability] clause should not be enforceable" to sever any invalid provision of the arbitration clause); Booker, 2004 U.S. Dist. LEXIS at *34-35 (applying the severability clause of the employment agreement to sever an unenforceable punitive damages ban contained in the arbitration clause).

13


blanket presumptions by plaintiffs that arbitration is per se disadvantageous." <u>Brown,</u> 267 F. Supp. 2d at 76.

Dr. Tio was not denied a meaningful choice in whether or not to sign the Employment Agreement. In addition, the terms of the Agreement are not so unreasonably in favor of the Hospital so as to render the Agreement unconscionable. The Agreement and the arbitration clause are, therefore, enforceable.

> ### 4. There Was No Failure Of Mutuality Or Consideration In The Formation Of The Employment Agreement

Plaintiffs' last discernable argument challenging the enforceability of the Agreement and the arbitration clause falls under the subheading "No mutuality and no consideration exists as to plaintiffs under the contract and the provision for arbitration." Opposition at 12. Plaintiffs' actual argument, however, appears to be that Mrs. Tio, a non-party to the Agreement, cannot be bound by its terms. The Hospital can only assume that this argument is the "mutuality argument." In terms of the "consideration" argument, Plaintiff appears to suggest that the Hospital's failure to share with Dr. Tio "such addition income from his patient referrals . . . or to adjust his income as promised under a future incentive compensation formula [sic]" after the Hospital apparently shared in income generated by Dr. Tio from "outside" sources, "constitute a failure of consideration as called for under the terms of compensation under the contract sufficient to void the Agreement and the arbitration clause [sic]" <u>Id.</u> at 13.

Dr. Tio's consideration argument is utterly meritless. Plaintiff entered into an agreement in which he offered his professional services in exchange for annual compensation of two hundred twenty-five thousand dollars ($225,000.00), plus fringe benefits. <u>See</u> Employment Agreement at 2. Thus there was consideration. Plaintiff certainly received compensation as he states in his Complaint, "[t]he average monthly salary for Plaintiff Dr. Tio as of April 18, 2003

14

[was] $19,315.00." Complaint ¶ 35. The fact that Dr. Tio may be displeased with the amount, or feel that he is owed more, does not constitute a lack of consideration that can void the Agreement.

Similarly, Plaintiffs' argument that Mrs. Tio cannot be bound by the terms of the Agreement fails to alter the arbitrability of the Complaint. All of Mrs. Tio's claims are derivative of her husband's action for wrongful termination. As Plaintiffs admit in their Opposition, "[t]he defendants had reason to know, or were acting in careless disregard of the fact, that a wrongful termination action against plaintiff Dr. Tio would have negative consequences for his family, including a working spouse whose career might be separately impacted and create distinct actionable claims [sic]." Opposition at 2. All of Mrs. Tio's claims, therefore, are entirely dependant on, and in fact, cannot survive without, a finding that Dr. Tio's termination was wrongful.

If the Hospital is exonerated and either this Court or the arbitrator determines that Dr. Tio's termination was legitimate and not wrongful, then Mrs. Tio has no cause of action. All of her claims require a finding that the Hospital acted negligently in some way in its treatment of her husband. When the spouse's claims cannot survive independently from the primary claims, just as Mrs. Tio's claims cannot survive independent of Dr. Tio's, it is proper for this Court to dismiss her claims along with her husband's and compel them to arbitrate the claims together. See Evans v. Visual Technology, Inc., 953 F. Supp. 453, 460 n.9 (N.D.N.Y. 1997). Plaintiff's admission that Ms. Tio's claims are dependent on Dr. Tio's is fatal to their attempts to avoid arbitration.

15



**C.    Public Interest Is Served By Arbitrating Plaintiffs' Claims**

Finally, Plaintiffs argue that their claims "are matters affecting the greater public interests," and, therefore, should not be arbitrated. Opposition at 19. Specifically, they claim that the District of Columbia's strong public policy against discrimination, the public's interest in the safe and effective operation of hospitals, and the public's demand for the enforcement of antitrust laws require that their claims be heard in this Court rather than by an arbitrator. Id. at 19-20. This argument is entirely unsupportable, especially in light of strong policy in favor of arbitration, including the arbitration of discrimination and antitrust claims.

Courts repeatedly have held that public policy favors arbitration, especially in employment discrimination cases. While Plaintiffs argue that public policy is against discrimination, they have offered no reason why this policy cannot be fully addressed in arbitration. Arbitration does not prevent claims of discrimination from being resolved. More importantly, this Court has recognized that public policy favors arbitration of employment discrimination disputes. See Nelson, 215 F. Supp. 2d at 149 (acknowledging the "strong public policy favoring arbitration" in directing arbitration of the plaintiff's employment discrimination claim). Moreover, the Supreme Court held that "by agreeing to arbitrate a statutory claim, a party does not forgo the substantive rights afforded by the statute; it only submits to their resolution in an arbitral, rather than judicial, forum." Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26 (1991) (quoting Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc., 473 U.S. 614, 628 (1985)). Submitting these claims to arbitration in no way violates public policy against discrimination.

Similarly, arbitration would not deny the public highly skilled, professional medical care. Plaintiff argues that the public desires and deserves highly skilled professional medical care.

This argument, however, has no bearing on whether the claims should be arbitrated. As this Court has emphasized, public policy favors arbitration and "any doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." Nur v. K.F.C., USA, Inc., 142 F. Supp. 2d 48, 50 (D.D.C. 2001) (quoting Moses H. Cone Mem'l Hosp. V. Mercury Constr. Corp., 460 U.S. 1, 24-25 (1983)). In fact, the Supreme Court has acknowledged the economic benefits that arbitration has over judicial review, especially in cases of employment litigation: "arbitration agreements allow parties to avoid costs of litigation, a benefit that may be of particular importance in employment litigation, which often involves smaller sums of money than disputes concerning commercial contracts." Circuit City Stores, Inc. v. Adams, 532 U.S. 105, 123 (2001). Rather than frustrate public policy, submitting these claims to arbitration would further public policy by resolving a discrimination dispute and by promoting alternative forms of dispute resolution with less economic strain on the parties involved.

The public's interest in enforcing antitrust laws is also met by arbitrating Plaintiffs' claims. The Supreme Court has specifically held that antitrust claims are properly subject to arbitration. In Mitsubishi Motors, the Supreme Court stated that "where the parties have agreed that the arbitral body is to decide a defined set of claims which includes, as in these cases, those arising from the application of American antitrust law, the tribunal therefore should be bound to decide that dispute in accord with the national law giving rise to the claim." 473 U.S. at 636-37 (1985). Thus, in response to Plaintiffs' argument that antitrust laws must be enforced to ensure a reasonable cost for medical procedures and treatments, the Supreme Court has responded that arbitration is a perfectly acceptable forum for achieving this. Arbitration does not prohibit the enforcement of antitrust laws, but rather provides a forum for enforcing them.

17

There is no doubt that the District of Columbia has a strong policy against discrimination, that the public deserves highly skilled health care professionals, or that antitrust laws must be enforced to keep medical costs reasonable. More importantly, there is no dispute among the courts that these concerns are properly addressed through arbitration. Plaintiffs' claims should, therefore, be dismissed and submitted to arbitration in furtherance of the public policy favoring arbitration and disfavoring discrimination, unsafe hospitals, and antitrust violations.

## III.

## CONCLUSION

Dr. Tio entered into a binding and enforceable Employment Agreement containing an arbitration clause. This arbitration clause encompasses all of his claims. Pursuant to the FAA, those claims should be dismissed and Dr. Tio should be compelled to submit them to arbitration as per the terms of his Employment Agreement. Since all of Mrs. Tio's claims are dependent on the outcome of her husband's claims, they, too, should be dismissed and arbitrated along with her husband's claims.

Respectfully submitted,

Dated:  June 21, 2004

_____/s/_____
Keith J. Harrison (D.C. Bar # 416755)
KING, PAGANO & HARRISON
1730 Pennsylvania Ave, N.W., Suite 900
Washington, DC 20006
(202) 371-6800
(202) 371-6770 (fax)

Counsel for Defendants

18



## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 21st day of June 2004, I caused a

copy of the foregoing DEFENDANTS' REPLY IN SUPPORT OF THEIR MOTION TO

DISMISS AND COMPEL ARBITRATION to be delivered via first class mail, postage pre-paid,

to the following individual:

> Anthony M. Rachal, III
> Edmonds Bldg
> 903 D Street, NE
> Suite 200
> Washington, D.C. 20002
>
>
> Counsel for Plaintiff

<br>

> _____/s/_____
> Daniel M. Creekman

FILE COPY

19

# Exhibit D

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

THIAN LOK TIO, M.D. *et al.*,          :
                                       :
          Plaintiffs,          :          Civil Action No.:          04-0701 (RMU)
                                       :
          v.          :          Document No.:          3
                                       :
WASHINGTON HOSPITAL CENTER *et al.*, :
                                       :
          Defendants.          :

## MEMORANDUM OPINION

### GRANTING THE DEFENDANTS' MOTION TO DISMISS

## I. INTRODUCTION

This matter comes before the court on the defendants' motion to dismiss and compel arbitration. The defendants argue that the plaintiffs must submit their claims to binding arbitration pursuant to the terms of the employment agreement the plaintiff signed with defendants. Because the parties entered into a valid and enforceable arbitration agreement that encompasses the claims brought in the plaintiffs' complaint, the court grants the defendants' motion to dismiss.

## II. BACKGROUND

### A. Factual History

Plaintiff Thian Lok Tio, M.D. ("Dr. Tio") is a former employee of Washington Hospital Center, *et al.* (collectively, "the Hospital") who once held the position of Director of Endoscopy in the Section of Gastroenterology. Compl. ¶ 3. The employment relationship commenced on

1

November 30, 2000, when Dr. Tio executed a written employment contract ("Agreement")

Compl. Ex. 1. This Agreement set forth the terms and renewal of Dr. Tio's annual employment.

Compl. ¶ 16. Paragraph 5 of the Agreement, titled "Term and Termination," indicated that the

contract was renewable from year to year and stated that "[e]ither party shall have the right at any

time to terminate this Agreement without cause by providing at least ninety (90) days prior

written notice to the other party of intention to terminate." Compl. Ex. 1, ¶ 5. Paragraph 12 of

the Agreement, titled "Dispute Resolution," stated that "[a]ny controversy, dispute or

disagreement arising out of or relating to this Agreement, or the breach thereof, shall be settled

by binding arbitration." Compl. Ex. 1, ¶ 12. On April 18, 2003, the Hospital terminated Dr. Tio

with cause, effective immediately, by way of a "Notice of Termination with Cause" letter.

Compl. Ex. 3.

### B. Procedural History

On March 17, 2004, Dr. Tio and his wife, Ting Soan Tio ("Mrs. Tio"), filed suit against

the Hospital in D.C. Superior Court, alleging: (1) tortious breach of contract; (2) tortious

interference with contract of employment; (3) denial of common-law good faith and fair dealing;

(4) tortious interference with third-party physician-patient contracts; (5) defamation/slander; (6)

intentional infliction of emotional distress; (7) fraud/misrepresentation; (8) antitrust violations;

(9) wrongful discrimination under state and federal law; and (10) loss of consortium. Compl. ¶¶

16-106.

On April 28, 2004, the Hospital removed the action to this court on the grounds that the

complaint included a claim for relief under the Federal Civil Rights Act of 1866, 42 U.S.C. §

1981, a federal statute arising under the laws of the United States. Def.'s Mot. for Removal, ¶¶ 3-

2

4 (citing 28 U.S.C. § 1441).

Finally, on May 5, 2004, the defendants moved to dismiss the complaint and compel the plaintiffs to pursue arbitration in accordance with the terms of Dr. Tio's Employment Agreement and the Federal Arbitration Act. The court now turns to that motion.

## III. ANALYSIS

### A. Legal Standard for Motion to Dismiss and Compel Arbitration

The Federal Arbitration Act ("FAA") provides that "a written provision in . . . a contract to settle by arbitration a controversy thereafter arising out of such contract . . . shall be valid, irrevocable, and enforceable save upon any grounds as exist at law or in equity for the revocation of any contract." 9 U.S.C. § 2. The FAA creates a strong presumption in favor of enforcing arbitration agreements and "[a]ny doubts concerning the scope of arbitrable issues should be resolved in favor of arbitration." *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220, 226-27 (1987) (stating that arbitration agreements must be rigorously enforced); *Moses H. Cone Mem'l Hosp. v. Mercury Constr. Corp.*, 460 U.S. 1, 24-25 (1983) (noting that federal policy favors arbitration). Nevertheless, parties cannot be forced into arbitration unless they have agreed to do so. *AT&T Techs. Inc. v. Communications Workers*, 475 U.S. 643, 648-49 (1986). Moreover, the authority of arbitrators to resolve disputes is derived from the agreement of parties to engage in arbitration. *Equal Employment Opportunity Comm'n v. Waffle House, Inc.*, 534 U.S. 279, 294 (2002). Because arbitration provisions are in essence a matter of contract between the parties, it is for the courts to decide whether the parties are bound by a given arbitration clause. *Howsam v. Dean Witter Reynolds, Inc.*, 537 U.S. 79, 84 (2002) (holding that "a gateway

3

dispute about whether the parties are bound by a given arbitration clause raises a question of arbitrability for a court to decide") (internal quotation omitted).

Such questions of arbitrability are typically brought before the court pursuant to section 4 of the FAA, which permits a party to petition any United States district court which would otherwise have subject matter jurisdiction "for an order directing that such arbitration proceed in the manner provided for in such agreement." 9 U.S.C. § 4. When presented with a motion to compel arbitration, a district court must "determine the enforceability of the agreement [to arbitrate] and decide whether arbitration should be compelled." *Nelson v. Insignia/ESG, Inc.*, 215 F. Supp. 2d 143, 146 (D.D.C. 2002). It is well-settled law that to make such a determination, courts must engage in a two-part inquiry. *Id.* at 149-50. First, the court must decide whether the parties entered into a valid and enforceable arbitration agreement. *Nur v. K.F.C. USA, Inc.*, 142 F. Supp. 2d 48, 50-51 (D.D.C. 2001). If the court finds that the parties did enter a valid arbitration agreement, the second step is to determine whether the arbitration agreement encompasses the claims raised in the complaint. *Id.*

If the party opposing arbitration contends that no agreement to arbitrate was entered, this effectively raises the issue of whether there was a meeting of the minds on the agreement to arbitrate, and the standards for resolving a summary judgment motion pursuant to Federal Rule of Civil Procedure 56 should be applied. *Booker v. Robert Half Int'l, Inc.*, 315 F. Supp. 2d 94, 99 (D.D.C. 2004). Hence, "the proper approach to employ in reviewing the defendant's motion to dismiss and compel arbitration is to apply the same standard of review that governs Rule 56 motions." *Brown v. Dorsey & Whitney, LLP*, 267 F. Supp. 2d 61, 67 (D.D.C. 2003).

4

### B. Legal Standard for Motion for Summary Judgment

Summary judgment is appropriate when the pleadings and the evidence demonstrate that "there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." FED. R. CIV. P. 56(c); *see also Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Diamond v. Atwood*, 43 F.3d 1538, 1540 (D.C. Cir. 1995). To determine which facts are "material," a court must look to the substantive law on which each claim rests. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A "genuine issue" is one whose resolution could establish an element of a claim or defense and, therefore, affect the outcome of the action. *Celotex*, 477 U.S. at 322; *Anderson*, 477 U.S. at 248.

In ruling on a motion for summary judgment, the court must draw all justifiable inferences in the nonmoving party's favor and accept the nonmoving party's evidence as true. *Anderson*, 477 U.S. at 255. A nonmoving party, however, must establish more than "the mere existence of a scintilla of evidence" in support of its position. *Id.* at 252. To prevail on a motion for summary judgment, the moving party must show that the nonmoving party "fail[ed] to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322. By pointing to the absence of evidence proffered by the nonmoving party, a moving party may succeed on summary judgment. *Id.*

In addition, the nonmoving party may not rely solely on allegations or conclusory statements. *Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999); *Harding v. Gray*, 9 F.3d 150, 154 (D.C. Cir. 1993). Rather, the nonmoving party must present specific facts that would enable a reasonable jury to find in its favor. *Greene*, 164 F.3d at 675. If the evidence "is merely

5

colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477

U.S. at 249-50 (internal citations omitted).

### C. Agreement to Arbitrate is Valid and Should Be Enforced

The court concludes that Dr. Tio entered into a valid and enforceable agreement with the

Hospital. The Supreme Court has held that the coverage of the FAA extends to employment

contracts. *Circuit City Stores, Inc. v. Adams*, 532 U.S. 105, 119 (2001). The evidence shows

that the plaintiff entered into and signed an Employment Agreement with the Hospital that

included a requirement that all disputes arising out of or relating to the Agreement be arbitrated.

Compl. Ex. 1, ¶ 12. Furthermore, it is basic law that "[o]ne who signs a contract which he had an

opportunity to read and understand is bound by its provisions." *Paterson v. Reeves*, 304 F.2d

950, 951 (D.C. Cir. 1962).

Nevertheless, the plaintiff challenges the enforceability of the Agreement on the grounds

that (1) there was no mutuality or meeting of the minds, (2) the agreement is an unconscionable

contract of adhesion, (3) there was no consideration, and (4) there was fraud in the inducement of

the agreement. Pl.'s Opp'n to Mot. to Dismiss ("Pl.'s Opp'n"). The court determines each of

these arguments to be equally unavailing.

First, it is clear that "a signature on a contract indicates 'mutuality of assent' and a party is

bound by the contract unless he or she can show special circumstances relieving him or her of

such an obligation." *Emeronye v. CACI Int'l, Inc.*, 141 F. Supp. 2d 82, 86 (D.D.C. 2001); *Davis

v. Winfield*, 664 A.2d 836, 838 (D.C. 1995) (stating that "[m]utual assent to a contract, often

referred to as a 'meeting of the minds,' is most clearly evidenced by the terms of a signed written

agreement"). No such special circumstances are evidenced or adduced by the plaintiffs in this

6

action. All of Dr. Tio's arguments regarding his perceived lack of mutual assent relate to his

*subsequent* dissatisfaction with the Hospital's apparent failure to honor "future revenue

participation in all his professional and client referred income." Pl.'s Opp'n at 10. But it is basic

contract law that in giving effect to the mutual intent of the parties, a court is to assume that the

language of a contract reflects the intentions of the parties. *NRM Corp. v. Hercules, Inc.*, 758

F.2d 676, 681-82 (D.C. Cir. 1985). As for the parties' meeting of the minds at the time the

contract was made, the plaintiff simply relies on his own bare assertion that there was no meeting

of the minds. Pl.'s Opp'n at 9. However, a plaintiff cannot solely rely on this conclusory

statement to defeat the defendant's argument. *Greene*, 164 F.3d at 625. Thus, the court

concludes that the plaintiff's signature on the contract indicates mutuality of assent.

The court is not persuaded by Dr. Tio's alternative claim that the arbitration clause is

unenforceable as a provision of an unconscionable contract of adhesion imposed on one party by

the other. Pl.'s Opp'n at p.11. To establish unconscionability, the plaintiff must prove both that

he lacked a meaningful choice and that the terms of the contract were unreasonably favorable to

the other party. *Smith, Bucklin & Assoc., Inc. v. Sonntag*, 83 F.3d 476, 480 (D.C. Cir. 1996). Dr.

Tio has proven neither in this case.

Courts refuse to hold that a plaintiff has been deprived of a meaningful choice where the

plaintiff had a fair opportunity to understand the terms of his Employment Agreement and was

not compelled to sign the agreement out of fear of unemployment. *Booker*, 315 F. Supp. 2d at

102; *Nur*, 142 F. Supp. 2d at 51. Here, it is manifest that Dr. Tio had ample opportunity to go

over the terms of the Agreement. Not only did Dr. Tio read and understand the terms, he even

negotiated for additional and/or different terms himself. Pl.'s Opp'n Ex. 10. As demonstrated in

7

a letter from the Hospital to Dr. Tio, the Hospital responded to Dr. Tio's concerns by sending him a "revised agreement." Pl.'s Opp'n Ex. 11. The fact that the plaintiff actually negotiated terms himself, and had the Hospital modify terms, shows that the plaintiff had a fair opportunity to understand the terms of his Employment Agreement.

Moreover, the fact that the plaintiff is a well-educated professional with an international reputation in the specialized field of gastroenterological medicine further supports the conclusion that he should be bound by the terms of the Agreement. "Courts have often taken the education and background of the employee into account in determining whether the employee should be bound by an arbitration agreement." *Brown*, 267 F. Supp. 2d at 82-83; *see, e.g., Emeronye*, 141 F. Supp. 2d at 86 n.5 (stating that "the fact that the plaintiff had a legal education and two law degrees supports that the plaintiff should be bound by the terms of the contract she signed"); *Gilmer v. Interstate/Johnson Lane Corp.*, 500 U.S. 20, 33 (1991) (noting there was "no indication in this case . . . that Gilmer, an experienced businessman, was coerced or defrauded into agreeing to the arbitration clause in his registration application"). Similarly, Dr. Tio's education and experience demonstrate that he was fully aware of the implications of signing the Agreement with the Hospital. The fact that Dr. Tio was able to negotiate for a revised agreement is further proof of his competence. Pl.'s Opp'n, Ex. 11.

Given that the plaintiff here had a fair opportunity to understand the terms of the agreement, including the arbitration clause, the Court concludes that he had a meaningful choice when he decided to sign the agreement. Moreover, the court notes that this is not a case where the plaintiff was compelled to sign the agreement out of a fear of being unemployed if he failed to do so. *Brown*, 267 F. Supp. 2d at 74. It is clear from the plaintiff's own allegations that had he

8

not signed the Agreement with the Hospital, Dr. Tio could have remained at Georgetown

University Medical Center.  Compl. ¶ 83.

Dr. Tio has adduced no evidence whatsoever that the terms of the agreement "are so

unreasonably favorable to the defendant that the Court must find the Employment Agreement as

a whole unconscionable." *Brown*, 267 F. Supp. 2d at 75.  Dr. Tio was to be compensated at an

annual salary of $225,000.00, plus fringe benefits, in exchange for his professional services.

Compl. Ex. 1 at 2.  Nothing in the Agreement indicates anything other than reasonable and fair

contract of employment between Dr. Tio and the Hospital.

As stated above, Dr. Tio was compensated at an annual rate of $225,000.00 for his

services.  *Id.*  Despite Dr. Tio's apparent dissatisfaction with the Hospital's alleged failure to

compensate him for patient referrals, Pl.'s Opp'n at 12, the court does not consider any such

allegations as sufficient to render the contract unconscionable.  The seminal line of cases

regarding unconscionable contract claims, starting with *Williams v. Walker-Thomas Furniture

Co.*, 350 F.2d 445 (D.C. Cir. 1965), demonstrate that courts are only willing to find price-value

as an unreasonable contract term where the pricing is so gross, excessive or exploitative as to

render the contract terms unconscionable and the contracts unenforceable.  *See, e.g., Patterson v.

Walker-Thomas Furniture Co.*, 277 A.2d 111, 114 (D.C. 1971) (concluding that in a proper case

gross overpricing may be raised in defense as an element of unconscionability).  However, the

facts of the instant case hardly rise to level of exploitative, as evidenced by the fact that the

plaintiff has not even attempted to provide evidence that an annual salary of $225,000.00 is akin

to gross under-pricing of his services.

Finally, the plaintiff's assertion that he was fraudulently induced into entering the entire

9

Agreement carries no weight. Only if the plaintiff were alleging fraudulent inducement of the specific arbitration clause would this have any bearing on the court's power to hear this dispute. It is well established that "if the claim is fraud in the inducement of the arbitration clause itself – an issue which goes to the 'making' of the agreement to arbitrate – the federal court may proceed to adjudicate it." *Prima Paint Corp. v. Flood & Conklin Mfg. Co.*, 388 U.S. 395, 403-04 (1967). However, when a party raises fraud in the inducement of the contract generally, this is a matter for arbitration. *Id.*

Here, the plaintiff alleges that he was "fraudulently induce [sic] to leave the employment of Georgetown University Medical Center" and "to refer his patients to Defendant WHC based upon false promises, statements and misrepresentations by Defendants on behalf of the WHC upon which the plaintiff relied to his detriment." Compl. ¶¶ 83-84. Dr. Tio also argues that "[t]he fraudulent promise of future revenue participation in all his professional and client referred income generated for the hospital was never honored and the allegation of similar treatment of all physicians were misrepresentations upon which plaintiff was induced to rely to sign the contract and to accept the arbitration clause to his detriment [sic]." Pl.'s Opp'n at 10. Both of these arguments suggest that Dr. Tio was fraudulently induced to enter into the entire Agreement. Significantly, nowhere in his Complaint does Dr. Tio argue that he was fraudulently induced to specifically enter into the arbitration clause. Def.'s Reply at 9-10. Thus, his argument regarding fraudulent inducement is ultimately without merit. In sum, the court concludes that the Employment Agreement entered into by the parties is valid and should be enforced.

### D. The Arbitration Agreement Encompasses the Claims in the Complaint

Next, the court must determine whether the Agreement to Arbitrate encompasses the

claims Dr. Tio raises in his Complaint. *AT&T Techs.*, 475 U.S. at 648-49. Here, the Agreement requires that "any controversy, dispute or disagreement arising out of or relating to this Agreement, or breach thereof, shall be settled by binding arbitration." Compl. Ex. 1 ¶ 12. The Supreme Court has held that the "language 'arising out of or relating to' the underlying contract or agreement" should be interpreted broadly. *Mitsubishi Motors Corp. v. Soler Chrysler-Plymouth, Inc.*, 473 U.S. 614, 624 n.13 (1985); *Prima Paint*, 388 U.S. at 406. The Court concludes that the arbitration provision contained in the Agreement between Dr. Tio and the Hospital is broad enough to encompass each claim in the plaintiffs' complaint, including those brought by Dr. Tio for defamation and slander.

Dr. Tio argues that the defamation and slander was "committed after the contract was terminated" and thus is not arbitrable because "the contract and the provision for arbitration was never intended to cover actions after the contract is revoked or breached by either party." Pl.'s Opp'n at p. 8. However, Dr. Tio's defamation claim is based on his allegation that the Hospital "falsely and maliciously composed and published in a conspicuous place . . . its letter of termination." Compl. at ¶ 63. Since the alleged defamation is based entirely on Dr. Tio's termination letter, the court concludes that Dr. Tio's defamation claim falls within the scope of the arbitration clause of the employment contract. *Pearce v. E.F. Hutton Group, Inc.*, 828 F.2d 826, 832-33 (D.C. Cir. 1987) (enforcing an arbitration agreement over claims of defamation).

Dr. Tio nonetheless submits that he is exempt from the provisions of the FAA under section 1 of the Act because he is within the "class of workers engaged in foreign or interstate commerce." Pl.'s Opp'n at 15-17. However, this argument has been squarely rejected by the Supreme Court, which held in *Circuit City* that the exemption only applies to "transportation

11

workers." *Circuit City*, 532 U.S. at 109. Numerous other courts have also examined the exemption in question, and all have found that section 1 of the FAA "exempts only the employment contracts of workers actually engaged in the movement of goods in interstate commerce." *Cole v. Burns Int'l Security Serv.*, 105 F.3d 1465, 1471 (D.C. Cir. 1997) (citing cases from the First, Second, Third, Fifth, Sixth and Seventh Circuits).

The court also determines that Mrs. Tio's claims are entirely derivative of and dependent on Dr. Tio's claims, and should accordingly be arbitrated along with Dr. Tio's claims. Mrs. Tio is seeking damages "as a direct and proximate result of her husband's intentional and wrongful termination by Defendants." Compl. ¶ 9. All of Mrs. Tio's claims are derivative of her husband's action for wrongful termination, as each is entirely dependent on and cannot survive without a finding that Dr. Tio's termination was wrongful. *Smith v. Brown & Williamson Tobacco Corp.*, 3 F. Supp. 2d 1473, 1477 n.5 (D.D.C. 1998); *Meek v. Shepard*, 484 A.2d 579, 582 n.6 (D.C. 1984) (dismissing spouse's claim along with the plaintiff's claim because spouse's claim for damages was wholly derivative and dependent on the plaintiff's claim). Thus, the court dismisses Mrs. Tio's claims along with her husband's and compels them to arbitrate the claims together.

Finally the Court finds equally meritless the plaintiff's assertion that the Hospital has somehow waived its arbitration rights because it did not seek arbitration before it terminated Dr. Tio. Pl.'s Opp'n at 19. Nowhere in the Agreement does it say that the Hospital must seek arbitration before it may exercise its right to terminate the Dr. Tio. In fact, the Agreement itself gives both parties the right "to terminate the Agreement" without cause. Compl. Ex. 1, ¶ 5. Since the Hospital has acted consistently within its arbitration right, the court finds that the Hospital has not waived any right to compel arbitration.

12

## IV. CONCLUSION

For the foregoing reasons, the court grants the defendants' motion to dismiss. An order consistent with this Memorandum Opinion is separately and contemporaneously issued this 5th day of November, 2004.

RICARDO M. URBINA
United States District Judge

13

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| THIAN LOK TIO, M.D. *et al.*, | : | | |
| | : | | |
| Plaintiffs, | : | Civil Action No.: | 04-0701 (RMU) |
| | : | | |
| WASHINGTON HOSPITAL CENTER | : | Document No.: | 3 |
| *et al.*, | : | | |
| | : | | |
| Defendants. | : | | |

## ORDER

For the reasons stated in the accompanying Memorandum Opinion, it is this 5th day of

November, 2004,

**ORDERED** that the defendants' motion to dismiss is **GRANTED**; and it is

**FURTHER ORDERED** that the plaintiffs' claims are referred to arbitration under the

arbitration clause of the parties' employment agreement.

**SO ORDERED**.

RICARDO M. URBINA
United States District Judge

# Exhibit E

Thian Lok Tio, M.D.
169 South Detroit Street
Los Angeles  California 90036

Claimant,

And                    JAMS REF. 1410003842

Washington Hospital Center Corporation
T/A Washington Hospital Center
110 Irving Street, N.W.
Washington DC  20010

Respondent.

---

## FINAL AWARD

<u>Counsel</u>

Anthony M. Rachal III                         Trina L Fairley
Law Offices of Anthony M. Rachal III          Keith J. Harrison
Edmonds Building – Capitol Hill               Crowell & Moring
903 D Street, NE                              1001 Pennsylvania Avenue N.W.
Suite 200                                     Washington DC  20004
Washington DC  20002

Counsel for Claimant                          Counsel for Respondent

<u>Arbitrator:</u>

Jerry P. Roscoe, Esq.
JAMS
555 13th Street NW
Suite 400W
Washington DC  20004
(202) 533-2059     (202) 265-9050 (fax)

<u>Place of Arbitration:</u>      Washington DC

<u>Date of Final Award:</u>      January 2, 2008

Final Award
JAMS Matter No 1410003842
January 2, 2008


THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the agreement between the parties dated November 28, 2000, the parties' April 5, 2005, consent to arbitrability of and jurisdiction over all issues alleged herein, the Demand for Arbitration dated December 14, 2004, the court order from the United States District Court for the District of Columbia, Civil Action No. 04-0701 (filed March 17, 2004) referring this matter to arbitration, and having examined the submissions, proof and allegations of the parties, now finds, concludes and issues this Final Award as follows:

## I.    Introduction and Procedural Statement

This action, originally filed in the United States District Court for the District of Columbia, was brought before the arbitrator when a Demand for Arbitration dated December 14, 2004, was filed with JAMS.

All parties participated in a Preliminary Hearing of this matter on April 5, 2005. By consent of the parties, the terms of the scope of discovery, the conduct of discovery, and all schedules related to this matter, were embodied in Scheduling Order No. 1, issued on April 6, 2005.

### Claimants Claims for Relief

During the Preliminary Hearing, the arbitrator narrowed the parties to those who were within the scope of the operable agreement to arbitrate contained in the arbitration clause in the Agreement of Employment between the Washington Hospital Center, a not for profit Delaware corporation, and Thian Lok Tio, M.D., made and executed November 28th 2000. Neither party objected to the elimination of parties who were not parties to the Agreement of Employment.

On January 25, 2007, the arbitrator granted Respondent's Motion for Summary Judgment, in part. As a result, the claims remaining to be heard were Claimant's allegations that Respondent breached his employment contract and illegally terminated his employment on the basis of discrimination. This ruling was reaffirmed on an oral motion for reconsideration at the start of the hearing.

### Discovery Disputes

The parties in this matter were served by counsel who diligently resolved discovery issues, generally without resorting to the Arbitrator. Counsel in this matter are to be recognized for their professional demeanor throughout the arbitration proceeding as well as their effective presentation of a relatively fact intensive employment dispute.

2

Final Award
JAMS Matter No 1410003842
January 2, 2008

The Evidentiary Hearing

The parties mutually agreed to several postponements of the hearing of this matter during
2005 and 2006. Eight days of hearing spanned the period from August 20, 2007 through
October 31, 2007. Post-trial briefs were deemed filed on December 5, 2007. The hearing
was deemed closed on December 14, 2007.

II.     Facts

The Arbitrator finds[1] that the weight of relevant evidence introduced at hearing showed
the following:

At the time relevant to the allegations in this matter, Dr. Thian Lok Tio ("Claimant") was
a physician who enjoyed an international reputation in the specialized field of advanced
endoscopic ultrasound for gastroenterology medicine.

Prior to the events complained of, Claimant was employed as a physician at the
Georgetown University Hospital, located in Washington DC. On December 10, 2000,
Claimant executed an employment agreement ("2000 Agreement") with Respondent
Washington Hospital Center ("Respondent" or "WHC"). Claimant's position as Director
of Endoscopy entailed coordinating operations with the Section Director and the
supervising nurse, supervising operation of the Endoscopy Laboratory as well as its
residents and practicing physicians, and participating in WHC meetings and committee
activities related to operations, policy, quality assurance, and regulatory goals. Claimant
also rendered patient care as a member of the Gastroenterology Section.[2]

Among other things, the 2000 Agreement provided that Claimant's employment could be
terminated without cause.[3]

Claimant began working at WHC on February 1, 2001. For the first year, the
employment relationship appeared to have been mutually successful.[4]

---

[1] The parties' versions of the circumstances related to their mutual allegations were
diametrically opposed. While credibility of witnesses was taken into account by the
Arbitrator, a finding that does not comport with a particular party's testimony should not
necessarily be deemed a finding that the party lacked credibility. All findings were based
upon the cumulative weight of all admissible evidence, including testimony.
[2] Claimant's Job Description as Director of the Endoscopy Laboratory was admitted as
Hearing Exhibit 90.
[3] Claimant's Employment Agreement was admitted as Hearing Exhibit 12.
[4] For example, Claimant's productivity during his first year of employment exceeded
budget expectations.

3

Final Award
JAMS Matter No 1410003842
January 2, 2008

On or about April 23, 2002, Claimant was given notice that his position was to be eliminated. Respondent explained that this was due to a reduction in force that resulted from a loss in hospital revenues, and that Claimant's position was to be eliminated on the basis of a "last in first out" practice. There was evidence presented that Claimant was not the only employee terminated from WHC at that time.

One month later, WHC rescinded its decision and Claimant was informed of his reinstatement. As Claimant never actually stopped working, he suffered no loss of salary or benefits. In June, 2002, the parties negotiated an amendment to Claimant's employment agreement, resulting in an increase of Claimant's base compensation from $225,000 to $237,000.

In addition to a salary increase, Claimant sought an employment agreement that assured greater job security. The evidence reflects Claimant's dismay upon realizing that, despite individual performance that exceeded expectations (at least during the first 12 months of his employment at WHC) he could be terminated without cause. However, the parties did not execute an employment agreement that provided additional guarantees of salary increases or tenure.

At some time in 2001, Claimant initiated an employment application process at the Cedars-Sinai Hospital in California.[5]  Whatever his motivation for seeking outside employment in 2001, Claimant's frustration with the lack of job security precipitated by his termination on April 23, 2002, led him to continue to pursue outside employment opportunities throughout 2002.

In addition to seeking alternative employment, Claimant curtailed his work at WHC. He began to travel extensively, attending conferences, speaking at engagements, and taking international trips and vacations. Claimant's productivity, measured in terms of patient revenues and responsiveness to operational needs, plummeted.

On or about April 23, 2003, WHC was terminated Claimant's employment for cause, citing primarily Claimant's lack of leadership, decreased attention to his duties, and decline in productivity.

### III.   Analysis

Claimant, born in Indonesia and a citizen of Germany, submits that he has established a *prima facie* case of employment discrimination. Claimant is a member of a protected class who suffered an adverse action with respect to his employment. Having established those two prongs of a *prima facie* case, Claimant must still show by a preponderance of

---

[5] In addition to other evidence supporting Claimant's pursuit of employment at Cedars-Sinai, at least one WHC physician received Claimant's request for a letter of reference written on Claimant's behalf during August 2001.

4

Final Award
JAMS Matter No 1410003842
January 2, 2008

the evidence that he was treated differently from others who were not members of a
protected class. Were Claimant to prove such disparate treatment, Respondent would be
obliged to articulate legitimate, non-discriminatory reasons for the adverse action.
Should Claimant then prove Respondent's reason(s) pretext, Claimant would prevail with
a finding of illegal employment discrimination.[6]

Claimant argues that he was treated disparately from other physicians when:

      he was denied administrative leave for a funeral;

      his supervisor did not approve travel and other leave;

      he was cited with radiation safety concerns in his medical unit; and

      when it was alleged that he failed to attain budgetary goals.[7]

In support of Claimant's first allegation, denial of administrative leave for a funeral,
Claimant cited a circumstance where other employees may have been given leave to
attend an employee's funeral. However there was no evidence regarding time records of
other employees, nor was there evidence of time records of Claimant's peers, other
physicians or unit heads, who could have served as comparators to the treatment
Claimant is alleged to have received. Thus, the arbitrator was unable to conclude that
such leave was either given to others in that circumstance, customarily given to others,
afforded to others in Claimant's position, or that it was otherwise wrongfully denied
Claimant.

In support of Claimant's second allegation, WHC's failure to approve travel or other
leave, the evidence shows that, after he received notice of termination in April 2002,
Claimant missed many days of employment and began to travel extensively. Because his
employment agreement required prior approval for travel, Claimant could not argue that
failure to approve was illegal unless it were conducted in a disparate manner, either with
regard to other physicians or relative to an acquiescence to similar travel during
Claimant's first year of employment with WHC. However there is no evidence to
indicate whether Claimant was permitted to travel the same number of hours in his first
year or whether other physicians traveled to the same extent as Claimant during either of
the two years in question. Only one witness testified that he traveled internationally, but
that was not quantified sufficiently so as to permit meaningful comparison to Claimant's
experience.

---

[6] The elements established in *McDonnell Douglas Corp. v. Green*, 411 U.S.792 (1973)
were cited by both parties to this arbitration.
[7] Claimant's allegations summarized in Claimant's Post Hearing Brief, at 17.

5

Final Award
JAMS Matter No 1410003842
January 2, 2008

In support of Claimant's allegations that he was treated differently with regard to radiation safety, Claimant relied upon committee safety notes that specified radiation levels that were neither statistically correlated nor practically related to the radiation safety incidents that were at issue in Claimant's unit. The arbitrator was provided insufficient evidence upon which to base a finding of disparate treatment in this regard.

In support of Claimant's allegations that others were not required to meet budgetary goals, Claimant made little credible effort to explain his lack of patient care, nor did he identify any other physician whose patient care numbers ever sank to the level of Claimant's.[8]  Even though some drop in patient numbers might have been attributable to Claimant's termination in April 2002, rescinded in May 2002, or even patient assignments, one cannot help but correlate Claimant's lack of productivity to his absence from WHC, his extensive travel schedule, and his delayed responses to paperwork needs, including billing and departmental communications.

Claimant did introduce evidence that he had played a significant role in obtaining grants to cover acquisition costs and some operating expense of new equipment. However, Claimant's attempt to bolster his economic contribution to Respondent by equating equipment grants with patient-generated revenue was not supported by the economic analysis provided in this matter. Accordingly, the arbitrator was unable to find disparate treatment regarding productivity or achievement of related budgetary goals.

Other allegations raised at the hearing included disparate treatment regarding equipment repairs, leadership, and meeting attendance. It does appear that Claimant was an excellent practitioner and, indeed, an expert in his field. He was clearly loved by his patients and respected by physician residents. Nonetheless, mere allegations of disparate treatment, without substantial proof, do not provide sufficient basis for an arbitrator to either establish disparate treatment or pretext in Respondent's explanations of its actions. Mere allegation of discrimination, without either direct evidence or even sufficient evidence to warrant an inference of bias, does not equate to a preponderance of the evidence.

Given the findings above, there was insufficient evidence to support a finding of breach of contract by Respondent. The evidence supported a finding that Respondent met all the terms of its contract with Claimant.

Other than inferences drawn by Claimant, this matter was noteworthy for the complete absence of any evidence of racial bias or other impermissible intent to discriminate against Claimant on the part of Respondent Washington Hospital Center.

---

[8] By June 2002, Claimant was seeing only four patients per month, exponentially fewer patients than other physicians in his unit and a dramatic reduction from his prior year at WHC.

6

Final Award
JAMS Matter No 1410003842
January 2, 2008

Accordingly, the Arbitrator finds in favor of Respondent regarding all allegations made against it in this proceeding. Each party shall bear its own fees, costs and expenses.

Dated:  January 2, 2008
Washington DC

by:

Jerry P. Roscoe
Arbitrator

7

PAGE 8/9 * RCVD AT 1/11/2008 3:47:00 PM [Eastern Standard Time] * SVR:DCNTFAX01/0 * DNIS:6285116 * CSID: * DURATION (mm-ss):03-28

## PROOF OF SERVICE BY FACSIMILE & U.S. MAIL

Re: Thian Lok Tio, M.D., et al. / Washington Hospital Center, et al.
Reference No. 1410003842

I, Melanie Lopez-Grewal, not a party to the within action, hereby declare that on January 11, 2008 I served the attached Final Award on the parties in the within action by facsimile and depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Washington, DISTRICT OF COLUMBIA, addressed as follows:

Anthony M. Rachal, III Esq.
L/O Anthony M. Rachal III
9th and D Streets, N.E., Second Floor
Edmonds Building- Capitol Hill
Washington, DC 20002  USA
Tel: 202-393-7000
Fax: 202-393-7009

Keith J. Harrison Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004-2595  USA
Tel: 202-624-2560
Fax: 202-628-5116

Tami Taylor Esq
L/O Anthony M. Rachal III
9th and D Streets, N.E., Second Floor
Edmonds Building- Capitol Hill
Washington, DC 20002  USA
Tel: 202-393-7000
Fax: 202-393-7009

Trina L. Fairley Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave. NW
Washington, DC 20004-2595  USA
Tel: 202-624-2830
Fax: 202-628-5116

I declare under penalty of perjury the foregoing to be true and correct. Executed at Washington, DISTRICT OF COLUMBIA on January 11, 2008.

Melanie Lopez-Grewal

# Exhibit F



**THE RESOLUTION EXPERTS**

NOTICE TO ALL COUNSEL (Please see Service List)                    March 28, 2005

RE:    <u>Thian Lok Tio, M.D., et al. / Washington Hospital Center, et al.</u>
       Reference #: 1410003842

Dear Counsel:

This letter will confirm that a conference call in the above-referenced matter has been scheduled as follows:

DATE:       Tuesday, April 5th, 2005 at 4PM Eastern (**Call-in code 125-599#**)

PANELIST:   Jerry P. Roscoe Esq.

Please dial 1-877-696-5267 at the time of your call. Call-in code 125-599# will place you directly into Mr. Roscoe's conference line.

We appreciate your business and as *The Resolution Experts* we take pride in helping you to resolve your dispute. If you have any questions, please feel free to contact me directly at 202-942-9180.

Very truly yours,

Joseph C Edmonds
Case Manager
JEdmonds@jamsadr.com

555 13TH STREET N.W.     SUITE 400 WEST     WASHINGTON, D.C. 20004     TEL 202-942-9180     FAX 202-942-9186



# PROOF OF SERVICE

I am over the age of 18 and not a party to the within action. I am employed by JAMS. My business address is 555 13th Street, NW, Suite 400 West, Washington, DC 20004

I hereby certify that on March 28, 2005, I served the foregoing document described as **NOTICE OF CONFERENCE CALL** in **Thian Lok Tio, M.D., et al. / Washington Hospital Center, et al.,** Reference Number 1410003842, upon each of the parties listed below:

Anthony M. Rachal, III Esq.
L/O Anthony M. Rachal III
9th and D Streets, N.E., Second Floor
Edmonds Building- Capitol Hill
Washington, DC 200002  USA
Tel: 202-393-7000
Fax: 202-393-7009

Keith J. Harrison Esq.
King, Pagano & Harrison
1730 Pennsylvania Ave., NW
Washington, DC 20006  USA
Tel: 202-371-6800
Fax: 202-371-6770

( x ) **By First Class Mail:** as follows: I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Services. I know that the correspondence was deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business. I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date in the United States mail at Washington, D.C.

( x ) **By Facsimile Transmission:** I caused the above-referenced document(s) to be transmitted to the above named person(s) at the telecopy numbers listed.

I declare under penalty of perjury that the above is true and correct.

Joseph C. Edmonds
Case Manager
JEdmonds@jamsadr.com

# Exhibit G

# JAMS ARBITRATION MATTER

Thian Lok Tio, M.D.
169 South Detroit Street
Los Angeles  California 90036

Claimant,

And                    JAMS REF. 1410003842

Washington Hospital Center Corporation
T/A Washington Hospital Center
110 Irving Street, N.W.
Washington DC  20010

Respondent.

---

REPORT OF PRELIMINARY HEARING<br>AND SCHEDULING ORDER NO. 1

A preliminary hearing was conducted in this matter on April 5, 2005, pursuant to written notice, and the following order is made respecting the conduct of this arbitration:

1.    **Parties and Counsel.**  The parties to this arbitration are identified in the caption and are represented as follows:

Anthony M. Rachal III                  Trina L Fairley
Law Offices of Anthony M. Rachal III   Keith J. Harrison
Edmonds Building – Capitol Hill        King, Pagano & Harrison
903 D Street, NE                       1730 Pennsylvania Avenue N.W.
Suite 200                              Suite 900
Washington DC  20002                   Washington DC  20006

Counsel for Claimant                   Counsel for Respondent

2.    **Arbitrator:**  Jerry P. Roscoe, Esquire

3.    **Case Manager:**  Joseph Edmonds

4.    **Agreement to Arbitrate.** The Arbitration Clause between Thian Lok Tio, M.D. and the Washington Hospital Center is contained in the Employment Agreement executed by the parties November 28, 2000.

5.    **Pleadings and Arbitrability.** The claims are stated in the Demand for Arbitration dated December 14, 2004. Also before the arbitrator is a Court Order from the United States District Court for the District of Columbia, Civil Action No. 04-0701, referring Claimant's claims to arbitration under the arbitration clause of the parties' employment agreement. The arbitration clause is contained in the Agreement of Employment between the Washington Hospital Center, a not for profit Delaware corporation, and Thian Lok Tio, M.D., made and executed November 28th 2000.

There is a dispute as to whether additional parties would properly be before the arbitrator. The question of what parties are properly before the arbitrator and arbitrability of issues will be decided on the basis of the Preliminary Hearing and filings by the parties made according to the following schedule. By agreement of the parties, Respondent shall file a motion raising the issue of parties and arbitrability no later than May 6, 2005. Claimant shall respond by June 1, 2005. Should they elect, the parties will have five days to file a rebuttal or sur-rebuttal, as appropriate.

6.    **Applicable Law and Rules.** The substantive law of the District of Columbia and the AHLA Arbitration Rules and Procedures shall apply in this proceeding.

7.    **Discovery and Exchange of Information.**

(a)    The parties shall work out a discovery plan cooperatively. Otherwise, the arbitrator shall propose and supervise all discovery to the extent necessary.

(b)    Claimant and Respondent shall complete all discovery by October 6, 2005.

(c)    The parties shall respond or object to requests for discovery within 30 days of service. Unless parties resolve objections or apply to the Arbitrator for a ruling within 14 days of filing for objections, the party objecting to discovery shall not be required to respond to that portion of the discovery request subject to the objection.

(d)    The parties may serve third-party and party hearing subpoenas, which shall issue on or before September 15, 2005.

(e)    Counsel shall identify all exhibits and list all non-rebuttal percipient and expert witnesses expected to testify at the Hearing and indicate the manner in which each witness is expected to testify (in person, telephonically or by affidavit or declaration), not later than September 15, 2005.

(f)     All motions, other than motions *in limine* shall be filed on or before
October 6, 2005.  Responses must be filed within 20 days.  Reply briefs
must be filed within 5 business days.

**9.     Hearing Procedures**

(a)     The Hearing shall be conducted from December 12 - 16, 2005,
commencing at 9:00 am in the offices of JAMS Metro Center Dispute Resolution Center,
555 13th Street, NW, Suite 400 West, Washington DC 20004.

(b)     Pre-hearing briefs and motions *in limine*, if any, shall be filed not later
than November 21, 2005.

(c)     Trial exhibits shall be pre-marked with consecutive Arabic numerals
(without any indication of the party offering same) and a joint exhibit list shall be
prepared not later than December 7, 2005.  The parties shall indicate any objection to the
introduction of any exhibit.  The joint exhibit list and objections shall be furnished to the
arbitrator at the commencement of the hearing.  Exhibits not objected to shall be deemed
admitted at the commencement of the hearing.  One set of exhibits shall be prepared for
the arbitrator and one for the witnesses in addition to copies for counsel.  All exhibits will
be discarded 30 days after the issuance of the final award unless a party requests, in
writing, that the exhibits be retained or returned.

(d)     The parties are encouraged to execute a stipulation of undisputed facts and
to submit that document to the arbitrator at the hearing.  A disk formatted to Microsoft
Word shall accompany any such stipulation.

(e)     The parties are encouraged to agree on any division of cost with respect to
the court reporter they desire, and to agree that such costs shall or shall not be an
allocable cost of this proceeding.

(f)     The award shall state the reasons on which the decision of the arbitrator is
based.  The award may be served by regular mail unless any party requests, in writing,
service by certified mail.

**9.     Miscellaneous.**

(a)     Documents shall be served on JAMS through the Case Manager, with a
copy for the arbitrator, except the trial exhibits shall be submitted only to the arbitrator on
the day of the hearing.

(b)    Cancellation fee of the arbitrator. The parties will be requested to deposit fees sufficient to compensate the arbitrator for the scheduled hearing days in advance of the commencement of the hearing. If the hearing is cancelled or continued for any reason within 45 days of the commencement of the hearing, the deposit for the cancelled day(s) shall be deemed a cancellation fee and shall be immediately payable to JAMS. JAMS shall refund fees for any hearing day which is rebooked to the extent of fees earned on that day.

(c)    All deadlines herein shall be strictly enforced. This Order shall continue in effect unless and until amended by subsequent order of the arbitrator.

Dated: April 6, 2005

Jerry P. Roscoe
**Arbitrator**

# PROOF OF SERVICE

I am over the age of 18 and not a party to the within action. I am employed by JAMS. My business address is 555 13th Street, NW, Suite 400 West, Washington, DC 20004

I hereby certify that on April 6, 2005, I served the foregoing document described as **Scheduling Order No. 1 in Thian Lok Tio, M.D., et al. / Washington Hospital Center, et al.**, Reference Number 1410003842, upon each of the parties listed below:

Anthony M. Rachal, III Esq.
L/O Anthony M. Rachal III
9th and D Streets, N.E., Second Floor
Edmonds Building- Capitol Hill
Washington, DC 200002  USA
Tel: 202-393-7000
Fax: 202-393-7009

Keith J. Harrison Esq.
King, Pagano & Harrison
1730 Pennsylvania Ave., NW
Washington, DC 20006  USA
Tel: 202-371-6800
Fax: 202-371-6770

**(X) By Mail:** as follows: I am "readily familiar" with the firm's practice of collection and processing of correspondence for mailing with the United States Postal Services. I know that the correspondence was deposited with the United States Postal Service on the same day this declaration was executed in the ordinary course of business. I know that the envelope was sealed and, with postage thereon fully prepaid, placed for collection and mailing on this date in the United States mail at Washington, D.C.

**(X) By Facsimile Transmission:** I caused the above-referenced document(s) to be transmitted to the above named person(s) at the telecopy numbers listed.

I declare under penalty of perjury that the above is true and correct.

Carolina El'Azar
Case Coordinator
cel'azar@jamsadr.com

# Exhibit H

## JAMS ARBITRATION MATTER

**Thian Lok Tio, M.D.**
**169 South Detroit Street**
**Los Angeles  California 90036**

Claimant,

And                              **JAMS REF.** 1410003842

**Washington Hospital Center Corporation**
**T/A Washington Hospital Center**
**110 Irving Street, N.W.**
**Washington DC  20010**

Respondent.

---

## SCHEDULING ORDER NO. 4

A preliminary hearing was conducted in this matter on April 5, 2005, pursuant to written notice, and the following order is made respecting the conduct of this arbitration:

Hearing of this matter is now scheduled to commence at 10:00 am on April 24, and continue through April 26, 2006.  Hearing is to be held at the JAMS Resolution Center at 555 13th Street, NW Suite 400 W Washington DC.

All deadlines herein shall be strictly enforced.  This Order shall continue in effect unless and until amended by subsequent order of the arbitrator.

**Dated: December 6, 2005**

Jerry P. Roscoe
Arbitrator

**Copies to all parties**

## PROOF OF SERVICE BY FACSIMILE & U.S. MAIL

I, Ingrid Garcia Ruiz, not a party to the within action, hereby declare that on December 6, 2005 I served the attached Scheduling Order No. 4 on the parties in the within action by depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Washington, DISTRICT OF COLUMBIA, addressed as follows:

Anthony M. Rachal, III Esq.
L/O Anthony M. Rachal III
9th and D Streets, N.E., Second Floor
Edmonds Building- Capitol Hill
Washington, DC 200002  USA

Keith J. Harrison Esq.
King, Pagano & Harrison
1730 Pennsylvania Ave., NW
Suite 900
Washington, DC 20006  USA

Tami Taylor Esq
L/O Anthony M. Rachal III
9th and D Streets, N.E., Second Floor
Edmonds Building- Capitol Hill
Washington, DC 200002  USA

I declare under penalty of perjury the foregoing to be true and correct. Executed at Washington, DISTRICT OF COLUMBIA on December 6, 2005.

Ingrid Garcia Ruiz

# Exhibit I

## JAMS ARBITRATION MATTER

Thian Lok Tio, M.D.
169 South Detroit Street
Los Angeles CA 90036

Claimant

v.                                          Jams Arbitration No. 1410003842

Washington Hospital Center Corporation
T/A Washington Hospital Center
110 Irving Street, N.W.
Washington DC 20010

Respondent

## Pre Hearing Order No. 1

Before the Arbitrator are the following pre-hearing motions: Respondent's Motion for
Expert Discovery and Designation; Respondent's Motion to Exclude Witnesses and
Exhibits; and Respondent's Motion for Summary Judgment; and responses thereto.

On the basis of the written motions and all responses filed thereto, as well as oral
argument made by the parties, the Arbitrator issues the following Order with regard to the
conduct of the Hearing.

1.  All causes of actions heretofore asserted by Claimant against Respondent
    shall be, and hereby are Dismissed, with prejudice, except for:
    a. Breach of Contract, and
    b. Wrongful Termination of Employment.

2.  Subject to objection by the opposing party, each party may attempt to
    offer into evidence all exhibits identified in their respective exhibit lists.
    The parties are reminded that, absent a sufficient showing of cause, failure
    to respond to proper discovery requests may be deemed grounds for
    exclusion of evidence at hearing.

3.  In addition to eliciting testimony from each designated expert as well as
    from party opponents, each party may present the following witnesses at
    hearing. Absent a sufficient showing of cause, only rebuttal witnesses
    may be added.

    a.  Claimant
- i. Elizabeth Hernandez Beltree
- ii. Julio Salcedo
- iii. Bhargab M. Dixit
- iv. Ramin F. Manesh
- v. Tom Abernathy
- vi. Floyd Angus
- vii. Averell Sherker

    b.  Respondent
- i. Leonard Wartofsky
- ii. Susan L. Hart
- iii. Noel K. Simpson
- iv. Robert Burakoff
- v. Michael Boivin

4. Respondent's expert witness, Mr. John Wills, shall be deemed designated and may be proffered as an expert at the Hearing of this matter.

5. Each party has thirty (30) days from the date of this Order during which to depose the other's designated expert witness.

6. It is expected that the Hearing shall last sixteen hours, conducted over the course of two days. Absent agreement by the parties, Hearing time shall be divided evenly, for a total of eight Hearing hours per party.

7. The parties shall participate in a telephone conference Hearing at 11:00 am on January 29, 2007, at which time they shall agree upon a date for commencement of the Hearing.

8. The parties are reminded that this matter is being conducted pursuant to the AHLA Rules of Procedure for Arbitration in effect at the time of filing of the Request for a Dispute Resolver with the AHLA. Where AHLA rules are silent, and to the extent that they do not contradict the AHLA rules, JAMS rules shall apply.

To the extent that they are not amended by this Order, all other Orders remain in effect.

**So Ordered this 25th day of January, 2007**

By: _____
Jerry P. Roscoe
Arbitrator

Copies to All Counsel

## PROOF OF SERVICE BY FACSIMILE & U.S. MAIL

Re: Thian Lok Tio, M.D., et al. / Washington Hospital Center, et al.
Reference No. 1410003842

I, Rachel Williams, not a party to the within action, hereby declare that on January 25, 2007 I served the attached Pre-Hearing Order No. 1 on the parties in the within action by facsimile and depositing true copies thereof enclosed in sealed envelopes with postage thereon fully prepaid, in the United States Mail, at Washington, DISTRICT OF COLUMBIA, addressed as follows:

Anthony M. Rachal, III Esq.
L/O Anthony M. Rachal III
9th and D Streets, N.E., Second Floor
Edmonds Building- Capitol Hill
Washington, DC 200002  USA
Tel: 202-393-7000
Fax: 202-393-7009

Keith J. Harrison Esq.
Crowell & Moring LLP
1001 Pennsylvania Ave., NW
Washington, DC 20004-2595  USA
Tel: 202-624-2560
Fax: 202-628-5116

Tami Taylor Esq
L/O Anthony M. Rachal III
9th and D Streets, N.E., Second Floor
Edmonds Building- Capitol Hill
Washington, DC 200002  USA
Tel: 202-393-7000
Fax: 202-393-7009

I declare under penalty of perjury the foregoing to be true and correct. Executed at Washington, DISTRICT OF COLUMBIA on January 25, 2007.

_Rachel Williams_

Rachel Williams

# Exhibit J

## JAMS ARBITRATION MATTER

THIAN LOK TIO, M.D. ET AL., )
)
                ) JAMS REF. 1410003842
         PLAINTIFFS, ) ARBITRATOR: JERRY P. ROSCOE
v. )
)
WASHINGTON HOSPITAL )
CENTER ET AL., )
)
       DEFENDANTS. )

### CLAIMANTS' AMENDED WITNESS LIST

NOW COME claimants in the above-captioned matter and submits their **Amended Witness List.** The list consists of persons that Claimants anticipate calling at the Arbitration Hearing scheduled for January 2007. The witnesses are arranged pursuant to their importance and various claims in which they will be rendering testimony.

**PRIMARY WITNESSES**

1. Elizabeth Hernandez Beltree (All Claims)

2. Norman McKenzie (All Claims)

3. Barbara Jackson (All Claims)

4. Susan Leland McKenzie (All Claims/Damages)

5. Daryl Testa, Grants & Accounts Manager, Pentax Corporation (All Claims/Equipment Damages)

6. Julio Salcedo, M.D. (All Claims/Damages)

7. Mark Ayers (All Claims/Damages)

8. Bhargab M. Dixit, M.D. (All Claims/Damages)

9. Barbara Helsely (All Claims/Damages)

10. David Fleischer, M.D. (All Claims/Damages)

11. Claudio Tombazzi, M.D. (All Claims/Damages)

12. Jesus Esquivel, M.D. (All Claims)

13. Kevin Collier, M.D. (All Claims)

1

14. Victor M. Lopez (All Claims)

15. Tonya Adams, M.D. (All Claims)

16. Donna Kane, D.P.C. (All Claims)

17. Ronald Hoffman (All Claims)

18. Anita Wolke, M.D. (All Claims)

19. Kok Seah Lee, M.D. (All Claims)

20. Paul S. Jowell, MB, ChB (All Claims

21. Ken Brown, M.D. (All Claims & Damages)

22. Robert Jensen, M.D. (All Claims)

23. Robynne Chutkan, M.D. (All Claims)

24. Richard B. Edelman, Ph.D., Expert (Damages)

25. Frank Sanders, Real Estate Expert (Damages)

26. Gustafo Marino, M.D. (All Claims)

27. William Mayoral, M.D. (All Claims)

**SECONDARY WITNESSES**

1. David Morowitz, M.D. (All Claims)

2. Ramin F. Manesh, M.D. (All Claims)

3. Donald O'Keefe (All Claims)

4. Dorett Griffiths (All Claims)

5. Irma Cajina (All Claims)

6. Ann Francis (All Claims)

7. James Ahlgren, M.D. (All Claims)

8. Paul Sugarbecker, M.D. (All Claims)

9. Tom Abernathy, M.D. (All Claims)

10. Floyd Angus, M.D. (All Claims)

2

11.   Fred Finelli, M.D. (All Claims)

12.   Danny Shearer, M.D. (All Claims)

13.   William Steinberg, M.D. (All Claims)

14.   Lalit Gualti  (All Claims)

15.   Esmeralda Kirkpatrick  (All Claims)

16.   Averell Sherker, M.D. (All Claims)

17.   Vickie Norris  (All Claims)

18.   Eric R. Lee, M.D. (All Claims)

19.   Richard Zubarik, M.D. (All Claims)

20.   Richard Kozarek, M.D. (All Claims)

Claimants reserve all rights to supplement the primary and
secondary witnesses prior to the hearing.

Law Offices of
Anthony M. Rachal, III


Anthony M. Rachal, III
9th and D Streets, NE
Second Floor
Washington, D.C. 20002-0009
Phone: (202) 393-7000
Fax: (202) 393-7009

Counsel for Claimants

3

## CERTIFICATE OF SERVICE

I hereby certify that on this _15th_ day of September, 2006, I served a copy of **Claimants' Amended Witness** was forwarded by first class mail to:

Keith J. Harrison, Esq.
King, Pagano & Harrison
1730 Pennsylvania Avenue, NW
Suite 900
Washington, D.C. 20006

Jerry P. Roscoe
JAMS Resolution Center
555 13th Street, NW
Suite 400
Washington, D.C. 20004


_____
Anthony M. Rachal, III

4

# Exhibit K

Page 5

1    before we went on the record you mentioned that

2    you might have something to address.

3        MR. RACHAL:  Yes, I do, Mr. Roscoe.  I

4    would like to address -- you have had an

5    opportunity to hear comments on the record and

6    off the record.  I would also like to first

7    raise my objection.  I did not receive a

8    pre-hearing order, number 1, issued by you in

9    this matter the result of which have eliminated

10   most of the plaintiffs' claims on a

11   one-sentence statement when there was a pending

12   motion for summary judgment.  There was no

13   separate order addressing that motion for

14   summary judgment.

15       Most of the claimants' witnesses which

16   have been pre-identified as requested by you on

17   two occasions have been stripped down to a mere

18   seven witnesses.  The claimants' expert witness

19   has not been included on that list.  The Pentax

20   representative has been excluded from that

21   list.  We are disturbed by the lateness of this

Page 29

1    deposition resumed at 11:50 p.m.)

2         THE ARBITRATOR:  I went ahead and looked

3    at the file, my file of my orders.  And I see

4    that prehearing order number one dated January

5    25, 2007, was made on the basis of written

6    motions, all the responses filed thereto, and

7    oral arguments.  On the basis of all that the

8    order issued, prehearing order number one.  And

9    then subsequent to that I ordered a telephone

10   conference call in order to set the hearing of

11   this matter.  And the conference call was at

12   1:30 p.m. on March 16.  Actually it wasn't a

13   conference wall.  The parties came here in

14   person.  I ordered the parties to be here in

15   person.  And I believe that took place on

16   March 16.

17        Mr. Rachal, you weren't here I believe.

18        MR. RACHAL:  There was one hearing.

19        THE ARBITRATOR:  Where you came in person.

20        MR. RACHAL:  But there was no discussion

21   of any ruling at that point on the motion of

Page 30

1    summary judgment.

2        THE ARBITRATOR:  Between the two on

3    January 29 there was a telephone conference

4    call hearing at 11 a.m. and think that's the

5    one we are talking about.  I want to share with

6    the parties that I see that on the fax cover

7    sheet it looks like it was sent to Mr. Rachal's

8    number of 202-293-7009.  I'm sorry, 393-7009.

9        Mr. Rachal, is that your fax number?

10        MR. RACHAL:  Yes.

11        THE ARBITRATOR:  But it shows there was an

12    error on the fax sent to you.  Nonetheless,

13    because of that it's the policy and practice of

14    JAMS to also serve by hard copy mail and I have

15    an attestation that it was also sent to you on

16    January 21 in sealed envelopes by first class

17    mail that was mailed to you at Ninth and D

18    Streets, Second Floor, Edmonds Building,

19    Capitol Hill, Washington, D.C. 20002 USA, and

20    another copy to Tammy Taylor at the same

21    address.  Apparently two were sent.

Page 31

1       And as you stated, Mr. Rachal, you did

2    participate in the January 29 conference call.

3       MR. RACHAL:  Yes, I did.  And if I may

4    infer, there was a prior ruling or hearing

5    where you reduced my witnesses.  So any

6    discussions about any less days had to do with

7    the fact that the witnesses that we could put

8    on had been reduced from 70 to 40, not that you

9    ruled on and eliminated all these other issues

10   in the case or had limited me from 40 to seven.

11   That had never come up until this morning.

12       MS. FAIRLEY:  Mr. Roscoe, --

13       THE ARBITRATOR:  But one interesting note,

14   and again I'm not going to get into an argument

15   because I have to deal with the record of the

16   case, it's the order itself that set the

17   January 29 call at 11 a.m.  So how did you

18   otherwise know about the call?

19       MR. RACHAL:  A call from Joe Edmonds.

20   There were follow-ups like that, but just with

21   respect to making sure that it was convenient

Page 80

1  no cause of action for that.

2          MR. RACHAL:  If I may reply, it's not

3  just the contract with the patients.  As I said

4  before, it's the contract with the hospital where

5  the doctor is employed where he brings the

6  patients.  In this case we're talking about a

7  contract with Washington Hospital Center.  We're

8  talking about why he left a contract with

9  Georgetown University Medical Center to take a new

10  position, why he went to Cedars-Sinai to take a

11  contract with that hospital and why his

12  compensation gets set at a certain level.  It's

13  based on what patients he's going to bring to that

14  practice.

15          THE ARBITRATOR:  You're saying a book of

16  business.

17          MR. RACHAL:  A book of business, exactly,

18  and there's direct connection.

19          THE ARBITRATOR:  Anything else?

20          MR. HARRISON:  No.

21          THE ARBITRATOR:  I'm going to deny the

1    Motion For Reconsideration.   The order stands as

2    is.   The basis for that is in Respondent's 43-page

3    brief they thoroughly briefed these issues.

4    Claimant had an opportunity to review that brief

5    and respond, and Claimant did take advantage of

6    that both in writing and in oral argument.   It's

7    documented in the record of this case.

8             The arbitrator hasn't heard anything new

9    that either wasn't or could not have been brought

10   up in those pleadings or in oral argument,

11   notwithstanding the assertion that the ultimate

12   decision by the arbitrator wasn't received by

13   Claimant.

14            However, I haven't heard any opposition

15   from Respondent to hearing, addressing the six

16   issues that Claimant's concerned about in the

17   letters.   So, I think those get in and the evidence

18   relative to those get in.   And if there is one or

19   two, if there's a witness or perhaps two witnesses

20   that go to damages in terms of wrongful

21   termination, i.e., did Respondent do something that

Page 82

1   damaged Claimant, I'm inclined to find that

2   relevant to damages.  And given that Claimant takes

3   a position that they have not received this, that

4   I'm inclined to reconsider, which witnesses you'd

5   like to identify that go to motive or conduct by

6   Respondent that were excluded in the order,

7   prehearing order number one and we can do that by

8   agreement or do that right now.

9            So, I'm, if Claimant has one or two

10  witnesses that go to the conduct of the hospital

11  relevant to damages in the allegations of the

12  discrimination and wrongful termination I think I

13  can, inclined to hear those.

14           MR. RACHAL:  Well, this was supposed to

15  be a proffer.  I was asking for time to file the

16  written comments which I haven't been able to do.

17           THE ARBITRATOR:  Right.  I find the

18  proffer insufficient.  Even if I found everything

19  that you're telling me about I would deny the

20  Motion For Reconsideration.

21           MR. RACHAL:  But I didn't have an

Page 83

1   opportunity to submit any written documents in the

2   Motion For Reconsideration.

3            THE ARBITRATOR:  Everything you've talked

4   about -- Claimant did have the opportunity to

5   address everything you talked about in the

6   pleadings at the end of 2006 or in the oral

7   argument in January.  I didn't hear any new area

8   that would persuade me to reconsider even if the

9   testimony were as you purport it would be.

10           MR. RACHAL:  But what Respondents just

11  said with respect to the law is only maybe as to

12  the doctor and the patient but not as to the doctor

13  and the hospital.  That's a business contract.

14  That's a relationship that's been interfered with.

15           THE ARBITRATOR:  And that is going to be

16  arbitrated and I'm going to permit witnesses based

17  on that, and if there are more witnesses that you

18  can make a showing that you need in order to make a

19  full case I'm happy to entertain that.

20           MR. RACHAL:  But you're saying that

21  there's no basis for a tortious interference with

1              P R O C E E D I N G S

2          MS. FAIRLEY:  I have an objection that I

3    would like to make before we get started.  I see

4    that Claimant is prepared to put on Dr. Edelman who

5    is the damages expert in this case.

6          THE ARBITRATOR:  Would you like to excuse

7    the witness at this point for the discussion?

8          (Witness excused.)

9          THE ARBITRATOR:  And because we haven't

10   really started the record yet with the day and the

11   caption and all of that I'd like to note the

12   presence of case manager Melanie Lopez by consent

13   of the parties.  Good morning, Counsel.  You may

14   proceed.

15         MS. FAIRLEY:  Mr. Roscoe, we have various

16   concerns with Dr. Edelman's testimony this morning.

17   As background, we were able for the first time to

18   take Dr. Edelman's expert deposition yesterday.  At

19   that deposition Counsel produced through the

20   witness for the first time an expert witness report

21   for Dr. Edelman.  That expert witness report

1    according to the testimony of Dr. Edelman was based

2    on various documents that we have never seen before

3    but requested in discovery as early as two to

4    three years ago and all summer and throughout the

5    arbitration proceedings.  Of specific concern is

6    Cedars-Sinai information that we specifically

7    requested of Dr. Tio.  Then we requested it as part

8    of a subpoena duces tecum.  It was provided to us

9    this morning.

10           Our first motion is that any damages

11   information based on Cedars-Sinai information

12   should be stricken because that was the subject of

13   a motion in limine early on.  It was the subject of

14   discovery requests and letters exchanged by counsel

15   and was never provided and now this morning it's

16   provided as part of the support for damages.  Our

17   expert witness has never had an opportunity to

18   review it, you know, and isn't even here today.  I

19   had no idea that giving us the information this

20   morning knowing that we've never had an opportunity

21   to review it that Dr. Edelman would be their first

Page 871

1   witness.

2           THE ARBITRATOR:  Mr. Rachal?

3           MR. RACHAL:  Yes.  I have a couple

4   responses.  Number one, we had indicated earlier

5   that Dr. Edelman was available for a deposition

6   ever since he was listed as a witness by us.  He

7   was listed as a witness in our first submission to

8   the Plaintiffs, I mean the Respondents.  We also

9   indicated at the last hearing that he was available

10  during the break.  It was not our choice to

11  schedule it right the day before this.  They could

12  have scheduled it at any time during that

13  proceeding.  I sent a letter as early as August

14  24th, the day after the hearing advising

15  Mr. Harrison that I was still making my witness

16  available, sent him all the background with regard

17  to Dr. Edelman.

18           Also, Counsel misstates the availability

19  of information.  She had it during the deposition

20  when she took the deposition of Dr. Edelman

21  yesterday.  Her expert was at the deposition, was

1   able to consult with her.  The deposition did not

2   start on time.  She asked for a break of about

3   45 minutes or so to review the report that was

4   provided to her and to consult with her expert to

5   review any questions.  Dr. Edelman is prepared to

6   confirm that that was the process.

7            Also, many of the documents that

8   Dr. Edelman relied upon were already in the record,

9   number one being the complaint, number two being

10  information that was in the control of the

11  Respondents, namely his pay records and everything

12  of that nature.  We gave the W-2s from Cedars-Sinai

13  which was only to indicate what he had earned.  The

14  Claimant is under an obligation to mitigate

15  damages.  He's done so.  I think under the law he

16  only had to look for a job in this vicinity.

17  Notwithstanding that he looked for a job throughout

18  the country and reduced the damages by taking a job

19  in Cedars-Sinai on the opposite side of the

20  country.  He incurred reasonable cost to obtain

21  that level of compensation, and the record will

Page 873

1    reflect in Dr. Edelman's presentation that the

2    Respondents were beneficiaries of the fact that Dr.

3    Tio was able to get a job in Cedars-Sinai.  We have

4    not tried to double count the income claiming

5    excess damages.  We have credited them for every

6    dollar that he received from Cedars-Sinai to our

7    detriment to lower our damages in this particular

8    case.

9         So, I mean if we were trying to take

10   benefit of this we would have not put in the

11   Cedars-Sinai information to in essence overstate

12   the loss to Washington Hospital Center by virtue of

13   the breach.  We've not done so.  Dr. Edelman's

14   testimony will reflect that he got the necessary

15   information to do an accurate and proper accounting

16   of the damages given the obligation of the Claimant

17   to mitigate those damages.

18        THE ARBITRATOR:  Thank you.  Anything

19   further?

20        MS. FAIRLEY:  Yes, Mr. Roscoe.  I'd like

21   to point out a couple of things.  Mr. Rachal states

1   that we were always able to depose Dr. Edelman.

2   That's simply not correct.  We have tried for

3   months to depose Dr. Edelman.  I have here which is

4   at least the second Notice of Deposition Duces

5   Tecum that we sent out on August 8th and weeks went

6   by before we ever even heard from Mr. Rachal on

7   scheduling.  Scheduling remained a problem.  It's

8   hard to get in contact with Mr. Rachal.  I have

9   multiple e-mails that I can produce if necessary

10  trying to pin down dates, and specifically the

11  notice of duces tecum asks for specific

12  information, all documents and/or data which you

13  reviewed in reaching your opinion and conclusions

14  regarding damages in this case, all documents

15  and/or data upon which you relied in reaching your

16  opinions and conclusions regarding damages in this

17  case, all documents and data upon which you

18  intentionally relied or based your testimony upon

19  at this arbitration.  We got this deposition

20  yesterday.  For the first time an expert report was

21  produced.

Page 875

1         The expert report was dated August 26,

2   2007.  The expert stated that he had finished that

3   on or about that time, but we never saw it until

4   yesterday.  It is incorrect that the documents were

5   made available for us.  The expert had one set of

6   documents, his working documents.  We were told

7   that they would be produced this morning and that

8   our expert would have a chance to review them.  Our

9   expert was not there yesterday.  John Wills was not

10  at the deposition.  His associate was there, but

11  John Wills, the person who's testifying in this

12  case, was not there.

13        With respect to the Cedars-Sinai

14  information, I'm looking at discovery request back

15  from September of '05 where we specifically asked

16  for discovery pertaining to Cedars-Sinai.  That was

17  never forthcoming.  And so, now it's used as the

18  report is based upon information that we've asked

19  for repeatedly but never been given.  And so, at

20  this point to put Dr. Edelman on as the first

21  witness when the first time that I'm seeing the

Page 876

1  information related to any damages is today is, you

2  know, is just, it's unfair and it's prejudicial.

3          THE ARBITRATOR:  Mr. Rachal, did you want

4  to add to that?

5          MR. RACHAL:  Yes, I want to add to that.

6          THE ARBITRATOR:  And then I'll close the

7  discussions so we can keep going.

8          MR. RACHAL:  In terms of the argument the

9  testimony of Dr. Edelman was going to be related to

10  Dr. Bussy's testimony which would have been ruled

11  out, and he could not finalize his report until a

12  decision was made on whether or not Bussy was going

13  to be a part of the proceeding.  That had to do

14  with vocational opportunities for Dr. Tio in terms

15  of future pay.  As a result his report is limited

16  only to back pay.  He did not get that information,

17  could not complete the report with regard to future

18  pay.

19          And again, that situation is to the

20  benefit, at least from Dr. Edelman's report, to the

21  Respondents, not the Claimants in terms of that

Page 877

1   particular issue.

2          And further, their expert is not

3   testifying today.  Their expert is going to be

4   testifying when their time is to proceed with this

5   case which is not for another week and a half on

6   the 30th and 31st.  He has plenty of time to review

7   whatever testimony Dr. Edelman puts forth and a

8   chance to prepare I think appropriate responses to

9   that evidence and testimony.

10         THE ARBITRATOR:  What I would like to do

11  is have this hearing put on and concluded in four

12  days.  I think the parties have had a protracted

13  hearing, and I think we're ready to move it along

14  and get it heard.  I suggest that we hear the

15  testimony of Mr. Edelman, and what I would ask of

16  counsel is on cross-examination to note when the

17  witness has relied upon a document that Respondent

18  claims was not properly produced, to so note that

19  during cross-examination.  And what I will permit

20  in those areas is for Respondent to keep cross open

21  until next week and to recall the witness to cross

Page 878

1    in those areas where Respondent might be

2    prejudiced.  And if that creates a time issue with

3    regard to Respondent's two days we'll deal with it

4    then.  So, this witness is subject to recall in any

5    area where, number one, it's shown through witness

6    testimony that the witness has relied upon it.  If

7    the witness hasn't relied upon it in his testimony

8    it's not really an issue, and two, make a

9    representation on its face that it wasn't produced.

10    You don't need to go through the letter and verse

11    of what the request was and all that because I have

12    all that information, but let me know and then we

13    can make it subject to recall.  Why don't we

14    proceed and use these two days as effectively and

15    efficiently as we can?

16             (Witness returns.)

17             EXAMINATION BY MR. RACHAL:

18    Q.    Would you please state your name?

19    A.    I'm Professor Richard Edelman.

20    Q.    And where are you located?

21    A.    My address is 8515 Whittier Boulevard in

Page 996

1    from Dr. Stein saying that the patient is a truck

2    driver driving all over the country and can bleed

3    to death somewhere in this country.  Despite all of

4    this there is no response from Hospital Center.

5              He said this patient is a truck driver

6    and his route are all over town.  I advised him to

7    change jobs given the acuity of bleeding if occurs.

8    So, it is so obvious.  When will you have the glue?

9              MR. RACHAL:  At this point, Mr. Roscoe,

10   I'd like to take Dr. Tio off the stand and put on

11   my next witness, Mark Ayers, who's arrived now.

12             THE ARBITRATOR:  That's fine.  You're

13   excused, Doctor, for the time being.

14             (Witness excused.)

15   Whereupon --

16                    MARK H. AYERS,

17   a witness, called for examination, having been first duly

18   sworn, was examined and testified as follows:

19             EXAMINATION BY MR. RACHAL:

20        Q.   Good afternoon again, Mr. Ayres.  Would

21   you please state your full name for the record?

Page 997

1      A.    Mark H. Ayers, A-Y-E-R-S.

2      Q.    And where do you currently reside?

3      A.    413 Clayton Lane, Alexandria, Virginia.

4      Q.    And where are you currently employed?

5      A.    I'm the president of the building and

6  construction trade department AFLCIO.

7      Q.    And is that a union organization?

8      A.    Yes.  I'm over the 15 construction unions

9  in the United States and Canada.

10     Q.    And about how many people do you

11 supervise?

12     A.    Well, I'm responsible for three million

13 people.

14     Q.    Did there come a time that you engaged

15 the services of Dr. Tio?

16     A.    Yes, there was.

17     Q.    And when was that first occurrence?

18     A.    Best of my recollection I would say 2002,

19 2001, that era.

20     Q.    Do you recall how you came to select

21 Dr. Tio to attend to you?

Page 998

1     A.    Yes.   I became seriously ill while giving

2   a speech in Chicago, travelled back to Washington.

3   Actually, I was with Senator Durgan, travelled back

4   to Washington, sought out my primary physician who

5   recommended that I see Dr. Tio because my portal

6   veins to my liver were blocked.

7     Q.    And who was your primary physician at

8   that time that made the referral?

9     A.    It would have been Dr. Murphy I believe.

10  It was either my primary physician or my

11  hematologist Dr. Kessler, Dr. Kessler.

12    Q.    And at what hospital were they

13  associated?

14    A.    Georgetown.

15    Q.    And was Dr. Tio at Georgetown at that

16  time?

17    A.    He was.

18    Q.    And how did the treatment work out with

19  Dr. Tio?

20    A.    Well, I had to have an EUS which Dr. Tio

21  specializes in which is an endoscopy ultrasound,

1  and unfortunately there was really no treatment

2  other than very drastic measures which Dr. Tio

3  could explain to you, but it required constant

4  follow-up to see how the blockage was progressing

5  or if any arteries had cut a path around the

6  blockage.

7      Q.   And how did you find Dr. Tio's care and

8  attention of you as a patient?

9      A.   Exceptional.

10     Q.   And how did you find his

11 interrelationship with the other doctors at

12 Georgetown at that time?

13     A.   I've never seen Dr. Tio treat anyone else

14 except for just absolute respect, and I'm very

15 funny about that.  I'm a very fussy man.

16     Q.   I guess as a high ranking union official

17 you would understand the relationship between

18 employer employee?

19     A.   I do, and customer.

20     Q.   And customer.  Thank you for that

21 correction.  Did there come a time that Dr. Tio

Page 1011

1   and I'm sure during all that a conversation about

2   doctors came up.  And there is another doctor that

3   I do know there, and I use a gastroenterologist.  I

4   can't recall his name, but he is known for taking

5   photos, photos of electrical transmission lines and

6   that's what caught my attention when I would see

7   these photos down the hall and I can't recall his

8   name but I have talked to him before too.

9       Q.   I show you what has been previously

10  marked as Plaintiff's Exhibit 54.  It's in the

11  documents that were distributed.  Please review and

12  identify this for the record.

13          MS. FAIRLEY:  I'd just like to make an

14  objection to the extent that Mr. Rachal is about to

15  ask the witness about a letter that is neither

16  written by or written to this witness.  It clearly

17  states that it's from James Caldas to Victor Lopez.

18          THE ARBITRATOR:  Is this something the

19  witness has seen before?

20          MR. RACHAL:  No, it's not something the

21  witness has seen before, but it's something the

Page 1012

1  witness has testified to and I wanted to inquire of

2  the witness whether he shared the views of a

3  similar patient.

4         THE ARBITRATOR:  I'm not sure this

5  witness is qualified to testify as to his view of

6  what someone else said.

7         MR. RACHAL:  Well, I think he's qualified

8  to testify to the statements as to how that patient

9  was treated and whether he in fact shares some of

10  those similar views and experiences.

11         THE ARBITRATOR:  You can ask him about

12  his views, the similarity of which and the

13  statements made by another patient though aren't

14  his area of expertise.  His area of expertise is

15  what he saw, what he witnessed, the conclusions he

16  made within the can of a lay person and the general

17  atmosphere and environment, but he can't testify as

18  to a statement by another patient.

19         MR. RACHAL:  Well, he's testified to that

20  he's had other interreactions with other patients

21  while awaiting treatment at the hospital and has

Page 1013

1    discussions about physicians.

2          THE ARBITRATOR:  It's irrelevant what

3    another patient said to a party who's not here.

4    These are two parties not in the room.

5          MR. RACHAL:  Well, Mrs. Lopez was here.

6    She testified and identified as to this particular

7    letter.  He has an ability to cross-examine Mrs.

8    Lopez regarding her statements.

9          THE ARBITRATOR:  I am struggling, but I

10   cannot find a basis to permit this witness to use

11   this letter.  I cannot conceive of a legal basis in

12   relevance let alone hearsay.  So, I can't.

13         MR. RACHAL:  With respect to a patient's

14   experiences similar to another patient with respect

15   to a doctor?  The hospital has accused Dr. Tio --

16         THE ARBITRATOR:  If we're going to have

17   that discussion we're going to excuse the witness.

18         MR. RACHAL:  Okay.  I'll excuse the

19   witness.

20         THE ARBITRATOR:  Sir, you may be excused.

21         (Witness excused.)

Page 1014

1          THE ARBITRATOR:  So, I've made my ruling,

2  but if you want to address it and respond that's

3  okay.

4          MR. RACHAL:  Well, I'm attempting to

5  address it in the case of relevance that the

6  hospital has challenged this doctor in terms of his

7  ability, in terms of his interrelations with other

8  fellows, patients.  Well, the university has as a

9  policy that patients are first.  This witness is a

10 patient.  He's being asked to review the comments

11 of another patient as if he was in the waiting room

12 hearing from another patient.  The testimony of

13 this particular patient has been documented, made

14 available for cross-examination by the other side

15 and I'm just asking him does he share similar

16 viewpoints and experiences as expressed in that

17 letter from Mr. and Mrs. Lopez.

18         MS. FAIRLEY:  Mr. Roscoe, I think there

19 are a couple of issues.  The hospital has never

20 stated anything about Dr. Tio's care as to

21 patients.  That's not an issue.  It's never been an

Page 1015

1  issue.  So, it goes to relevance, and then as

2  Mr. Roscoe has already indicated -- I don't want to

3  repeat -- you're talking about someone who's not

4  here.  It's a letter.  You're asking him to testify

5  about some letter that he didn't write and it

6  involves another witness who was here.  So, you

7  already had an opportunity to address the issue,

8  and Mr. Rachal has already had an opportunity to

9  ask the witness about the letter.  So, I'm not sure

10  what asking Ayers about a letter that he didn't

11  write, especially when he says he didn't even

12  recall Mr. Lopez.

13          MR. RACHAL:  This also goes to the issue

14  with respect to the hospital not wanting to allow

15  Dr. Tio to stay in contact with his patients.

16          THE ARBITRATOR:  And I think you got that

17  in through this witness with regard to this witness

18  and you probably got in all this.

19          The fire alarm is going off at the time.

20  So, let's go off the record for a second.

21          (Whereupon, a discussion was held off the

Page 1016

1   record.)

2           THE ARBITRATOR:  Let's reconvene at the

3   end of the fire alarm.

4           (Recess taken -- 3:01 p.m.)

5           (After recess -- 3:38 p.m.)

6           THE ARBITRATOR:  You can ask him

7   questions about his, and I think you've done a

8   thorough job on eliciting from him his impressions

9   and understandings and all that.

10          MR. RACHAL:  Well, it wasn't to make the

11  letter in.  I thought the letter came in with Mrs.

12  Lopez's testimony previously.  So, I was just

13  asking him.

14          THE ARBITRATOR:  If he agreed with it?

15          MR. RACHAL:  Yes.

16          THE ARBITRATOR:  Yeah.  I can tell you

17  I've tried that in Federal Court and Judge

18  Overdorfer almost had me hanging in front of a

19  jury, but you can't do it.  30 years ago, but you

20  can't do it.  There's no basis for it, but it's in

21  evidence.  So, you've done what needs to be done.

Page 1017

1    So, why don't we get the witness back?

2          (Witness returns.)

3          THE ARBITRATOR:   I apologize for the

4    interruption.

5          BY MR. RACHAL:

6    Q.   Mr. Ayers is there anything else you'd

7    like to convey about your relationship with Dr. Tio

8    in terms of patient physician?

9    A.    Yeah.   I would just like to say again Dr.

10   Tio left a lasting impression upon my wife and I as

11   living up to the code that medical doctors are to

12   live up to.   He emulated to us everything that that

13   medical code's about.

14          On the other hand, the hospital

15   demonstrated to me that they didn't care anything

16   about that code whatsoever, that apparently it was

17   all about money.   It certainly wasn't about patient

18   or patient care.   They didn't care about my care or

19   they would have told me where Dr. Tio was, and

20   that's disturbing to me and it should be disturbing

21   to anyone.   And I'm sure that in retrospect there's

Page 1425

1   the last 30 minutes.  Make sure you're not paying

2   for something you didn't get.

3          BY MR. RACHAL:

4      Q.   Dr. Salcedo, would you disagree with the

5   statement that Dr. Tio forced fellows to complete

6   all consult service billings?

7      A.   I'm not aware of that, that it ever

8   occurred and that he ever did that.

9      Q.   Did he do it with you when you were a

10  fellow?

11     A.   No.

12     Q.   Did he do it with fellows at Washington

13  Hospital Center that you may have observed?

14     A.   Not that I observed.

15     Q.   Did you, would you disagree -- would you

16  agree with the statement that Dr. Tio abused

17  supplies and equipment by causing breakage of

18  fluoroscopy tubes due to excessive exposure during

19  endoscopic procedures performed by him?

20     A.   No.  I never knew anything about that.  I

21  mean, it never affected my cases that I had done

Page 1426

1    and I'm not aware of that.

2        Q.    Would it be fair to it or would it be

3    appropriate to base the termination on breakage due

4    to alleged misuse of ultrasound probes in the GI

5    unit?

6            MR. HARRISON:  Objection.

7            THE ARBITRATOR:  I'll let it go.

8    Objection is noted for the record.  Go ahead.

9            THE WITNESS:  Can you restate that one

10   more time?

11           BY MR. RACHAL:

12       Q.    I said would it be appropriate to

13   terminate Dr. Tio or anyone based on the breakage

14   due to misuse of ultrasound probes that are

15   available for use by everyone?

16           THE ARBITRATOR:  Well, for that question

17   I'll sustain the objection because that's beyond

18   the scope for which the witness is being offered.

19   That's beyond his knowledge.

20           BY MR. RACHAL:

21       Q.    Would it be appropriate to base

1  termination based on breakage of ultrasound probes?

2       MR. HARRISON:  Objection.

3       THE ARBITRATOR:  I'm not sure this

4  witness was offered to opine on what constitutes

5  the basis for termination or not, and ultimately

6  those are the questions I'll be asked and his

7  opinion on those matters aren't helpful.  No

8  disrespect intended.

9       MR. RACHAL:  Well, the witness has

10  testified that the ultrasound probes are broken

11  based on usage and that the usage is random.

12       THE ARBITRATOR:  And based on all the

13  evidence it's up to me to decide whether

14  termination, again whether termination on the basis

15  of breakage was fair or appropriate or not.  That's

16  for me to decide.  What I need is information about

17  breakage, about what went on, about costs so that I

18  can have as much data as possible to make that

19  determination.  This witness is being placed in a

20  position for which he's not being offered.  So, I'm

21  going to sustain the objection.  That's beyond his

Page 1428

1    area of --

2              BY MR. RACHAL:

3         Q.    Would you agree that Dr. Tio controlled

4    the inventory level and the frequency by which the

5    inventory and supplies were used in the GI unit?

6         A.    To my understanding it was he that was

7    involved in the ordering of the equipment, but we

8    also went to him and said we need these probes, we

9    need these sphincter tomes and these catheters or

10   that sort of thing and he would put it on the list

11   to be ordered.

12        Q.    And these requests would come from the

13   private physicians as well as other physicians in

14   the unit?

15        A.    Yeah, because every physician has certain

16   likes and dislikes of what kind of equipment they

17   like to use.

18        Q.    And the usage would occur by Dr. Tio or

19   other physicians?

20        A.    Right.  We would all use the different

21   types of equipment there.

1      Q.    And equally would everyone be able to use

2    the supplies that are made available?

3      A.    Yes.   If that's the procedure you needed

4    to do and you required that supply you would be

5    given that supply.

6      Q.    Would you agree with the statement that

7    collar badge dosage in the GI lab have risen

8    significantly this year, being 2003, but do not

9    exceed the ALARA levels as being a basis for

10   termination?

11           THE ARBITRATOR:   I have the same problem.

12   This witness is not competent to opine on what or

13   what does not constitute a basis for termination.

14   He hasn't been offered.   There's no foundation laid

15   for that, no proffer.   He's not here for that.   But

16   he could testify as to the subject matter and what

17   went on at the Hospital Center.   That would be

18   valuable.

19           BY MR. RACHAL:

20     Q.    Has the GI lab in your experience

21   received excessive radiation dosage or collar badge

Page 1901

1  convenient.  We can take a two minute break if you

2  would, please.

3           (Recess taken -- 11:21 a.m.)

4           (After recess -- 11:21 a.m.)

5           THE ARBITRATOR:  I've accorded Respondent

6  a certain amount of time before which asking for a

7  proffer for continuing cross-examination.  Because

8  of my concern regarding prejudice which Respondent

9  raises but also to all parties in that -- Claimant

10  raises.  I'm sorry.  In that Claimants had 40 hours

11  plus of hearing time and Respondents had four plus

12  hours, my proposal is this.  I don't know how long

13  Respondent's case-in-chief is going to be.  Once

14  Claimant is finished with his hour -- and I'll add

15  time to it because I'm talking up time now -- my

16  proposal would be that we stop cross-examination of

17  this witness, put on Respondent's case-in-chief,

18  make sure that that's on and then to the extent

19  there's time left continue with any

20  cross-examination.

21           MR. HARRISON:  The only problem with that

Page 1973

1    there be no fear of retribution to the fellows, and

2    there were several comments that year from fellows

3    regarding Dr. Tio.

4              THE ARBITRATOR:   I'll permit one more

5    question on cross.

6              BY MR. RACHAL:

7        Q.    Can you identify any of those fellows,

8    Doctor?

9        A.    They were anonymous as I indicated.

10       Q.    So, you based a determination without Dr.

11   Tio having a chance to defend himself on some

12   anonymous claim.  Did you talk to any of the

13   fellows that were in the program at the Hospital

14   Center?

15       A.    Not to my recollection.  I talked to them

16   all the time, but about that specific issue not to

17   my knowledge.

18             THE ARBITRATOR:  Now we'll go to -- we're

19   going to go to redirect.  To make the record we've

20   had 52 hours of hearing time and Respondent has had

21   only four hours for their case-in-chief.  I cannot

Page 2063

the mitigation of damages has been established.    I

think once the mitigation was established and Dr.

Tio proved that he could not only equal but excel

what he had previously earned at Washington

Hospital Center, I believe the computation of

damages stops there.

Q.    Please tell us whether or not Dr. Edelman

included any fringe benefits in his calculation

located at Table 1?

A.    He did include a factor that in his

deposition he testified was for the assumed

employer payment based on national averages

attributable to things like a 401K employer

contribution that was essentially a hypothetical

component and was based on normative data that he

evaluated loosely.

Q.    In your opinion was the inclusion of this

employer pension contribution appropriate?

A.    No, it was not.

Q.    Why not?

A.    Because I believe the objective was to

# Exhibit L

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the matter of
the Arbitration between

THIAN LOK TIO
169 Detroit Street
Los Angeles, California  90036,
        And
MRS.*TING SONG S. TIO*
169 Detroit Street
Los Angeles, California  90036,

*Petitioners,*

        v.                                    Civil Action, File No:
                                              _____

WASHINGTON HOSPITAL CENTER CORP.,
t/a WASHINGTON HOSPITAL CENTER, et al.,
110 Irving Street, N.W.
Washington, D.C.  20011,

*Served: Registered Agent        and    Attorneys of Record*
*        C T Corporation System          Keith Harrison, Esq.*
*        1015 15th Street, N.W.           Trina L.Fairley, Esq.*
*                                         CROWELL & MORING, LLP*
*        Suite 1000                       1001 Penn.Ave.,N.W.,*
*        Washington, D.C.  20005          Washington, D.C. 20036*

    AND
MEDSTAR HEATH INC.,
t/a MEDSTAR HEALTH, et al.,
110 Irving Street, N.W.
Washington, D.C.  20011,

*Served: Registered Agent        and    Attorneys of Record*
*        C T Corporation System          Keith Harrison, Esq.*
*        1015 15th Street, N.W.           Trina L.Fairley, Esq.*
*                                         CROWELL & MORING, LLP*
*        Suite 1000                       1001 Penn.Ave.,N.W.,*
*        Washington, D.C.  20005          Washington, D.C. 20036*

*Respondents.*

## PETITION TO VACATE ARBITRATION AWARD

    Petitioners, Mr. Thian Lok Tion and Mrs. Ting Soan S. Tio,

1

by and through their counsel, pursuant to Title 9, United States
Code, Section 10, petitions and moves this court for an order
vacating the award of the arbitrator herein and remanding all
issues for new arbitration hearing before a new arbitrator, in
support thereof, respectfully states as follows:

1.    Petitioner Dr. Tio, is an individual, party to a
contract of employment, and Petitioner Mrs. Tio, is the wife of
Dr. Tio and beneficiary under to said contract, who now reside at
169 South Detroit Street, Los Angeles, California 90036.

2.    Respondents Washington Hospital Center Corporation,
trading as, Washington Hospital Center ("WHC") and Medstar
Health, Inc., trading as Medstar Health, the parent corporate
entity of WHC, are corporations duly organized and existing under
the laws of the State of Delaware, with its principal place of
business as a treatment, training and research hospital in the
city of Washington, D.C. at 110 Irving Street, Northwest.

3.    The jurisdiction of this court, over the persons and
subject matter of the above-captioned matter, is invoked under
Title 9, United States Code, and particular Section 10 thereof,
and under Title 28, United States Code, Section 1332, on grounds
of diversity where the amount in controversy exceeds, exclusive
of interest and costs, $50,000.

4.    On or about December 12, 2000, Respondents and
Petitioners Tio, entered into an agreement in writing for
employment which provided for the arbitration of disputes arising
under the agreement, a copy of which is attached hereto and

2

incorporated by reference herein as part of the Transcript Exhibit, and made a part hereof.

5. This contract involves interstate commerce as is shown by the following facts:

(a) duties of Dr. Tio, the first District of Columbia licensed Foreign Physician of Conceded Eminence for Gastrolory as a specialist in the field of endoscopic ultrasound (EUS) included patient care services and treatments, fellowship education and training, medical protocals, publications and research for illnesses and disease in patients from all over the country and the world;

(b) he rendered professional medical services by lectures given, submitted research proposals, awarded grants, made consults, and received referrals from other physicians and patients all across this nation and from foreign countries; and

(c) he performed such other valuable activities that were being engaged in that affected such commerce.

6. The employment contract contains in Clause 12 an agreement to settle by arbitration "any controversy, dispute or disagreement arising out or relating to the contract or the breach thereof.

7. The arbitration agreement provides that judgment shall be entered by a court of competent jurisdiction upon an award made pursuant to arbitration under the agreement.

8. On April 18, 2003, the following controversy arose out of the contract: the wrongful termination of Dr. Tio allegedly

3

for clause as charged in the letter of termination of same date,
a copy of which was attached and incorporated by reference as
part of the Transcript Exhibits, and made a part hereof.

9.    Significantly, however, the arbitration provisions in
the employment agreement is not applicable to the dispute and
other issues of separate contracts and torts, because the dispute
arose after the employment agreement was terminated by
respondents.   Without invoking arbitration of this dispute to
enable petitioner Tio's  challenge against to the alleged
grounds, respondents terminated Dr. Tio for cause without hearing
of compliance with grievance procedures under the Employee
Handbook. Petitioners timely filed a complaint for relief in D.C.
Superior Court, a copy of which was attached and incorporated by
reference as part of the Transcript Exhibits.

10.    Furthermore, the arbitration provision is not
applicable to the contractual dispute of tortious interference
with present, past, and prospective contractual business client
relationships between Dr. Tio and other third parties.   This
would include his "present, past, and prospective" patients, his
similar referring physicians and his similar medical equipment
company associates.   As a result of these acts and omissions,
his was denied an ability to retain or obtain their future
engagements or compensation and was prevented from taking his
"book of business" for himself or other prospective hospital
employers. These facts were presented by testimony of witnesses
and document evidence from patients and colleagues.   See

4

Transcript Exhibit Testimony of Mrs. Lope, Mr. Ayers, Ms. Beltri, Dr. Abernathy, Dr. Dixit, Dr. Salcedo, and Dr. Edelman, a copy of which was attached and incorporated by reference as part of the Transcript Exhibits, respectively, and made a part thereof.

Respondents willfully and intentional refuse to inform his existing patients, both under his present and past treatment and care, his peer physicians, his business associates and his fellows of his new contact information as requested by them in writing. But rather, Respondents intentionally attempted to retain such patients and referrals for treatment to their doctors for their own financial benefit to the detriment of Petitioner Tio. This interference with prospective business relationships is an independent and separate arising apart from any basis for termination, and was malicious for purposes of retaliation for petitioner's being offer another position after is first termination "without cause" based on alleged budgetary and economic reasons. This first firing was unrelated to his professional performance. It was reverse based upon the out cry from private physicians. It did not make sense to fire the person who exceeded his budget by 125% when other lesser revenue producing doctors were retained such as DR. Bull-Henry, Dr. Sherker, Dr. Gold, and Dr. Burakoff. The second firing was done after Dr. Burakoff and Dr. Wartosky found a program listing Dr. Tio in error as on the faculty of another hospital, Cedar Sina in California. The arbitrator refused to acknowledge these contradiction in facts and the real motivation behind the second

5

termination was for retention of Dr. Tio's clients and retaliation for his disloyalty in taking such position after reinstatement following the first termination allegedly "without cause". In arbitration of this prospective business claim, the arbitrator exceeded the scope of this authority under the contract's arbitration clause and exercised manifest disregard of the know law on interference with prospective business relationships in this jurisdiction. See Petitioners Post-Hearing Brief, a copy of which is attached hereto and incorporated by reference herein as Exhibit 1, and made a part hereof. Yet, despite this issue's inclusion in arbitration, the decision of the arbitrator is completely silent as to a decision on this claim without accepting or admitting its nonarbitability.

12. Respondents filed to enforce arbitration which was granted by U.S. District Court under Civil Action No. 04-0701, on file in this court.

13. Pursuant to this court's decision, the parties then submitted the controversy to arbitration. Following the procedures provided by the arbitration agreement, the parties selected Mr. Jerry Roscoe of JAM Arbitration Group as the arbitrator to determine the issues in controversy.

14. Thereafter, the matter was present to the arbitrator. Upon the receipt of written pleadings for summary judgment, the arbitrator granted, in manifest disregard of the law and public policy, partial summary dismissal of nearly all petitioners' major claims and all key individual parties, without oral

argument or other hearing.  Although issued several months after
filing, this decision was done with a single sentence.  The split
decision without any recap of the grounds is error because it
combined and interrelated facts and law governing these complex
claims and parties.  It establishes that the arbitrator, knew the
law governing summary judgment but chose to misapply it, in
manifest disregard of the law, so as to be able to impose his own
personal standards and industrial brand of justice.  To find
sufficient facts to permit breach of contract claim but eliminate
all individual parties involved is totally inconsistent and
illegal.  Moreover, this partial finding is wrong with regard to
claims of discrimination where the breach of contract could be
based on such grounds.  It is against public policy where
petitioners have had to pay for half of the fees and expenses to
try constitutionally protected issues when others do not have to
do as well.  This is a violation and denial of equal protection
clause and due process. The decision must be vacated because the
arbitrator exceeded his authority, and while knowing the law,
acted in manifest disregard for the law, and acted against the
dominant public policy which fervently fosters equal protection
and due process against discrimination, whether racially or
national origin based, in both Federal and state law.

15.  As a further display of the arbitrator's partiality,
this clavier action, was cleverly timed to be issued just prior
to hearing when it had been pending for months.  This was
designed with a intentional  disregard for due process and with a

7

totally manifest disregard for the law governing such partial
summary judgment rulings in this jurisdiction in order to deny
Petitioners a full, fair and impartial hearing on all issues.
Subsequently, with a record display of further partiality, the
arbitrator rulings endeavored to elimininate and 'restrict the
claims, the parties,   the number of witness, the timing and
order of presentation of Petitioner's case in chief in order to
deny Petitioner's right to due process of law.  This abuse of
authority and interference is against both Federal and state
public policy which abhors all forms of discrimination and
disparate treatment against a member of a protected class
possessing constitutionally protected rights against race and
national origin discrimination.  In the hearing, petitioners'
request for reconsideration of its opposition to grant of partial
summary judgment was denied without grounds expressed. On January
11, 2008, in the city of Washington, D.C., which is within the
district in which this Court sits, the arbitrator's final award
in writing was release for service upon the parties, whereby he
granted judgment for respondents and rejected the remaining
claims of petitioner Dr. Tio.

16.    The JAM Arbitration group lacked authority to hear
these contractual and tortious disputes.

17.    The JAM Arbitration group and the District Court
overruled petitioners' objections to the arbitrability of these
matters.

18.    Thereafter, the JAM arbitrator entered an awarded in

8

favor of defendants that denied plaintiffs any recovery of loss wages, compensation for grants raised, and deferred compensation including fringe benefits of pension, health, insurance, medical and hospitalization, moving expenses, lost on forced sale of former local residence real estate, wife's business income and consortium that exceeds $50,000, a copy of which award decision, issued January 11, 2008, is attached hereto and incorporated by reference herein as Exhibit 2, and made a part hereof.

19.   Since the arbitrator lacked authority to enter this award, there is a patent irregularity in the arbitration process that constitutes a sufficient basis to vacate the award.

20.   Moreover, the arbitrator's award should be vacated for the following statutory reasons under Title 9, Section 10 (a):

A.   The arbitrator was required to allow the plaintiffs an opportunity to present their full case and otherwise received a fundamentally fair hearing which was denied by:

1. One sentence decision to grant partial summary judgment for Respondents which cut off multiple claims for damages for tortious interference with prospective contract, defamation, and discrimination against public policy;

2.   Denying motion for reconsideration without the opportunity to reply or argue the same before the arbitrator;

3.   Denying the petitioners the opportunity to call certain key witnesses at trial; taking testimony of petitioners witness out of arbitrator's presence and refusal to place deposition testimony on the record; denying the opportunity for petitioners

9

to present rebuttal testimony by witnesses or other evidence;
denying the petitioners request for its full witness list and
directing which witness that could be called; refusing to direct
defendants' witnesses to be  instructed to answer as presented or
to be permitted to be evasive delaying the proceedings.

11.  The arbitrator deprived petitioners of a fair hearing,
in violation of Title 9, section 10(a) by a manifested disregard
on the law and the evidence that is inconsistently presented in
the award decision.

12.  The arbitrator deprived plaintiffs of a fair hearing,
in violation of Title 9, section 10(a) by a manifested display of
partiality reflective of pre-judgment of the evidence before
being heard  that is evident during the hearing and
inconsistently presented in the award decision.

13.  The arbitrator deprived petitioners of a fair hearing,
in violation of Title 9, section 10(a) by a denial to grant
continuance for new trial date; cutting short trial time;
extending time deadlines for respondents after only after
decision to set firm dates, that is inconsistently presented in
the objective hearing before award was decided.

14.  In making the award, the arbitrator was guilty of
misconduct in that he refused to hear evidence that was pertinent
and material to the controversy and that supported petitioner's
claims.  The evidence that the arbitrator refused to hear
included as follows:

10

(a)  testimony  taken,  during  the  hearing  outside  of  his
presence,  of  Mrs.  Lopez,  the  wife  of  hospitalized  patient  that
was  always  at  bedside  of  patient  treated  by  Dr.  Tio;

(b)  testimony  of  other  patients  of  Dr.  Tio  to  show  total
revenue  generated  due  to  high  income  for  specialized  procedures
given  the  difficulty  and  complexity  of  his  case  and  time
requirements  for  such  procedure  done  with  highest  regard  for
patient  care  versus  simpler  procedure  performed  by  other
physicians  in  the  same  unit;

(c)  testimony  of  other  physicians  and  fellows  as  to  Dr.
Tio's  leadership  in  running  the  unit,  treatment  and  behavior  with
other  doctors,  fellows,  nurses  and  employees  in  the  unit;
testimony  of  equipment  company  representatives,  such  as  Mr.
Darral  Testor,  although  listed  could  not  be  called  to  due
inability  to  schedule  appearance  when  interrupted  by  arbitrator's
interference  with  the  order  of  Petitioner's  case.

(d)  rebuttal  testimony  of  witness  to  refute  testimony  of
respondents  witnesses  because  no  rebuttal  testimony  was
permitted.

15.    In  making  the  award,  the  arbitrator  was    evidently
partial  to  respondents  in  that  arbitrator  repeatedly  allowed
respondent  witnesses  to  be  non-responsive  to  questioning,  be
argumentative,  and  be  evasive  without  instruction  or  penalty:
including:  (a)  Susan  Hart;  (b)  Dr.    Wartoski;    and    (c)Dr.    Bull
Henry,  as  compared  with  his  treatment  of  petitioners'  witnesses

11

who were threatened with comments of disbelief and trival relevance while testifying:

(a) Dr. Abernathy; (b) Dr. Salcedo; (c) Ms. Beltri; (d) Mr. Ayers; and (e) Dr. Tio.


WHEREFORE, Petitioners pray for judgment against Respondents as follows:

1.   For vacation of the arbitration award and remand for a new arbitration hearing before a new arbitrator.

2.   For the costs of the arbitration proceeding, this motion, and reasonable attorneys' fees.

Respectfully submitted,

Dated: 4/10/08

John Rerazich, Esq.
D.C. Bar No. 027144
1835 Irving Street, N.E.,
Washington, D.C. 20010
(202) 986-9500

Attorney for Petitioners

12

# Exhibit M

**JAMS ARBITRATION MATTER**

THIAN LOK TIO, M.D. ET AL., )
                          ) JAMS REF. 1410003842
             PLAINTIFFS, ) ARBITRATOR: JERRY P. ROSCOE
v.                               )
                               )
WASHINGTON HOSPITAL      )
CENTER ET AL.,              )
                               )
         DEFENDANTS.     )

### CLAIMANTS' OPPOSITION TO RESPONDENTS' MOTION FOR SUMMARY JUDGMENT

Claimants, by their counsel, pursuant to Federal Rule of Civil Procedure, Rule 56, file this opposition  in response to Respondents' Motion for Summary Judgment for the following reasons:

1.  Generally, certain classes of cases are not considered suitable for a total disposition by way of summary judgment. See Bartley v. National Rehabilitation Hospital, 1996 U.S. Dist. LEXIS 5298 (D.C. 1996)(holding that summary judgment in discrimination cases must be approached with special caution and the Court "must be extra-careful to view all evidence in light favorable to the plaintiff); Ross v. Runyon, 859 F. Supp. 15, 21-22 (D.D.C. 1994).  The claims in this case present certainly one such class.  The many tortious and negligence issues presented are ordinarily not susceptible of summary adjudication. Davis v. Henderlong Lumber Co., 221 F.Supp. 129 (Ind. 1963). In particular, this Circuit has held that because proof of

discrimination may be difficult for a plaintiff to establish, the Court should use summary judgment motion with special caution." Childers v. Slater, 44 F. Supp. 2d. 8, 15 (D.D.C. 1999)(citing AKA v. Washington Hospital Ctr., 325 U.S. App. D.C. 255, 116 F. 3d 876,879 (D.C. Cir. 1997)). Furthermore, the District of Columbia's Human Rights Act makes it "unlawful and discriminatory practice for an employer to "discharge" any employee for "wholly or partially" for a discriminatory reason based upon the actual or perceived race." See D.C. Code § 2-1402.11(a)(2001); Price v. Washington Hospital Ctr., 321 F.Supp 2d. 38 (D.C. 2004).

In addition, cases involving state of mind present factual issues rarely determinable on motions for summary judgment. As noted in Alabama Great v. Louisville, 224 F.2d 1 (Ala. 1955), the principle is that where motive, intent, subjective feelings and reactions, consciousness and conscience, are to be searched. Indeed, such critical facts should more properly be tried in the ordinary manner such that the trier of facts may fully test credibility of witnesses under direct examination and cross examination. These are necessary instruments and processes for obtaining the truth that the issues and facts may not be disposed of on summary judgment.

2

2.  The burden of proving the nonexistence of a genuine
issue as to any material fact(s) is on the party who moves
for summary judgment.  Accordingly, any doubt as to either
the genuineness of a fact issue appearing on the face of the
pleadings, or as to the materiality of the fact in issue,
will be resolved against the moving party.  Moreover, the
evidence presented must be construed liberally in favor of
the party opposing the motion.  U.S. v. Diebold, Inc., 369
U.S. 654 (1963); Childers v. Slater, 44 F. Supp. 2d. 8, 15.
Any failure of the opposing party to submit competent proof
in opposition to a motion for summary judgment will not
avail if the moving papers themselves disclose the existence
of such an issue or issue as in this instant case.

In addition, a fact asserted in, or properly inferred
from, acceptable evidence proffered on behalf of the party
opposing the motion will be treated as verity for purposes
of disposing of the motion for summary judgment.  It has
been recognized that verified pleadings that meet the
standards required for affidavits under Federal Rule of
Civil Procedure, Rule 56(e) may be treated as affidavits in
support of a motion for summary judgment.  See Fowler v.
Southern Bell Tel. & Tel. Co., 343 F.2d 150 (1965, CA5 Ga).
The respondents failed to point out the fact of claimants'
verified pleadings in their motion to side step its affect

3

upon their opinions and allegations contained in their motion. This was done because by definition, a motion for summary judgment cannot be granted if there is dispute as to material facts. Furthermore, the existence or nonexistence of such a factual issue is a question for the independent determination by a court or the arbitrator. Fountain v. Wilson, 336 US 681(1949), *rev* 171 F.2d 999 (App.D.C. 46). The purpose of Rule 56 is not to cut litigants off from their right to a full evidentiary hearing before a trier of facts in dispute. Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, *reh den* 322 U.S. 767.

5. Although the rules of evidence at trial will control as to the evidential value or admissibility, there are two aspect that are worthy of attention in this instance. One, the documents proffered by respondents must be, but have not been , appropriately certified or their authenticity established in a manner that would permit them to be received in evidence as an exhibit at trial for the purpose used on the motion for summary judgment. See Steven v. Roscoe Turner Aeronautical Corp., 324 F.2d 157 (Ind. 1967) unauthenticated copy of testimony could not be used on motion for summary judgment. Two, but where the court would normally not be able to consider otherwise inadmissible evidence at trail, may properly consider the same in ruling

4

on the motion for summary judgment.  See Klingman v. National Indem. Co., 317 F.2d 850 (1963, CA7 Wis); Mitchell v. Dooley Bros., Inc., 286 F.2d 40 (1960, CA1 Mass). This is contrary to the respondents' position as to use and consideration of the alleged hearsay evidence noted on the record in their motion.  When determining whether to direct of verdict on summary judgment, the court will ignore personal conclusions as to motive or credibility in order to liberally construe such statements and other evidence so that to the fullest extent, it may, it is viewed in the light most favorable to the party opposing the motion for summary judgment.  Similarly, affidavits, which are technically not evidence, are authorized in order to provide in a summary judgment proceeding a means of determining whether an apparent issue(s) of fact (i) does not exist or (ii) is not genuine or (iii) is not material to the propositions of law determinative of the controversy. General Constr. Co. V. Hering Realty Co., 201 F.Supp. 487 (1962, DC SC).  But the determination of the existence or nonexistence is viewed most favorably in opposing the motion for summary judgment.  Accordingly, if different inferences can be drawn by a reasonable man from the facts, an issue of fact is considered to exist and summary judgment must be denied.  This is especially so, given where a determination

5

of Dr. Tio's and his wife's element of motive or of
credibility is involved in the determination as to the
genuineness of an issue as to a material fact  that may be
involved in a claim of discrimination or antitrust.  In both
claims, alleged discrimination and alleged antitrust
violations involve elements of motive and intent and for
that reason are not ordinarily considered suitable to a
disposition on a motion for summary judgment.  In Poller v.
Columbia Broadcasting System, 368 U.S. 464 (1962) the court
stated:

> We believe that summary procedures should be used
> sparingly in complex antitrust litigation where
> motive and intent play leading roles, the proof is
> largely in the hands of the alleged conspirators,
> and hostile witnesses thicken the plot.  It is
> only when the witnesses are present and subject to
> cross-examination that their credibility and the
> weight to be given their evidence can be
> appraised.

Thus, manifestly, if there exists a dispute of a fact which
is material to:

(1)  establishing the cause of action

(2)  establishing the defense imposed; or

(3)  justifying the relief sought;

it follows that a summary judgment cannot be so ordered.
The phrase "as a matter of law" does, however, connote a
basic discretion in the trial court to deny the motion and
require a formal trial. Therefore, the requirement that the

6

successful party be entitle to judgment as a matter of law is a limitation and not a mere redundancy.

6.    This profuse motion contains twenty-four (24) Exhibits which amounts to more than three hundred plus (300+) pages of documents.  The number of exhibit pages is actually more since Respondents have chosen to copy four (4) pages on a single page in several incidents.  This palters of paper, by its sheer weight alone supports the notion that there are more facts than law that must be decided by the trier of fact and cannot be ignore.

7.    Respondents' contains many misstatements and ill formed conclusions that are not in fact supported by the record and are in dispute based upon the verified complaint and the exhibits and testimony of the parties. Specifically, Dr. Tio did not abandon his work based upon his own belief, behavior and the actions of his patients who continued inquire of his status in order to procure his services.  See Affidavit of Dr. Tio and Letters of WHC Patients treated by Dr. Tio.

Witnesses schedule to testify for claimants will support the fact that Dr. Tio's revenues and endoscopic procedures and patient care continued until the very end of his tenure despite the wrongful termination. See Affidavit of Dr. Tio. It is wrong to allege that the leave was

7

unauthorized when this was in part how Dr. Tio was able to obtain patient referrals from across the globe, from other physicians who heard his lectures, read his papers and participated in his seminar and symposiums. Dr. Tio was encouraged to continue such activities. This was written in as permitted and encourage as part of his contract. The respondents were acutely aware of Dr. Tio's international distinctions in the medical community and while he was at Georgetown University Medical Center and from which they induced him to leave.

The respondents knew, and this court should take judicial notice of the special license that Dr. Tio had been granted by the District of Columbia Medical Board. He received the first medical license issued in D.C. based on "medical imminence " as recognized international as a outstanding specialist in a given field of medical science. To hold this active license he had to be associated with a local medical institution that would vouch for and require his special skills and services. It is wrong to assert the Dr. Tio personally "hired counsel to change the law to become a doctor." By judicial notice the law does not read nor is named for Dr. Tio. This law is known as the Eminent Physician statute in the District of Columbia. It was and is modeled after a similar statute first passed in

8

neighboring state of Maryland.  Other like statues can be found on the books in other states.  The D.C. Law was passed with the efforts of Georgetown Medical Center which has now been acquired by the respondents such that the continued existence of this statute without repeal or amendment benefits and serves the interests of the respondents and not that of Dr. Tio.  He is no longer able to obtain work in the District of Columbia due to the monopoly that respondents have over all major hospitals.

Equally, it is inaccurate to state that his revenues declined, when it is in dispute as to why this occurred. Furthermore, the action taken was different, disparate, and discriminatory as compared with other white physicians whose income declined in other years and in the same period with no adverse actions against them.  The respondents controlled how the referrals were made to which physicians.  Both in terms of the number of cases and dollar value of the procedures to be done in those cases. They could reduce Dr. Tio's case load or the quality of that case load. In fact, such referrals could ensure that he would receive work on the less paying procedures and operations.  Thus, any incentive pay would be limited or maximized according to the WHC's goals.  The respondents could decide what income could

9

be shared and what the percentage would be for every physician it employed.

8.  Claimant Tio proffers an affidavit to refute many of the mere allegations and assertions of fact that the respondents must alleged to have the court entertain this motion.

9.   For the aforementioned reasons, Claimants counsel requests that the motion for summary judgment be denied with prejudice.

Respectfully submitted,


Anthony M. Rachal III
D.C.Bar No. 229047
Edmonds Bldg.-Capitol Hill
903 D Street, N. E.
Suite 200
Washington, D.C. 20002
(202) 393-7000

Attorney for Claimants

10

**JAMS ARBITRATION MATTER**

THIAN LOK TIO, M.D. ET AL., )
                            ) JAMS REF. 1410003842
            PLAINTIFFS,   ) ARBITRATOR: JERRY P. ROSCOE
v.                              )                   )
WASHINGTON HOSPITAL     )
CENTER ET AL.,              )
                                 )
         DEFENDANTS.    )

## ORDER

Upon consideration that Respondents have filed a motion for Summary Judgment pursuant to Federal Rule of Civil Procedure, Rule 56, and the court has been advised of the facts and circumstances, including opposition of the Claimants, the verified Complaint and Affidavit.

For good cause, it is ordered that respondents' motion is denied.

          _____
             [Date]

                                        _____
                                        Jerry P. Roscoe,
                                        Arbitrator

Copies to all parties.

## **CERTIFICATE OF SERVICE**

I hereby certified that a copy of the Claimants' Reply in Opposition to Respondents' Motion for Summary Judgment with Affidavit in Support and proposed Order was deliver by first class mail, postage prepaid and facsimile this 30th day of November, 2006 to Counsel of Record for Respondents Washington Hospital Center, *et al.*, as follows:

Keith Harrison, Esq.
KING, PAGANO & HARRISON
1730 Pennsylvania Avenue, N. W., Suite 900
Washington, D. C.  20006


_____
Anthony M. Rachal III

12

# Exhibit N

## JAMS ARBITRATION MATTER

**THIAN LOK TIO, et al.,**
*Claimants,*

V.

### JAMS REF. 1410003842

**WASHINGTON HOSPITAL CENTER, et al.,**          Jerry P. Roscoe, Esq.
*Respondents.*                                   Arbitrator

## CLAIMANTS' POST HEARING BRIEF

Claimants, by their counsel, pursuant to the request of the Arbitrator in this matter

files this Post Hearing Brief as to Claimants' claims and basis for recovery, as follows:

I.    **INTRODUCTION**

This Post Hearing Brief is filed in support of the issues and claims argued in the case

brought by Dr. Thien Lok Tio and his wife against Dr. Tio's former employer, the Washington

Hospital Center ("WHC"), its parent corporation MediStar Inc., and associated individuals.

Prior to his discharge on April 18, 2003, Dr. Tio was employed by WHC under a written

contract. Dr. Tio was born in Indonesia and is a citizen of Germany with a national and

international reputation in the specialized field of advanced endoscopic ultrasound for

gastroenterology medicine. Dr. Tio, because of his national origin and race was discriminated

against with respect to compensation and his termination. He held the first issued District of

Columbia license for eminence in the field of endoyscopic ultrasound due to his association with

a hospital or medical teaching institution. Only through satisfaction of this requirement would

the special licensing requirements be authorized under the District of Columbia's Eminent

Physician Law under the D.C. Code. With this specially required hospital sponsorship, Dr. Tio

spent ten years as a staff physician and professor at Georgetown University Medical Center

("Georgetown Hospital") before, according to the hearing evidence, he was recruited and

enticed away by the WHC. Because Georgetown Hospital was acquired by the WHC before his

departure, Dr. Tio was not able to return there to resume his past position or any other hospital

affiliated with MediStar the parent of WHC. There are limited opportunities for Dr. Tio to

practice his unique and specialized skills and to serve his former, present and prospective clients

in this area. The hearing evidence has shown that "part of the invidious discrimination suffered

by plaintiff was that similar and lesser credentialed white male physicians were better treated and

paid more than plaintiff."

In addition, Dr. Tio's evidence has demonstrated that because of the highly technical and

expensive equipment requirements in this specialized field, there are limited hospitals with the

financial resources to acquire and maintain such equipment. Dr. Tio contends that this fact,

when combined with such mandatory licensing sponsorship by a hospital, placed him in a

weakened bargaining position, and WHC/MedStar held the key to his ability to practice in the

District of Columbia. He argued before this arbitration that this unequal bargaining power made

his contract of employment one of adhesion for which he had little or no options, that the terms

of the proffered Agreement were non-negotiable and placed plaintiff in a "take it or leave it"

position including any compensation adjustments. Dr. Tio further has argued that

WHC/Medstar's monopolist position in the hospital service industry creates noncompetitive

market power; thus, by their dominance in this health care market, they maintain an

uncompetitive advantage over Dr. Tio for his medical skills and services and his ability to

practice his profession and earn a living. The public and other physicians are allegedly harmed

2

by the lack of competition for such medical care and services.

The reason Dr. Tio was recruited and hired by WHC was ultimately to acquire the "book of business" – his client base, developed in the course of his practice as a physician – that came from the patients of his that followed him from his last employer, Georgetown Hospital, to the WHC. The specific contention is that WHC has intentionally did so to keep, steal, or interfere with these transferred patients from following Dr. Tio by now suggesting they use a WHC doctor, and that they provided no information about Dr. Tio when they had his e-mail and home address, and that they fired him in retaliation because they believed he had taken a new position at Cider Sini in Los Angeles, California. The hearing evidence testimony of Dr. Tio's patients, Marc Ayers and Mrs. Victor Lopez, posited that patients' rights should prevail, and the right of Dr. Tio to follow clients' progress after medical treatments or procedures in order to avoid personal malpractice liability that could arise if a patient does not recover or respond to such procedure or treatment.

As in *Wright v. Southern Mono Hospital District*, 631 F.Supp. 1294 (E.D. Cal 1986) [plaintiff physician alleged that defendants interfered with plaintiff's relationship with his patients by attempting to influence medical board to refuse to certify plaintiff], WHC has attempted to influence Dr. Tio's patient to use another doctor, specifically one of theirs. See also, *Ramona Manor Convalescent Hospital v. Care Enterprises*, 177 Cal. App.3d 358, 222 Cal. Rptr. 841 (1986) withdrawn, reprinted as mod. 177 Cal. App.3d 1120, 225 Cal. Rptr. 120 (1986) [finding of liability upheld despite lack of evidence that defendant was anything more than indifferent to plaintiff where defendant's unlawful detainer against property rented from a third party prevented plaintiff from taking possession]; *Southern Bell Telephone & Telegraph Co. v*

3

*Roper*, 482 So.D. 538 (Fla. App. 1986) ["constructive" intent may be found where defendant's methods are improper]. WHC exhibited extreme indifference to these concerns and interests of both Dr. Tio and his patients by their delay in replying, and in most cases by the total lack of responsiveness, to these reasonable requests for contact information. This behavior is equally actionable as proof of actual or "constructive" intent to prevent prospective business relationships. Courts have held that it is sufficient if the source of the lost business opportunity is simply an identified class of yet unknown customers or clients who might be in the market for the product or service offered by the claimant. *Bulter v. Pultizer Publishing Co.*, 684 S.W.2d 473 (Mo. App. 1984) [unknown prospective clients of psychic reader are source of lost business opportunity]; *Blatty v New York Times Co.*, 184 Cal. App.3d 1144, 221 Cal. Rptr. 236 (1985), superseded 42 Cal.3d 1033, 232 Cal. Rptr. 542, 728 P.2d 1177 (1986) [unknown prospective purchasers of novel written by plaintiff were source of lost business opportunity].

Dr. and Mrs. Tio initially filed a lawsuit in the Superior Court in the District of Columbia on March 17, 2004, which the defendants removed to federal court and moved to dismiss based on the arbitration clause in the employment agreement. The court granted the defendant's motion and the case is now before arbitration. Several of Dr. Tio's lawsuit counts involve claims during the contract period, as well others after the alleged breach of contract by defendants, involving defamation/slander, tortious interference with prospective business relationships, and intentional infliction of emotional distress, and derivative-spousal claims by Mrs. Tio. Although the actions asserted by Dr. Tio in the complaint included: 1) tortious breach of contract; 2) tortious interference with contract of employment; 3) denial of common-law good faith and fair dealing; 4) tortious interference with third-party physician-patient contracts; 5)

4

defamation/slander; 6) intentional infliction of emotional distress; 7) fraud/misrepresentation; 8) antitrust violation; and 9) wrongful discrimination under state and federal law, the Arbitrator has wrongfully limited the hearing to breach of contract related claims.

One significant issue is interference by the WHC in preventing Dr. Tio from having his patients know how to reach him after he was dismissed. As noted above, claimant has taken the position that this breached his right to continue his income with the patients and take this "book of business" to other employers, and his patients' right to continue to hire him as a physician, and that these facts and circumstances support the claim of tortious interference with third-party physician-patient contracts; that is, the claim alleges a breach for interference with contracts between Dr. Tio and the patients -- not between Dr. Tio and WHC, including existing follow-up care for previous treatments, but also prospective business for future treatment and care. However, WHC takes the view that law in D.C. is that there is no contract between a doctor and his patient recognized by law; however, no contract is necessary for tortious interference with prospective business relationship with existing, past or future clients/patients under any potential third party contract.

Under D.C. case law, a physician can be held liable for failure to provide needed attention and care, because of a perceived decision to withdraw or a perceived abandonment when a patient is not informed of reasons or given reasonable notice of the withdrawal and the opportunity to obtain alternate care of their selection in consultation with their formerly selected physician. See *Stager v. Schneider*, 494 A.2d 1307, (D.C. App. 1985); *Quick v. Thurston*, 110 App. D.C. 169, 290 F.2d 360 (1961) [directed verdict]. This duty of attention and care not only arises during the pendency of the physician-patient relationship, but continues post-operative or

5

post-procedure, and may not cease post-discharged from the hospital, until such time as the

patient no longer requires medical attention to avoid complications to their recovery. See, e.g.

*Ascher v. Gutierrez,* 175 App. D.C. 100, 533 F.2d 1235 (1976) [District of Columbia law];

*Betsch v. United States,* 400 F.Supp. 238 (D. D.C. 1974) [Maryland law]; *Doan v. Griffith,* 402

S.W.2d 855 (Ky 1966) [failing to provide follow-up care or to monitor need for follow-up care];

*Wickline v. State,* 192 Cal. App.3d 1630, 239 Cal. Rptr 810 (1986) [defendant discharged

plaintiff when from hospital when still in need of attention]. In being able to contact patients to

provide them with a list of other physicians that their chosen attending doctor would recommend,

Dr. Tio could comply with this standard of attention and care. See *Miller v. Greater Southeast

Community Hospital,* 508 A.2d 927 (D.C. App. 1986) [in releasing patients after treatment].

The existence of a physician-patient relationship is shown or established by the patient

seeking medical attention from the doctor for symptoms subsequently treated by the chosen

physician or a promise of treatment as required. The record reflects years of such an established

relationship with patients-- Ayers, Lopez, and other international referred patients, and their

following Dr. Tio to another hospital. The principal of "patient first", warrants that the patient

has the right to expect that his chosen doctor will keep the patient, and himself informed, as to

the patient's condition, which cannot be done if he removes himself without notice or does not

contact the patient to be aware of what is happening to the patient. By withholding the requested

information, or failing to take specific action related to contact information, on Dr. Tio, WHC

gave the false impression that Dr. Tio had abandoned them or unilaterally withdrew his care

without proper notice or guidance for which they initially sought his medical opinions or

services. The record supports that this was intentionally done, by notices sent without such

6

information, particularly when it had been first requested by Dr. Tio himself and his patients.

Another issue the evidence Dr. Tio has presented raises whether, when one of the charges used as grounds for termination is refuted, the validity or reliability of other charges is called into question. This is so in this case where a second termination was initiated upon allegedly numerous grounds with multiple subclaims are apparently to overload the cause because there was no valid single cause in and of itself to support termination without the chance for remediation or confrontation in defense. This is particularly so when previously a without clause termination failed for adverse reaction by other private physicians and patients that were able to react to reverse the action before it became final at the end of the notice of termination period.

While WHC cited numerous grounds for its termination of Dr. Tio's employment, he refutes and denies all of these grounds, and contends that WHC summarily, and without cause, terminated his employment and revoked the contract. Dr. Tio contends that there was no opportunity for him to dispute the termination, that WHC rejected reinstatement or postponement of its decision pending arbitration, and that he and his wife were forced to sell their home and relocate in order to obtain continued employment.

The hearing evidence also described disparate treatment against Dr. Tio by WHC in granting administrative leaves, travel approvals, assignment of higher budget requirements and allocation for few cases to build-in a case for failure of performance when other physicians not meeting budgets were given satisfactory considerations and no termination of their contracts. In a particularly offensive instance, other employees were given administrative leave to attend the funeral of a former employee, but not the Director, as head of the unit, when the office in-fact

7

was closed to allow doctors and staff to attend and participate in the funeral services. The matter

was of such important to hospital personnel, that WHC also provided shuttle transportation for

them, but denied Dr. Tio's request for administrative leave in connection with the same event.

The unit was kept open only for emergency matters only and none of which required his

attendance. WHC assigned Dr. Tio higher revenue goals than required of other unit physicians

and handicapped his ability to meet such demands by allocating fewer cases for his billings.

Only in the second year of his employment, Dr. Tio travels were unequally and wrongfully

adjusted six months after his travel had been approved by his immediate supervisor's in

retaliation for his mistakenly being assumed to have taken a new position at another hospital.

Given his prior reputation and history of lecturing on his employment vitae, that required his

travel, both nationally and internationally, in response to the demand for his unique professional

skills, there were no adjustments in year one at WHC for Dr. Tio. Although his trips were

thought as "boondoggles" in year two, similar trips or cruises made by other doctors to allegedly

equally "exotic" locations or for similar periods of time were not complained about. These

activities required Dr. Tio to spend extended hours in advance preparation for and in their live

delivery at conferences which were above and beyond his standard 40 work hours of base

compensation. There was never any compensatory or overtime provided for such extra activities

which benefited the promotion and development of WHC's national and international reputation

in this medical field of specialty. Dr. Tio has argued that WHC's actions support a breach of

contract, duty of fair dealing, or discrimination as a matter of law because the discharge with

cause was not supported by substantial evidence, was not in accordance to law, or was arbitrary,

capricious, or an abuse of discretion. Claimant had contractual rights to continued employment

to enable compensation for equally as long as his ten year history of prior employment with an

8

affiliated hospital of WHC/Medistar, Georgetown University Medical Center. Although Dr.

Kathy Bull-Henry did not meet her budget goals, she was permitted to leave WHC without any

termination action and to be hired later at Georgetown hospital. Although Dr. Shurker and others

did not meet their budgeted goals by higher percentages, they too were not discharged or given

higher future goals but rather were rewarded with more case work I order to ease their

performance goals unfairly in comparison to those of Dr. Tio.

## II.  DISCUSSION

### A.  Tortious Interference With Patient-Physician Relationship, Prospective Business Opportunities

In *Business Equipment Center Ltd. v. DeJur Amsco Corp.*, 465 F. Supp. 775 (D.D.C.

1978), the court noted that "interference with business relations is a tort that can arise in two

situations." *Id.* at 788. The court described these as (1) where "there is interference with a

contract between the plaintiff and some third party," and (2) where the defendant interferes with

the "plaintiff's prospective business advantage." *Id.* (emphasis added). In *Paul v. Howard Univ.*,

754 A.2d 297, 309 (D.C. 2000), the D.C. Court of Appeals stated that the elements of tortious

interference with contract are: "(1) the existence of a contract; (2) knowledge of the contract; (3)

intentional procurement of a breach of the contract; and (4) damages resulting from the breach.

754 A.2d at 309 (footnote and citation omitted).

The elements of tortious interference with prospective business advantage mirror those of

interference with contract. *Id.; Brown v. Carr*, 503 A.2d 1241, 1247 (D.C. 1986). However, to

9

prevail, a plaintiff need not demonstrate the existence of a contract, but merely a prospective

advantageous business transaction. *Id.* The Court of Appeals has defined "prospective

advantage" as "business expectancies, not grounded on present contractual relationships [,] but

which are commercially reasonable to anticipate." *McManus v. MCI Communications Corp.*, 748

A.2d 949, 957 (D.C. 2000). Thus, to establish a prima facie case of tortious interference with

prospective business advantage, Dr. Tio need not show he had a contract with the subject

patients, but only that he had a reasonable expectancy or anticipation of their engaging his

services, that the defendants' interference with this expectancy was intentional, and resulting

damage. *See id; Alfred A. Altimont, Inc. v. Chatelain, Samperton & Nolan*, 374 A.2d 284, 289

(D.C. 1977); *Paul v. Howard Univ., supra,* 754 A.2d at 309.

      Moreover, under the most applicable case law in the D.C. Federal Circuit, proof of the

hospital's arbitrary and capricious actions toward Dr. Tio should satisfy the intent element for

this cause of action. *See Okusami v. Psychiatric Institute of Washington*, 295 U.S. App. D.C. 58,

959 F.2d 1062, 1069 (D.C. Cir. 1992). In *Okusami* a physician brought a diversity action against

a hospital, its medical director, and two affiliated corporations over their handling of his

application for admitting privileges at, and appointment to the medical staff of, the hospital. *Id.*

at 1063. While the court affirmed the lower court's dismissal of the physician's claims for

violations of antitrust laws, intentional infliction of distress, denial of due process, and

conspiracy, it remanded his claims of negligence and "tortious interference with

plaintiff-physician's business relationship with his patients." *Id.* Significantly, the majority

opinion in the *Okusami* case did not include a separate element of improper intent in its

formulation of the doctor's tortious interference claim. *Id.* The majority soundly rejected

10

defendants' argument that the plaintiff had not alleged "an intent to interfere by defendants[,]" stating:

> Not so. See paragraph 19 ("Defendants purposefully applied the peer review process discriminatorily to him to interfere with his function as a physician"); see also paragraph 30 ("Defendants' failure to afford him the process and protections encompassed in its bylaws amounted to arbitrary, capricious, and otherwise discriminatory conduct . . . against him as a physician, and thus tortiously interfered with Plaintiff's business relationship with his patients"). We therefore hold that the claim for tortious interference, like the claim for negligence, is adequately pled.

*Id.*

In sum, the *Okusami* majority found the physician's tortious interference claim to have been adequately pleaded by the barebones assertion that "defendants' failure to afford [the physician plaintiff] the process and protections encompassed in its bylaws amounted to arbitrary, capricious, and otherwise discriminatory conduct . . . against him as a physician, and thus tortiously interfered with Plaintiff's business relationship with his patients . . . ." 959 F.2d at 1066 (emphasis added). According to this analysis, in a case (such as Dr. Tio's) involving a physician's claim of improper or unfair application of a hospital's peer review process, a finding of arbitrary and capricious action will satisfy the element that the interference was *intentional*. See *id.*; *cf. Canady v. Providence Hosp.*, 942 F. Supp. 11, 18 (D.C. Cir. 1996), *aff'd* 1997 U.S. App. LEXIS 34885 (1997) ("According to [the analysis in *Okusami*], in a case involving a physician's claim of improper or unfair application of a hospital's peer review process, a finding of arbitrary and capricious action would satisfy the element of a purpose more culpable than intent.") (internal quotations omitted).

The hearing testimony from Dr. Tio and his patients, Mr. Marc Ayers and Mrs. Victor

11

Lopez, in arbitration supports this interference with *prospective business advantage* relative to

his former client's interests, efforts to continue their medical relationship of physician/patient for

a  base place in his "book of business." By eliminating proof of contract with those patients as

an element, this type of interference claim effectively overcomes WHC's argument that there is

no contract between a doctor and his patient recognized by law. *See id.*

### B. HCQIA's Qualified Immunity

Dr. Tio's claim that hospital breached contract when it terminated his contract without

just cause because hospital was entitled to such action without a chance to confront the

allegations or to remedy them.

Under the WHC contract a "professional review action" requires certain due process and

fairness requirements, for those participating in such a review with respect to the action.  This

excludes from its coverage civil rights suits brought under any Federal or State law (such as 42

U.S.C. 1981, *et seq.*, and D.C.'s Human Rights Act discussed below), it applies to <u>all</u> the

common law and other statutory claims alleged in Dr. Tio's complaint. *See Patrick v. Burget*,

486 U.S. 94, 105 n.8, 100 L. Ed. 2d 83, 108 S. Ct. 1658 (1988); *Canady v. Providence Hosp.*,

*supra* (tortious interference); *Lee v. Trinity Lutheran Hosp.*, 408 F.3d 1064 (8th Cir. 2005)

(defamation); *Bryan v. James E. Holmes Regional Medical Center*, 33 F.3d 1318 (11th Cir.

1994); *Ali v. MedStar Health*, *supra* (breach of contract).

Under *Imperial v. Suburban Hosp. Ass'n, Inc.*, 37 F.3d 1026, 1028 (4th Cir. 1994) Dr.

Tio's termination action was not justified because the action is taken was not:

(1) in the reasonable belief that the action was in the furtherance of quality health care,

12

(2) after a reasonable effort to obtain the facts of the matter,

(3) after adequate notice and hearing procedures are afforded to the physician involved or after such other procedures as are fair to the physician under the circumstances, and

(4) in the reasonable belief that the action was warranted by the facts known after such reasonable effort to obtain facts and after meeting the requirement of paragraph (3).

If by a preponderance of the evidence, any one of the above four requirements was not satisfied, the WHC action is no longer afforded immunity from damages under the Health Care Quality Improvement Act ("HCQIA"). 42 U.S.C. § 11112(a); *see, e.g., Islami v. Covenant Medical Center, Inc.*, 822 F. Supp. 1361, 1377-78 (N.D. Iowa 1992) (plaintiff presented sufficient evidence for a jury to conclude review participants did not provide plaintiff with fair and adequate process); *Lipson v. Anesthesia Servs., P.A.*, 790 A.2d 1261 (Del. Super. 2001) (court found that medical practice was not engaging in protected review when it took informal action against one member and ultimately forced him out of practice, so that the court found he could sue for defamation, constructive discharge, and interference); *Clark v. Columbia/HCA Info. Servs.*, 117 Nev. 468, 25 P.3d 215 (2001) (psychiatrist overcame the presumption of hospital review board's immunity under HCQIA when his loss of staff privileges was apparently in response to the psychiatrist's good faith reports of perceived improper hospital conduct to outside agencies); *Clermont v. Fallon Clinic, Inc.*, 16 Mass. L. Rep. 325, 1998 Mass. Super. LEXIS 738 (Mass. Super. Ct., May 15, 2003) (court allowed doctor's defamation claim against medical clinic to go forward where it found that a reasonable jury could conclude that the doctor had shown by preponderance of evidence that defendants did not provide him with adequate notice and process until *after* his termination in violation of 42 U.S.C.§ 11112(b)).

Consistent with the foregoing case law, Dr. Tio, for recover damages on any non-civil rights claim, has shown by the preponderance of the evidence that WHC did not meet the HCQIA requirements discussed above. As some D.C. courts have characterized this burden, Dr. Tio has proved that WHC acted "arbitrarily and capriciously" in conducting the so-called "for cause" termination (if in fact WHC even conducted a peer review within the meaning of the HCQIA). *See Okusami v. Psychiatric Inst. of Washington, Inc., supra,* 959 F.2d at 1066; *Canady v. Providence Hosp., supra; see also Harris v. Bradley Mem. Hosp. & Health Ctr.,* 2005 Conn. Super. LEXIS 1401 (Conn. Super. Ct.,, May 19, 2005) (surgeon's evidence that his notice of peer review committee's meeting was short and that his opportunity to be heard was constrained by the short notice and manner in which meeting was conducted established a genuine issue of fairness sufficient to rebut the statutory presumption that hospital satisfied requirements of 42 U.S.C.S. § 11112(a)(3)).

### C. Intentional Race Discrimination under section 1981

The Civil Rights Act of 1866, 42 U.S.C. § 1981, provides that "[all] persons . . . shall have the same right . . . to make and enforce contracts . . . and to the full and equal benefit of all laws and proceedings . . . as is enjoyed by white citizens. . . . ." 42 U.S.C. § 1981(a). Section 1981 claims "most commonly involve contracts of employment," *Mitchell v. DCX, Inc.,* 274 F. Supp. 2d 33, 44 (D.D.C. 2003). In order to state a claim under 42 U.S.C. § 1981, a plaintiff must show that (1) he is a member of a racial minority group;[1] (2) "the defendant had an intent to

---

[1] Claims of discrimination in employment against minority group of a distinct national origin are cognizable under 42 USCS § 1981 when elements of racial discrimination are inferable from allegations. *Maldonado v. Broadcast Plaza, Inc.,* 1974 U.S. Dist. LEXIS 6237, *2, 10 Fair Empl. Prac. Cas. (BNA) 839,10 Empl. Prac. Dec. (CCH) P10,264 (D.C. Ct. 1974) (complaint found sufficient where it stated that plaintiff is "a citizen of the United States of Puerto Rican descent"). By comparison, the D.C. Human Rights Act discussed below expressly recognizes an employment discrimination claim brought on the basis of national origin. *See* D.C. Code § 2-1402.11(a).

14

discriminate on the basis of race"; and (3) "the discrimination concerned one or more of the activities enumerated in the statute." *Id.* at 44-45.

In general, there are two ways a plaintiff can show he was a victim of intentional discrimination. Discrimination under section 1981 can be established through either direct or circumstantial evidence. *See Wallace v. Methodist Hosp. Sys.*, 271 F.3d 212, 219 (5th Cir. 2001). Assuming that Dr. Tio had no hearing evidence of direct discrimination by WHC, his discrimination claims are valid and must be properly analyzed under the familiar standard and burden-shifting methodology generally referred to as the *McDonnell Douglas/Burdine* test. This test, described in *McDonnell Douglas v. Green*, 411 U.S. 792, 36 L. Ed. 2d 668, 93 S. Ct. 1817 (1973), and *Texas Dep't of Community Affairs v. Burdine*, 450 U.S. 248, 67 L. Ed. 2d 207, 101 S. Ct. 1089 (1981), is employed when there is no direct evidence of discriminatory animus and the plaintiff must resort to circumstantial evidence to prove that element. *See Carter v. Duncan-Huggins, Ltd.*, 234 U.S. App. D.C. 126, 727 F.2d 1225, 1232 (D.C. Cir. 1984).

"Direct evidence is that evidence which, if believed, requires the conclusion that unlawful discrimination was at least a motivating factor in the employer's actions." *Jacklyn v. Schering Plough Healthcare Prods. Sales Corp.*, 176 F.3d 921, 926 (6th Cir. 1999). It does not require the fact finder to draw any inferences to reach that conclusion. *Nguyen v. City of Cleveland*, 229 F.3d 559, 563 (6th Cir.2000). Again, *if* there is no direct evidence of racial or ethnic animus, the arbitrator should apply the *McDonnell Douglas/Burdine* test to determine if there is sufficient proof of the second element: intentional discrimination by the defendants.

In making out a prima facie case of disparate-treatment discrimination, Dr. Tio has

demonstrated that (1) he is a member of a protected class; (2) he suffered an adverse action with respect to his hospital privileges/employment; and (3) the unfavorable action gives rise to an inference of discrimination. *George v. Leavitt,* 366 U.S. App. D.C. 11, 407 F.3d 405, 412 (D.C. Cir. 2005). Moreover, the plaintiff must establish a prima facie case of discrimination by a preponderance of the evidence. *Hollins v. Fannie Mae,* 760 A.2d 563, 571 (D.C. 2000).

One way a claimant has shown satisfaction of the third prong of the prima facie test is by establishing that he "was treated differently from similarly situated employees who are not part of the protected class." *George,* 407 F.3d at 412. Although the D.C. Circuit Court has held that showing different treatment than similarly situated employees is not the only way to establish the third prong of the prima facie test, *see George,* 407 F.3d at 412, an employee alleging discrimination based on changed conditions or terms of employment must make some sort of showing that the change affected him in some way <u>different</u> from other employees. *See Burlington Northern & Santa Fe Ry. v. White,* 126 S. Ct. 2405, 2410, 165 L. Ed. 2d 345 (2006) ("No one doubts that the term 'discriminate against' refers to distinctions or differences in treatment that injure protected individuals."). In an unlawful discharge case, a plaintiff can demonstrate an inference of discrimination by demonstrating that the discharge was not attributable to "performance below the employer's legitimate expectations or the elimination of the plaintiff's position altogether." *George,* 407 F.3d at 412.

If the plaintiff establishes a prima facie case, the defendant must then come forward with a legitimate, nondiscriminatory reason for its actions. *McDonnell Douglas,* 411 U.S. at 802. That is, if the plaintiff successfully establishes a prima facie case, the burden shifts to the defendant employer "to articulate some legitimate, non-discriminatory reason" for the

16

employment action. *Id.* If the employer meets it burden, the burden then shifts back to the plaintiff to "prove by a preponderance of the evidence that the [employer's] proffered reasons are a pretext for discrimination." *Mastro v. Potomac Elec. Power Co.*, 371 U.S. App. D.C. 68, 447 F.3d 843, 850 (D.C. Cir. 2006) (citing *Burdine,* 450 U.S. at 253. Under this methodology, the plaintiff must first come forward with evidence that he was denied a right, privilege or opportunity that was available to others who were not members of the plaintiff's protected class. Such proof "raises an inference of discrimination only because we presume [the defendant's] acts, if not otherwise explained, are more likely than not based on the consideration of impermissible factors." *Burdine*, 450 U.S. at 254. The defendant is then given the opportunity to dispel this inference by offering "some legitimate, nondiscriminatory reason" for its purportedly discriminatory action, *McDonnell Douglas*, 411 U.S. at 802, evidence "legally sufficient to justify a judgment for the" employer, *Burdine*, 450 U.S. at 255.

The legitimacy of these reasons is then tested in the third phase of the analysis. The plaintiff then has "the full and fair opportunity to demonstrate," through presentation of his own case and through cross-examination of the defendant's witnesses, "that the proffered reason was not the true reason for the employment decision," *id.*, at 256, and that race was. He retains that "ultimate burden of persuading the [trier of fact] that [he] has been the victim of intentional discrimination." *Ibid.*

An employee suffers an adverse employment action if he experiences "materially adverse consequences affecting the terms, conditions, or privileges of employment or future employment opportunities such that a reasonable trier of fact could find objectively tangible harm." *Forkkio v. Powell*, 353 U.S. App. D.C. 301, 306 F.3d 1127, 1131 (D.C. Cir. 2002) (citing *Brown v. Brody*,

339 U.S. App. D.C. 233, 199 F.3d 446, 457 (D.C. Cir. 1999)). "Mere idiosyncrasies of personal

preference are not sufficient to state an injury." *Brown*, 199 F.3d at 457. The denial of

administrative leave, granted to other employees for the funeral; the reversal of prior approved

travel six month after for similar purposes, venues and time; the singling out of claimant for a

report with the lack of adverse action for more serious radiation breaches by other medical units;

and the singling out of claimant for budget performance without taking any adverse action

against other doctors in the unit for similar or greater budget failures, amounted to an adverse

employment action to support a 1981 action.

Moreover, refuting any reasons WHC gave for terminating Dr. Tio's employment will

generally be helpful in proving his section 1981 claim (as well as the similar claim under the

D.C. Human Rights Act discussed below). As mentioned earlier, that refuting one reason given

for a termination necessarily undermines the validity of another reason, is a logically sound

argument to make. *See George v. Leavitt*, 366 U.S. App. D.C. 11, 407 F.3d 405 (D.C. Cir. 2005)

the court held judgment was improperly granted for employer on former employee's disparate

treatment discrimination claims although employer articulated and supported legitimate reasons

for employee's discharge, employee proffered ample evidence to call into question the stated

reasons for her discharge as being unworthy of credence.

In the *George* case, the plaintiff maintained that her work was satisfactory and that her

coworkers were at fault for the confrontations that she had with them. 407 F.3d at 414. The

court observed that

> There is nothing to indicate that her assessment is either incredible or fanciful. Indeed,
> her performance evaluation and some of the statements from other employees support

18

George. Therefore, there is a genuine issue as to George's performance and conduct. *See Weldon v. Kraft, Inc.*, 896 F.2d 793, 800 (3d Cir. 1990) ("There is no rule of law that the testimony of a discrimination plaintiff, standing alone, can never make out a case of discrimination that could withstand a summary judgment motion."). Combined with George's other evidence, there is no question that a reasonable jury could conclude that George did not suffer from "performance and conduct deficiencies" and that EPA's [the employer's] explanation is therefore not worthy of credence. *See* 1 LARSON, See 1 [LEX K. LARSON, *EMPLOYMENT DISCRIMINATION* § 8.04, at 8-62 [(2d ed. 2005)] ("Pretext may usually be established by demonstrating that the employer's proffered reason is simply false.").

407 F.3d at 414 (emphasis added).

In *George*, because the plaintiff had "vigorously" disputed the validity of the reasons cited by the EPA, the court found that there was genuine dispute, sufficient for the jury to decide whether or not the EPA's reasons were pretextual. *Id.* Usually, proffering "evidence from which a jury could find that [the employer's] stated reasons . . . were pretextual . . . will be enough to get a plaintiff's claim to a jury." *Carpenter v. Fannie Mae*, 334 U.S. App. D.C. 124, 165 F.3d 69, 72 (D.C. Cir. 1999) (citing Aka v. Wash. Hosp. Ctr., 332 U.S. App. D.C. 256, 156 F.3d 1284 (D.C. Cir. 1998) (en banc)). However, "an employer's reason need not be false in order to be pretextual." *Id.* In *George*, the plaintiff also proffered evidence that the white male engineers in her office escaped discipline despite engaging in verbal arguments and incorrectly handling Hotline messages, the same conduct for which plaintiff allegedly was fired. *Id.* EPA responded that this evidence was not probative of disparate treatment, because the other engineers in the office were not similarly situated to the plaintiff. *Id.* The court concluded that whether two employees are "similarly situated" ordinarily presents a question of fact for the jury, and did so in that case. *Id.*

In addition, WHC cannot avoid the remediable procedures merely because some aspect of

19

claimant's alleged performance, however minor, was irremediable would be "mischievous" and would encourage employers to attempt to circumvent remediability requirements by "salting" charges against employees with trivial specifications of irremediable deficiencies. The alleged charges cannot be supported as irremediable due to harm to patients and fellows because the record is full of how Dr. Tio was regarded as a fine doctor and professor. There was no evidence of any claims of malpractice against Dr. Tio while at WHC on the entire record. Appropriate discharge procedures, were required under the WHC Rules for Physicians and Medical Staff and no time to challenge the alleged charges or no hearing permitted to deny alleged grounds prior to this second termination.

Consistent with the foregoing well established rules and principles, Dr. Tio has established a prima facie case and ultimately should prevail on his breach of contract and discrimination claim (under either Section 1981 or the DCHRA discussed below) by having proved, by a preponderance of evidence that the reasons WHC gave for discharging him were simply not true. *See id.* Even if any were true, he can still prevail by proving by a preponderance of the evidence that WHC did not penalize other similarly situated doctors for the same type of conduct or under performance. *See id.; see also Saunders v. George Wash. Univ.*, 768 F. Supp. 854 (D.D.C. 1991) the court found university professor had viable claims against George Washington University for retaliation under the D.C. Human Rights Act Statute because reasonable jury could conclude that the University's decision to not renew professor's contract, the decision to deny the professor's request to convert a position from a contract to a tenured-tracking position, and the refusal to consider the professor's renewed request to convert the position to a tenured-tracking position was in retaliation for professor's 42 U.S.C.S. § 1981

20

claim against the University for discrimination.

### D.  Individual Liability under Section 1981

Unlike under Title VII, individual defendants should not have been dismissed so they can be sued for intentional race discrimination under § 1981 if they are personally involved in the discrimination or if plaintiff can "demonstrate some affirmative link to causally connect" the individual defendant with the discriminatory act. *Patterson v. County of Oneida*, 375 F.3d 206, 229 (2nd Cir. 2004); *see also Flores v. Denver*, 30 Fed. Appx. 816, 819 (10th Cir. 2002) holding that the individual defendant does not have to be in privity of contract with the plaintiff to be held liable under § 1981; *Whidbee v. Garzarelli Food Specialties, Inc.*, 223 F.3d 62, 75 (2nd Cir. 2000); *Al-Khazraji v. Saint Francis Coll.*, 784 F.2d 505, 518 (3rd Cir. 1986); *Jones v. Continental Corp.*, 789 F.2d 1225, 1231 (6th Cir. 1986); *Tillman v. Wheaton-Haven Recreation Ass'n, Inc.*, 517 F.2d 1141, 1146 (4th Cir. 1975). *But see Foley v. Univ. of Houston Sys.*, 355 F.3d 333, 338 (5th Cir. 2003) noting "a tension between [two] decisions . . . with respect to the liability of individual defendants who are not party to the employment contract" under § 1981. The persuasive authority in this district also supports this view. *See e.g., MacIntosh v. Bldg. Owners & Managers Ass'n Int'l,* 355 F. Supp. 2d 223, 227 (D.D.C. 2005) noting that the reach of § 1981 is much broader than that of Title VII; *Richard v. Bell Atl. Corp.*, 946 F. Supp. 54, 74 (D.D.C. 1996) the court held that "officers, directors and employees of a corporation may become personally liable" under § 1981 (internal quotations omitted); *Sheppard v. Dickstein, Shapiro, Morin & Oshinsky*, 59 F. Supp. 2d 27, 33 (D.D.C. 1999); *Weaver v. Gross*, 605 F. Supp. 210, 212-213 (D.D.C. 1983) this case held that individuals can be held liable under § 1981 only when they have been personally involved or directly participated in the discrimination. *Contra Hunter*

21

*v. Ark Rests. Corp.*, 3 F. Supp. 2d 9, 15-16, 17 (D.D.C. 1998) (stating that individuals cannot be

held liable under § 1981 and DCHRA, but citing only Title VII cases to support that finding).

### E.  Claim Under District of Columbia Human Rights Act, § 2-1403.41 *et seq*.

The claims of discrimination under state law should not have been dismissed as well. The

District of Columbia Human Rights Act (DCHRA), codified at D.C. Code § 2-1403.41 *et seq.*,

proscribes discriminatory employment practices based on an employee's "race, color, religion,

national origin, sex, age, marital status, personal appearance, sexual orientation, gender identity

or expression, family responsibilities, genetic information, disability, matriculation, or political

affiliation . . . ." D.C. Code § 2-1402.11(a) (emphasis added); *see generally RAP, Inc. v. District

of Columbia Commission on Human Rights*, 485 A.2d 173 (D.C. 1984).  According to the

DCHRA, "[a] private cause of action pursuant to this chapter shall be filed in a court of

competent jurisdiction within one year of the unlawful . . . act or the discovery thereof. . . ." §

2-1403.16(a).  Thus, Dr. Tio's action, filed within one year of his termination, was timely to the

extent it is based on his firing or other illegal actions taken by WHC against him on or after

March 17, 2003. *See id*.

The DCHRA specifically prohibits firing or otherwise to "discriminate against any

individual, with respect to his compensation, terms, conditions, or privileges of employment,

including promotion . . . ." D.C. Code § 2-1402.11(a)(1).  In addition, the statute makes it

unlawful "to coerce, threaten, retaliate against, or interfere with any person in the exercise or

enjoyment of . . . any right granted or protected under this chapter." D.C. Code § 2-1402.61(a);

*see, e.g., Passer v. American Chemical Society*, 290 U.S. App. D.C. 156, 166, 935 F.2d 322, 332

22

(1991); *Ravinskas v. Karalekas*, 741 F. Supp. 978, 980 (D.D.C. 1990).

The D.C. Circuit and the District of Columbia courts have consistently held that "the burdens of persuasion and production for claims raised under [the DCHRA] . . . are identical to those for claims alleging discriminatory treatment in violation of Title VII." *Mungin v. Katten, Muchin & Zavis*, 325 U.S. App. D.C. 373, 116 F.3d 1549, 1553 (D.C. Cir. 1997); *accord American University v. District of Columbia Comm'n on Human Rights*, 598 A.2d 416, 422 (D.C. 1991) ("In deciding cases brought under the [D.C. Human Rights] Act, we follow the allocations of burdens and order of proof prescribed for cases brought under Title VII of the Civil Rights Act of 1964."). Thus, proof of discrimination in violation of the DCHRA also proceeds in three steps, as discussed above in connection with the 1981 claim. *See id.*

First, Dr. Tio has made a prima facie showing of discrimination (the elements of which are described above) by a preponderance of the evidence on this hearing record. *E.g., United Planning Organization v. District of Columbia Commission on Human Rights*, 530 A.2d 674, 676-677 (D.C. 1987); *Atlantic Richfield Co. v. District of Columbia Commission on Human Rights*, 515 A.2d 1095, 1099 (D.C. 1986); *RAP, Inc. v. District of Columbia Commission on Human Rights, supra,* 485 A.2d at 176-177. Once that has been done, a rebuttable presumption has arisen that the WHC's conduct amounted to unlawful discrimination. *E.g., Shaw Project Area Committee v. District of Columbia Commission on Human Rights*, 500 A.2d 251, 254 (D.C. 1985) (citing cases). The burden then shifts to WHC to rebut this presumption "by articulating some legitimate, nondiscriminatory reason for the employment action at issue." *Atlantic Richfield Co., supra*, 515 A.2d at 1099 (citations omitted); *see generally St. Mary's Honor Center v. Hicks*, 509 U.S. 502, 125 L. Ed. 2d 407, 113 S. Ct. 2742 (1993) (1993) (describing shift in burden of

proof under corresponding federal statute). Finally, if WHC has articulated any legitimate, non-discriminatory reason for the disputed conduct, the burden shifts back to Dr. Tio to prove, again by a preponderance of the evidence, that WHC's stated justification for its action "was not its true reason but was in fact merely a pretext" to disguise a discriminatory practice. *Atlantic Richfield Co., supra*, 515 A.2d at 1100 (citations omitted). This was done in both the direct testimony of Dr. Tio, all the former fellows, private physicians, former patients, Mr. Marc Ayers and Mrs. Victor Lopez, and private physicans, and the cross-examinations of Susan Hart, Dr. Leonard Wartasky and Kim Simpson.

### F. "Denial" of Good Faith, Fair Dealing

The District of Columbia recognizes an independent cause of action for a breach of the implied covenant of good faith and fair dealing. *Allworth v. Howard University*, 890 A.2d 194, 201 (D.C. 2006). A party may bring suit for breach of the implied covenant when the other party to the contract "evades the spirit of the contract, willfully renders imperfect performance, or interferes with performance by the other party." *Id.* However, the implied covenant may not override the express provisions of the contract. *See TV Capital Corp. v. Paxson Communs. Corp.*, 894 A.2d 461, 2006 D.C. App. LEXIS 136, 2006 WL 647978, at *4 (D.C. 2006). Additionally, breach of the implied covenant is <u>not</u> an independent cause of action when the allegations are identical to other claims for relief under an established cause of action. *See Jacobsen v. Oliver*, 201 F. Supp. 2d 93, 98 n. 2 (D.D.C. 1996) ("[A] party is not entitled to maintain an implied duty of good faith claim where the allegations of bad faith are 'identical to' a claim for 'relief under an established cause of action.' "). The implied covenant of good faith and fair dealing merely prohibits parties from interfering with the performance and other obligations

24

under a contract. *Wash. Metro. Area Transit Auth. v. Quik Serve Foods, Inc.*, 2006 U.S. Dist. LEXIS 24510 (D.D.C., April 28, 2006).

### G. Defamation Claim

As already noted, Dr. Tio's defamation claim should not have been dismissed since it can be supported by showing that WHC's actions simple did not comport with the HCQUIA, or acted arbitrarily and capriciously in conducting the so-called peer review of Dr. Tio. *See Canady v. Providence Hosp., supra.*; *Harris v. Bradley Mem. Hosp. & Health Ctr., supra.* In *Brown v. Presbyterian Healthcare Servs.*, 101 F.3d 1324 (10th Cir. 1996) the defendant health care provider, was liable for defamation and antitrust violations owing to a report of plaintiff physician's loss of hospital privileges; after a jury ruled in plaintiff's favor on the defamation, interference with contract, and antitrust claims, court upheld jury verdict, ruling that that defendants were not immune as a matter of law under HCQUIA.

"In the District of Columbia, 'a statement is defamatory if it tends to injure [the] plaintiff in his [or her] trade, profession or community standing or lower him in the estimation of the community'." *Guilford Transp. Indus., Inc. v. Wilner*, 760 A.2d 580, 594 (D.C. 2000) (quoting *Howard Univ. v. Best*, 484 A.2d 958, 989 (D.C. 1984)). "'A plaintiff bringing a defamation action . . . must show: (1) that the defendant made a false and defamatory statement concerning the plaintiff; (2) that the defendant published the statement without privilege to a third party; (3) that the defendant's fault in publishing the statement amounted to at least negligence; and (4) either that the statement was actionable as a matter of law irrespective of special harm or that its publication caused the plaintiff special harm.'" *Crowley v. North American Telecomms. Assoc.*,

25

691 A.2d 1169, 1173 n.2 (D.C. 1997) (quoting *Prins v. International Tel. and Tel. Corp.*, 757 F.

Supp. 87, 90 (D.D.C. 1991)). If the arbitrator concludes that the defendants made statements

against Dr. Tio that were both false and defamatory, he should recover for resulting damages to

his reputation. *See Beeton v. District of Columbia*, 779 A.2d 918, 923 (D.C. App. 2001); *see

also Clermont v. Fallon Clinic, Inc., supra.*

### H.  Antitrust Claim

An antitrust claim by a physician relative to his discharge or other adverse employment

action is also subject to recovery. Since Dr. Tio has established by a preponderance of evidence

that WHC acted arbitrarily and capriciously in the "peer review" process or conducted none at

all. *See Brader v. Allegheny Gen. Hosp.*, 64 F.3d 869, 875 (3rd Cir. 1995). In *Brader*, the court

found that a physician's allegation that he has been excluded from the relevant market and that

such exclusion constituted an unreasonable restraint on trade was a sufficient allegation of

antitrust injury. *Brader* concerned a hospital's suspension of a physician through use of unfair

proceedings and for no reasonable basis related to performance reasons, and the hospital's

dissemination of a report about the doctor's suspension, which allegedly prevented the doctor

from obtaining another position and caused a reduction in the provision of medical services in

the Pittsburgh market. 64 F.3d at 871-72.

### III.    CONCLUSION

To recover under any of the non-civil rights claims, Dr. Tio has overcome the qualified

immunity accorded to WHC and its employees by the HCQIA with respect to the peer review

process. That is, Dr. Tio has established by a preponderance of evidence that WHC did not comply with the four prongs of the HCQIA, or that it acted arbitrarily and capriciously in conducting the review or none at all.

Moreover, the cause of action Dr. Tio has pursued with respect to the defendants' unlawful interference with the doctor-patient relationship is interference with *prospective business advantage* with his former patients, future patients and future hospitals. This action involves independent third-party contracts or prospective relationships and does not require proof of a contract with the patients or hospitals as an element of the claim.

WHC beached Dr. Tio's contract of employment based upon grounds not substantiated by the record evidence, was arbitrary and capricious, without due process or equal treatment, but rather discriminatory, as well as in violation of the implied covenant of good faith and fair dealing based upon differences in treatment applied to unit physicians and unit employees.

Respectfully submitted,

Anthony M. Rachal III
D.C.Bar No. 229047
EdmondsBldg.-Capitol Hill
903 D Street, N.E., Suite 200
Washington, D.C. 20002
(202) 393-7000

Attorney for Claimants

27

## CERTIFICATE OF SERVICE

I hereby certified that a copy of the Claimants' Post Hearing Brief was deliver by e-mail and first class mail, postage prepaid this 3rd day of December, 2007 to Counsel of Record for Respondents Washington Hospital Center, *et al.*, as follows:

Keith Harrison, Esq.
COELLRING & MORING, LLP
1001 Pennsylvania Avenue, N. W.
Washington, D. C.  20006

AND

Trina Farley, Esq.
CROWELL & MORING, LLP
1001 Pennsylvania Avenue, N. W.
Washington, D. C.  20006

Anthony M. Rachal III

28



# Exhibit O

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

In the Matter of
the Arbitration between

THIAN LOK TIO, et al.,
*Petitioners*,

       v.                            Civil Action No:

WASHINGTON HOSPITAL CENTER, et al.,
*Respondents*.
                                  _____

**MEMORANDUM OF POINTS AND AUTHORITIES IN SUPPORT OF
PETITION TO VACATE ARBITRATION AWARD**

BACKGROUND

    Although District of Columbia courts have repeatedly recognized, that "'judicial review of

arbitrable awards is extremely limited, "'and they '" do not sit to hear claims of factual or legal

error by an arbitrator as [they do] in reviewing decisions of lower courts.'" *Teamsters Local*

*Union No. 61 v. United Parcel Serv., Inc., 348 U.S. App. D.C. 198, 272 F.3d 600, 604 (D.C. Cir.*

*2001) (quoting Kanuth v. Prescott, Ball & Turben, Inc.,292 U.S. App. D.C. 319, 949 F.2d 1175,*

*1178 (D.C. Cir. 1991)),* the Federal Arbitration Act (FAA), *9 U.S.C. § 10(a),* lists only four

grounds upon which an arbitration award may be vacated.


    The four grounds are as follows:

> (1) where the award was procured by corruption, fraud, or undue means; (2)
> where there was evident partiality or corruption in the arbitrators, or either of
> them; (3) where the arbitrators were guilty of misconduct in refusing to
> postpone the hearing, upon sufficient cause shown, or in refusing to hear
> evidence pertinent and material to the controversy; or of any other
> misbehavior by which the rights of any party have been prejudiced; or (4)
> where the arbitrators exceeded their powers, or so imperfectly executed them
> that a mutual, final, and definite award upon the subject matter submitted was
> not made.

18

*Title 9 U.S.C. § 10(a)*.

In addition, to above limited statutory grounds on which an arbitration award may be vacated, there is also recognized limited nonstatutory grounds for vacation. This occurs when "arbitration awards [must] be vacated [only] if they are in 'manifest disregard of the law,'" *Cole, 105 F.3d at 1486* (quoting *First Options of Chicago, Inc. v. Kaplan, 514 U.S. 938, 942, 131 L. Ed. 2d 985, 115 S. Ct. 1920 (1995))*, or "if they are contrary to 'some explicit public policy' that is 'well defined and dominant' and ascertained 'by reference to the laws or legal precedents.'" *Id.* (quoting *United Paperworks Int'l Union v. Misco, Inc., 484 U.S. 29, 43, 98 L. Ed. 2d 286, 108 S. Ct. 364 (1987))*. Manifest disregard of the law "means more than error or misunderstanding with respect to the law." *Kanuth v. Prescott, Ball & Turben, Inc., 292 U.S. App. D.C. 319, 949 F.2d 1175, 1178 (D.C. Cir. 1991)* (citing *Sargent v. Paine Webber Jackson & Curtis, Inc., 280 U.S. App. D.C. 7, 882 F.2d 529, 532 (D.C. Cir. 1989))*. Consequently,

> to modify or vacate an award on this ground, a court must find that (1) the arbitrators knew of a governing legal principle yet refused to apply it or ignored it altogether and (2) the law ignored by the arbitrators was well defined, explicit, and clearly applicable to the case.

*LaPrade v. Kidder, Peabody & Co., 345 U.S. App. D.C. 358, 246 F.3d 702, 706 (D.C. Cir. 2001)*; *DiRussa v. Dean Witter Reynolds, Inc., 121 F.3d 818, 821 (2d Cir. 1997)* (quotations omitted); *see also Glennon v. Dea Witter Reynolds, Inc., 83 F.3d 132, 136 (6th Cir. 1996).*

Petitioners contend that certain of those statutory and nonstatutory grounds are applicable here. The specific ones are noted in the argument and analysis below.

19

ARGUMENT AND ANALYSIS

1. The Arbitrator Erred in Granting Partial Summary Judgment of Interrelated Claims and Parties.

For purposes of ruling on a motion to dismiss, the factual allegations of the complaints are presumed to be true and liberally construed in favor of the plaintiff. *Browning v. Clinton, 352 U.S. App. D.C. 4, 292 F.3d 235, 242 (D.C. Cir. 2002).* The trier's analysis is governed by the rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. This required analysis is governed by the rule that a complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. Summary judgment is appropriate when there is no genuine issue as to any material fact. *Fed. R. Civ. P. 56(c).* A fact is material if it will affect the outcome of the case.

Moreover, a moving party is entitled to summary judgment as a matter of law when the law supports the moving party's position. Inferences drawn from the facts must be viewed in the light most favorable to the party opposing the motion. Once a moving party files a proper summary judgment motion, the burden shifts to the non-moving party to produce specific facts showing that there is a genuine issue for trial. *Fed. R. Civ. P. 56(e). See Celotex Corp. v. Catrett, 477 U.S. 317, 322-23, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986).* A fact is material if it will affect the outcome of the case. *Id.* Moreover, a moving party is entitled to summary judgment as a matter of law when the law supports the moving party's position. *See Jeffery v. Sarasota White*

20

*Sox, Inc., 64 F.3d 590, 594 (11th Cir. 1995).* Inferences drawn from the facts must be viewed in

the light most favorable to the party opposing the motion. *Adickes v. S.H. Kress & Co., 398 U.S.*

*144, 157, 26 L. Ed. 2d 142, 90 S. Ct. 1598 (1970).* As the non-moving party, petitioner must

have established that some genuine issues of material facts because the arbitrator grant partial

summary judgment. This kept petitioners' claim for breach of contract alive. These facts existed

through substantiated factual assertions as contained in the pleadings, affidavits and documents

presented in support of its opposition to the motion and were accepted by the arbitrator as true.

However, these facts, which supported continuing the breach of contract claim, were intertwine

and interrelated to the claims against the individual parties and to the other claims of the initial

complaint. The facts warranting the breach of contract claim were so inextricably linked to

petitioners' other claims for interference with contracts with prospective third parties,

discrimination, and emotional distress that it is error to dismiss them as well. The arbitrator has

attempted to pick and choose the facts most appealing to him and not most favorable, or even

deferential, to petitioner as required under well established, well defined and explicitly applicable

to such a motion under the law governing summary dismissals. Because the arbitrator knew

such law but refused to apply it, or chose to ignored it altogether, he exercised a "manifest

disregard of the law", notwithstanding such knowledge, in order to dispense "his own brand of

industrial justice". *United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574,*

*597 (1960).* When an arbitrator dispenses his own brand of industrial justice, a court may find

his decision unenforceable. This is an egregious deviation from well-established law favoring a

full and fair hearing on the merits; thus, this court should rule the award is unenforceable and

requiring a remanded new hearing with a new arbitrator.

21

2. The Arbitrator Exceeded His Authority under the Arbitration Clause of the Employment Agreement.

Although "[t]here is a strong federal policy that favors the submission of civil disputes to arbitration," and courts have no "power to substitute a judicial resolution of a dispute for an arbitrable one.", the courts' deference to arbitration awards, however, does not grant to arbitrators unrestrained authority. *Davis v. Chevy Chase Fin. Ltd., 215 U.S. App. D.C. 117, 667 F.2d 160, 164-65 (D.C. Cir. 1981)*. Arbitration is a matter of contract and the arbitrator's authority is limited by the arbitrable agreement.    Accordingly, parties "cannot be required to submit to arbitration any matter that they did not agree would be subject to that manner of dispute resolution." *Id. at 165*, citing *United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)*. In particular, an arbitrator has no power to "grossly deviate from . . . the issues submitted for arbitration." *Office & Professional Employees Int'l Union, Local 2 v. Washington Metro. Area Transit Auth., 233 U.S. App. D.C. 1, 724 F.2d 133, 140 (D.C. Cir. 1983)*. The petitioner argues that the question of whether the arbitrator could decide interference with prospective business relationship in arbitration when it was not part of the contract with the respondents but rather with third parties not in privity with the contract containing the arbitration arbitration," and courts have no "power to substitute a judicial resolution of a dispute for an arbitral one.", the courts' deference to arbitration awards, however, does not grant to arbitrators unrestrained authority. *Davis v. Chevy Chase Fin. Ltd., 215 U.S. App. D.C. 117, 667 F.2d 160, 164-65 (D.C. Cir. 1981)*. Arbitration is a matter of contract and the arbitrator's authority is limited by the arbitrable agreement.    Accordingly, parties "cannot be required to submit to

22

arbitration any matter that they did not agree would be subject to that manner of dispute resolution." *Id. at 165*, citing *United Steelworkers of Am. v. Warrior & Gulf Navigation Co., 363 U.S. 574, 582 (1960)*. In particular, an arbitrator has no power to "grossly deviate from . . . the issues submitted for arbitration." *Office & Professional Employees Int'l Union, Local 2 v. Washington Metro. Area Transit Auth., 233 U.S. App. D.C. 1, 724 F.2d 133, 140 (D.C. Cir. 1983)*. The petitioner argues that the question of whether the arbitrator could decide interference with prospective business relationship in arbitration when it was not part of the contract with the respondents but rather with third parties not in privity with the contract containing the arbitration clause, was not before the arbitrator at the hearing, and therefore should not have been decided.

In particular, an arbitrator has no power to "grossly deviate from . . . the issues submitted for arbitration." *Office & Professional Employees Int'l Union, Local 2 v. Washington Metro. Area Transit Auth., 233 U.S. App. D.C. 1, 724 F.2d 133, 140 (D.C. Cir. 1983)*. Moreover, having articulated the issue erroneously, further err was committed by not addressing the matter in the award without a decision or comment is wrong as exceeding authority or in manifest disregard of law. In particular, an arbitrator has no power to "grossly deviate from . . . the issues submitted for arbitration." *Office & Professional Employees Int'l Union, Local 2 v. Washington Metro. Area Transit Auth., 233 U.S. App. D.C. 1, 724 F.2d 133, 140 (D.C. Cir. 1983)*.

For instance, in rendering an award "[t]he arbitrator may not ignore the plain language of the contract." *United Paperworkers Int'l Union v. Misco, Inc., 484 U.S. 29, 38, 108 S. Ct. 364, 98 L. Ed. 2d 286 (1987)*; *see also Madison Hotel, 144 F.3d at 858* . "Nor can an arbitrator simply ignore the contract and 'dispense his own brand of industrial justice.'" *Madison Hotel, 144 F.3d at 859* (quoting *United Steelworkers of Am. v. Enterprise Wheel & Car Corp., 363 U.S. 593, 597*,

*80 S. Ct. 1358, 4 L. Ed. 2d 1424 (1960))*. An arbitrator, therefore, is confined to the

"interpretation and application" of the parties' agreement. *Enterprise Wheel, 363 U.S. at 597*. The

issue in this case, then, is whether the arbitrator "grossly deviate[d] from his conferred authority

or from the issues submitted for arbitration" in rendering his award.

3. The Arbitrator's Award Violates Title 9 Sections 10(a) Due To Evident Partiality; Due to
Misconduct in Refusing to Postpone Hearing and Refusing to Hear Pertinent and Material
Evidence on Claims and from Witnesses Prejudicial to Petitioners.

An arbitration award that is based on facts contrary to record evidence must fail. If an

arbitrator not only erred in view of the facts, but also the sole articulated basis for the award was

in error, the award must be overturned as the result of a gross mistake made out by evidence, but

for which, according to the arbitrator's rationale, a different result would have been reached.

Petitioner further argues that even if the arbitrator did not exceed his authority, the basis of

his decision is unsupported by the record evidence. An arbitration award that is based on facts

contrary to record evidence must fail. *Office and Professional Employees International Union,*

*Local 2 v. Washington Metropolitan Area Transit Authority, 724 F.2d at 140*; *Devine v. White,*

*697 F.2d at 436 n.80*.   If an arbitrator not only erred in view of the facts, but also the sole

articulated basis for the award was in error, the award must be overturned as the result of a

"'gross mistake . . . made out by evidence,' but for which, according to the arbitrator's rationale, a

different result would have been reached." *Electronics Corporation of America v. International*

*Union of Electrical, Radio and Machine Workers, Local 272, 492 F.2d 1255, 1257 (1st Cir.*

*1974) (quoting Burchell v. Marsh, 58 U.S. 344, 350, 15 L. Ed. 96 (1854))*.

The award in the instant action is clearly based solely on the lack of "industrial due process"

where the charges against Dr. Tio were made without the direct knowledge of the signer of the

letter, Dr. Waltosky, and both the testimony and cross-exmination of the witnesses refuted the charges of all counts in the letter or termination.

Courts have have held that if the grounds for an alleged action are shown to be false it calls into question the validity of the other charges bound together to establish a basis for termination. See petitioners' Post Hearing Brief. The arbitrator in manifest disregard of this legal principal continued to validate these charges shown to be meritless.

The petitioner asserts that the arbitrator's decision to credit the testimony of "the parties not directly involved in the incident". They were contradicted on cross-examination. These individual included Susan Hart, Dr. Leonard Waltosky, Dr. Kathy Bull-Henry and others. This decision shows he grossly deviated from his authority to decide the dispute on the evidence. The arbitrator's credibility determination and decision not to consider certain evidence did "rise to the level of the Arbitrator applying his own industrial brand of justice" and contravenes public policy.

The Court does have the benefit of a transcript of the hearing before the Arbitrator, upon which petitioner relies to show partiality and prejudgment. There is enough substance to the petitioners' request for continuance to address the threshold issue concerning what was raised before the Arbitrator.

The arbitrator's partiality was further demonstrated by evidentiary rulings that involved "refusal to hear" such material evidence that calls for vacation of an award under local statute. See D.C. Code Section 16-4311(a)(4) (2001). His refusal to hear the testimony of Mrs. Lopez. And Ms. Belfrey taken as Depositions during the Hearing outside of his presence. In addition, he denied petitioner's request for rebuttal testimony prior to close of hearing. He refused to allow

25

petitioner to call the following witnesses for hearing that were stricken from his filed witness list,

including, but not limited to, the following witnesses:

Ms. Barbara Sullivan; Dr. Ken Brown, private physician; Mr. Darryl Tester, Pentax

Representative, Dr. Michael Gold and others witnesses.

The exclusion of this relevant evidence so affected the rights of petitioner that they

substantially undermined the fundamental fairness of the proceedings for which petitioner was

forced to pay half the fees and expenses. *Drysdale Design Assoc. v. Frist, 23 Fed. Appx. 6*

*(2001).* See also, *Gilmer v. Interstate/Johnson Lane Corp., 500 U.S. 20, 26, 114 L. Ed. 2d 26, 111 S. Ct. 1647*

*(1991); Cole v. Burns International Security Services, 323 U.S. App. D.C. 133, 105 F.3d 1465 (D.C. Cir. 1997).*

4. The Arbitrator's Award Violates Dominant Federal and State Public Policy Against
Discrimination on the Grounds of Race or National Origin.

An arbitration award may also be set aside if it violates public policy. *See generally*

*Northwest Airlines, Inc. v. Air Line Pilots Assoc., Int'l, 257 U.S. App. D.C. 181, 808 F.2d*

*76, 78 (D.C. Cir. 1987).* The Petitioner alleged in its Post Hearing Brief that the arbitration

award would violated public policy because facts, affidavits of the petitioner alleging

disparate treatment discriminating against members of a protected class due to their race

and/or national origin and such discrimination is not tolerated. As "ascertained by

reference to positive law" under the D.C. Human Rights Act, D.C. Code 1981, as

amended, Sections 1-2501, *et seq.*, and under Title VII of the Civil Rights Act of 1964, as

amended, 42 U.S.C. Section 1983 and 2000(e)(1988 & Supp. V 1993), it is an "explicit,

well defined, and dominant" state and Federal public policy. The arbitrator's ruling by

26

summary dismissal of these claims, without full treatment most favorable or deferential to petitioner, voids the groundless award that denied a full and impartial hearing on the merits. *Eastern Assoc. Coal Corp. v. United Mine Workers of Am., 531 U.S. 57, 63, 121 S. Ct. 462, 148 L. Ed. 2d 354 (2000).*

Petitioners' discrimination claims should not have been cut off by way of Summary Judgment granted to the Respondents. It should have only been granted in this case only if respondents had shown that there is no genuine issue of material fact and that respondents are entitled to judgment as a matter of law. *Celotex Corp. v. Catrett, 477 U.S. 317, 325, 91 L. Ed. 2d 265, 106 S. Ct. 2548 (1986); Aka v. Washington Hosp. Ctr., 325 U.S. App. D.C. 255, 116 F.3d 876, 879* (D.C. Cir.), *reh'g en banc granted, 124 F.3d 1302 (1997).* This was not the case with such complex inter-linked claims. Furthermore, the D.C. Circuit has directed that trial courts should apply "an added measure of 'rigor' to motions for summary judgment in employment discrimination cases." *Aka, 116 F.3d at 879-80.* Neither "vigor", nor any discernment from other dismissed claims, is shown by a single lump sum dismissal on all claims inclusive of those for discrimination against respondents in this arbitrator's ruling for partial summary judgment.

As noted earlier, in resolving summary judgment motions, the Court must view all of the evidence in the light most favorable to the plaintiff. *See id. at 879; see also Matsushita Elec. Indus. Co., Ltd. V. Zenith Radio Corp., 475 U.S. 574, 89 L. Ed. 2d 538, 106 S. Ct. 1348 (1986); Bayer v. United States Dep't of Treasury, 294 U.S. App. D.C. 44, 956 F.2d 330, 333 (D.C. Cir. 1992).* This law was not applied to the claims of petitioner, especially with regard to those of discrimination on grounds of race and/or national origin in this proceeding below.

27

CONCLUSION

For the above discussed reasons, the award in the matter should be vacated with remand

for a new hearing before a new arbitrator.

Respectfully submitted,

John Rerazich
D.C. Bar No. 027144
1835 Irving Street, N.W.
Washington, D.C.  20010
(202) 986-7500

Attorney for Petitioners Dr. and Mrs. Tio

28

# Exhibit P

**JAMS ARBITRATION**

THIAN LOK TIO, M.D.
169 South Detroit Street
Los Angeles, CA 90036

          Claimant,

vs.

      WASHINGTION HOSPITAL CTR.
CORPORATION
T/A WASHINGTON HOSPITAL
110 Irving Street, N.W.
      Washington, D.C. 20010,

      Respondent.

**JAMS Reference #: 1410003842**

## CLAIMANTS TIOS' WITNESS LIST

    NOW COME claimants in the above-captioned matter and submit their **Witness List**.

Claimants expressly reserve the right to amend their Witness List prior to the Arbitration Hearing

in this matter. Additionally, Claimants reserve the right to call any and all persons listed on

Respondent's Witness List(s).  Claimants witness' are as follow:

1. Elizabeth Beltree

2. Jesus Esquivel,M.D.

3. Charles Lightdale, M.D.

4. Kevin Collier, M.D.

5. Victor Lopez, M.D.

6. Tonya Adams, M.D.

7. Norman McKenzie

8. Susan Leland McKenzie

9. Grants & Accounts Manager, Pentax Corporation

10.    Linda Jackson

11.    Donald O'Keefe

12.    Donna Kane, D.P.C.

13.    Michael Gold, M.D.

14.    Dorrett Griffiths

15.    Irma Cajina

16.    Barbara Helsely

17.    Ann Francis

18.    Mark Ayers

19.    James Ahlgren, M.D.

20.    Mark Soberman, M.D.

21.    Paul Sugarbecker, M.D.

22.    Tom Abernathy, M.D.

23.    Jae Kim, M.D.

24.    Floyd Angus, M.D.

25.    Ross Palmer, M.D.

26.    Fred Finelli, M.D.

27.    Danny Shearer, M.D.

28.    William Steinberg, M.D.

29.    David Shocket, M.D.

30.    Ronald Hoffman

31.    Anita Wolke, M.D.

32.    Kok Seah Lee, M.D.

33.    David L. Carrr-Locke, M.D.

34.    Martin Bashir, M.D.

35.    Michael Pistoli, M.D.

36.    Lalit Gualti

2

37.  Robert Jensen, M.D.

38.  Esmeralda Kirkpatrick

40.  David Morowitz, M.D.

41.  Julio Salcedo, M.D.

42.  Averell Sherker, M.D.

43.  Paul S. Jowell, MB, ChB

44.  Ross Palmer

45.  Vickie Norris

46.  Grace Kim

47.  David Fleischer, M.D.

Respectfully submitted,

Anthony M. Rachal III
Tami L. Taylor, Esq.
903 D Street, N.E.
Capitol Hill
Washington, D.C.  20002

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this _____ day of August, 2006, I forwarded a copy via first class mail of **Claimants' Witness List** to the following individual:

Keith J. Harrison, Esq.
Trina Fairley, Esq.
King Pagano Harrison
1730 Pennsylvania Avenue, N.W.
Suite 900
Washington, D.C. 20006

3

# Exhibit Q

# JAMS ARBITRATION

| | |
|---|---|
| THIAN T. LOK TIO, M.D., ET AL., ) | |
| ) | |
| Claimants, ) | |
| ) | |
| v.  ) | JAMS Case No. A-021005-291 |
| ) | |
| WASHINGTON HOSPITAL CENTER, ET AL., ) | |
| ) | |
| Respondents.  ) | |

## RESPONDENTS' MOTION FOR SUMMARY JUDGMENT

Respondents Washington Hospital Center ("WHC" or "Hospital") et al. hereby file this

Motion for Summary Judgment and Memorandum of Law in Support thereof:

## I.

## SUMMARY OF ARGUMENT

This case is about a physician who abandoned his duties at WHC, pursued a new job at another Hospital and then sued WHC after it terminated in his employment because he abandoned his job. Dr. Tio's employment was terminated after he charged 31 days of unauthorized administrative leave to the Hospital, while simultaneously interviewing and applying for employment at another Hospital. During this same time period, he stopped seeing patients on a consistent basis failing to meet his productivity and revenue goals; failed to attend and conduct meetings as required by his job description and duties; and consistently failed to complete administrative and patient documentation, despite repeated requests by his supervisor.

Dr. Tio essentially stopped working at WHC, started traveling to conferences all over the world, all in anticipation of his moving to California to work at Cedars-Sinai Hospital. It is no surprise that WHC discharged him because he stopped working. What is a surprise is that Dr. Tio filed this meritless lawsuit.

Claimants have alleged ten causes of action. Yet, based on the undisputed facts in this case, Claimants cannot prove the <u>prima facie</u> elements of any one of their claims. Even viewing the Claimants' Complaint in the light most favorable to the Claimants, the record evidence in this case makes clear that their claims are based entirely on conclusory and speculative allegations that are unsupported by even a shred of evidence. The evidence in this case demonstrates, as a matter of law, that there are no genuine issues of material facts that must be resolved at an arbitration hearing. Rather, Claimants have utterly failed to produce evidence to sustain any one of their claims.

For example, Dr. Tio admitted under oath that he has no factual basis to believe that Dr. Wartofsky, the Chairman of the Department of Medicine who made the decision to terminate Dr. Tio's contract, discriminated against him based on race or national origin. As Dr. Tio testified:

> Q: Do you have any factual basis to believe that Dr. Wartofsky discriminated against you because of either your race or your national origin?
>
> A: I cannot recall it. I don't know.

Deposition of Lok Thian Tio, M.D. ("Tio Dep.") at p. 303, ln. 17-21, attached hereto as Exhibit "1." The other nine claims were equally baseless.

Indeed, Claimants' claims in this case are nothing more than Dr. and Mrs. Tio's attempt to manufacture a valid legal ground to challenge Dr. Tio's termination of employment where no such ground exists. The undisputed facts in this case demonstrate that WHC terminated Dr.

Tio's employment, in accordance with the Termination Provisions in his Employment Agreement, due to his on-going, well-documented performance issues -- and not for any invalid or illegal reason. As such, Claimants' ten count Complaint seeking to challenge his valid termination should be dismissed in its entirety.

## II

## MATERIAL FACTS AS TO WHICH THERE IS NO GENUINE DISPUTE

1.      Claimant, Lok Thian Tio, M.D. ("Dr. Tio"), who is Asian, was employed at WHC from approximately February 1, 2001 in the Section of Gastroenterology until his employment was terminated on April 18, 2003. See Complaint at ¶¶ 1 and 18 attached hereto as Exhibit 2; Termination Letter, dated April 18, 2003 ("Termination Letter"), attached hereto as Exhibit 3. While employed at WHC, Dr. Tio was the Director of the Endoscopy Laboratory, which is located in the Section of Gastroenterology. See Complaint at ¶ 19. At all relevant times, Dr. Tio's supervisor was Leonard Wartofsky, M.D., who is the Chairman of the Department of Medicine. Deposition of Leonard Wartofsky, M.D. ("Wartofsky Dep.") at p. 8, ln. 22 – p. 9, ln. 10, attached hereto as Exhibit 4.

2.      Prior to his employment at WHC, Dr. Tio worked at Georgetown University Hospital in Washington, DC. See Tio Dep. at p. 19, ln. 14-16. Prior to joining Georgetown University Hospital, Dr. Tio had great difficulty obtaining a license to practice medicine in the District of Columbia. Tio Dep. at p. 19, ln. 17 – p. 20, ln. 16. This difficulty stemmed from the fact that Dr. Tio's medical school training, which took place in Germany, could not be verified. See Tio Dep. at 19-20. As a consequence, Dr. Tio had to retain counsel to assist him in getting a law passed that would enable him to practice in the District of Columbia. Tio Dep. at pp. 19-20.

3

3.     In connection with his employment at WHC, Dr. Tio and WHC signed an

Employment Agreement ("Agreement"). <u>See</u> Employment Agreement, attached hereto as

Exhibit 5.  The initial term of the Agreement began on February 2001 and ended on January

2002, but the Employment Agreement was to renew automatically from year to year unless

terminated.  <u>Id.</u>  Dr. Tio's Employment Agreement included a section on Termination of

employment, which provided that his employment could be terminated either "without cause" or

"for cause."  <u>See</u> Employment Agreement at p. 4, Section 5.  The "for cause" termination

provision of his Agreement stated, in pertinent part, as follows:

> This Agreement may also be terminated forthwith
> for cause or for breach of contract, provided,
> however, that in the case of a breach or cause
> which is remediable, the termination shall not
> become effective until notice in writing has been
> given, and the party so notified has failed to
> remedy the breach or cause, including the payment
> of all costs incident thereto within thirty (30) days
> after receipt thereof.   For purposes of this
> Agreement, "cause" shall be taken to be (i)
> professional incompetence, as determined by the
> department Chair and the Medical Director of
> HOSPITAL, …(iii) failure to comply with
> policies, standards or regulation of HOSPTIAL,
> (iv) voluntary or involuntary neglect of
> responsibilities….

Employment Agreement at p. 4, Section 5.

4.     As the Director of Endoscopy, Dr. Tio's job responsibilities included, among

other things, interacting with the Section Director and the supervising nurse to ensure efficient

and appropriate supervision function of the Endoscopy Laboratory; participating in committees

to implement functional policy, quality assurance, and regulatory goals; attending meetings with

the Section Practice committee, Endoscopy Unit Advisory Committee, liaison groups for other

relevant departments, Section Credentials committee, and other medical staff, hospital, and

departmental committees; supervising the selection, employment, and training of the Endoscopy

Suite staff, and serving in traditional patient care role as a member of the Gastroenterology

Section.   See Job Description, Director Endoscopy Laboratory ("Job Description"), attached

hereto as Exhibit 6.

     5.     Although Dr. Tio's job description permitted him to engage in extramural

activities such as conducting conferences outside of the Hospital, his Job Description made clear

that "[a]ll such activities shall have prior approval by the Director of the Section, the Chairman

of the Department of Medicine and the Medical Director. See id.   Moreover, Dr. Tio's

Employment Agreement specifically prohibited him from "engag[ing] in any private professional

practice of medicine outside of this Agreement during the term thereof except as specifically

authorized by his departmental chair and the Medical Director.  Employment Agreement at p. 2,

Section 1.

     6.     During the initial year of Dr. Tio's employment, Dr. Tio's Employment

Agreement provided that his compensation would be $225,000.  See Employment Agreement at

p. 2, Section 2.  At Dr. Tio's request, his Employment also added the following other provision:

> It is the <u>intent</u> of the parties to develop an incentive
> compensation model for DOCTOR beginning in year two
> of this Agreement.  It is <u>mutually understood</u> that in order
> to convert from a pure base compensation model to an
> incentive model that DOCTOR'S base compensation shall
> be decreased and an incentive formula developed with the
> goal of at least maintaining DOCTOR'S total
> compensation at the same level for the same billing and
> collection rates. . . .

See Employment Agreement at p. 2, Section 1 (emphasis added).  Nothing in the Employment

Agreement stated that the parties SHALL create such an incentive model.  See Employment

Agreement.  Moreover, nothing in the Agreement put sole responsibility for creating an incentive

model on WHC or set any particular percentage of revenue that Dr. Tio could expect to receive should such incentive model be created. Id.

7.    During Dr. Tio's first quarter at the Hospital, he performed his job satisfactorily, even achieving greater than his budgeted revenue. See Note from R. Burakoff to Dr. Tio, dated January 9, 2002, attached hereto as Exhibit 7. Shortly thereafter, however, Dr. Tio's performance began to decline dramatically. By June 2002, he was only seeing four patients per month (approximately 10% of the patients being treated by other physicians in his Department) and his low productivity continued over the next two quarters. See Chart logging patients seen by physicians between July 2002 to June 2003 (reflecting that by the end of the quarter ending March 2003, Dr. Tio had only seen six patients), attached hereto as Exhibit 8. Dr. Tio's performance also fell seriously below the budgeted revenue goals that WHC set for him. See Email from Dr. Wartofsky to Dr. Tio, dated December 22, 2002 ("December 22, 2002 Email") (stating that Dr. Tio's billing are down from budget by over $200,000) (Exhibit 9). By March 2003, Dr. Tio had an Inpatient Revenue of only $91,105 compared to his $274,995 budgeted revenue. See FY03 Physician Monthly Revenue Report, dated April 11, 2003, attached hereto as Exhibit 10. On the Outpatient side, Dr. Tio's actual revenue was $274,400 compared to budgeted revenue of $573,260. See id. In 2003, Dr. Tio's revenue and productivity were dramatically below the revenue and productivity levels he had met just the year before. Wartofsky Dep. at p. 52, ln. 8 through p. 54, ln. 7.

8.    During this same time period, Dr. Tio had begun to spend significant time outside of the Hospital. Dr. Tio took very extravagant trips and charged them as administrative leave to the Hospital instead of personal vacation time. See December 22, 2002 Email (Exhibit 9); Wartofsky Dep. at p. 39, ln. 5 through p. 44, ln. 4. Dr. Tio's travel itinerary during 2002,

included cruises and trips to France, Greece, and Venezuela. Id. Review of Dr. Tio's time records revealed that for July 1 through December 17, 2002, alone, he charged 264 hours of administrative leave to the Hospital for these personal trips. See Memorandum from L. Wartofsky to L. Gulati and D. Griffiths, dated January 22, 2003 ("January 22, 2003 Memorandum), attached hereto as Exhibit 11.

9.    Although Dr. Tio claimed that he was participating in medical conferences during his multiple absences, review of the materials from the conferences revealed that Dr. Tio had taken far more time than the dates for which the alleged conferences had been scheduled. See Wartofsky Dep. at p. 39, ln. 5 through p. 44, ln. 4; Email from Dr. Wartofsky to Dr. Tio, dated January 29, 2003 ("January 29, 2003 Email"), attached hereto as Exhibit 12. Even giving Dr. Tio the benefit of the doubt, Dr. Wartofsky determined that only 64 of the 200 hours that Dr. Tio missed from work at WHC could be construed to be genuine time spent at conferences for work related purposes. See December 22, 2002 Email. (Exhibit 9); Wartofsky Dep. at 200, ln. 15 through p. 202, ln. 19; see also January 29, 2003 Email (Exhibit 11).

10.    On December 22, 2002, Dr. Wartofsky expressed his serious concern to Dr. Tio about the impact that Dr. Tio's chronic absenteeism was having on his productivity and performance at the Hospital. See December 22, 2002 Email (Exhibit 9). In that email, Dr. Wartosky stated as follows:

> Lok:
>
> You are yet to respond to the inquiry below dated 12/3. You have been gone for 38 days and your billings are down from budget by over $200,000. I am instructing Human Resources to charge you for 30 days vacation time and 8 days Administrative leave. Please make an appointment to see me on your return.

7

Id.

11.    · None of the time that Dr. Tio took was authorized by Dr. Tio's supervisors.  See Email· from Dr. Wartofsky to Dr. Tio, dated December 3, 2002 (explaining that the time Dr. Tio took away from the Hospital was unauthorized and negatively affected revenue in the Department).

12.    During this same time period, both Dr. Wartofsky and Susan Hart, who was the Assistant Vice President for the Department of Medicine, began to receive numerous complaints about virtually every aspect of Dr. Tio's job· performance at the Hospital.  See Termination Letter; ) (Exhibit 3) see also Deposition of Susan Hart ("Hart Dep.") at p. 54, ln.10 through p. 56, ln. 21; p. 69, ln. 2 through p. 74, ln. 16; p. 103, ln. 20 through p. 108, ln. 21, attached hereto as Exhibit 24; Wartofsky Dep. at p. 104, ln. 10 through p. 108, ln. 17; p. 110, ln. 16 through p. 119, ln. 3.    Specifically, the staff in the Endoscopy Suite complained about Dr. Tio's lack of leadership as demonstrated by his refusal to attend regularly scheduled meetings to 'discuss the operation and direction of the Endoscopy Laboratory, his refusal to lead Advisory Committee meetings as required in his job description, his failure to address day-to-day concerns of employees that he supervised within the Laboratory, and the condescending manner in which he spoke to staff and Fellows-in-Training, whom· he was supposed to be mentoring.  See Wartofsky Dep. at p. 104, ln. 13 through p. 108, ln. 17; p. 110 ln. 16 through p. 118, ln. 3.

13.    Furthermore, Dr. Wartofsky and Ms. Hart received persistent complaints about Dr. Tio's failure to complete in a timely manner consult service billing, Medicare "bluesheets", and critical documentation on patient care.  See Termination Letter (Exhibit 3); see also Email from Shana E. Reams to Dr. Tio, dated September 17, 2002, attached hereto as Exhibit 14. Without these Medicare Bluesheets, the Hospital could not receive payment for services

8

provided to Medicare eligible patients. Wartofsky Dep. at p. 112, ln. 20 – p. 113, ln. 15. By the date of his termination, Dr. Tio had even been restricted from removing patient charts from the file room due to his chronic delays in returning them.    See Termination Letter. Despite numerous reminders and reprimands from Dr. Wartofsky urging Dr. Tio to improve in fulfilling his administrative obligations, Dr. Tio never improved. See September 17, 2002 Email (Exhibit 14); Email from Susan Hart to Dr. Tio, dated November 8, 2002, attached hereto as Exhibit 15; Email from Susan Hart to Dr. Tio, dated September 23, 2002, attached hereto as Exhibit 16.

14.    In addition, Ms. Hart, who was responsible for all administrative, financial, budgeting, supplies, and personnel for Gastroenterology, constantly received complaints about the rate at which Dr. Tio broke and damaged expensive equipment in the Endoscopy Suite. See Hart Dep. at p. 54, ln. 10 through p. 56, ln. 21. The Department expended $21,000 to replace ultrasound probes that Dr. Tio broke on a regular basis, while performing procedures. Moreover, the Department had to incur the cost of 14 major repairs to ultrasound scopes, which totaled $112,000, as a result of Dr. Tio's mishandling of the equipment. Email from Guido E. Villacres to Susan L. Hart, dated April 15, 2003, attached hereto as Exhibit 17.

15.    Finally, the Radiation Safety Committee also complained to Dr. Wartofsky and Ms. Hart that Dr. Tio's radiation exposure levels for patients had risen significantly, and that Technicians who worked with Dr. Tio in the Laboratory reported that he instructed them to disarm the alarms in the Laboratory that detect unsafe levels of radiation exposure. See Termination Letter, (Exhibit 3); see also Radiation Safety Committee Meeting Agenda, dated March 21, 2003, attached hereto as Exhibit 18.

16.    By April 2003, it had become clear that Dr. Tio's peers, employees, and supervisor, alike, had lost confidence in him and his ability to lead the Endoscopy Laboratory.

See Termination Letter. It became clear that Dr. Tio's numerous breaches of contract and unprofessional conduct, were not remediable. See Termination Letter (Exhibit 3). As a result, on April 18, 2003, Dr. Wartofksy issued to Dr. Tio a Termination Letter. The Letter terminated Dr. Tio's employment for cause effective close of business on April 18, 2003. See Termination Letter.

17. The Termination Letter stated that Dr. Tio "consistently demonstrate[d] [his] failure to comply with the policies, standards or regulations of the Hospital as well as voluntary or involuntary neglect of responsibilities." See id. The Letter further outlined six grounds supporting Dr. Tio's "for cause" termination of employment. These six grounds, in pertinent part, were as follows: (1) abuse of time and attendance, (2) failure to attend to clinical obligations as evidenced by dramatically reduced clinical revenue, (3) total lack of leadership and failure to perform duties required by his job description as Director of Endoscopy, including failure to attend required meetings and address day-to-day issues in the Endoscopy Suite, (4) continuing deficiencies in administrative accountability, including failure to complete required billing and Medicare blue sheets, (5) abuse of hospital supplies and equipment, and (6) mounting concerns from the Radiation Safety Committee about excessive radiation exposure to patients. See id.

18. In April 2002, prior to Dr. Tio's April 2003 for cause termination, the President of WHC directed that certain positions be eliminated due to well-documented economic and financial issues that the Hospital was experiencing. As a result, the President of WHC directed Dr. Wartofsky to notify Dr. Tio of the no-cause elimination of his position. See April 23, 2002 Termination Letter; Wartofsky Dep. at p. 55, ln. 27 through p. 58, ln. 7.

19.    Soon after the President of WHC identified Dr. Tio's position for elimination, the President of WHC was himself terminated. See id. As soon as the acting President was in place, Dr. Wartofsky, Dr. Tio's supervisor, petitioned the acting President and requested that Dr. Tio's position be reinstated.  Id.  As a direct result of Dr. Wartofsky's efforts, Dr. Tio's notice of termination was withdrawn and his position was reinstated.    See Tio Dep. at p. 29, ln. 15 through p. 32, ln. 19, Wartofsky Dep. at p. 55, ln. 17 through p. 58, ln. 7. Dr. Tio's employment was never terminated, and his salary and benefits were not affected. See Tio Dep. at p. 29, ln. 15 through p. 32, ln. 19.. The time period between when Dr. Tio was notified that his position was being eliminated and the time it was reinstated was only a couple of weeks.  Wartofksy Dep. at p. 55, ln. 17 through p. 58, ln. 7.

20.    Despite this fact, Dr. Tio concluded that he no longer wanted to work at WHC, even after receiving notice that his position was being reinstated  See Tio Dep. p. 92, ln. 6 through p. 93, ln. 1.  Consequently, he began actively exploring employment opportunities at other hospitals.  Id.  Although Dr. Tio had begun exploring opportunities at other Hospitals during the summer of 2001, he began to focus aggressively pursue an opportunity at Cedars-Sinai Hospital in California. See Tio Dep. at p. 66, ln. 17 – p. 69, ln. 6; p. 92, ln. 6 through p. 93, ln. 1.

21.    The record is undisputed that even prior to April 2002, Dr. Tio had received an offer and completed applications materials to join the medical staff of Cedars-Sinai Hospital in Los Angeles, California during the summer of 2001. Id. Dr. Tio even put WHC on notice of his intent to accept employment at Cedars-Sinai by asking Dr. Robert Burakoff, his then supervisor, for a letter of reference. Tio Dep. at p. 62, ln. 4 through p. 64, ln. 1;  p. 76, ln. 20 through p. 77, ln. 20. However, as Dr. Tio has admitted under oath, he began to push the recruitment process at

11

Cedars-Sinai opportunity more aggressively following the withdrawn notice of termination from WHC in April 2002. Tio Dep. at p. 72, ln. 2 through p. 74, ln. 2. He also discussed the move with his family and made plans to move to California once his application materials were complete, well before his April 2003 for cause termination. Tio Dep. at p. 108, ln. 13-17.

22.    Beginning the second half of 2002, it is undisputed that while still an employee of WHC, Dr. Tio spent significant time traveling back and forth to Cedars-Sinai for programs and teaching obligations. See Tio Dep. at p. 60, ln. 9 through p. 61, ln. 2 (admitting that he performed a medical procedure in 2002 at Cedars-Sinai Hospital). In fact, his name appeared on a brochure as a faculty member for a conference sponsored by Cedars-Sinai on October 4-6, 2002. See Conference Brochure, attached hereto as Exhibit 20 (stating that Dr. Tio was Cedar-Sinai's Director of Endoscopic Ultrasound Pancreaticobiliary and Interventional Endoscopy). This time period corresponds with Dr. Tio's significant absences from WHC and his dramatic decline in productivity and revenue. See Conference Brochure (Exhibit 20), January 22, 2003 Memo (Exhibit 11), December 3, 2002 Email (Exhibit 13) (providing the dates of Dr. Tio's excessive absenteeism). Importantly, Dr. Tio has admitted under oath that his productivity declined after he increased his efforts to secure employment at Cedars-Sinai in California. See Tio Dep. at p. 244, ln. 10 through p. 245; p. 261, ln. 5-8.

23.    Even Dr. Tio was aware that his aggressive efforts to pursue employment at Cedars-Sinai was distracting from his efforts at WHC and, as a consequence, jeopardized his employment at WHC. See Email from Simon Lo, M.D. to Dr. Tio, dated March 19, 2003 ("March 19, 2003 Email"), attached hereto as Exhibit 21 (apologizing to Dr. Tio for Cedars-Sinai's long recruitment process and stating that he understood that the process is "costing [him] the security of [his] position").

12

24.    After Dr. Tio's employment at WHC was terminated in April 2003, Dr. Tio and his family, in fact, moved to Los Angeles, California so that Dr. Tio could accept employment at Cedars-Sinai.  See Tio Dep. at p. 223, ln. 8-10.  Dr. Tio admitted under oath that his salary at Cedars-Sinai was higher than at WHC.  See Tio Dep. 272, ln. 6 through p. 273, ln. 2.

25.    Dr. Tio has admitted under oath that he did not leave WHC and begin working at Cedars-Sinai prior to April 18, 2003 was because he was still awaiting approval and issuance of his California medical license.  See Tio Dep. at p. 223, ln. 11 through p. 224, ln. 3.  Dr. Tio explained that he experienced the same type of difficulty obtaining a California medical license as he did obtaining a District of Columbia license, due to problems with verifying his medical training.  See Tio Dep. at p. 107, ln. 3 through p. 108, ln. 6; March 19, 2003 Email (Exhibit 21).

26.    Shortly after Dr. Tio's departure from WHC, in response to Dr. Tio's request, the Hospital forwarded form letters to Dr. Tio's patients advising them that Dr. Tio was no longer employed by the Hospital.  See Patient Letters ("Patient Letters") from J. Caldas and M. Gold, attached hereto as Exhibit 22.  These letters did not, in any way, address the circumstances under which Dr. Tio left them Hospital.  Id.  Rather, the letters simply notified Dr. Tio's former patients of the fact that he had left the Hospital, and provided patients with information for how they could receive any future necessary treatment.  See Patient Letters.

27.    Dr. Tio has admitted under oath that none of the Respondents made any defamatory statements against him.  Tio Dep. at pp. 249 through p. 251, ln. 19 p. 255, ln. 15 through p. 256, ln. 3.

28.    Further, Dr. Tio has admitted that he no basis to believe that race played a role in the termination of his employment.  Rather, it is his belief that the conflicts he had with several of his colleagues were due to professional jealousy and personality conflicts.  See Tio Dep. at p.

13

255, Ln. 15-21; p. 261, Ln. 13; p. 262, Ln. 3.  The individual, Dr. Abeti, whom Dr. Tio contends was hired to replace him, after Dr. Tio told his supervisors that he was resigning to accept a position at Cedars-Sinai, like Dr. Tio, is a minority.  See Tio Dep. at p. 188, ln. 11 through p. 191 ln. 12  It is undisputed that Dr. Abeti is of Iranian or Muslim descent.  Id.

## III.

## LEGAL STANDARDS FOR SUMMARY JUDGMENT

The Supreme Court has recognized that summary judgment is not a "procedural short-cut," but rather a means "to secure the just, speedy and inexpensive determination of [an] action." Celotex Corp. v. Catrett, 477 U.S. 317 (1986).  There is no necessity for trial unless there is sufficient evidence favoring the non-moving party for a fact-finder to find in favor of that party.  Catrett v. Johns-Manville Sales Corp., 826 F.2d 33, 39 (D.C. Cir. 1987), cert. denied, Celotex Corp. v. Catrett, 484 U.S. 1066 (1988) (quoting Anderson v. Liberty Lobby, Inc., 477 U.S. 242 (1986)).

Accordingly, in this case, if the Respondents demonstrate that no genuine issues of material fact exists, they are entitled to summary judgment as a matter of law. D.C. Sup. Ct. 56. A motion for summary judgment should be granted if, taking all reasonable inferences in the light most favorable to the non-moving party (in this case the Claimants), a reasonable fact-finder could not find for the Claimants.  Terrazas v. Medlantic Healthcare Group, Inc., 45 F. Supp. 2d 46, 50 (D.D.C. 1999).  The moving party (the Respondents) carry the initial burden of demonstrating the absence of a material factual dispute and that they are entitled to judgment as a matter of law.  Adickes v. S.H. Kress & Co., 398 U.S. 144 (1970); Rodway v. United States Dep't of Agriculture, 482 F.2d 722, 727 (D. C. Cir. 1973).

14

Once the Respondents satisfy this initial burden, the non-moving party must produce opposing evidence, that would be admissible at the arbitration hearing, to demonstrate the existence of a genuine factual dispute as to a material fact. Cinchillo v. Powell, 236 F. Supp. 2d 18, 22 (D.D.C. 2003). In order for a factual dispute to be genuine and thus defeat a motion for summary judgment, the dispute must be over facts that are necessary to prove an element of the claim. Terraza, 45 F. Supp. 2d at 49 (citing Anderson 477 U.S. at 248; Celotex, 477 U.S. at 322). It is not sufficient for Claimants to establish "the mere existence of a scintilla of evidence in support of the [Respondents'] position . . .; there must be evidence on which the [arbitrator] could reasonably find for the [Claimants]." Anderson, 477 U.S. at 252. If the Claimants fails to supply a genuine issue of material facts, the Respondents are entitled to judgment as a matter of law. See Chinchillo, 236 F. Supp. 2d 18 (granting defendants' motion for summary judgment).

## IV.

## ARGUMENT AND AUTHORITIES

**A. Dr. Tio's Tortious Breach of Contract Claim Must Be Dismissed A Matter of Law Because There Is Absolutely No Evidence That WHC's Actions In Terminating Dr. Tio For Cause Rose To The Level of Oppressive, Wanton, Reckless or Malicious.**

Count I of Dr. Tio's Complaint, which alleges a claim for tortious breach of contract, must be dismissed as a matter of law, because the facts simply do not state a claim for tortious breach of contract, as a matter of law. The four corners of Dr. Tio's complaint reveal that he did not plead a breach of contract claim. Rather, he pled a claim for "tortious" breach of contract claim. These claims are entirely different and distinct. See The Plan Committee v. Price WaterhouseCoopers, 335 B.R. 234 (D.D.C. 2005) (explaining the elements for a breach of contract; P.U.D. v. Days Inn of America, 1999 U.S. LEXIS 5603 (E.D.N.C. Feb. 26, 1999) (to establish a claim for tortious breach of contract, Plaintiff must show some aggravating factor beyond the breach itself).

15

To establish a claim for tortious breach of contract, Dr. Tio must not only show that WHC's termination of his Employment Agreement constituted a breach of contract, but he must also prove that in terminating his Employment Agreement, the Hospital acted in an oppressive, wanton, reckless, or malicious manner and exhibited an indifference to the consequences of its action. Courts routinely dismiss tortious breach of contract claims where the facts of the case are insufficient to prove that, even assuming there was a breach of contract, the breaching party's actions rose to the level of oppressive, wanton, reckless or malicious behavior. See Keiter v. The Penn Mutual Insurance Company, 900 F. Supp. 1339 (D. Haw. 1995) (dismissing plaintiff's tortious breach claim because he could not prove the existence of a breach of contract and recklessness and wantonness); P.U.D.,1999 U.S. LEXIS 5603 (E.D.N.C. Feb. 26, 1999) (granting summary judgment on tortious breach of contract claim because there were no aggravating factors to suggest that the alleged breach was oppressive, wanton, reckless or malicious).

The undisputed facts in this case are insufficient to establish a claim for tortious breach of contract against any of the Respondents, as a matter of law. First, with respect to the individual Respondents, Dr. Tio was not a party to a contract with any of the individually-named Respondents. The only Respondent with which Dr. Tio had a contract was WHC. Only a party to a contract can tortiously breach that contract. See Trueposition, Inc. v. Allen Telecom, 2003 U.S. Dist. LEXIS 881 at * 5 (D. Del. Jan. 21, 2003); see also Traffas v. Bridge Capital Investors, II, 1993 U.S. Dist. LEXIS 12028 at *3 (D. Kan. 1993) ("It would be a novel holding for the court to rule that a breach of contract action can be maintained against a person who is not a party to the contract being sued upon ... A party to a contract cannot sue a person who is not a party to that contract for breach of contract."); Credit Gen. Ins. Co. v. Midwest Indem. Corp., 916 F.

Supp. 766, 772 (N.D. Ill. 1996) (finding "ludicrous" the defendants' contention that a non-party

to a contract can breach that contract). As such, the individually-named Respondents could not

have tortiously breached any contract with Dr. Tio and the claims against them must be

dismissed.

With respect to WHC, review of Count I of Dr. Tio's Complaint and applicable discovery

in this case reveals that he has not alleged, nor can he prove, that WHC breached any provision

of his Employment Agreement in terminating his employment. See Complaint (Exhibit 2).

Although Dr. Tio's tortious breach of contract claim (Count I) alleges that Respondents

wrongfully terminated his employment under his Employment Agreement, conspicuously, Dr.

Tio does not allege that WHC breached either the Termination provision, or any other provision

of Dr. Tio's Employment Agreement, in terminating his employment. As such, Dr. Tio's

tortious breach of contract claim must be dismissed, on this basis alone.

This notwithstanding, even if Dr. Tio could prove any breach of contract, which he

cannot, his tortious breach of contract claim against WHC fails for another reason. The

undisputed facts of this case demonstrate that there is not a shred of evidence that in terminating

Dr. Tio's employment, WHC acted in a manner that was oppressive wanton, reckless or

malicious. There is simply nothing about WHC's termination of Dr. Tio's Employment

Agreement that rises to the level of tortious conduct.

To the contrary, the undisputed evidence in this case is that WHC provided Dr. Tio with a

Termination Letter, dated April 18, 2003, setting forth six ongoing, well-documented bases for

the termination of his Employment Agreement. Furthermore, according to Dr. Tio's own sworn

testimony, the Hospital's termination of his employment came after his productivity had

decreased dramatically due to Dr. Tio's own decision that he no longer wanted to work at WHC

17

and was, therefore, actively pursuing employment at Cedars-Sinai Hospital in California.  <u>See</u>

Tio Dep. at p. 92, ln. 6 through p. 93, ln. 1.

Indeed, there is not a shred of evidence that Respondents took any "wanton" or

"reckless" action against him.  Rather, WHC's actions in terminating Dr. Tio's Employment

Agreement on April 18, 2003 resulted, not from any oppressive, reckless or wanton breach of

contract by WHC, but   rather, Dr. Tio's termination resulted from his own breach of the

Agreement and failure to perform his job duties in accordance with the terms of his Employment

Agreement.  As such, Dr Tio's Employment Agreement must be dismissed as a matter of law.

**B.      Claimants Cannot State a Claim for Tortious Interference With A Contract Of
Employment Because It Is A Legal Impossibility For WHC to Interfere with Its
Own Contractual Relationship.**

Dr. Tio's tortious interference with contract claim under Count II of the Complaint

should also be dismissed because he has failed to state a claim for which relief can be granted

based on well-settled case law.  Dr. Tio alleges in his complaint that Respondents tortiously

interfered with Dr. Tio's Employment Agreement with WHC.  Dr. Tio's claim, however, fails

because WHC cannot interfere with a contract to which it is a party.  Further, the individual

Respondents, who, at all relevant times, were all employees of the Hospital cannot interfere with

their employer's contracts, as a matter of law.

In <u>McManus v. MCI Communications Corp.</u>, 748 A.2d 949, 957-58 (D.C. 2000), the

Court of Appeals dismissed this exact type of claim, holding that "an employer cannot interfere

with its own contracts."  In <u>McManus,</u> the plaintiff sued her employer for interference with

prospective advantage, as well as several other claims.  In affirming the trial court's grant of

summary judgment on the plaintiff's tortious interference claim, the <u>McManus</u> court held, as a

matter of law, that an employer cannot be liable for interfering with its relationship with its own employee. See id. at 958.

The McManus court reasoned that tortious interference with prospective business advantage is "a three party tort," Art Metal-U.S.A., Inc. v. United States, 577 F. Supp. 182, 185 (D.D.C. 1983), and therefore "requires a showing of action by the defendant toward a third party." Jones v. Sabis Educational Systems, Inc., 1999 U.S. Dist. LEXIS 6911 at *37 (N.D. Ill. May 3, 1999). Accordingly, it "is both logically and legally untenable for a plaintiff to claim an employer interfered with itself." Williams v. Weaver, 495 N.E.2d 1147, 1153 (Ill. App. Ct. 1986) ("Preliminarily, we note that since the tort of interference with prospective advantage requires a showing of action by the defendant toward a third party...plaintiff's position — which is, essentially that the board tortiously interfered with its own business relationship with him — is both logically and legally untenable" (citations omitted)).

The McManus court's rejection of the plaintiff's argument was in complete harmony with the hornbook law elements for the tort of interference, which "require that the tortfeasor's actions have interfered with contractual relations between plaintiff and a third party." Art Metal, 577 F. Supp. at 184. Under McManus, Dr. Tio's claim that the Hospital interfered with its own contract of employment with him is both logically and legally untenable and should be dismissed as a matter of law.

Likewise, Dr. Tio's tortious interference claims against individual Hospital employees (the individually-named Respondents) must also fail. District of Columbia law

> affords to a supervisor . . . a qualified privilege to act properly and justifiably toward a fellow employee and that employee's true employers — those who have the power to hire and fire." . . . The defendant's employees acting within the scope of their employment are identified with the defendant .

19

> . . so that they may ordinarily advise the defendant
> to breach his [or her] own contract without
> themselves incurring liability in tort.

McManus v. MCI Communications Corp., 748 A.2d 949, 958 (D.C. 2000) (citing Sorrells v.

Garfinckel's, et al., 565 A.2d 286, 291 (D.C. 1989); W, Keeton, Prosser & Keeton on the Law of

Torts § 129, at 990 (5th ed. 1984)).

The undisputed facts of this case are that Dr. Wartofsky terminated Dr. Tio's

employment for-cause due to multiple on-going performance issues. These performance issues,

which are well-documented, constituted a breach of Dr. Tio's duties under his Employment

Agreement. Under these circumstances, Dr. Wartofsky's termination of Dr. Tio's employment

was justified and any alleged "interference" by Dr. Wartofsky, or any other Respondent, with Dr.

Tio's Employment Agreement was privileged, as a matter of law. As such, Dr. Tio's claim for

tortious interference with contract against WHC and the individually-named Respondents has

absolutely no merit and should be dismissed.

**C.    Dr. Tio's Claim for Breach of The Implied Duty of Good Faith and Fair Dealing
Should Be Dismissed For The Same Reasons That His Tortious Breach of Contract
Claim Should Be Dismissed.**

Count III of Dr. Tio's Complaint, which alleges a claim for denial of common law good

faith and fair dealing, must be dismissed for essentially the same reasons that Dr. Tio's tortious

breach of contract claim should be dismissed. See supra at 16. As an initial matter, to the extent

that Dr. Tio is attempting to assert a claim for breach of the duty of good faith and fair dealing

against the individual Respondents, those claims must be summarily dismissed. As stated above,

Dr. Tio did not have a contractual relationship with any of the individual Respondents.

Therefore, the individuals could not owe Dr. Tio a contractual duty of good faith. Rather, Dr.

Tio was an employee of WHC, and his only contractual relationship was with WHC. Because

his good faith and fair dealing claim is based upon his contractual relationship with WHC, any claim against the individual Respondents cannot stand, as a matter of law.

Dr. Tio's claim for breach of the duty of good faith and fair dealing against WHC must also be dismissed. Although the District of Columbia implies a common law duty of good faith and fair dealing in all contracts, a claim for good faith and fair dealing may not override an express contract provision. Where there are specific contract provisions that govern the dispute between the parties, a claim for breach of the covenant of good faith and fair dealing must be dismissed. Wash. Metro. Area Transit Auth., 2006 U.S. Dist. LEXIS 24510 at 14-15 (citing TV Capital Corp. v. Paxson Comm. Corp., 894 A.2d 461, 468 (D.C. 2006) (explaining that a claim for breach of the covenant of good faith and fair dealing cannot override an express contract provision). Furthermore, breach of the implied covenant of good faith and fair dealing cannot stand as an independent cause of action when such allegations are identical to other claims for relief under other established causes of action. Wash. Metro. Area Transit Auth., 2006 U.S. Dist. LEXIS 24510 at *14-15 (citing Jacobsen v. Oliver, 201 F. Supp. 2d 93, 98 n. 2 (D.D.C. 1996) (holding that plaintiff's legal malpractice claim was identical to the breach of implied covenant of good faith and fair dealing claim and thus dismissing the breach of covenant claim).

Finally, to prevail on a claim for breach of the covenant of good faith and fair dealing, Dr. Tio must show that WHC "evade[d] the spirit of [his Employment Agreement], willfully render[ed] imperfect performance, or interfere[d] with performance by [Dr. Tio]." Allworth v. Howard University, 890 A.2d 194, 201 (D.C. 2005). In other words, Dr. Tio must prove that WHC's actions in terminating his Employment Agreement were arbitrary, capricious, and "designed" to destroy or injure him. See Allworth, 890 A.2d at 201 (affirming summary

21

judgment for defendant on plaintiff's breach of good faith and fair dealing claim and holding that

to sustain the claim the defendant's actions must have been arbitrary and capricious)

In the present case, Dr. Tio's claim for breach of the covenant of good faith and fair

dealing against WHC must be dismissed for several reasons. First, the basis for Dr. Tio's good

faith and fair dealing claim is that the Hospital wrongfully terminated his Employment

Agreement. Because the Employment Agreement contains express provisions on the subject of

termination of employment, those provisions apply to the instant dispute, and Dr. Tio's claim for

good faith and fair dealing cannot override those provisions.

Second, Dr. Tio's claim for breach of the covenant of good faith and fair dealing are

duplicative of other claims that he has pled in this case. He has already asserted a claim for

tortious breach of contract, which is based on the alleged wrongful termination of his

Employment Agreement. As such, his good faith and fair dealing claim is duplicative and,

therefore, cannot stand as an independent claim. See Washington Metro. Area Trans. Auth.,

2006 U.S. Dist. LEXIS 24510 at ** 14-15.

Third, as set forth in Section I above, on the facts of this case, Dr. Tio simply cannot

prove that WHC acted in an arbitrary, capricious, wanton, or reckless manner in terminating his

Employment Agreement. The facts in this case are undisputed that Dr. Tio's termination in this

case was not based on a sinister plot to "destroy" him. Indeed, if anyone breached the covenant

of good faith and fair dealing, it was Dr. Tio, who essentially abandoned his job, began to travel

the world at the Hospital's expense, obtained employment at another hospital, stopped seeing

patients, and ignored his administrative responsibilities, all because he had obtain a new higher-

paying job at Cedars-Sinai Hospital. Thus, Dr. Tio's termination resulted from his well-

document and undisputed failure to (1) perform his job duties, despite being warned about these

22

failures, and (2) adhere to specific provisions of his Employment Agreement. <u>See</u> Termination

Letter (Exhibit 3). Under these circumstances, Dr. Tio's good faith and fair dealing claim fails,

as a matter of law.

**D.    Dr. Tio's Claim for Tortious Interference with Third-Party Physician Contracts Should Be Dismissed, As A Matter of Law, Because There Is No Evidence That Dr. Tio Had Contracts With Any Third Party Patients.**

Count IV of the Complaint alleges tortious interference with third-party physician

contracts. However, because no such third party contracts exist with Dr. Tio's patients, this

Count must also be dismissed

To establish a <u>prima facie</u> case of intentional interference with third party contractual

relations, Plaintiff must show: "(1) the existence of a contract; (2) knowledge of the contract; (3)

intentional procurement of a breach of the contract; and (4) damages resulting from the breach."

<u>Futrell v. Department of Labor Federal Credit Union</u>, 816 A.2d 793, 807 (D.C. 2003). The

District of Columbia Court of Appeals has defined 'intentional procurement of a breach' as

> [o]ne who intentionally and improperly interferes with the performance of a contract . . . between another and a third person by inducing or otherwise causing the third person not to perform the contract, is subject to liability to the other for the pecuniary loss resulting to the other from the failure of the third person to perform the contract.

<u>Paul v. Howard University</u>, 754 A.2d 297, 309 n.23 (D.C. 2000) quoting Restatement (Second)

of Torts § 766 (1979)).

In the present case, there is no evidence that Dr. Tio had contracts with any patients.

Indeed, at all relevant times, Dr. Tio was an employee of WHC. As such, he treated patients as

an employee of WHC. Neither Dr. Tio nor WHC had contracts with any patients. <u>See</u>

Wartofsky Dep. at p. 72, ln. 1-22. Furthermore, even if Dr. Tio could prove he had contracts

with any patients, he has not produced, nor can he, a shred of evidence to suggest that

Respondents either knew about the contracts or took any steps to induce or otherwise cause the patients not perform under any contract with Dr. Tio.

In fact, the only evidence in this case is that after Dr. Tio's termination, the Hospital advised former patients that Dr. Tio was no longer employed at the Hospital and recommended other options for future treatment should the patients require such treatment. Dr. Tio has produced absolutely no evidence, nor is there any such evidence, that the Respondents either knew about or stopped any patient from performing under a contract with Dr. Tio.

**E.    Dr. Tio's Claim For Defamation Must Be Dismissed Because The Undisputed Facts In This Case Demonstrate That No Respondent Made Any False Statement About Dr. Tio and Any Event, Any Statements Made By Respondents Were Privileged.**

Dr. Tio's defamation claim (Count V of the Complaint) also fails, as a matter of law, because Dr. Tio has admitted under oath that none of the Respondents made any false or defamatory statement about him. To prevail on a defamation claim, Dr. Tio must prove that the Respondents (1) made a false and defamatory statement about him; (2) published the statement without privilege to a third party; (3) were at least negligent in making the publication; and (4) caused Dr. Tio special harm or were otherwise liable, as a matter of law. Klayman v. Segal, 783 A.2d 607, 613 (D.C. 2001); see also Moss v. Stockard, 580 A.2d 1011, 1023 (D.C. 1990) (noting the elements that the plaintiff must prove). District of Columbia courts have made clear that not every uncomplimentary remark, however, is defamatory. Guilford Transp. Indus. v. Wilner, 760 A.2d 580, 594 (D.C. 2000). Indeed, defamatory statements must be more than just unpleasant or offensive; rather, they must make the claimant appear "'odious, infamous or ridiculous.'" Id.

In determining whether a statement is defamatory, the arbitrator must employ an objective standard, construing the communication in context just as an average person would construe it. Guilford, 760 A.2d at 594; see also Prins v. Int'l Tel. & Tel Corp., 757 F. Supp. 87,

24

91 (D.D.C. 1991). A mere statement that an employee was fired from a job does not constitute

defamation. Prins, 757 F. Supp. at 91 quoting Davis v. Ross, 754 F.2d 80, 4 (2d Cir. 1985)

(holding that publishing the fact that an employee was fired standing alone is not defamatory).

Furthermore, unspecified statements about an individual's incompetence does not constitute

defamatory statements. District Council 20, AFSCME v. District of Columbia, 1997 U.S. Dist.

LEXIS 11798, 21-22 (D.D.C. 1997) (holding that detailed statements of alleged professional

failings may stigmatize but that unspecified statements of incompetence do not); Coles v.

Washington Free Weekly, 881 F. Supp. 26, 32 (D.D.C. 1995), citing Liberty Lobby, Inc. v. Dow

Jones & Co., 838 F.2d 1287 (D.C. Cir. 1988), (holding that that statements characterizing an

attorney's courtroom argument as "crude," "ugly," "pernicious," and "breathtaking in its daring,"

were not actionable because "'evaluative statements of taste and belief can never provide the

basis for a defamation suit because such statements are incapable of being proved false'"), cert.

denied 488 U.S. 825 (1988).

In the present case, Dr. Tio has testified under oath that he is not aware of any

defamatory statement made by any of the Respondents in this case. Indeed, when asked to

identify defamatory comments made by Respondents in this case. Dr. Tio testified as follows:

> Q: [By Attorney for Respondents]: Did doctor – let me see here. Did President
> Caldas ever make a false statement about you?
> A: I never met him. I don't know.
> Q: Did...Eugene Wood ever make a false statement about you that you know of?
> A: I don't --
> Q: I'm sorry. You don't –
> A I can't recall. I don't know.
> Q: Did Dr. James Howard ever make a false statement about you?
> A: I cannot recall that.
> Q: Did Susan Hart ever male a false statement about you?
> A: She didn't like me. I know that.
> Q: Did Ms. Hart ever make a false statement about you that you are aware of?

**A: She's in charge for buying accessory [sic]. If she say that I order $100,000 without doing anything. I don't know where this comes from. She never likes me. I couldn't get along with her quite well. Nobody likes her anyway.**

**Q: Did Michael Boivin, B-O-I-V-I-N, did he ever make a false statement about you?**

**A: I cannot recall**

Dr. Tio Dep. at pp 249-250.

\*\*\*

**Q:    Now Ms. Simpson, did she make any false statements about you or your profession?**

**A:    She was always unfriendly. Always I have problems in scheduling my cases**

\*\*\*

**Q: So you didn't get along with Ms. Simpson, did you?**

**A: Nobody can get along with her.**

**Q: And nobody got along with Ms. Hart either, right?**

**A: As far as I know she is a difficult person.**

**Q: Linda Jackson, did Linda Jackson ever make any false statement about you?**

**A: She may. I don't know. I cannot recall it.....**

Dr. Tio Dep. at p. 255, ln. 15 through p. 256, ln. 3.

Although Dr. Tio asserted that he heard from a third party that Dr. Michael Gold, an employee of WHC, made a defamatory statement about him, such hearsay statements cannot meet a claimant's burden of proof at summary judgment. See Singleton v. Potter, 402 F. Supp.2d 37 (D.D.C. 2005) (observing that "only that portion of a deposition that would be admissible in evidence at trial may be introduced on a summary judgment motion") (internal quotation marks and citation omitted). However, even if this hearsay statement could constitute admissible evidence – which it cannot -- the undisputed facts in this case demonstrate that the statements Dr. Gold allegedly made cannot constitute defamation, as a matter of law.

The alleged comment made by Dr. Gold amounted to nothing more than Dr. Gold's general opinion about Dr. Tio as a doctor. According to Dr. Tio, he heard that Dr. Gold told someone that Dr. Tio was too "aggressive" and "not a good doctor." See Tio Dep. at p. 251, ln.

26

2 through p. 252, ln. 20. Such a generic statement is the classic type of opinion statements that do not constitute defamatory statements, as a matter of law. See Coles v. Washington Free Weekly, 881 F. Supp. at 32. More importantly, even Dr. Tio admitted under oath that the alleged statements made by Dr. Gold were just "his opinion." Tio Dep. at p. 251, ln. 15-20.

The only other statements at issue in this case that were allegedly made by Respondents were the standardized, form letters that Dr. Gold and Mr. Caldas forwarded to Dr. Tio's former patients at Dr. Tio's request, following his termination from the Hospital. None of these letters made any false statement about Dr. Tio, as a matter of law. See Patient Letters (Exhibit 22). Rather, the letters merely explained that Dr. Tio was no longer employed at WHC and provided patients with information about how to obtain any necessary treatment.

Under no circumstances can these letters be considered defamatory. Furthermore, even if the letters could be construed to contain false or defamatory information, District of Columbia law is clear that the letters are privileged communications and, therefore, cannot form the basis for a defamation claim, as a matter of law. Joftes v. Kaufman, 324 F. Supp. 660, 663 (D.D.C. 1971) (affirming summary judgment and holding that the defendant-employer's letter which outlined reasons for plaintiff's termination, including incompetence, malfeasance and misfeasance, was not defamatory regardless of whether said reasons were true or just because all reasons related to the job performance and employer's dissatisfaction of same).

**F.    Claimants' Intentional Infliction of Emotional Distress Claim Must Be Dismissed Because There is Not a Shred of Evidence That Respondents Engaged in Any Outrageous Conduct or That Claimants Suffered Severe Emotional Distress.**

Claimants' intentional infliction of emotional distress claim (Count VI of the Complaint) must also be dismissed, as a matter of law. There is no sufficient evidence in this case to prove

27

that Respondents engaged in extreme or outrageous conduct or that either Dr. or Mrs. Tio suffered severe emotional distress as a result.

To prevail on the intentional infliction of emotional distress claim ("IIED claim"), the Claimants must prove that the Respondents: (1) engaged in extreme and outrageous conduct; (2) intentionally and recklessly caused Claimants to experience; (3) severe and emotional distress. Ferenc v. World Child, Inc., 977 F. Supp. 56 (D.D.C. 1997). Under District of Columbia law, the alleged conduct must be so "outrageous in character, and so extreme in degree, as to go beyond all possible bounds of decency, and to be regarded as atrocious, and utterly intolerable in a civilized community." Homan v. Goyal, 711 A.2d 812, 818 (D.C. 1998). Tiefenbacher v. AARP, Civil Action No. 05-1802, 2006 U.S. Dist. LEXIS 23629 at *1, 7 (D.D.C. 2006) (citing cases) (explaining that if this standard "means what it says, then the conduct alleged must truly be extraordinary to hold a defendant accountable"); see also Homan, 711 A.2d at 818 (noting that the facts of this claim must provoke an average person to exclaim "Outrageous!").

Additionally, in the employment context, District of Columbia courts "'traditionally have been demanding in the proof required to support an intentional infliction of emotional distress claim.'" Washington v. Thurgood Marshall Acad., 2006 U.S. Dist. LEXIS 40318 at *1, 49-50 (D.D.C. 2006) (citing cases); see, e.g., Thompson v. Jasas Corp., 212 F. Supp. 2d 21, 28 (D.D.C. 2002) quoting Lockamy v. Truesdale, 182 F. Supp. 2d 26, 38 (D.D.C. 2001) (the proof required to support a claim for intentional infliction of emotional distress in the employment context "is particularly demanding").

Indeed, District of Columbia courts have repeatedly held that employer-employee conflicts do not generally rise to the level of outrageous conduct, and an employee's termination is not considered to be conduct that "goes beyond all possible bounds of decency such that it is

28

atrocious and utterly intolerable in a civilized society." Tiefenbacher, 2006 U.S. Dist. LEXIS 23629 at *11-12 (citing cases and holding that the defendant's alleged "demeaning and humiliating" behavior, "vulgar expletives" and "browbeating tactics" which berated and belittled plaintiff, its hostile warnings and threats to plaintiff to desist in her complaints which caused plaintiff to feel "humiliated, shocked, physically shaken and distraught" might have been rude, callous, and insensitive but it was simply not "extreme and outrageous" conduct that proves an intentional infliction of emotional distress claim); see, e.g., Kerrigan v. Britches of Georgetowne, Inc., 705 A.2d 624, 628 (D.C. 1997) (holding that plaintiff's claim that defendant-employer's targeted investigation, manufactured evidence and false allegations of sexual harassment against plaintiff, which defendant leaked to other employees, did not constitute conduct of an employer-employee conflict that, as a matter of law, arose to the level of outrageous conduct).

In this case, the record is devoid of any facts to support the Claimants' intentional infliction of emotional distress claim. The claims in this case amount to nothing more than Dr. Tio's dissatisfaction with having his employment relationship with WHC terminated. The undisputed facts in this case demonstrate that WHC terminated Dr. Tio's employment for cause, as a result of his failure to perform his job duties and adhere to his obligations under his Employment Agreement. Terminating an employee's employment for performance issues, and then subsequently notifying the employee's former patients of his departure (without articulating any negative reason for the departure) simply does not go beyond the bounds of decency in an utterly civilized community. Nor does it provoke the average person to exclaim "Outrageous!" For this reason, alone, Claimants' IIED claim must be dismissed.

29

Claimants' IIED claim, however, must be dismissed for yet another reason. There is not a shred of evidence in the record from which Claimants can prove that they suffered "severe" emotional distress. Dr. Tio testified under oath that he visited a Dr. Kane on one occasion shortly after his termination, but never visited any other doctor related to his termination. Tio Dep. at p. 241, ln. 6 through p. 242, ln. 7. Likewise, there is no evidence in the record that Mrs. Tio engaged in any ongoing medical treatment or suffered from any severe emotional condition as a result. Id. Indeed, neither Dr. nor Mrs. Tio have produced a single medical record or any other evidence to demonstrate that they suffered any "severe" emotional distress.

**G.    Claimants' Fraud Claim Must Be Dismissed Because Dr. Tio Has Failed To Plead Or Prove Any False Statements Upon Which He Reasonably Relied.**

Count VII of Claimant's Complaint alleges fraud and misrepresentation [sic]. Complaint at ¶¶ 82-90. Claimant contends that he was "fraudulently induced to leave his employment at Georgetown University Medical Center based upon false promises, statements and misrepresentations." Complaint at ¶ 83. Claimant also contends that he was "fraudulently induced to refer his patients to Defendant WHC." Id. at ¶ 84. Nowhere in the Complaint does Dr. Tio identify any specific false statement. Because Dr. Tio failed to state his claim of fraud with particularity, his claim must be dismissed on this basis alone. See United States ex. rel. Fisher v. Network Software Assoc., 227 F.R.D. 4, 9 (D.D.C. 2005) (stating that "[t]he circumstances of the fraud that generally must be plead with specific are "the time, place, and content of the misrepresentations, "the misrepresented fact, and what the opponent retained or the claimant lost as a consequence of the alleged fact"). This notwithstanding, even taking into account the general allegations of fraud that Dr. Tio disclosed during his sworn deposition, Dr. Tio still cannot state a fraud claim, as a matter of law.

30

In order to state a claim for fraud, Dr. Tio must prove the following: (1) Respondents made a false representation or willful omission of a material fact; (2) Respondents knew the representation was false; (3) Respondents made the statement with the intention of inducing reliance; and (4) Dr. Tio took action in reliance on the misrepresentation, <u>Howard v. Riggs National Bank</u>, 432 A.2d 701, 706 (D.C. 1977). Statements regarding "[o]pinions or predictions of future events do not constitute representations of material fact upon which a [Claimant] successfully may place dispositive reliance"). <u>Id.</u> at 706 (explaining that "prophecy or prediction of something which is merely hoped or expected will occur in the future is not actionable upon it nonoccurrence"); <u>see also</u> <u>Kroger v. Legalbill.com</u>, LLC, 436 F. Supp. 2d 97 (D.D.C. 2006) (stating that plaintiff could not state a claim for fraud because the alleged statements did not relate to past or existing facts, but rather, were based on conjecture and future intentions).

In the employment context, several courts have dismissed fraud claims where the basis for the fraud claim is a statement based on a future intention or prediction. <u>Kroger</u>, 436 F. Supp. 2d at 108 (plaintiff's allegation that defendant assured plaintiff a certain percentage of revenues generated, that defendant would use it best effort to involve plaintiff in key meetings, and that plaintiff would get credit for certain accounts were not sufficient to state a claim for fraud because the alleged statements related to future events or promises); <u>Karp v. Roach</u>, 1990 U.S. Dist. LEXIS 17618 (D.D.C. Dec. 24, 1990) (concluding that alleged promise to help plaintiff find reemployment after discharge cannot create an actionable fraud claim); <u>Gardner v. Anesthesia & Pain Consultants</u>, 2004 Tenn. App. LEXIS 813 at *7 (Tenn. Ct. App. 2004) (promise to an anesthesiologist that he would soon receive a two-year written employment contract if would relocate and start work did not relate to a past or existing fact); <u>see also</u> <u>Fowler</u>

31

v. Happy Goodman , 575 S.W.2d 496, 499 (Tenn. 1978) (representations to a concert promoter

that a musical group would reduce its future performance fees if the promoter entered into a

series of contract do not relate to a past or existing fact).

At his deposition, Dr. Tio testified as to the basis of his fraud claim. Tio Dep. at pp. 284-

297. Dr. Tio identified all of the allegedly false promises on which he relied.

According to Dr. Tio:

- WHC promised Dr. Tio that he would be the Director of Endoscopy at WHC. Tio Dep. at p. 285, ln. 10 through p. 287, ln. 10.

- WHC promised Dr. Tio that he would be "reinstated" or "reinstalled" in an academic position at Georgetown University. Tio Dep. at p. 288, ln. 11 through p. 292, ln. 2.

- WHC promised Dr. Tio that his salary would be increased to 35% of his revenue. Tio Dep. at 293, ln. 14 through p. 295, ln. 18.

- WHC promised him that he would be able to travel for medical meetings. Tio Dep. at p. 295, ln. 19 through p. 297, ln. 1.

None of the above claims is sufficient to survive summary judgment on Dr. Tio's fraud claim.

First, Dr. Tio's claim that WHC fraudulently promised to make him the Director of

Endoscopy is nonsensical. Indeed, Dr. Tio was the Director of Endoscopy. He admits to such in

his Complaint and his deposition. See Complaint at ¶ 3. Tio Dep. at p. 252, ln. 3-10. Moreover,

both his Job Description and his Employment Agreement confirm that he was, in fact, the

Director of Endoscopy.    See Job Description, (Exhibit 6); Employment Agreement at p. 1

(Exhibit 5). Thus, Dr. Tio's contention that he did not feel like the Director of Endoscopy

because the head nurse "would not listen" to him makes no sense. Dr. Tio's belief or feeling that

the head nurse would not listen to him has absolutely nothing to do with the fact that Dr. Tio was

the Director of Endoscopy. If anything, the alleged problems Dr. Tio was having with the staff

provides further evidence of Dr. Tio's failure to perform his leadership role as Director of Endoscopy.

Second, Dr. Tio's claim that he was fraudulently promised that he would be "reinstated" or "reinstalled" in an academic position at Georgetown University is belied by the undisputed facts in this case. Dr. Tio testified under oath that the basis for this allegation is Dr. Wartofsky's statement in letter dated September 6, 2000, in which Dr. Wartofsky wrote, "I believe that you will be eligible to maintain your appointments as Professor of Medicine at Georgetown University School of Medicine." See Tio Dep. at p. 288, ln. 11 through p. 292, ln. 2. Nothing in Dr. Wartofsky's Letter constituted a factual promise that Dr. Tio would retain the appointment. Rather, Dr. Wartofsky merely stated his believe or opinion about some future fact. Case law is clear that Dr. Wartofsky's opinion or belief cannot be the basis for a fraud claim. See Howard, 432 A.2d at 706. Furthermore, as Dr. Tio admits in his deposition, he has no basis to believe that Dr. Wartofsky did not attempt to determine whether Dr. Tio could keep his appointment at Georgetown. See Tio Dep. at p. 291, ln. 20 through p. 292, ln. 2. As such, there is absolutely no evidence that Dr. Wartofsky did not believe his statement to be true at the time he made it.

Third, Dr. Tio's contention that WHC promised to pay him 35% of his revenues, at some point in the future, is also not sufficient to establish a fraud claim. First, review of Dr. Tio's Employment Agreement makes clear that WHC never promised to pay Dr. Tio any percentage of his revenues, much less 35% of his revenue. See Employment Agreement. Dr. Tio's Employment Agreement provides as follows:

> It is the intent of the parties to develop an incentive compensation model for DOCTOR beginning in year two of this Agreement. It is mutually understood that in order to convert from a pure base compensation model to an incentive model that DOCTOR'S base compensation shall be decreased and an incentive formula developed with the

33

> goal of at least maintaining DOCTOR'S total compensation at the same level for the same billing and collection rates. . . .

See Employment Agreement at p. 2, Section 1 (emphasis added). The plain language of the Employment Agreement makes clear that WHC never promised Dr. Tio payment based on any revenue. Rather, the Agreement provides that it is the "intent" of the parties to develop an incentive compensation model in year two of the Agreement. Importantly, the Employment Agreement provides further that it is "mutually understood" that in order to convert to an incentive compensation model, Dr. Tio's base compensation would be decreased. Id. As an initial matter, the parties' statement of their intent to do something in the future cannot form the basis for Dr. Tio's fraud claim, as a matter of law. See Howard, 432 A.2d at 706.

Furthermore, the express language in the Employment Agreement regarding the incentive model is not mandatory. Rather, it merely speaks of what the parties "intended" to do at the time they signed the Agreement. Dr. Tio has introduced no evidence, nor is there any such evidence, to suggest that it was not the mutual intent of the parties, at the time they signed the Agreement, to create an incentive model in year two of the Agreement. However, it is not unusual for circumstances to change, and in this case they did. During the second half of year two, Dr. Tio's revenue went down dramatically and his overall performance seriously declined. This notwithstanding, Dr. Tio's received a $12,000 increase to his base compensation, which was supposed to decrease upon the creation of any incentive model. See Tio Dep. at p. 41, ln. 2-10.

Dr. Tio points to an alleged "Addendum" to support his claim that WHC promised to may him 35% of his revenue. See Draft Unsigned Addendum attached hereto as Exhibit 23. The face of the Unsigned Addendum demonstrates, however, that this so-called "Addendum", was never signed or agreed upon by the parties. The alleged unsigned "Addendum" is nothing

34

more than Dr. Tio's wish list, which was not granted. On these facts, Dr. Tio's allegation regarding WHC's failure to pay him 35% of his revenue cannot form the basis for a fraud claim, as a matter of law.

Fourth, Dr. Tio's claim that the Hospital fraudulently promised him he could travel to medical conferences is equally meritless. Both Dr. Tio's Employment Agreement and his Job Description makes clear that Dr. Tio's ability to travel would not be limitless. See Employment Agreement and Job Description (requiring that travel be "approved" by Dr. Tio's supervisors).

In this case, the record is undisputed that Dr. Tio took at least 31 days of authorized leave that had not been approved by any supervisor. He further attempted to charge the unauthorized leave to the Hospital. If anyone's actions in this case were fraudulent, they were Dr. Tio's. As such, Dr. Tio's fraud claims against Respondents must be dismissed as a matter of law.

**H.    Claimants Have Utterly Failed to State an Antitrust Claim, as A Matter of Law**

While it is not at all clear what type of antitrust violation Claimants are attempting to allege in this case, it is abundantly clear that Count VIII of Claimants' Complaint does not state a valid antitrust claim, as a matter of law. The federal antitrust laws were enacted to protect competition, not competitors. Cargill, Inc. v. Monfort of Colorado, Inc., 479 U.S. 104, 110 (1986). Hence, as a threshold matter, a party suing under the antitrust laws must allege an "antitrust injury" within a particular market, regardless of the conduct alleged. ASA Accugrade, Inc. v. Am. Numismatic Ass'n, 370 F. Supp. 2d 213, 215-18 (D.D.C. 2005).

Moreover, the Complaint contends that Dr. Tio, an individual physician, was trying to compete with the Washington Hospital Center, one of the nation's leading hospitals. See Complaint at ¶ 92. Dr. Tio admitted under oath, however, that he is "not a hospital." Tio Dep. at

35

p. 301, ln 11-13.  Since Dr. Tio is not a hospital, he and the hospital are not even in the same market.  Dr. Tio and WHC are not competitors and, therefore, Dr. Tio's antitrust claim is baseless.

To establish a claim for monopoly or any other anti-competition claim, Claimants must prove that Respondents' acts have had an "anticompetitive effect," meaning the allegedly wrongful acts have caused harm to the competitive process.  See United States v. Microsoft Corp., 253 F.3d 34, 58 (D.C. Cir. 2001) (holding that a Sherman Act violation must unfairly tend to destroy competition); Brooke Group Ltd. v. Brown & Williamson Tobacco Corp., 509 U.S. 209, 219-27 (1993) (holding that "by its terms, the Robinson-Patman Act condemns price discrimination only to the extent that it threatens to injure competition").  However, a mere showing of individual harm to one or more competitors will not suffice to state an antitrust claim.  Microsoft, 253 F.3d at 58; see, e.g., Mizlou Television Network, Inc. v. National Broadcasting Co., 603 F. Supp. 677, 683-85 (D.D.C. 1984) (plaintiff's claim failed because it failed to allege any specific, demonstrable, adverse effect on the market and plaintiff's own loss of business did not suffice).

The antitrust laws do not ban competitive conduct or even severely competitive conduct. Microsoft, 253 F.3d at 58 (citing cases and holding that only conduct which unfairly destroys competition is banned); ASA Accugrade, Inc., 370 F. Supp. 2d at 215-18 (plaintiff must show that the wrongful act caused an actual, adverse effect to the relevant competitive market; proving harm to an individual competitor is insufficient).  Likewise, the antitrust laws do not ban conduct such as defamation or tortious interference because it is not the sort of conduct that constitutes an antitrust violation.  Concord Boat Corp. v. Brunswick Corp., 207 F.3d 1039, 1058 (8th Cir. 2000).  Such conduct is neither "manifestly anticompetitive," nor does it "almost always tend to

36

restrict competition." Id. Moreover, neither the loss of one's job, nor one's inability to secure a comparable position, is the kind of injury that sustains an antitrust claim. Rafferty v. NYNEX Corp., 744 F. Supp. 324, 328 (D.D.C. 1990) (citing cases and holding that employees do not have standing under antitrust).

In the present case, at best, Claimants' complaint recites minimal, conclusory antitrust verbiage that simply does not meet the threshold for stating an antitrust claim. Claimants' evidence adduced from discovery fares no matter. Claimants have wholly failed to define any market that injured competition generally. More importantly, the only anti-competitive injury Dr. Tio alleges is his own. Indeed, Dr. Tio did not allege, nor is this an evidence whatsoever that WHC's termination of Dr. Tio's employment affected competition among Hospitals in any given market. WHC's termination of its relationship with Dr. Tio is not an act which "almost always unduly tends to destroy competition." Concord Boat Corp., 207 F.3d at 1058. In sum, Dr. Tio simply argues that he – not the market – was wronged. Such allegations do not, as a matter of law, prove an antitrust claim. Mizlou, 603 F. Supp. at 683-85 (holding that "[l]iberal use of the language of antitrust will not transform the cause of action … 'when stripped to its essential[s], the complaint does no more than state plaintiff's commercial disappointment'"

I.     **Dr. Tio's Claims for Wrongful Discrimination under District of Columbia Humans Rights Act and the Federal Civil Rights Act of 1866, 42 U.S.C. Section 1981 Must Be Dismissed Because Dr. Tio Admitted There Is No Evidence That He Suffered An Adverse Employment Action Because Of His Race.**

Count IX of Claimant's Complaint should be dismissed because Dr. Tio cannot establish a race discrimination claim under the District of Columbia Human Rights Act ("DCHRA") or Section 1981. In order to survive a motion for summary judgment on either of these claims, Dr.

37

Tio must prove that his employment was terminated because of his race and national origin. Dr. Tio, however, cannot do so.

In order to establish a prima facie case of discriminatory discharge based on race or national origin, Dr. Tio must demonstrate that (1) he belongs to a protected class; (2) that he was qualified for the job from which he was terminated; (3) that his termination occurred despite his employment qualifications; and (4) that his termination was based on his race or national McDonnell Douglas Corp. v. Green, 411 U.S. 792, 802 (1973); Arthur Young & Co. v. Sutherland, 631 A.2d 354, 361 (D.C. 1993); Futrell v. Dep't of Labor Fed. Credit Union, 816 A.2d 793, 803 (D.C. 2003); Sparrow v. United Air Lines, Inc., 216 F.3d 1111, 1114 (D.C. Cir. 2000); Wilson v. Stroh Cos., Inc., 952 F.2d 942, 945 (6th Cir. 1992) ("The plaintiff must produce evidence sufficiently strong to raise an inference that the employer's conduct was racially motivated") (citations and internal quotations omitted); see Beckwith v. Career Blazers Learning Ctr., 946 F. Supp. 1035 , 1045 (D.D.C. 1996) (stating that the elements for proving a DCHRA and Section 1981 claim are the same).

If Dr. Tio establishes a prima facie case of discrimination, the burden then shifts to the Respondents to articulate a legitimate, non-discriminatory reason for Dr. Tio's termination. It is important to note that the Respondents' burden in articulating a legitimate, non-discriminatory reason is not a burden of proof, but merely a burden of production. See Glenn v. Williams, 2006 U.S. Dist. LEXIS 8687 (D.D.C. Feb. 21, 2006) Texas Dept. of Comm. Affairs v. Burdine, 450 U.S. 248, 254 (1981); see also St. Mary's Honor Ctr. v. Hicks, 509 U.S. 502, 509 (1993) ("The determination that a defendant has met its burden of production (and has thus rebutted any legal presumption of intentional discrimination) can involve no credibility assessment.").

Once the Respondents have proffered a non-discriminatory reason for the termination, in order to avoid dismissal of his claim, Dr. Tio must prove by a preponderance of evidence that "both the [stated] reason [for his termination] was false, and that discrimination was the real reason [for termination of her employment]." St. Mary's Honor Center v. Hicks, 509 U.S. 502, 515 (1993). "It is not enough for the [claimant] to show that a reason given for a job action is not just, or fair, or sensible. [He] must show that the explanation given is a phony reason." Fischbach v. D.C. Dep't of Corrections, 86 F.3d 1180, 1183 (D.C. Cir. 1996) (citing and quoting Pignato v. American Trans Air, Inc., 14 F.3d 342, 349 (7th Cir. 1994)). "Once the employer has articulated a non-discriminatory explanation for its action, . . . the issue is not the correctness or desirability of the reasons offered but whether the employer honestly believes in the reasons it offers." Fischbach, 86 F.3d at 1183 (quotation marks and citation omitted); see Vasilevsky v. Reno, 31 F. Supp. 2d 143, 149 (D.D.C. 1998) ("Plaintiff must do more than just deny or criticize the proffered reasons of the defendant").

In the present case, Dr. Tio's race and national origin discrimination claims cannot withstand summary judgment, as a matter of law. First, Dr. Tio cannot establish a prima facie case of discrimination. Second, even if he could, he cannot prove, nor is there any evidence to suggest, that the legitimate, non-discriminatory reasons, contained in the Termination Letter, for Dr. Tio's termination were phony or that race was the real reason for his termination.

More importantly, Dr. Tio has not produced even a scintilla of evidence to prove that he experienced any adverse employment action because of his race. When directly asked whether he believed that race played any role in the notice of termination he received in April 2002, he admitted under oath that he had no such belief. Tio Dep. at p. 261, ln. 13 through p. 262, ln. 3. Dr. Tio also admits he has no reason to believe that Dr. Wartofsky, who made the decision and

39

actually terminated his employment in April 2003, discriminated against him. Tio Dep. at p. 303, ln. 17-21. Although Dr. Tio contends that before he was terminated, WHC hired a Dr. Mohamed Abedi to replace him, the record is undisputed that Dr. Abedi is a minority of middle eastern descent. Tio Dep. at p. 188, ln. 11 through p. 191. ln. 12. Thus, the alleged replacement of Dr. Tio with Dr. Abedi cannot constitute evidence of discrimination. Moreover, there is no evidence in the record that Dr. Abedi actually replaced Dr. Tio.

Further, even if such evidence were sufficient to establish a prima facie case of discrimination, the undisputed record evidence demonstrates that the Hospital had a legitimate, non-discriminatory reason for terminating Dr. Tio's contract. Indeed, the termination letter sets forth six legitimate reasons for terminating Dr. Tio's employment contract. The Hospital also had a non-discriminatory reason for hiring Dr. Abedi. Prior to WHC's hiring of Dr. Abedi, Dr. Tio had informed his colleagues at WHC, including his supervisors, that he was leaving the Hospital to accept a position at Cedars-Sinai. He had even requested references from WHC to support his Cedars-Sinai application. See Tio Dep. at p. 62, ln. 4 through p. 64, ln. 1; p. 76, ln. 20 through p. 77, ln. 20. Under these circumstances, not only did WHC have a legitimate, non-discriminatory reason terminating Dr. Tio's contract, it also had an ethical and professional obligation to hire a physician to ensure that patients would have appropriate care upon Dr. Tio's departure.

Both Dr. Tio's complaint and the evidence adduced from discovery in this case demonstrate that Dr. Tio's claim of race and national origin are merely based on his own speculation and conclusory allegations. See Marshall v. James, 276 F. Supp. 2d 41, 57 (D.D.C. 2003 (explaining that plaintiff's speculative claims could not survive summary judgment); Hatcher-Capers v. Haley, 762 F. Supp. 393 (D.D.C. 1991) (dismissing plaintiff's Equal Pay

Claim on the ground that it is not the intent of Rule 56 to allow speculative claims to proceed to trial); see also Greene v. Dalton, 164 F.3d 671 (D.C. Cir. 1999) ("Accepting such conclusory allegations as true, therefore, would defeat the central purpose of the summary judgment device, which is to weed out those cases insufficiently meritorious to warrant the expense of ... trial).

Indeed, Dr. Tio admits the decision maker, Dr. Wartofsky, did not make any decisions based on race. According to Dr. Tio, any such negative treatment was based on his colleagues' jealousy of him and personality conflicts. See Tio Dep, at p. 255, ln. 15-21; p. 261, ln. 13 through p. 262, ln. 3 (admitting that professional jealousy, not race, were the source of conflicts with his colleagues). For these reasons, Dr. Tio's race and national origin claims should be dismissed.

**J.    The Loss Of Consortium Claim Fails As A Matter Of Law Because The Underlying Torts Upon Which Plaintiff Based The Claim Also Failed As A Matter Of Law.**

The undisputed facts in this case also demonstrate that Dr. Tio's loss of consortium claim must be dismissed because Dr. Tio cannot prevail on any of his tort claims in this case.

In Count X, Claimants allege that because of Dr. Tio's tortiously wrongful unemployment, and the Respondents' alleged false and malicious attack on his professional reputation and credentials, he was adversely affected such that he could neither support nor care for his family. See Complaint at ¶¶ 102-03. As a prerequisite for prevailing on a loss of consortium claim, Claimants must first prevail on their underlying tort claims. As set forth herein, each of Claimants' underlying tort claims upon which any loss of consortium claim may be based fail, as a matter of law. For this reason, Claimants' loss of consortium claim must also fail as a matter of law.

The term consortium includes marital services such as the affection, companionship and relations between a man and wife, i.e., the customary and shared spousal amenities. See Lyles v. Micenko, 404 F. Supp. 2d 182, 189 (D.D.C. 2005). Yet, while a spouse may recover damages for loss of consortium due to: (1) an injury negligently inflicted upon the other spouse; or (2) an injury to the marital relationship where the spouse suffered no physical harm, such injuries must in fact result from a cognizable tortious act. Id.; Beeton v. District of Columbia, 779 A.2d 918, 925 (D.C. 2001) (holding that plaintiff's loss of consortium claim failed because all other underlying tort claims also failed); see also Feirson v. District of Columbia, 362 F. Supp. 2d 244, 254 (D.D.C. 2005) (holding that because the defendant-physicians were not liable for her husband's injuries, the plaintiff-wife's claims for loss of consortium failed); Crowley v. North Am. Telcoms. Ass'n, 691 A.2d 1169, 1174-75 (D.C. 1997) (noting that only where an actual loss of society incident to the marriage is proven to have proximately resulted from another's tortious conduct, will a claim for damages lie).

In this case, each and every alleged tort that could have proximately caused the Plaintiffs' loss of consortium claim should be dismissed, as argued *supra*. As such, Claimants' loss of consortium claim must fail as well. A loss of consortium claim is parasitic to other tort claims and thus when the other torts are dismissed, summary judgment on the loss of consortium claim is also proper. Elliott v. Healthcare Corp., 629 A.2d 6, 10 (D.C. 1993) (holding that plaintiffs' loss of consortium failed as a matter of law because the underlying torts such as abusive discharge, defamation, and intentional infliction of emotional distress were dismissed).

42

## CONCLUSION

For each of the foregoing reasons, Respondents are entitled to Summary Judgment, and

Claimants' complaint should be dismissed in its entirety.


Respectfully submitted,


Dated: October 16, 2006                                     /s/
                                        _____
                                        Keith J. Harrison (D.C. Bar No. 416755)
                                        Trina L. Fairley (D.C. Bar No. 464102)
                                        KING, PAGANO & HARRISON
                                        1730 Pennsylvania Ave, N.W., Suite 900
                                        Washington, DC 20006
                                        (202) 371-6800
                                        (202) 371-6770 (fax)

                                        Counsel for Respondents

43

## CERTIFICATE OF SERVICE

I hereby certify under penalty of perjury that on this 16th day of October 2006, I caused a copy of the foregoing RESPONDENT'S MOTION FOR SUMMARY JUDGMENT to be delivered via first class mail, postage pre-paid, to the following individual:

> Anthony M. Rachal, III
> Edmonds Building - Capitol Hill
> Ninth & D Street, N.E.
> Second Floor
> Washington, DC  20002-0009

> Counsel for Claimants

/s/
Trina L. Fairley

81899

# Exhibit R

**JAMS ARBITRATION MATTER**

| | |
|---|---|
| THIAN LOK TIO, M.D. ET AL., | ) |
| | ) JAMS REF. 1410003842 |
| PLAINTIFFS, | ) ARBITRATOR: JERRY P. ROSCOE |
| v. | ) |
| | ) |
| WASHINGTON HOSPITAL | ) |
| CENTER ET AL., | ) |
| | ) |
| DEFENDANTS. | ) |

**AFFIDAVIT IN SUPPORT OF CLAIMANTS' OPPOSITION TO RESPONDENTS' MOTION FOR SUMMARY JUDGMENT**

District of Columbia))ss:

I, THIAN LOK TIO, a Claimant in this matter, do solemnly swear or affirm that I have personal knowledge of the statements herein made to this Court as follows:

1. I did not abandon my work nor my patients at any time during my employment with the WHC.

2. My revenues and my daily endoscopic procedures and patient care continued until the very last minute of my termination day. Ms. Elisabeth Beltri, who was my endoscopy assistant can testify to this true fact, and is listed as a witness to do so, because she was with me during most of my procedures.

3. I deny that my leave was unauthorized because I did not make any unauthorized trips or take any unauthorized leave. All my leave days were documented as participation

1

in National and International medical conferences as an
active participant.   The claims, allegations or assertions
of Dr. Wartofsky to the contrary are shamelessly bogus and
as declared retrospectively to defend their wrongful actions
to fire me unjustly.

4.   I did not make or take any unauthorized leave for a
job interview and I had not accepted any position at Cedars
Sinai Medical Center in Los Angeles before I was terminated.

5.   Unfortunately, Cedars Sinai had made an erroneous
announcement for the meeting in Santa Barbara, California in
October 2002, in which I was listed as a faculty member of
Cedars Sinai Medical Center.   I provided in discovery to
respondents my e-mail to Dr. Simon Lo at Cedars Sinai dated
on March 6, 2003. I did explore an opportunity at Cedars
Sinai but only after I was first terminated in April 2002
without reason by Dr. Wartofsky.   At that time, even though
I met the expected revenue ( 75% over the Budget, as noted
from Dr. Burakoff) as shown in the Exhibit with the verified
complaint, I was let go.   This first termination was revoked
by Dr. Wartofsky orally without any written document to
reassure me about  my re-installment. This event triggered
my feeling of  insecurity in my position at WHC and lead me
to explore other opportunity to secure my future due their
alleged budget adjustments.   At that time, Dr. Kathy Bull

2

Henry, my co-associate and I shared the responsibility as Directors of Endoscopy. She was in charge for quality assurance and I was in charged for daily routine at GI-lab. I never abandoned any meetings or duty as the director of endoscopy. Some documents with regard to so-called "bluesheet" , in which the percentage of my activities with regard to hours for endoscopy, patient care and administration might have been delayed due to my participation on national and international meetings and conferences. This, however, did not affect my patient care and real day to day activities as the Endoscopic Director.

6. I know that all my travels were documented properly prior to my leaving. My former colleagues at WHC, Dr. Julio Slacedo, and my endoscopy assistant, Ms Elisabeth Beltri, are willing to testify for any further inquiries.

7. As a matter of fact, Dr. Wartofsky had set up a plan to fire me after he recruited Dr. Abedi, who was trained in Canada and United States. During a faculty meeting in WHC sometime in January 2003,
Dr. Wartosky proclaimed him as a superstar in ERCP and EUS, even though I did trained him only on EUS for only one day at his previous hospital in Richmond, Virginia. On one occasion during a subsequent interview prior to his employment, Dr. Abedi said to me that his initial annual

3

salary was $170,000.00, almost $55,000.00 below my initial
salary.  Obviously, WHC and Medstar were motivated to save
money in hiring Dr. Abedi and to fire me a second time as
soon as employment began notwithstanding the terms of our
contract for a buyout upon early termination.

8.  On page 2 of the motion, the statement about my
wife is ridiculous because she was not deposed although she
was scheduled for one.  The statement regarding her is
inaccurate, baseless and condescending.

9.  On page 3 of the motion, the statement about my
difficulty in getting a physician license is inaccurate and
unprofessional and indicative of the respondents' slanderous
behavior with the lowest regard for my international
reputation.  As a foreign medical graduate certain
requirements for Board licensure needed to be met, namely:
United States licensing Exams, internship, residency and
fellowship need to be obtained in USA.  However, as a
talented foreign medical graduate such requirements can be
waived.  It had nothing to do with what was wrongly said
that "my training in Germany could not be verified".  This
statement is totally baseless and inaccurate.  It defames my
integrity and my mental abilities to complete the rigorous
medical school academic program.  It slanderously infers
that I may have faked or perpetrated a fraud upon both

4

Georgetown Medical Center and the WHC with false and fraudulent credentials.  This paints me as a criminal and a scoundrel.  Such tarring of a professional individual is actionable because it wrongly infers that I was attempting to avoid or hide from my educational inferior foreign training  and internship.  This derogatory attack on my medical education, training and professional credentials as not verifiable is an outrages and baseless attack that could have been easily confirmed.  There was no need to create this air of suspension and disrespect that undetermined my abilities to continue my working relationships at WHC as well as with both my present and future patients or consulting physician clients. It supports the  continuing discrimination against and contempt held for me as a foreign national of Asian descent that has been able to qualify in a way few can by special recognition for one's medical skills and scholarly books and publications.  This will be shown by the testimony of my physician peers, patients, medical company representatives and former fellows contrary to the malicious allegations made against me in the termination letter and other actionable comments by the respondents.

    10.  On page 4 of the motion, there is no statement regarding my termination in April 2002 by Dr. Wartofsky ,

which was revoked lately by Dr. Wartofsky himself due to an outcry by the private physicians at WHC.

11.  On page 5 of the motion, there was a separate addendum to the contract regarding incentive model, which was attached to the agreement and accepted by Dr. Wartofsky.

12.  On page 6 of the motion, the remarks about my failure to meet the new budget are patently wrong.  The new budget was set by the administration only without exact information given to or taken from me as to how the number was made; obviously to me, the administration made the calculation without involvement of the Endoscopy Director.

My out patient activity did not reflect my real daily routine because patients were referred to me directly by practicing gastroenterologist for special procedures.  Dr. Burakoff, my former GI chief, did say that my main revenue should come from special procedures rather than from seeing clinic out-patients.

The attempt to change the rules of the game after the fact is unfair and discriminatory, not done to others at the hospital.

13.  On page 7 of the motion, the way Dr. Wartosky calculate my leave and evaluated the value of the conferences was very subjective and baseless.  Prior to my acceptance of employment, I did discuss with Dr. Wartofsky

6

that my contributions to WHC were not only my special skills for special procedures but also my involvement in the National and International Medical communities through my direct participation and appearance. Dr. Wartofsky did agree with this philosophy, that WHC should become renown nationally and internationally. As a result of these continuing activities, I eventually received patients for the Netherlands, Venezuela, Canada and Singapore etc. that became patients of WHC. These patients generated revenues for other WHC departments for which I received no credit, recognition or compensation of any kind.

Prior to my recruitment, I was promised by Dr. Wartofsky that I should not have any problems in keeping my academic title as "Professor of Medicine at Georgetown". As explained, the reasons for this were: first, both Georgetown University Hospital and WHC belong to Medstar, Inc., their parent corporation; second, he too had also been allowed to hold an academic appointment as professor without any problems. On several occasions, I reminded Dr. Wartofsky about my academic appointment, which unfortunately never did happen up to the time of my termination. It seems that a double standard existed for white physicians versus those of minority or foreign nationality.

7

14.   On page 8 of the motion, the comments about my leadership came after the erroneous announcement of Cedars Sinai for the Santa Barbara meeting in October 2002; obviously, I believe it was a setup to fire me soon after the recruitment for Dr. Abedi was completed.  While I was still there, and before any questions about my performance, WHC did actively advertise for a new position at GI because Dr. Abedi did called me in this regard.

15.   As my witnesses will confirm at trial, Ms Susan Hart was a very difficult person to deal with.  This was especially true as against me because she often undermined my authority at GI lab as the Director of Endoscopy.   Ms Kim Simpson, the head nurse of GI-lab said to me one day that her boss was Susan Hart and not me.   This is not how my job description has it.  Plain and simple, in other words, it was known , and apparently sanctioned, throughout WHC that she was not willing to accept my authority.  This was the case even though Susan Hart did not have medical background and training.   This shift and subrogation of my authority covered any orders regarding medical equipment and accessories since they needed to be first approved by Susan and not by me.  It is now my understanding that recently both Susan Hart and Kim Simpson have left WHC.  I am told by

8

many that they were asked to leave after my termination and because of it.

16.  On page 10 of the motion, with regard to abuse of medical supplies and equipment, I have stated and must continue to say that these allegations were totally false and baseless.  Moreover, I was not the only GI ordering the supplies and equipment and I was not the only one using them in the section.  WHC's own records reveal there are several other physicians responsible for procedures and patient care that required medical supplies and equipment.  Furthermore, all orders must have been approved by Susan Hart.  Again, Ms Elisabeth Beltri would be the best objective witness because she assisted not only me but also other GI physicians in the unit.

17.  On page 11 of the motion, point 20 in its entirety presents incorrect statements.  My previously provided e-mail to Dr. Simon Lo on March, 2003, prior to my termination,  again supports that a setup had been in place. At this time, Dr. Abedi was already working at WHC.

18.  In addition, point 21 is wrong, again, since I had not accepted any position prior to my termination. The letter of recommendation from Dr. Burakoff was merely needed in order to comply with my possible recruitment.

9

19.  Point 22 misstates the facts, because again my travel to Cedars Sinai was related only to the National and International Congresses organized by Cedars Sinai: Pancreatic and Biliary endoscopy in January 2001, January 2002 and January 2003, Gastroenterology Congress in Santa Barbara in October 2002 etc.  As I mentioned previously, Cedars Sinai made an erroneous announcement but WHC used this as a contrivance to support their allegation as fact of my alleged acceptance at Cedars and another argument to fire me wrongfully.

20.  Under both point 23 and point 24, the inference is that I sought and took the job for more money; this is again inaccurate and misleading.  Although indeed my salary at Cedars was a little bit higher than at WHC, this was only by approximately only 10% three years later.  In the Los Angeles job market, there exists a higher cost of living than Washington region.  Taken in this context and with this perceptive of having to absorb moving and relocation expenses, it was no bargain or guaranteed financial gain since my wife had to forego her business relationships. After addressing the higher housing and living expenses that are much more expensive than in DC,  I do not believe that I am better off today.  In essence, the salary was not my goal or my reason for the move to California. It was the first

10

unwarranted firing later reversed and the subsequent setup termination at WHC that forced me to have to explore an opportunity elsewhere, even at Cedars.

In addition, my wife must and is still paying up to this date the monthly rent on her dental lab office space in Gaithersburg, Maryland which she was forced to give up prematurely before lease end. The damages for this forced loss of her business amounts to $470.00 per monthly since the date of my wrongful termination.

21. The statement as contained in Point 25, again, is completely incorrect. Every state in this country has its own rules and regulations. It had nothing to do with my verification of my training, this could, and was readily done, in order to obtain even a special license. Obviously, this statement is designed to discredit and deny my credentials, my training and my professional creditability and reputation. It is a callous and malicious effort to ruin my profession reputation and international status with my physician peers, patients, students, staff and companies in the medical community both nationally and aboard.

22. As regards point 26, several patients have contacted me through my cellular phone asking why they did not receive any letter or written explanation for my abrupt unannounced and unexpected departure from the WHC.

Initially, they tried to schedule procedures with me and they were told that I was not working at WHC anymore. No effort was made to transfer them directly or to refer their messages to me. Instead, however, they were offered to have a procedure done by someone else at WHC in total disregard of my prior relationship and continuing contracts and future contractual rights. This was a deliberate effort to interfere with my on going contractual arrangement and future livelihood with these consulting and referring physicians and prospective patients as my clients.

23. As regards point 28, this statement is not completely correct since I merely said that one of my colleagues make a comment that I might be needed to be concerted to Judaism. This comment was made to support their sick view of me that on several occasions was expressed that I was said to be predisposed to behave with a superiority complex against women based upon my Asian culture and heritage. This stereotypical view of me was emotional derogatory and demeaning of my loving relationship with my wife, a professional in her own right, and my daughter, a college student too bound for graduate studies. This comment, or similar statements, occurred often during my stay at WHC, even during the preparation of endoscopic procedures reports in the computer-report room for

12

physicians.  It is also widely known that WHC and Medstar treated
the private physicians better than the "hospital employed
physicians".  I often heard the term "blue shirt employee" used
derogatorily as a negative description of hospital employed
physicians like "blue collar workers" are not of the same status
or ranking of "white collar professionals". Why the need to
attribute more to me than I actually stated, it is another direct
attack against me for my ethnicity.    Dr. Keith Brown, who is
an African American private GI physician, said to me that he was
not happy with the way the hospital treated him as compared to
the other private physician group of Dr. Morowitz, which is
white.  Dr. Brown, whom I have known since 1988 during his
training at our Academic Medical Center in Amsterdam, finally
left the hospital to open his own GI-lab after my departure.

24.  I have never tried to smear the name and reputation of
the WHC, the motive to do otherwise to me is mystifying and
unwarranted.

25.  I have never had a full hearing to present my claims
since I was summarily dismissed without an opportunity to
confront all the charges and those individuals attacking me
personally as well as my professional reputation without
challenge.  Under any rationale of fair dealing and due process,
I should at least have that opportunity to do so.

13

Respectfully submitted,

_____

_____

[Date]                                  Dr. THIAN LOK TIO

    Subscribed and sworn to before me this 30th day of November, 2006.

_____

Notary Public

_____

My commission expires.

14